*Solicitation Version*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Jordan E. Elkin (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
steven.serajeddini@kirkland.com
jordan.elkin@kirkland.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
Yusuf Salloum (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com
yusuf.salloum@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| PRETIUM PACKAGING, L.L.C., *et al.*, | Case No. 26-10896 (CMG) |
| Debtors. [1] | (Joint Administration Requested) |

## DISCLOSURE STATEMENT FOR THE JOINT
## PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION
## OF PRETIUM PACKAGING, L.L.C. AND ITS DEBTOR AFFILIATES

---

[1]   The last four digits of Debtor Pretium Packaging, L.L.C.'s tax identification number are 7802. A complete list of each of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Pretium following the commencement of the Chapter 11 Cases. The location of the Debtors' service address in the Chapter 11 Cases is: 2560 White Oak Circle, Suite 120, Aurora, IL 60502.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

### **IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

**THE DEBTORS ARE SOLICITING VOTES ON THE *JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF PRETIUM PACKAGING, L.L.C. AND ITS DEBTOR AFFILIATES* FROM THE HOLDERS OF CLAIMS IN THE FOLLOWING CLASSES:**

| VOTING CLASSES | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| **CLASS 4** | **FIRST LIEN TRANCHE A-1 CLAIMS** |
| **CLASS 5** | **SECOND LIEN CLAIMS** |

**IF YOU ARE A HOLDER OF CLAIMS IN CLASS 4 OR CLASS 5, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.**

<u>**RECOMMENDATION BY THE DEBTORS**</u>

**EACH DEBTOR'S BOARD OF DIRECTORS, BOARD OF MANAGERS, SOLE MEMBER, OR EQUIVALENT GOVERNING BODY, AS APPLICABLE, HAS APPROVED THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT.   EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ASSETS, AND PROVIDE THE BEST RECOVERY TO THE DEBTORS' STAKEHOLDERS.  AT THIS TIME, EACH DEBTOR BELIEVES THAT THE RESTRUCTURING TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.**

**EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS WHOSE VOTES ON THE PLAN ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>MARCH 2, 2026, AT 5:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.**

<u>**DELIVERY OF BALLOTS**</u>

**CLASS 4 AND CLASS 5 BALLOTS
MAY BE RETURNED BY THE FOLLOWING METHODS:**

<u>**BY REGULAR MAIL, OVERNIGHT MAIL, OR HAND DELIVERY AT:**</u>

**Pretium Packaging, L.L.C. Ballot Processing Center
c/o Stretto
410 Exchange, Suite 100**

**Irvine, CA 92602**

<u>**BY ELECTRONIC ONLINE SUBMISSION AT:**</u>

<u>**https://forms.Stretto.com**</u>

**PLEASE CHOOSE ONLY <u>ONE</u> METHOD TO RETURN YOUR BALLOT.**

**CLASS 4 AND CLASS 5 BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY 5:00 P.M. (PREVAILING EASTERN TIME) ON MARCH 2, 2026 (SUBJECT TO BANKRUPTCY COURT APPROVAL, THE "<u>VOTING DEADLINE</u>"), AS DIRECTED ON THE BALLOT OR CONSENT FORM, AS APPLICABLE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR
VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AGENT AT:**

**<u>BY E-MAIL TO:</u>**
**<u>TEAMPRETIUM@STRETTO.COM</u>**
**(WITH A REFERENCE TO "PRETIUM" IN THE SUBJECT LINE)**

**<u>BY TELEPHONE:</u>**
**(855) 570-4247 (TOLL-FREE FROM US / CANADA)**
**OR +1 (949) 208-7723 (INTERNATIONAL)**

## <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS HERETO, THIS "<u>DISCLOSURE STATEMENT</u>") TO CERTAIN HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PREPACKAGED PLAN OF REORGANIZATION OF PRETIUM PACKAGING, L.L.C. AND ITS DEBTOR AFFILIATES* (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND INCLUDING ALL EXHIBITS AND SUPPLEMENTS THERETO, THE "<u>PLAN</u>").[2] A COPY OF THE PLAN IS ATTACHED HERETO AS <u>EXHIBIT A</u> AND IS INCORPORATED HEREIN BY REFERENCE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO SUCH RIGHTS SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VIII</u> HEREIN ENTITLED "RISK FACTORS", AND RELATED DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCIES BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (WHEN AND IF APPROVED) DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS REGARDING THE DEBTORS' FORTHCOMING CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, THE RESTRUCTURING SUPPORT AGREEMENT, OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN, THE RESTRUCTURING SUPPORT AGREEMENT, OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE

---

[2] Capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan or the Restructuring Support Agreement, as applicable. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan shall govern**.

INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AS OF THE DATE HEREOF OR SPECIFIED THEREIN.  WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND OPERATIONS AND THEIR FUTURE RESULTS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER BY THE DEBTORS OR ANY OTHER PARTY.  THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.   ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE OR DISTRIBUTE AN AMENDED OR MODIFIED RESTRUCTURING SUPPORT AGREEMENT OR PLAN AND RELATED DISCLOSURE STATEMENT, IN EACH CASE, FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT AND DO NOT TAKE RESPONSIBILITY FOR, OR PROVIDE ANY ASSURANCE AS TO THE RELIABILITY OF, ANY OTHER INFORMATION THAT OTHERS MAY GIVE YOU.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO

**ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY, INCLUDING ARTICLE VIII HEREIN, ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO ACCEPT OR REJECT THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

**SPECIAL NOTICE REGARDING FEDERAL
AND STATE SECURITIES LAWS AND FORWARD-LOOKING STATEMENTS**

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN FEDERAL REGULATORY AUTHORITY AND NEITHER THE SEC NOR ANY OTHER AGENCY OR REGULATORY AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS OR INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE BANKRUPTCY COURT HAS NOT REVIEWED THIS DISCLOSURE STATEMENT OR THE PLAN, AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("**BLUE-SKY LAWS**"). THE DEBTORS ARE RELYING ON SECTION 4(A)(2) OF THE SECURITIES ACT, REGULATION D PROMULGATED THEREUNDER, AND/OR REGULATION S UNDER THE SECURITIES ACT, AND SIMILAR BLUE-SKY LAWS PROVISIONS, TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE-SKY LAWS THE OFFER OF NEW EQUITY PRIOR TO THE PETITION DATE, INCLUDING IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, UNITED STATES PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE LAWS OF OTHER JURISDICTIONS. HEDGING TRANSACTIONS INVOLVING NEW EQUITY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT.

AFTER THE PETITION DATE, THE DEBTORS WILL RELY ON SECTION 1145(A) OF THE BANKRUPTCY CODE TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE-SKY LAWS THE OFFER, ISSUANCE, AND DISTRIBUTION, IF APPLICABLE, OF NEW EQUITY (OTHER THAN AND ANY NEW EQUITY UNDERLYING THE MANAGEMENT INCENTIVE PLAN) UNDER THE PLAN, AND TO THE EXTENT SUCH EXEMPTION IS NOT AVAILABLE, THEN SUCH NEW EQUITY WILL BE OFFERED, ISSUED AND DISTRIBUTED UNDER THE PLAN PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT, REGULATION D OR RULE 701 PROMULGATED THEREUNDER, REGULATION S UNDER THE SECURITIES ACT, AND/OR OTHER AVAILABLE EXEMPTIONS FROM REGISTRATION. NEITHER THE SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT, INCLUDING INFORMATION CONCERNING THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF CLAIMS, AMONG OTHER THINGS, THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF UNITED

STATES FEDERAL SECURITIES LAWS.  FORWARD-LOOKING STATEMENTS INCLUDE ANY STATEMENT THAT DOES NOT DIRECTLY RELATE TO ANY HISTORICAL OR CURRENT FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "ANTICIPATE," "ARE CONFIDENT," "ASSUME," "BELIEVE," "CONTINUE," "COULD," "ESTIMATE," "EXPECT," "INTEND," "MAY," "MIGHT," "OUTLOOK," "PLAN," "POTENTIAL," "PREDICT," "SEEK," "SHOULD," "TREND," OR "WILL," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY REGARDING FUTURE EVENTS OR CONDITIONS.  FORWARD-LOOKING STATEMENTS ARE BASED ON THE DEBTORS' CURRENT EXPECTATIONS AND ASSUMPTIONS, WHICH MAY NOT PROVE TO BE ACCURATE.  THESE STATEMENTS ARE NECESSARILY SPECULATIVE, NOT GUARANTEES, AND ARE SUBJECT TO RISKS, UNCERTAINTIES AND CHANGES IN CIRCUMSTANCES THAT ARE DIFFICULT TO PREDICT, AND SIGNIFICANT CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  MANY FACTORS COULD CAUSE THE DEBTORS' ACTUAL RESULTS TO DIFFER MATERIALLY AND ADVERSELY FROM ANY OF THESE FORWARD-LOOKING STATEMENTS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:

- THE DEBTORS' INTENTION TO COMMENCE THE CHAPTER 11 CASES;

- THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN;

- THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE ALTERNATIVE TRANSACTIONS IF THE PLAN IS NOT CONFIRMED;

- BANKRUPTCY COURT RULINGS IN THE CHAPTER 11 CASES, THE OUTCOME OF THE CHAPTER 11 CASES IN GENERAL, AND OTHER LITIGATION AND INHERENT RISKS INVOLVED IN A BANKRUPTCY PROCESS;

- THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES;

- THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES;

- THE LENGTH OF TIME OF THE CHAPTER 11 CASES AND THE CONTINUED AVAILABILITY OF OPERATING CAPITAL DURING THE PENDENCY OF THE CHAPTER 11 CASES;

- THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE AND ADDRESS THEIR DEBT SERVICE OBLIGATIONS

- THE DEBTORS' ABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES;

- THE EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- THE DEBTORS' EXPOSURE TO LITIGATION;

- TAXATION APPLICABLE TO THE DEBTORS AND ADVERSE TAX CHANGES;

- **THE DEBTORS' BUSINESS PLANS, OBJECTIVES, EXPECTATIONS, STRATEGIES, AND RESULTS FROM THE DEBTORS' OPERATIONS;**

- **THE DEBTORS' FINANCIAL STRATEGIES, CONDITION, REVENUES, CASH FLOWS, EXPENSES, BUDGET, AND PROJECTIONS;**

- **THE DEBTORS' ABILITY TO MAINTAIN RELATIONSHIPS WITH THIRD PARTIES AS A RESULT OF THE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;**

- **INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;**

- **THE DEBTORS' CUSTOMERS' RESPONSES TO THE CHAPTER 11 CASES;**

- **THE DEBTORS' LIMITED ACCESS TO CAPITAL RESOURCES, INCLUDING THE AVAILABILITY, TIMING, AND TERMS OF SUCH CAPITAL RESOURCES;**

- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS OR TO COMPLY WITH THE TERMS AND CONDITIONS OF ITS FINANCING ARRANGEMENTS;**

- **THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESS;**

- **GENERAL ECONOMIC, BUSINESS, AND BUSINESS CONDITIONS, INCLUDING FLUCTUATIONS IN OPERATING COSTS, TARIFFS, INTEREST RATES, AND CURRENCY VALUES AND THE POTENTIAL ADOPTION OF NEW REGULATIONS; AND**

- **OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS.**

**THESE FACTORS SHOULD NOT BE CONSTRUED AS EXHAUSTIVE AND SHOULD BE READ IN CONJUNCTION WITH THE ADDITIONAL INFORMATION AND DISCUSSION OF OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS UNDERTAKE NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS INCLUDED IN THIS DISCLOSURE STATEMENT AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**THE PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF CLAIMS AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION. ...........................................................................................................................1

II.    PRELIMINARY STATEMENT. .................................................................................................1

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT, THE RESTRUCTURING TRANSACTIONS, AND THE PLAN...........................................................4

    A.     What is chapter 11?..........................................................................................................4
    B.     Why are the Debtors sending me this Disclosure Statement? ..........................................4
    C.     Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?........................................................................................................................4
    D.     Am I entitled to vote on the Plan?....................................................................................5
    E.     What will I receive from the Debtors if the Plan is consummated? ..................................5
    F.     What is the Participation Premium?.................................................................................8
    G.     What is the Backstop Premium? ......................................................................................8
    H.     What are the First Lien Cash Out Option and the Second Lien Cash Out Option?...........8
    I.     Are any regulatory approvals required to consummate the Plan? .....................................9
    J.     What happens to my recovery if the Plan is not confirmed or does not go effective? ......9
    K.     If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"...........................................................................................................9
    L.     What are the sources of Cash and other consideration required to fund the Plan?..........10
    M.     Are there risks to owning the New Equity upon the Debtors' emergence from chapter 11? .........10
    N.     Is there potential litigation related to the Plan?.............................................................10
    O.     What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan? ............................................................................................................10
    P.     Will there be releases and exculpation granted to parties in interest as part of the Restructuring Transactions?..........................................................................................10
    Q.     Does the Plan preserve any Causes of Action? ..............................................................11
    R.     What is the deadline to vote on the Plan? ......................................................................12
    S.     How do I vote for or against the Plan?...........................................................................12
    T.     Why is the Bankruptcy Court holding a Confirmation Hearing?....................................12
    U.     What is the purpose of the Confirmation Hearing?.........................................................13
    V.     What is the effect of the Plan on the Debtors' ongoing businesses? ...............................13
    W.     How will the Reorganized Debtors be governed?...........................................................13
    X.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ................................................................................................................14
    Y.     Do the Debtors recommend voting in favor of the Plan?................................................14
    Z.     Who supports the Plan?..................................................................................................14

IV.   THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN. ...............................14

    A.     Restructuring Support Agreement..................................................................................14
    B.     The Plan. .......................................................................................................................15

V.    THE DEBTORS' CORPORATE HISTORY, BUSINESS OPERATIONS, AND PREPETITION ORGANIZATIONAL AND CAPITAL STRUCTURE. .........................................28

    A.     Pretium's Corporate History and Business Operations....................................................28
    B.     The Debtors' Prepetition Organizational and Capital Structure......................................32

VI.   EVENTS LEADING TO THE CHAPTER 11 CASES. ..............................................................34

    A.     Industry Headwinds and Operational Challenges. .........................................................34

|  | B. | The October 2023 Liability Management Transaction. | 35 |
|  | C. | The Restructuring Transactions. | 35 |
|  | D. | The ABL Amendments. | 36 |

**VII.** **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS RELATING TO THE RESTRUCTURING TRANSACTIONS AND POTENTIAL CHAPTER 11 CASES.** ....... **37**

|  | A. | Milestones. | 37 |
|  | B. | First Day Relief. | 37 |

**VIII.** **RISK FACTORS.** ....... **37**

|  | A. | Bankruptcy Law Considerations. | 38 |
|  | B. | Risks Related to Recoveries under the Plan. | 44 |
|  | C. | Risks Related to the Offer and Issuance of Securities Under the Plan. | 46 |
|  | D. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses. | 48 |

**IX.** **SOLICITATION, VOTING, AND RELATED MATTERS.** ....... **52**

|  | A. | Holders of Claims Entitled to Vote on the Plan. | 52 |
|  | B. | Voting Record Date. | 52 |
|  | C. | Voting on the Plan. | 52 |
|  | D. | Ballots Not Counted. | 53 |

**X.** **CONFIRMATION OF THE PLAN.** ....... **53**

|  | A. | Requirements for Confirmation of the Plan. | 53 |
|  | B. | Best Interests of Creditors/Liquidation Analysis. | 54 |
|  | C. | Feasibility. | 54 |
|  | D. | Acceptance by Impaired Classes. | 55 |
|  | E. | Confirmation Without Acceptance by All Impaired Classes. | 55 |
|  | F. | Valuation of the Reorganized Debtors. | 56 |

**XI.** **CERTAIN SECURITIES LAW MATTERS.** ....... **57**

|  | A. | New Equity. | 57 |
|  | B. | Exemption from Registration Requirements; Issuance of New Equity Under the Plan. | 57 |
|  | C. | Resales of New Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code. | 58 |

**XII.** **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.** ....... **61**

|  | A. | Introduction. | 61 |
|  | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Debtors. | 63 |
|  | C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote. | 66 |
|  | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims. | 72 |
|  | E. | Information Reporting and Back-Up Withholding. | 76 |

**XIII.** **RECOMMENDATION.** ....... **77**

## EXHIBITS[1]

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Restructuring Support Agreement

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Financial Projections

EXHIBIT E      Valuation Analysis

EXHIBIT F      Organizational Chart

EXHIBIT G      Exit ABL Commitment Letter

EXHIBIT H      Backstop Commitment Letter

---

[1]    Each Exhibit is incorporated herein by reference.

## I.    INTRODUCTION.

Pretium Packaging, L.L.C. and certain of its affiliates, as prospective debtors and debtors in possession (collectively, the "Debtors", and together with their non-Debtor affiliates, the "Company" or "Pretium"), intend to implement certain restructuring and recapitalization transactions (the "Restructuring Transactions") pursuant to the Plan, attached hereto as **Exhibit A** and incorporated herein by reference, and that certain Restructuring Support Agreement, dated December 30, 2025, by and among the Company and the Consenting Stakeholders (as may be amended, supplemented, or otherwise modified from time to time, and including all schedules, exhibits, and annexes thereto, the "Restructuring Support Agreement"), attached hereto as **Exhibit B**.  The Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Class 4 First Lien Tranche A-1 Claims and Class 5 Second Lien Claims against the Debtors to solicit their votes to accept or reject the Plan.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS AND THE CONSENTING STAKEHOLDERS THAT HAVE EXECUTED THE RESTRUCTURING SUPPORT AGREEMENT BELIEVE THAT THE RESTRUCTURING TRANSACTIONS AND COMPROMISES CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ASSETS, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THAT THE RESTRUCTURING TRANSACTIONS REPRESENT THE BEST AVAILABLE OPTION FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT.

Pretium commences these chapter 11 cases to implement a highly consensual recapitalization transaction in partnership with its primary equity sponsor and lenders holding approximately 88.6 percent of the outstanding First Lien Tranche A-1 Term Loans and 81.2 percent of the outstanding Second Lien Term Loans (collectively, the "Consenting Lenders") through a prepackaged chapter 11 plan of reorganization.  As further described herein, the proposed transaction is expected to reduce the Company's funded debt by approximately $900 million, raise new debt and equity financing, and ensure the Company is well capitalized at emergence, all while paying general unsecured creditors in full or reinstating their claims.  With the support of its key stakeholders, Pretium will have the financial flexibility to complete its operational turnaround and a strong foundation for long-term success and growth.

Pretium is a leading designer and manufacturer of rigid packaging, including plastic bottles, jars, closures, trays, and other containers.  Founded in 1992 and based in St. Louis, Missouri, the Company has grown to become one of the largest rigid packaging manufacturers in North America.  With an extensive catalog of custom and stock containers, decades of technical expertise, and a vertically integrated operating platform, Pretium provides full-service solutions, from design and engineering to production and distribution, to thousands of customers in the food and beverage, nutrition and wellness, household and commercial chemicals, healthcare, and personal care industries.  As of the date of this Disclosure Statement, Pretium operates twenty-four advanced manufacturing facilities across the United States, Canada, Mexico, Ireland, and the Netherlands, and employs approximately 3,000 workers globally.

Despite its strong foundation and industry-leading platform, Pretium has faced significant headwinds over the last several years.  In particular, industry-wide normalization of customer demand in the wake of the COVID-19 pandemic led to reduced order flow and lower plant utilization.  These headwinds were compounded by persistent high inflation, supply chain disruptions, and other operational

1

challenges.  In response, the Company implemented measures to enhance efficiency, improve liquidity, and integrate its global acquisitions.  While these efforts proved successful, the Company ultimately determined that its operational enhancements needed to be coupled with a comprehensive recapitalization of its balance sheet to enable it to execute on its long-term business plan.  To that end, the Company began engaging with its key stakeholders in the first half of 2025 regarding potential capital structure solutions.

As of the Voting Record Date, the Company has approximately $1,835.7 million of outstanding principal amount of funded debt obligations, consisting of approximately:

- $59.3 million under the ABL Facility;

- $337.6 million of First Lien Tranche A Term Loans;

- $1,237.4 million of First Lien Tranche A-1 Term Loans; and

- $201.4 million of Second Lien Term Loans.

As further described herein, the Company has spent significant time over the past several months working with its key economic stakeholders, including (a) its primary equity sponsor Clearlake Capital Group, L.P. (together with certain of its affiliates, "Clearlake" or the "Sponsor") and (b) an ad hoc group of lenders (the "Ad Hoc Group")[1] to explore strategic alternatives that maximize value for stakeholders and best position the Company for success.

On December 30, 2025, the Company entered into the Restructuring Support Agreement with lenders holding approximately 83.6 percent of the First Lien Tranche A-1 Term Loans and 75.6 percent of the Second Lien Term Loans (the "Initial Consenting Lenders") and Clearlake, in its capacity as the Company's primary equity sponsor and New Money Investor, documenting the Restructuring Transactions.

The key terms of the Restructuring Transactions, as reflected in the Restructuring Support Agreement and the Plan, include the following:

- the Company will raise a DIP ABL Facility with a $100 million revolving line of credit, which will provide liquidity for the Chapter 11 Cases together with the DIP Term Loans, refinance all prepetition ABL Claims, and, on the Effective Date, be either paid in full in Cash or, at the Debtors' election, be refinanced by the Exit ABL Facility set forth in the Exit ABL Commitment Letter attached to this Disclosure Statement as **Exhibit G**;

- the Company will raise up to $533.5 million of new money DIP Term Loans from the Holders of First Lien Tranche A-1 Claims, fully backstopped by the Backstop Parties in accordance with the Backstop Commitment Letter attached hereto as **Exhibit H**, the outstanding principal amount of which will, on the Effective Date, convert on a cashless, dollar-for-dollar basis into the Exit First-Out Term Loans;

- in addition to the opportunity to fund the DIP Term Loans and the Exit First-Out Term Loans, Holders of First Lien Tranche A-1 Claims will receive (i) First Lien New Equity equal to 72.5 percent of New Equity in the Reorganized Debtors, subject to dilution as set forth in the Plan and (ii) approximately $500 million of Exit Second-Out Term Loans;

---

[1]   The Ad Hoc Group comprises lenders holding First Lien Tranche A Term Loans, First Lien Tranche A-1 Term Loans, and Second Lien Term Loans and is represented by Milbank LLP and Moelis & Company.

- as consideration for the Holders of the First Lien Tranche A-1 Claims to participate in the funding of the DIP Term Loans and the Exit First-Out Term Loans, they will receive the Participation Premium equal to 10 percent of the aggregate committed amount, payable in New Equity, which will dilute the First Lien New Equity;

- as consideration for the Backstop Parties to backstop 100 percent of the DIP Term Loans and the Exit First-Out Term Loans, they will receive the Backstop Premium equal to 11.5 percent of the aggregate backstop commitment payable in New Equity, in accordance with the Backstop Commitment Letter attached hereto as **Exhibit H**, which will dilute the First Lien New Equity;

- Holders of First Lien Tranche A Claims will receive payment in full in cash with proceeds of the DIP Term Loans when the DIP Term Loans are funded;

- Holders of the Second Lien Claims will receive approximately $5.8 million of cash and Second Lien New Equity equal to 5.6 percent of New Equity;

- the New Money Investor will make a $50 million New Money Investment in exchange for New Money New Equity equal to 21.9 percent of New Equity;

- General Unsecured Claims will be paid in full in the ordinary course of business or otherwise Unimpaired; and

- Existing Interests in Poseidon Parent L.P., the ultimate parent entity of the Debtors, will be canceled without distribution.

In accordance with the Restructuring Support Agreement, the Company commenced solicitation of the Plan on January 25, 2026 and intend to commence Chapter 11 Cases on or around January 28, 2026 to implement the Restructuring Transactions by consummating the Plan. With strong support from the Sponsor and the Consenting Lenders, the Debtors intend to confirm the Plan and emerge from these Chapter 11 Cases on an expedited timeline[2] and resume normal operation with a deleveraged balance sheet and significant cash on hand to execute their go-forward business plan, drive future growth, and maximize value for all stakeholders. During these Chapter 11 Cases, the Debtors expect to continue operating in the ordinary course, with minimal disruption, if any, to customers, vendors, and employees.

The Restructuring Transactions are in the best interest of the Debtors and their estates and represent the best and most value-maximizing path forward for all their stakeholders. Moreover, it is in the best interest of all stakeholders that the Debtors proceed swiftly to consummate the Restructuring Transactions in accordance with the milestones set forth in the Restructuring Support Agreement and avoid substantial administrative costs and disruption to the business and instill confidence in the Debtors' customers, vendors, and employees that the chapter 11 process will not debilitate the business, but rather will maximize value for all of the Company's stakeholders. Consummation of the Restructuring Transactions will provide the Company with a right-sized capital structure, enhanced liquidity, and provide the financial flexibility to continue investing in automation, innovation, and sustainable packaging solutions, positioning the Company for long-term success.

---

[2]   Under the Restructuring Support Agreement, the Debtors are required to obtain interim and final approval of the debtor-in-possession financing within three business days and thirty-five days of the Petition Date, respectively, confirm the Plan within sixty days of the Petition Date, and, subject to regulatory approval, emerge within thirty days of confirmation.

**For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan**.

III.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT, THE RESTRUCTURING TRANSACTIONS, AND THE PLAN.**

A.    **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" until a chapter 11 plan is consummated.

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking the requisite stakeholder approvals to consummate the Restructuring Transactions by confirming a chapter 11 plan of reorganization.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims whose votes on the Plan are being solicited.  This Disclosure Statement is being distributed in accordance with these requirements.

C.    **Why are votes being solicited prior to Bankruptcy Court approval of the Disclosure Statement?**

By sending this Disclosure Statement and soliciting votes on the Plan prior to approval by the Bankruptcy Court, the Debtors are preparing to seek Confirmation of the Plan shortly after commencing the Chapter 11 Cases.  The Debtors will ask the Bankruptcy Court to approve this Disclosure Statement together with Confirmation of the Plan at the same hearing, which may be scheduled shortly after the commencement of the Chapter 11 Cases, all subject to the Bankruptcy Court's approval and availability.

### D.      Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (as defined herein).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."   Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | First Lien Tranche A-1 Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### E.      What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Allowed Claims or Allowed Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court, or otherwise.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Stakeholders, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| | | SUMMARY OF EXPECTED RECOVERIES[3] | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Allowed Amount of Claims[4] | Projected Recovery Under the Plan |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor or Reorganized Debtor, either: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $163,000 | 100% |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, which renders such Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $2.9 million | 100% |
| 3 | ABL Claims | Each Holder of an Allowed ABL Claim (to the extent such Allowed ABL Claim is not a DIP ABL Claim) shall receive, in full and final satisfaction of such Allowed ABL Claim on the Effective Date, (i)(a) payment in full in Cash (other than with respect to Letters of Credit and all Bank Product Obligations issued and outstanding under the ABL Documents) and (b) the cancelation, replacement, or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the ABL Documents) in accordance with the terms and in the amounts specified under the ABL Documents; or, to the extent the Exit ABL Facility is provided by the ABL Agent and the ABL Lenders (or their Affiliate(s)) and consistent with the terms set forth in the Exit ABL Commitment Letter and at the election of the Debtors or the Reorganized Debtors, (ii)(a) all Holders of Allowed ABL Claims shall be refinanced by conversion on a cashless, dollar-for-dollar basis, into Obligations (as defined in the Exit ABL Documents) under the Exit ABL Facility; (b) the Letters of Credit and all Bank Product Obligations issued and outstanding under the ABL Documents shall be converted to Letters of Credit and Bank Product Obligations, as applicable, deemed to be issued and outstanding under the Exit ABL Documents. | $59.3 million[5] | 100% |

---

[3]   The projected recoveries set forth in this table may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

[4]   Projected amounts of Claims represent estimated Allowed Claims as of the Effective Date and take into account estimated payments to be made under anticipated First Day Pleadings and DIP Orders.

[5]   As of the Effective Date, the ABL Claims shall be Allowed and deemed to be Allowed Claims in the aggregate principal amount outstanding under the ABL Credit Agreement, *plus* through January 28, 2026, the anticipated

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Allowed Amount of Claims[4] | Projected Recovery Under the Plan |
|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES[3]** | | | | |
| 4 | First Lien Tranche A-1 Claims | Each Holder of an Allowed First Lien Tranche A-1 Claim shall receive, in full and final satisfaction of such Allowed First Lien Tranche A-1 Claim: (i) its Pro Rata Share of the Exit Second-Out Term Loans; and (ii)(A) its Pro Rata Share of the First Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment is available, (B) the First Lien Cash Out Option. | $1,261 million[6] | 43.6%[7] |
| 5 | Second Lien Claims | Each Holder of an Allowed Second Lien Claim shall receive, in full and final satisfaction of such Allowed Second Lien Claim: (i) its Pro Rata share of the Second Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment is available, the Second Lien Cash Out Option; and (ii) its Pro Rata share of the Second Lien Cash Recovery. | $206 million[8] | 9.0%[9] |
| 6 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, at the option of the applicable Debtor or Reorganized Debtor, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code or (ii) payment in full in Cash on the Effective Date. | $16.1 million | 100% |
| 7 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Reorganized Debtor with the consent of the Required Consenting Stakeholders, either Reinstated, converted to equity, otherwise set off, settled, distributed, contributed, canceled, or released, in each case, in accordance with the Restructuring Steps Memorandum. | N/A | N/A |
| 8 | Intercompany Interests | On the Effective Date, Intercompany Interests shall be (i) Reinstated, (ii) set off, settled, discharged, | N/A | N/A |

[footnote continuation] Petition Date, accrued and unpaid interest, fees, and costs owed under the ABL Credit Agreement, *less* the amount satisfied in accordance with the DIP Documents.

[6] As of the Effective Date, the First Lien Tranche A-1 Claims shall be Allowed and deemed to be Allowed Claims in the principal amount of $1,237,395,831.42 *plus*, through January 28, 2026, the anticipated Petition Date, accrued and unpaid interest, fees, and costs owed under the First Lien Credit Agreement in connection with the First Lien Tranche A-1 Term Loans.

[7] The projected recovery for First Lien Tranche A-1 Claims under the Plan includes the Exit Second-Out Term Loans and the First Lien New Equity as diluted by the Participation Premium and the Backstop Premium, but does not include the Participation Premium or Backstop Premium.

[8] As of the Effective Date, the Second Lien Claims shall be Allowed and deemed to be Allowed Claims in the principal amount of $201,404,401.13 *plus*, through January 28, 2026, the anticipated Petition Date, accrued and unpaid interest, fees, and costs owed under the Second Lien Credit Agreement in connection with the Second Lien Term Loans.

[9] The projected recovery for Second Lien Claims under the Plan includes the Second Lien New Equity and the Second Lien Cash Recovery.

| | | SUMMARY OF EXPECTED RECOVERIES[3] | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Allowed Amount of Claims[4] | Projected Recovery Under the Plan |
| | | contributed, canceled, released, and extinguished, or (iii) otherwise addressed, in each case, at the option of the applicable Debtor or Reorganized Debtor with the consent of the Required Consenting Stakeholders. | | |
| 9 | Existing Interests | All Existing Interests shall be canceled, released, and extinguished and will be of no further force or effect. Holders of Existing Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Interest shall not receive or retain any distribution, property, or other value on account of such Existing Interest. | N/A | 0% |
| 10 | Section 510(b) Claims | On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims. | N/A[10] | 0% |

### F.    What is the Participation Premium?

The Participation Premium representing 23.4 percent of New Equity, subject to dilution by the MIP Equity, shall be issued to the DIP Term Loan Lenders as consideration of their participation in funding the DIP Term Loans and the Exit First-Out Term Loans.

### G.    What is the Backstop Premium?

The Backstop Premium shall be issued to the Backstop Parties as consideration of their agreement to provide the Backstop Commitments in accordance with the Backstop Commitment Letter.  The Backstop Premium, together with the Participation Premium, shall dilute the First Lien New Equity.

### H.    What are the First Lien Cash Out Option and the Second Lien Cash Out Option?

To the extent it is available, the First Lien Cash Out Option means the potential right of each Holder of an Allowed First Lien Tranche A-1 Claim to receive, subject to the Cash Out Option Investment Cap, Cash in an amount equal to the Cash value of its Pro Rata share of First Lien New Equity based on the Cash Out Value, in lieu of its Pro Rata Share of First Lien New Equity.  To the extent it is available, the Second Lien Cash Out Option means the potential right of each Holder of an Allowed Second Lien Claim to receive, subject to the Cash Out Option Investment Cap, Cash in an amount equal to the Cash value of its Pro Rata share of Second Lien New Equity based on the Cash Out Value, in lieu of its Pro Rata share of Second Lien New Equity.

The availability of the First Lien Cash Out Option and the Second Lien Cash Out Option and the Cash Out Value will be determined by the Required Consenting Stakeholders on the day that is 21 days prior to the anticipated Effective Date.

---

[10]    Notwithstanding anything to the contrary in the Plan, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

If the First Lien Cash Out Option and the Second Lien Cash Out Option are available, the Debtors will distribute additional materials to Holders of First Lien Tranche A-1 Claims and Holders of Second Lien Claims that will allow them to elect the First Lien Cash Out Option and the Second Lien Cash Out Option, respectively.

For additional detail regarding the First Lien Cash Out Option and the Second Lien Cash Out Option, see **Article IV.B.d.ii** of this Disclosure Statement.

## I.    Are any regulatory approvals required to consummate the Plan?

Certain aspects of the Restructuring Transactions may trigger regulatory filing and approval requirements in certain international jurisdictions where the Company operates.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to Consummate the Plan, it is a condition precedent to the Effective Date that they be obtained.  Under the Restructuring Support Agreement, to the extent the Company and the Required Consenting Stakeholders have otherwise complied with the terms of the Restructuring Support Agreement and the Definitive Documents and all other events and actions necessary for the Consummation of the Restructuring Transaction to have occurred, other than the receipt of regulatory or other approval of a government entity or unit necessary for such Consummation, the milestone for the Effective Date shall be automatically extended for one additional three-month period.  *See* **Article VIII.A.5** of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

## J.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended Chapter 11 Case, or of a liquidation scenario, see **Article X.B** of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit C**.

## K.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived before the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  The Effective Date is the date on which (i) all conditions precedent set forth in Article IX of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan and (ii) the Plan is declared effective by the Debtors.  "Consummation" of the Plan refers to the occurrence of the Effective Date.  *See* **Article X.A** of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan," for an overview of the conditions precedent to Consummation of the Plan.  **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN ARTICLE IX OF THIS DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL NOT BE COUNTED WITH RESPECT TO VOTING ON THE PLAN WITHOUT THE CONSENT OF THE DEBTORS.**

L.      **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with:  (1) the Debtors' Cash on hand as of the Effective Date, (2) the proceeds of the Exit Facilities, the New Money Investment, and the Cash Out Option Investment, and (3) the New Money Investor Wind Down Investment, if any.

M.      **Are there risks to owning the New Equity upon the Debtors' emergence from chapter 11?**

Yes.  *See* **Article VIII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of such risks.

N.      **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.  *See* **Article VIII.D.7** of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

The Debtors' operations are subject to various federal, state, and local laws and regulations.  The Debtors may be required to make large expenditures to comply with such regulations.  Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors. *See* **Article VIII.D.6** of this Disclosure Statement, entitled "The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* **Article X.E** of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

O.      **What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

On the Effective Date, the MIP Equity shall be reserved.  As defined in the Plan, MIP Equity means up to 8 percent of the fully-diluted New Equity, reserved pursuant to the Management Incentive Plan.  The terms and conditions of the Management Incentive Plan, including with respect to the form, terms, allocation, and vesting of the MIP Equity or other equity-based awards, shall be determined at the discretion of the New Board within 120 days of the Effective Date.

P.      **Will there be releases and exculpation granted to parties in interest as part of the Restructuring Transactions?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtor Release, Third-Party Release, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and their key constituents in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Restructuring Transactions, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the Plan's release and exculpation provisions. The full text of the Debtor Release, the Third-Party Release, the exculpation provisions, the injunction provisions, and the related definitions are copied in pertinent part in **Article IV.B.2** of this Disclosure Statement, entitled "Settlement, Release, Injunction, and Related Provisions." For more detail, see <u>Article VIII</u> of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions."

**ALL HOLDERS OF CLAIMS OR INTERESTS WHO: (I) VOTE TO ACCEPT THE PLAN OR (II) ARE DEEMED TO ACCEPT THE PLAN WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE NOTICE OF NON-VOTING STATUS INDICATING THAT THEY DO NOT GRANT THE RELEASES PROVIDED IN THE PLAN; (III) VOTE TO REJECT THE PLAN OR ARE DEEMED TO REJECT THE PLAN WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT OR NOTICE OF NON-VOTING STATUS INDICATING THAT THEY DO NOT GRANT THE RELEASES PROVIDED IN THE PLAN; OR (IV) ARE ENTITLED TO VOTE ON THE PLAN BUT ABSTAIN FROM VOTING ON THE PLAN AND WHO DO NOT AFFIRMATIVELY OPT OUT OF THE RELEASES PROVIDED BY THE PLAN BY CHECKING THE BOX ON THE APPLICABLE BALLOT INDICATING THAT THEY DO NOT GRANT THE RELEASES PROVIDED IN THE PLAN, WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, INCLUDING THE DEBTORS. YOUR FAILURE TO OPT OUT OF THE RELEASES PROVIDED BY THE PLAN IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER WILL RESULT IN YOUR IRREVOCABLE RELEASE OF ALL RELEASED CLAIMS AGAINST THE RELEASED PARTIES.**

Q.      **Does the Plan preserve any Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>Article VIII</u> of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in <u>Article VIII</u> of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.** The Reorganized Debtors may settle any such Causes of Action without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objecting party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### R.    What is the deadline to vote on the Plan?

The Voting Deadline with respect to the Plan is March 2, 2026, at 5:00 p.m. (prevailing Eastern Time), subject to Bankruptcy Court approval.

### S.    How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan (the "Ballots"). For your vote to be counted, your Ballot must be properly completed, executed, and delivered as directed, so that the Ballot containing your vote is *__actually received__* by the Solicitation Agent **on or before the Voting Deadline**. *See* **Article IX** of this Disclosure Statement, entitled "Solicitation, Voting, and Related Matters," for more information.

### T.    Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan. Shortly after the commencement of the Chapter 11 Cases, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing, at which time the Debtors will seek, among other things, Confirmation of the Plan. At the Confirmation Hearing, the Debtors will also seek Bankruptcy Court approval of this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing

adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and that the Debtors shared this Disclosure Statement with all Holders of Claims whose votes on the Plan are being solicited.  All parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled.  The Confirmation Hearing may be adjourned from time to time without further notice.

U.    **What is the purpose of the Confirmation Hearing?**

The purpose of the Confirmation Hearing is to seek approval of the Plan and this Disclosure Statement.  If so approved, the Bankruptcy Court will have held that this Disclosure Statement has provided the Voting Classes with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

V.    **What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors will seek to reorganize under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date of the Plan means that the Debtors will **not** be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

W.    **How will the Reorganized Debtors be governed?**

The corporate governance of the Reorganized Debtors will be set forth in the New Organizational Documents.  The substantially final form of the New Organizational Documents will be included in the Plan Supplement.  Significant provisions related to the governance of New Pretium are set forth in the Governance Term Sheet, attached as Exhibit D to the Restructuring Support Agreement.

Assuming that the Effective Date occurs, Holders of Allowed Claims that receive distributions representing a substantial percentage of the aggregate outstanding shares of New Equity may be in a position to influence matters requiring approval by the Holders of New Equity, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors, in all instances in accordance with the Governance Term Sheet and the New Organizational Documents.

On the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the members for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents.

**X.**    **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Stretto, Inc. ("Stretto"), via one of the following methods:

*By regular mail, overnight mail, or hand delivery at:*

Pretium Packaging, L.L.C. Ballot Processing Center
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602

*By electronic mail at:*
TeamPretium@stretto.com

*By telephone at:*
(855) 570-4247 (toll free) or +1 (949) 208-7723 (international)

Following the commencement of the Chapter 11 Cases, you may obtain copies of the Plan, this Disclosure Statement, and any documents publicly filed in the Chapter 11 Cases free of charge on the Solicitation Agent's restructuring website at https://cases.stretto.com/Pretium or for a fee through the Bankruptcy Court's website at https://ecf.njb.uscourts.gov.

**Y.**    **Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Restructuring Transactions provide for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Restructuring Transactions (as set forth in the Plan), which contemplate a significant deleveraging of the Debtors' balance sheet and will allow them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under and pursuant to the Plan.

**Z.**    **Who supports the Plan?**

The Restructuring Support Agreement and the Plan are supported by the Company, the Sponsor, and Holders of approximately 88.6 percent of the outstanding First Lien Tranche A-1 Term Loans and 81.2 percent of the outstanding Second Lien Term Loans.

**IV.**    **THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN.**

**A.**    **Restructuring Support Agreement.**

On December 30, 2025, the Debtors and the Consenting Stakeholders entered into the Restructuring Support Agreement.  The Debtors have since further documented the terms of the Restructuring Transactions contemplated thereby, including in the Plan, and have commenced solicitation of votes on the Plan.

The Restructuring Support Agreement and the Plan represent significant steps in the Debtors' restructuring process.  Pursuant to the Restructuring Support Agreement, the Restructuring Transactions are broadly supported by stakeholders across the Debtors' capital structure.  The Restructuring Support

Agreement will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence. The Restructuring Transactions contemplated by the Restructuring Support Agreement and the Plan will eliminate approximately $900 million of the Debtors' funded debt obligations and ensure the company is well capitalized on the Effective Date, including at least $50 million of new equity capital from the New Money Investor.  With a substantially deleveraged balance sheet and ample go-forward liquidity, the Reorganized Debtors will be well positioned to implement their business plan and achieve long-term success.

### B.     The Plan.

The Plan contemplates the following key terms, among others described herein and therein:

#### 1.     Means for Implementation of the Plan.

##### a.   General Settlement of Claims and Interests.

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  To the greatest extent permissible under the Bankruptcy Code, the Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

##### b.   Restructuring Transactions.

On or before the Effective Date, with the consent of the Required Consenting Stakeholders (to the extent set forth in the Restructuring Support Agreement or the applicable Definitive Documents), the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions, including the actions set forth in the Restructuring Steps Memorandum, as may be necessary or appropriate to effect the Restructuring Transactions, which may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, the Plan Supplement, the Restructuring Support Agreement, and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Plan Supplement, and the Restructuring Support Agreement, and having other terms for which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Equity Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation, organizational, governance, or constitutive documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable),

and the issuance, distribution, reservation, or dilution of the New Equity, as applicable and as set forth in the Plan, including pursuant to the New Equity Subscription Agreement; (5) the execution and delivery of the Exit Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (6) the reservation of equity under the Management Incentive Plan to the participants in the Management Incentive Plan; and (7) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

Notwithstanding anything to the contrary set forth in the Plan, the treatment of Claims, distributions, and other transactions contemplated in the Plan including, without limitation, the funding of the Exit Facilities, if any, may, at the election of the applicable participating parties, be effectuated by netting or other forms of cashless implementation.

### c.  The Reorganized Debtors.

On the Effective Date, the New Board shall be established in accordance with the Governance Term Sheet, and the Reorganized Debtors shall adopt their New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan, in each case consistent with the Restructuring Steps Memorandum. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth in the Plan or the Restructuring Steps Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, including the Exit Facility Documents, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents, as the boards of directors or boards of managers of the applicable Reorganized Debtors deem appropriate.

### d.  Sources of Consideration for Plan Distributions.

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with:  (1) the Debtors' Cash on hand as of the Effective Date; (2) the proceeds of the Exit Facilities, the New Money Investment, and the Cash Out Option Investment; and (3) the New Money Investor Wind Down Investment, if any.

### i.  Exit Facilities.

On and as of the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, pursuant to the Exit Facility Documents and the Restructuring Steps Memorandum.

Solely to the extent the Debtors reasonably determine, ten (10) Business Days prior to the anticipated Effective Date, they will not satisfy the Minimum Liquidity Condition on the Effective Date, after accounting for satisfaction in full in cash of all (a) closing costs in connection with the occurrence of

the Effective Date and (b) DIP ABL Claims or ABL Claims, as applicable (in each case, excluding Letters of Credit and all Bank Product Obligations) (collectively, the "Exit Funding Need"), (i) immediately before the occurrence of the Effective Date, the Debtors shall draw, and the DIP Term Loan Lenders shall fund, additional DIP Term Loans in a principal amount equal to such shortfall subject to the Liquidity Shortfall Funding Cap, which, together with the then-outstanding principal amount of the DIP Term Loans, shall be used to satisfy the Exit Funding Need and be converted to Exit First-Out Term Loans on the Effective Date in accordance with Article II.B of the Plan; and (ii) the principal amount of the Exit Second-Out Term Loans shall be reduced by the Exit Second-Out Adjustment, if any; provided that if the Liquidity Shortfall Funding Cap is met prior to satisfaction of the Exit Funding Need, the Debtors shall pay down the ABL Claims in accordance with Article III.B.3 of the Plan or DIP ABL Claims in accordance with Article II.B of the Plan to the extent required to meet any "minimum excess availability" requirement under the Exit ABL Facility in accordance with the Exit ABL Commitment Letter, accounting for "qualified cash" allowance under such facility, and the Minimum Liquidity Condition shall be reduced on a dollar for dollar basis to the Debtors' pro forma Cash on hand.  The DIP Term Loan Lenders shall not be obligated to fund the Debtors in excess of the lower of (x) the maximum principal amount of the DIP Term Loan Facility, including the Liquidity Shortfall Funding Cap and (y) the amount necessary to satisfy the Minimum Liquidity Condition, after giving effect to satisfaction of the Exit Funding Need; provided, further, that notwithstanding the foregoing, (i) in no event shall the treatment set forth in Article II.B of the Plan of the DIP ABL Claims or Article III.B.3 of the Plan of the ABL Claims be modified without the consent of the applicable DIP ABL Agent, DIP ABL Lenders, ABL Agent, or ABL Lenders, and (ii) this paragraph shall not be modified without the consent of the DIP ABL Agent or the ABL Agent (as applicable).

To the extent that the Exit ABL Facility is not available on the Effective Date in accordance with the Exit ABL Commitment Letter, the Debtors shall satisfy the treatment of DIP ABL Claims set forth in Article II.B of the Plan and/or Allowed ABL Claims set forth in Article III.B.3 of the Plan (as applicable) with sources of considerations acceptable to the Required Consenting Stakeholders; provided that notwithstanding the foregoing or anything else to the contrary in the Plan, in no event shall the treatment set forth in Article II.B of the Plan of the DIP ABL Claims or Article III.B.3 of the Plan of the ABL Claims be modified without the consent of the applicable DIP ABL Agent, DIP ABL Lenders, ABL Agent, or ABL Lenders.

To the extent applicable, Confirmation of the Plan shall be deemed (i) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), including the Liquidity Shortfall Funding Amount and the Exit Second-Out Adjustment, if any, to the extent not approved by the Bankruptcy Court previously, and (ii) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (A) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (B) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents:  (i) shall be deemed to be granted; (ii) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit Facility Documents; (iii) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever; and (iv) shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  As of the Effective Date, the Exit Facility Agents for the benefit of the applicable lenders

under the Exit Facility Documents shall have a valid, binding, perfected, non-avoidable, and enforceable lien on and security interest in the collateral and with priority specified in the Exit Facility Documents, and valid, binding, non-avoidable, and enforceable guarantee from each guarantor specified in the Exit Facility Documents.  To the extent provided in the Exit Facility Documents, the Exit Facility Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Reorganized Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### ii.      New Equity.

On the Effective Date, New Pretium shall issue the New Equity in accordance with the Restructuring Steps Memorandum.  The issuance of the New Equity, including the MIP Equity, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests.  The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or equity interests (as the case may be based on how the New Equity is denominated and the identity of New Pretium issuing such shares, units, or equity interests) of New Equity required to be issued under the Plan and pursuant to their New Organizational Documents and otherwise consistent with the Restructuring Support Agreement (and the exhibits thereto).

All of the shares, units, or equity interests (as the case may be based on how the New Equity is denominated) of New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan and the New Organizational Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  Any Entity's acceptance of New Equity shall be deemed as its agreement to the applicable New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  As a condition to receiving the New Equity, all recipients of the First Lien New Equity and the Second Lien New Equity shall be required to execute and deliver the New Investor Agreement; *provided*, *however*, that acceptance of such New Equity constitutes deemed acceptance and consent to the terms of the New Investor Agreement, without the need for execution by any party thereto.  For the avoidance of doubt, the Reorganized Debtors may waive the requirement to receive an executed signature page to the New Investor Agreement.  The New Investor Agreement will be effective as of the Effective Date, and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Equity will be bound thereby in all respects.

The New Equity will be distributed as follows:  (i) the New Money Equity, representing 21.9 percent of New Equity, subject to dilution by the MIP Equity only, will be distributed to the New Money Investor on account of the New Money Investment in accordance with the New Equity Subscription Agreement; (ii) the First Lien New Equity, representing 72.5 percent of New Equity, and subject to dilution by the Participation Premium, the Backstop Premium, and the MIP Equity, will be distributed to the Holders of Allowed First Lien Tranche A-1 Claims in accordance with Article III.B of the Plan; (iii) the Second Lien New Equity, representing 5.6 percent of New Equity, subject to dilution by the MIP Equity only, will be distributed to the Holders of the Allowed Second Lien Claims in accordance with Article III.B of the Plan; (iv) the Participation Premium, representing 23.4 percent of New Equity will be distributed to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents and the Plan; and (v) the Backstop Premium will be distributed to the Backstop Parties in accordance with the DIP Term Loan Documents. As illustrated below, the Participation Premium and Backstop Premium shall together dilute the First Lien New Equity, but they shall not dilute the New Money Equity or the Second Lien New Equity, and they shall be subject to dilution by the MIP Equity.

| | Pre-Dilution | Post-Dilution | |
| --- | --- | --- | --- |
| | | Backstop and Participation Premiums | MIP Equity[11] |
| First Lien New Equity | 72.5% | 22.2% | 20.4% |
| Second Lien New Equity | 5.6% | 5.6% | 5.2% |
| New Money Equity | 21.9% | 21.9% | 20.1% |
| Backstop Premium | -- | 26.9% | 24.7% |
| Participation Premium | -- | 23.4% | 21.5% |
| MIP Equity | -- | -- | 8.0% |
| **Total** | **100.0%** | **100.0%** | **100.0%** |

In respect of the Cash Out Option Investment, the Cash Out Option Investors may make a proposal in respect of the First Lien Cash Out Option and/or the Second Lien Cash Out Option to the Holders of Allowed First Lien Tranche A-1 Claims and Allowed Second Lien Claims on the Cash Out Option Offer Date.  If such a proposal is made, within 10 days thereafter, each Holder of an Allowed First Lien Tranche A-1 Claim or an Allowed Second Lien Claim may elect the First Lien Cash Out Option or the Second Lien Cash Out Option, in lieu of receiving its Pro Rata share of the First Lien New Equity or the Second Lien New Equity, respectively.  If a Holder of an Allowed First Lien Tranche A-1 Claim or an Allowed Second Lien Claim makes such an election, then, subject to the Cash Out Option Investment Cap, in lieu of its Pro Rata share of First Lien New Equity or Second Lien New Equity, it will receive Cash in an amount equal to the value of such First Lien New Equity or Second Lien New Equity based on the Cash Out Value.

In the event that the aggregate effect of all First Lien Cash Out Options and Second Lien Cash Out Options would cause the Cash Out Option Investment to exceed the Cash Out Option Investment Cap, the Cash distributed to each Holder of a First Lien Tranche A-1 Claim and/or Second Lien Claim who has elected the First Lien Cash Out Option and/or the Second Lien Cash Out Option, as applicable, shall be reduced on a Pro Rata basis such that the aggregate Cash Out Option Investment is reduced to the Cash Out Option Investment Cap.  On account and in lieu of such reduced Cash distribution, each such Holder shall retain First Lien New Equity or Second Lien New Equity that is equal in value to such reduced Cash distribution based on the Cash Out Value.

---

[11]  These figures are rounded for representation purposes.

To the extent applicable, Confirmation of the Plan shall be deemed (i) approval of (A) the issuance of New Money Equity to the New Money Investor pursuant to the New Equity Subscription Agreement (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), (B) the Cash Out Option Investors' purchase of Cash Out Option Equity through the Cash Out Option Investment, (C) the issuance of the Backstop Premium to the Backstop Parties in accordance with the Backstop Commitment Letter, and (D) the issuance of the Participation Premium to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents, each to the extent not approved by the Bankruptcy Court previously, and (ii) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (A) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the New Money Investment and, if applicable, the Cash Out Option Investment, and incur and pay any fees and expenses in connection therewith, and (B) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the New Money Investment and, if applicable, the Cash Out Option Investment, and effectuate the Backstop Commitment Letter.

### iii.    New Money Investor Wind-Down Investment.

In addition to the New Money Investment, the New Money Investor shall be responsible for funding, whether arising prior to or after the Effective Date, the following costs and amounts with respect to Pretium Parent (the "Pretium Parent Wind-Down Costs and Distributions"):  (1) any distributions required to be made under the Plan on account of any Allowed Claims in respect of Pretium Parent; and (2) all wind-down costs of Pretium Parent, including, without limitation, (a) the costs and expenses of preparing and filing tax returns and other required filings, (b) U.S. Trustee Quarterly Fees, (c) any reasonable and documented fees and expenses of Professionals and other advisors incurred in connection with the wind-down of Pretium Parent, and (d) any other expenses associated with the dissolution, liquidation, or case closing of Pretium Parent (including, for the avoidance of doubt, any Transaction Expenses of the New Money Investor incurred in connection with such matters); *provided* that any costs or expenses incurred in connection with an action taken on behalf of all or nearly all Debtors collectively, rather than Pretium Parent individually, including the closing of the Chapter 11 Cases in accordance with Article XII.M of the Plan, shall not constitute Pretium Parent Wind-Down Costs and Distributions; *provided further* that, in the aggregate, the Debtors and Reorganized Debtors shall fund up to the first $350,000 of the Pretium Parent Wind-Down Costs and Distributions, and the New Money Investor shall fund the amount by which the Pretium Parent Wind-Down Costs and Distributions exceed $350,000 (the "New Money Investor Wind-Down Investment"), if any.

The Debtors or Reorganized Debtors, as applicable, shall make all distributions and payments contemplated by the Plan in respect of Pretium Parent in accordance with Article VI of the Plan through the Disbursing Agent.  On the Effective Date and on a quarterly basis thereafter until all Pretium Parent Wind-Down Costs and Distributions have been paid in full, the New Money Investor shall pay to the Reorganized Debtors the New Money Investor Wind-Down Investment, if any.

Upon request by the Ad Hoc Group, the Debtors or Reorganized Debtors shall provide the Ad Hoc Group Advisors with an accounting of Pretium Parent Wind-Down Costs and Distributions and any New Money Investor Wind-Down Investment.

### e.    Corporate Existence.

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation or organization documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation or organization documents) are amended under the Plan or otherwise, in each case, consistent with the Restructuring Support Agreement (which are incorporated in the Plan pursuant to Article I.H), and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation or organization documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### f.    Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Confirmation Order, the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated therein, or entered into in connection therewith or pursuant thereto, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

### g.    Directors and Officers of the Reorganized Debtors.

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents.  To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents. Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

### h.  Management Incentive Plan.

On the Effective Date, the MIP Equity shall be reserved.  The terms and conditions of the Management Incentive Plan, including with respect to the form, terms, allocation, and vesting of the MIP Equity or other equity-based awards, shall be determined at the discretion of the New Board within 120 days of the Effective Date.

### 2.  Settlement, Release, Injunction, and Related Provisions.

### a.  Definitions

"*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; and (c) each Related Party of the Debtors and the Reorganized Debtors.

"*Released Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Agents; (e) the ABL Lenders and each Holder of an ABL Claim; (f) the DIP Lenders and each Holder of a DIP Claim; (g) the New Money Investor; (h) the Backstop Parties; (i) the Exit Facility Lenders; (j) all Releasing Parties; and (k) each Related Party of each Entity in clause (a) through (i); *provided* that any Holder of a Claim or Interest that opts out of, the releases contained in the Plan shall not be a "Released Party."

"*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Agents; (e) the ABL Lenders and each Holder of an ABL Claim; (f) the DIP Lenders and each Holder of a DIP Claim; (g) the New Money Investor; (h) the Backstop Parties; (i) the Exit Facility Lenders; (j) all Holders of Claims that vote to accept the Plan; (k) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (m) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (n) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (o) each Related Party of each Entity in clause (a) through (n); *provided* that, for the avoidance of doubt, each Holder of Claims and/or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the releases; *provided*, *further*, that notwithstanding anything contrary herein, with respect to funds and accounts managed by HPS Investment Partners, LLC or its Affiliates that are Consenting Lenders (the "HPS Consenting Creditors"), the defined terms "Releasing Parties" shall be limited to (i) the HPS Consenting Creditors, (ii) any trading desk(s), fund(s), account, branch, unit, and/or business group(s) of the HPS Consenting Creditors that have a beneficial interest in the Claims held by HPS Consenting Creditors, or are otherwise acting for the benefit of or at the direction of the HPS Consenting Creditors, against the Debtors, and (iii) any Affiliates and Related Parties of HPS Consenting Creditors for which the HPS Consenting Creditors are legally entitled to bind under applicable law.

"*Related Parties*" means, with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors,

22

successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

### b. Release of Liens.

**Except as otherwise provided in the Exit Facility Documents, the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created or entered into pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, title, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (or the applicable Agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the applicable Agents for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the Exit Facility Agents that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

### c. Releases by the Debtors.

**Except as expressly set forth in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Debtors, their Estates, and if applicable, the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state**

23

statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, their Estates, or the Reorganized Debtors the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, Avoidance Actions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause, the Effective Date.

Notwithstanding anything to the contrary in the Plan, the Debtors do not, pursuant to the releases set forth above, release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transactions, the Exit Facility Documents, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, or (iii) any Claims or Causes of Action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, *provided* that a party's compliance with, or execution, or implementation of the Restructuring Support Agreement or the Plan shall not be deemed actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) given in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after due notice and

opportunity for a hearing; and (vi) a bar to any of the Debtors, their Estates, or the Reorganized Debtors asserting any Claim or Cause of Action released pursuant to the Debtor Release against any of the Released Parties.

### d.   Releases by the Releasing Parties.

Except as expressly set forth in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, their Estates, or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause, the Effective Date.

Notwithstanding anything to the contrary in the Plan, the Releasing Parties do not, pursuant to the releases set forth above, release (i) any post-Effective Date obligations of any party or Entity

under the Plan, the Confirmation Order, any Restructuring Transactions, the Exit Facility Documents, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, (ii) the rights of any Holder of Allowed Claims to receive distributions under the Plan, or (iii) any Claims or Causes of Action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, *provided* that a party's compliance with, or execution, or implementation of the Restructuring Support Agreement or the Plan shall not be deemed actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release against any of the Released Parties.

e.   **Exculpation.**

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the solicitation of votes (before and after the Petition Date) for, or Confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation

governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### f.  Injunction.

Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities or the Estates on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Effective Date obligations of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facilities), or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Article VIII.F</u> of the Plan.

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to <u>Article VIII.C</u>, <u>Article VIII.D</u>, and <u>Article VIII.E</u> of the Plan without first (i) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (ii) obtaining from the Bankruptcy Court specific authorization for such party to bring such

**Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.**

## V.   THE DEBTORS' CORPORATE HISTORY, BUSINESS OPERATIONS, AND PREPETITION ORGANIZATIONAL AND CAPITAL STRUCTURE.

### A.   Pretium's Corporate History and Business Operations.

#### 1.   Pretium's Corporate History.

Since its founding in 1992, the Company recognized that proximity to customers, agility in operation and production, and responsiveness to shifting market demands were essential to delivering premium, specialized packaging solutions.  To that end, throughout its history, Pretium's growth has been driven by a disciplined strategy designed to expand its geographic reach, strengthen its technological capabilities, and diversify its end-market exposure through both organic and inorganic initiatives, including a series of targeted acquisitions intended to build scale while maintaining operational flexibility.

Clearlake acquired the Company in 2020.  Since the acquisition, Clearlake's ownership has provided additional resources, management expertise, and strategic guidance for the Company to drive manufacturing excellence, digital transformation, and sustainability while continuing to acquire strategic assets.  Under Clearlake's management, the Company implemented advanced automation and data-driven manufacturing systems, unified its digital infrastructure across twenty-four facilities, and accelerated its sustainability initiatives, including the use of post-consumer resins and bioresins and reducing the weight of its products.

In 2021, the Company completed its strategic acquisition of Alpha Packaging, Inc. ("Alpha") a St. Louis, Missouri-based manufacturer of rigid plastic containers with nine facilities in the United States and abroad.  This acquisition established the Company as a global platform with manufacturing operations spanning the United States, Canada, and Europe, provided complementary capabilities across North America, and broadened its sustainable, specialty packaging offerings.  That same year, Pretium also acquired Grupo Edid, which expanded the Company's product line to include thin-wall injection-molded containers, printed paperboard, and micro-corrugated packaging and served as the Company's entry point into Mexico.



## 2.    Pretium's Business Operations.

Pretium is a vertically integrated designer and manufacturer of rigid plastic packaging solutions serving customers across a diverse range of end markets.  Pretium primarily services customers with short- to medium-run production volumes that require specialized packaging solutions and a high degree of operational flexibility, including private label brands and high-growth, emerging brands.  Through its targeted approach, the Company has established strong ties to customers in diverse, growing, and recession-resilient end markets.  The Company manages customer relationships and sales, product design, and engineering in-house, and manufactures its products through a network of automated production facilities in North America and Europe.

### a.    Pretium's Solutions and Products.

Pretium provides both custom and stock solutions that strategically leverage its full-service capabilities from design to manufacturing for customers serving diverse markets.

*Custom Solutions*.  Depending on the level of customization its customers need, Pretium offers either a brand-focused approach where it develops exclusive customer-specific solutions through a collaborative process that balances design, carbon footprint, and cost or a market-focused approach where it develops proprietary solutions based on its knowledge of end market trends to address the needs of a broader set of customers on a non-exclusive basis.  Under the brand-focused approach, the customer owns the mold; under the market-focused approach, Pretium retains the mold and associated intellectual property.

*Stock Solutions*.  Pretium also has thousands of off the-shelf packaging products and product combinations in inventory that are available for direct purchase by both customers and distribution partners.  These brand agnostic products are suitable for a wide variety of uses across various industries and provide readily available, market-tested, and reasonably flexible solutions for customers focusing on speed to market.  Pretium owns the stock product molds.

Through strategic innovation, expansion, and diversification for more than thirty years, Pretium has accumulated extensive technical acumen, end market expertise, and proprietary capabilities.  Today,

the Company owns more than 3,000 active molds and produces packaging for more than 8,900 active SKUs. For all of its solutions—both custom and stock—Pretium produces a wide array of products.

*Rigid Packaging*.  Pretium primarily designs, engineers, and manufactures rigid, reusable plastic bottles, jars, trays, and other containers from the following materials:

- *polypropylene ("PP")*:  thermplastic that offers high rigidity, heat resistance, and durability for packaging caps, closures, and specialty containers; widely used for products such as vials, funnels, spice jars, and specimen containers;

- *clarified polypropylene ("CP")*:  a transparent form of PP with improved clarity and stiffness, suitable for applications requiring a glass-like appearance and heat resistance; typically used for bottles and cannisters containing personal care products such as creams, lotions, and gels;

- *high-density polyethylene ("HDPE")*:  provides durability and chemical and impact resistance for food, household, and industrial applications; typically used for products such as large chemical containers, milk gallons and other beverage bottles, coffee ground containers, and cosmetic bottles;

- *post-consumer recycled HDPE ("HDPE PCR")*:  a form of HDPE that incorporates recycled resin content for sustainability objectives or regulatory requirements while maintaining comparable performance; generally used to manufacture similar products as HDPE;

- *polyethylene terephthalate ("PET")*:  lightweight thermoplastic that offers clarity, rigidity, and moisture resistance, suitable for beverage and personal-care packaging; typically used for products such as condiment and beverage bottles and ready-to-eat packaging; and

- *post-consumer recycled polyethylene terephthalate ("PET PCR")*:  a form of PET that utilizes recycled PET resin for sustainability objectives or regulatory requirements while maintaining comparable performance; generally used to manufacture similar products as PET.

*Cardboard and Paperboard Packaging*.  Pretium's Ediprint division, acquired from Grupo Edid in 2021 and based in Mexico, manufactures and prints cardboard and paperboard packaging products ranging from coffee sleeves and cookie boxes to healthcare packaging and shipping containers for diverse consumer and industrial uses.  The division also provides a full suite of package finishing and assembly services, including varnish applications, hot stamping, and corrugated and micro corrugated splicing.

b. **Pretium's Operating Plants.**



As of the date of this Disclosure Statement, Pretium currently operates twenty-four automated production plants across North America and Europe.  The majority of these facilities are located within the United States, including the Company's Hillsborough, New Jersey manufacturing facility,[12] with additional operations in Canada, Mexico, Ireland, and the Netherlands.  Most of the Company's revenue is derived from its North American operations.  These plants are designed to support both short-run and medium-run production volumes, allowing Pretium to serve a broad range of regional and national customers efficiently.  At the same time, Pretium maintains open capacity to meet customer demand on short notice.

The Company has made significant capital investments to automate production lines across all facilities, build innovation centers, and upgrade its technology and data analytics capabilities.  The Company's automation of full-line processes, such as take outs, case packing, and palletizing—implemented across more than 60 percent of its production lines—has yielded measurable cost savings and efficiency gains and quickly produced returns on investment.  Pretium's manufacturing operations also utilize collaborative robots, accumulation tables, and vision inspection systems, each of which has improved labor efficiency and production reliability.

In addition to its production plants, Pretium operates dedicated innovation facilities that support product design, prototyping, and mold development.  The Company's innovation center in Aurora, Illinois, provides dedicated space for customer collaboration and design coordination.  The Company's Cleveland, Ohio innovation lab—located within one of Pretium's operating plants—enables it to introduce new molds and product designs more quickly and cost-effectively while avoiding disruption to active production lines.

Collectively, these investments in manufacturing, automation, and innovation have positioned the Company with a scalable, technologically advanced manufacturing platform capable of supporting customer needs across multiple markets and geographies.

---

[12]    The Company's New Jersey Operations span more than 180,000 square feet across three manufacturing sites and two warehouses.  New Jersey serves as the Company's center of excellence for the spice and seasoning end market.

**B.      The Debtors' Prepetition Organizational and Capital Structure.**

**1.      Pretium's Corporate Structure.**

Pretium is a privately held company.  The Company's current corporate structure is illustrated in the organizational chart attached hereto as **Exhibit F**.

**2.      Pretium's Prepetition Capital Structure.**

As of the Voting Record Date, the Company has approximately $1,835.7 million in aggregate outstanding funded debt obligations.

| Funded Debt | Principal Amount Outstanding |
|---|---|
| ABL Facility | $59.3 million |
| First Lien Tranche A Term Loans | $337.6 million |
| First Lien Tranche A-1 Term Loans | $1,237.4 million |
| Second Lien Term Loans | $201.4 million |
| *Total Funded Debt Obligations* | *$1,835.7 million* |

**a.   ABL Facility.**

On October 1, 2021, the Company entered into that certain Amended and Restated ABL Credit and Guarantee Agreement, dated as of October 1, 2021 (as amended by the first amendment, dated as of May 11, 2023, the second amendment, dated as of July 5, 2023, the third amendment, dated as of September 22, 2023, the fourth amendment, dated as of June 27, 2024, the fifth amendment, dated as of October 31, 2025 (the "Fifth ABL Amendment"), the sixth amendment, dated as of November 12, 2025 (the "Sixth ABL Amendment"), the seventh amendment, dated as of November 19, 2025 (the "Seventh ABL Amendment"), and the eighth amendment, dated as of December 30, 2025 (the "Eighth ABL Amendment" and together with the Fifth ABL Amendment, the Sixth ABL Amendment, and the Seventh ABL Amendment, the "ABL Amendments"), and as may be further amended, supplemented, restated, or otherwise modified from time to time, the "ABL Credit Agreement" and the asset-based revolving credit facility thereunder, the "ABL Facility"), by and among Poseidon Investment Intermediate, Inc. ("Intermediate"), as holdings and a guarantor, Pretium PKG Holdings, Inc. ("Holdings"), as the parent borrower (in such capacity, the "ABL Parent Borrower"); Pretium Holding, LLC, Mont Royal, L.L.C., Pretium Packaging, L.L.C., Pretium Canada Packaging ULC, Starplex Scientific Corp., Olcott Plastics, LLC, and Alpha Consolidated Holdings, LLC, as subsidiary borrowers (the "ABL Subsidiary Borrowers" and together with the ABL Parent Borrower, the "ABL Borrowers"; Intermediate together with the ABL Borrowers in their capacity as obligors under the ABL Facility, the First Lien Term Loans, and the Second Lien Term Loans, the "Loan Parties"); certain lenders from time to time party thereto (in such capacity, the "ABL Lenders"); and Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, as applicable, the "ABL Agent" and together with the ABL Lenders, the "ABL Secured Parties"), lead arranger, and bookrunner.

The ABL Facility provides a revolving line of credit in a maximum aggregate commitment amount of $100 million with a sublimit for the issuance of letters of credit in an amount equal to the lesser of (a) $20 million and (b) the aggregate amount of revolver commitments in effect at any given time.  The ABL

Facility matures on October 1, 2026, and bears interest at an aggregate rate of USD SOFR plus 1.75 percent[13] per annum.

The relative rights and priority between the ABL Secured Parties on the one hand, and the First Lien Secured Parties and the Second Lien Secured Parties (each as defined below) on the other hand, are governed by that certain Intercreditor Agreement, dated as of October 1, 2021 (as may be amended, supplemented, restated, or otherwise modified from time to time, the "ABL/Term Loan Intercreditor Agreement"), by and among the ABL Agent, the First Lien Agent, and Second Lien Agent, and the other persons from time to time party thereto from time to time.  Pursuant to the ABL/Term Loan Intercreditor Agreement, the ABL Secured Parties have first-priority liens on ABL Priority Collateral and second-priority liens on Term Priority Collateral (each as defined in ABL/Term Loan Intercreditor Agreement).

### b.  First Lien Term Loans.

On October 1, 2021, the Company entered into that certain First Lien Credit Agreement, dated October 1, 2021 (as amended by the first amendment, dated as of December 15, 2021, the second amendment, dated as of May 25, 2023, the third amendment, dated as of October 2, 2023 (the "Third First Lien Amendment"), and the fourth amendment, dated as of November 19, 2025 (the "Fourth First Lien Amendment"), and as may be further amended, supplemented, restated, or otherwise modified from time to time, the "First Lien Credit Agreement"), by and among Holdings, as the borrower and a guarantor; Intermediate, as holdings and a guarantor; certain lenders from time to time party thereto (in such capacity, the "First Lien Lenders"); and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, as applicable, the "First Lien Agent" and together with the First Lien Lenders, the "First Lien Secured Parties").

The First Lien Credit Agreement provides for a first-lien first-out term loan facility (the term loans thereunder, the "First Lien Tranche A Term Loans") and a first-lien second-out term loan facility (the term loans thereunder, the "First Lien Tranche A-1 Term Loans" and together with the First Lien Tranche A Term Loans, the "First Lien Term Loans").[14]  The First Lien Tranche A Term Loans bear interest at the aggregate rate of USD SOFR plus 5.00 percent per annum and mature on October 1, 2028.  The First Lien Tranche A-1 Term Loans bear interest at the aggregate rate of USD SOFR plus 4.60 percent per annum and mature on October 1, 2028.  As of the Petition Date, the principal amount of the First Lien Tranche A Term Loans outstanding is approximately $337.6 million, and the principal amount of the First Lien Tranche A-1 Term Loans outstanding is approximately $1,237.4 million.

The First Lien Term Loans are guaranteed by certain Loan Parties pursuant to that certain First Lien Subsidiary Guaranty, dated as of October 1, 2021, and amended, supplemented, restated, or otherwise modified from time to time, by and among the guarantors party thereto and the First Lien Agent.

The relative rights and priority between the First Lien Secured Parties and the Second Lien Secured Parties are governed by that certain First Lien/Second Lien Intercreditor Agreement, dated as of October 1, 2021 (as may be amended, supplemented, restated or otherwise modified from time to time, the "First Lien/Second Lien Intercreditor Agreement"), by and among Holdings, as the borrower; Intermediate, as holdings; the other grantors from time to time party thereto; the First Lien Agent, as senior

---

[13]  This margin over the USD SOFR is determined by the Average Excess Availability (as defined in the ABL Credit Agreement) as of any date of determination.

[14]  As of the date of this Disclosure Statement, Clearlake beneficially holds approximately $228 million of First Lien Tranche A-1 Term Loans and approximately 77.4 percent of Existing Interests in Debtor Poseidon Parent, L.P.

priority representative for the First Lien Secured Parties; the Second Lien Agent, as second priority representative for the Second Lien Secured Parties; and each additional representative from time to time party thereto.  Pursuant to the First Lien/Second Lien Intercreditor Agreement and the ABL/Term Loan Intercreditor Agreement, as applicable, the First Lien Secured Parties have first-priority liens on the Term Priority Collateral and second-priority liens on the ABL Priority Collateral.

The relative rights and priority between the holders of the First Lien Tranche A Term Loans and the holders of the First Lien Tranche A-1 Term Loans are governed by that certain Agreement Among Lenders, dated as of October 2, 2023 (as may be amended, supplemented, restated or otherwise modified from time to time, the "First Out/Second Out Intercreditor Agreement"), attached as an annex to the Third First Lien Amendment

### c.  Second Lien Term Loans.

On October 1, 2021, the Company entered into that certain Second Lien Credit Agreement, dated October 1, 2021 (as amended by the first amendment, dated May 25, 2023, and the second amendment, dated as of November 19, 2025 (the "Second Second Lien Amendment"), and as may be further amended, supplemented, restated or otherwise modified from time to time, the "Second Lien Credit Agreement," and the term loans thereunder, the "Second Lien Term Loans"), by and among Holdings, as the borrower and a guarantor; Intermediate, as a guarantor and holdings; certain lenders from time to time party thereto (in such capacity, the "Second Lien Lenders"); and UBS AG, Stamford Branch, as administrative and collateral agent (in such capacities, as applicable, the "Second Lien Agent" and together with the Second Lien Lenders, the "Second Lien Secured Parties").

The Second Lien Term Loans bear interest at the aggregate of USD SOFR plus 6.75 percent per annum and mature on October 1, 2029.  As of the Petition Date, the principal amount of the Second Lien Term Loans outstanding is approximately $201.4 million.

The Second Lien Term Loans are guaranteed by certain Loan Parties pursuant to that certain Second Lien Subsidiary Guaranty, dated as of October 1, 2021, and amended, supplemented, restated, or otherwise modified from time to time, by and among the guarantors party thereto and the Second Lien Agent. Pursuant to the First Lien/Second Lien Intercreditor Agreement and the ABL/Term Loan Intercreditor Agreement, as applicable, the Second Lien Secured Parties have second-priority liens on the Term Priority Collateral and third-priority liens on the ABL Priority Collateral.

## VI.    EVENTS LEADING TO THE CHAPTER 11 CASES.

### A.    Industry Headwinds and Operational Challenges.

The period from 2022 through 2023 was marked by significant volatility in the rigid packaging sector.  In 2020 and 2021, material shortages, supply chain disruption, and extended lead times spurred by the COVID-19 pandemic prompted customers to overorder packaging as a precautionary measure. Following these unprecedented demand surges, customer purchasing behavior normalized and widespread inventory destocking began in 2022 and 2023.  Once supply conditions such as freight reliability and resin availability stabilized, customers across nearly all end markets drew down safety stocks accumulated during 2020 and 2021, resulting in volume declines across many packaging categories.  This trend was particularly pronounced among private-label, emerging-brand, and distributor customers—segments that have historically represented a meaningful portion of Pretium's business.  These industry-wide dynamics reduced

the Company's order volumes and led to lower utilization rates across multiple plants and increased unit production costs due to diminished fixed-cost absorption.

In addition, since March 2022, the Federal Reserve has raised its benchmark short-term rate eleven times, reaching a target federal funds rate of 5.25 percent to 5.5 percent in July 2023, the highest level since 2001. While the Federal Reserve has since lowered the benchmark short-term rate to between 3.75 percent to 4.00 percent, the rate is markedly higher than any corresponding short-term rate over the last ten years. These high interest rates have had an immediate and continuing material impact on the Company's cash interest expense, as all of the Company's funded debt bears floating rates tied to USD SOFR.

Moreover, the industry-wide demand reset and the increased interest expense coincided with the Company's effort to integrate the Alpha business following the 2021 acquisition and amplified transitional disruption. While the acquisition materially expanded the Company's scale and broadened its footprint by adding nine new locations across the United States, Canada, and Europe, integrating Alpha required a multi-year process of facility consolidations, system harmonization, workforce alignment, planning migrations, and significant non-recurring expenditures.

In response, Pretium initiated corrective actions that have produced positive results. In 2024, Pretium appointed a new management team led by Chief Executive Officer James Rooney to advance the integration of the Alpha acquisition and improve operational efficiency. Under this new leadership, Pretium streamlined its organizational structure, enhanced operational oversight, and optimized its cost base. In 2025, these initiatives have begun to yield positive results, including more stable operations, improved service levels, and an expanded customer base.

### B.    The October 2023 Liability Management Transaction.

In 2023, to enhance near-term liquidity in light of the industry turbulence and operational challenges at the time, the Company engaged Kirkland & Ellis LLP ("Kirkland"), as legal advisor, and Evercore Inc. ("Evercore"), as investment banker, to explore potential capital structure solutions. In October 2023, Pretium executed a consensual liability management transaction (the "2023 LMT") with its lenders through the Third First Lien Amendment, among other documents. Through the 2023 LMT the Company (a) raised $325 million of First Lien Tranche A Term Loans from the holders of the first lien term loans existing immediately prior to the consummation of the 2023 LMT (the "Legacy First Lien Term Loans") and (b) purchased the Legacy First Lien Term Loans at a sale price of 93.6 percent of face value for First Lien Tranche A-1 Term Loans (i.e., every $100 of Legacy First Lien Term Loans was purchased with $93.60 of First Lien Tranche A-1 Term Loans).

99.8 percent of the Holders of the Legacy First Lien Term Loans participated in the 2023 LMT. As a result, the Company captured approximately $83 million of discount and obtained more than $200 million of liquidity.

### C.    The Restructuring Transactions.

Beginning in July 2025, Pretium took a proactive approach to address its liquidity challenges and balance sheet by engaging with key stakeholders to explore potential solutions. With the assistance of Kirkland and Evercore, the Company held initial discussions with the Ad Hoc Group regarding a transaction to further enhance liquidity and extend the runway for the operational turnaround. As liquidity pressures intensified and discussions progressed into the fall, however, it became apparent that a more comprehensive balance sheet restructuring was required to sufficiently deleverage the capital structure. As the Company

prepared to execute on this more holistic reorganization, it also retained FTI Consulting, Inc. ("FTI," and together with Kirkland and Evercore, the "Advisors") as financial advisor.

Throughout the fall of 2025, the Company and the Ad Hoc Group engaged in extensive, arm's-length negotiations on a comprehensive value-maximizing restructuring transaction. As negotiations advanced and liquidity tightened, Pretium, after consultation with its Advisors, elected to withhold the interest payment due on November 12, 2025 under the Second Lien Credit Agreement and to enter into the five-business-day grace period with respect to interest payment defaults. On November 19, 2025, the Company and the requisite First Lien Secured Parties and Second Lien Secured Parties entered into the Fourth First Lien Amendment and the Second Second Lien Amendment, respectively, whereby the requisite lenders agreed that the withheld interest payment would not constitute an event of default under the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively, until the earlier of (a) November 26, 2025 (later extended), or (b) to the extent a restructuring support agreement was executed, the termination of such restructuring support agreement.

Thereafter, on December 30, 2025, the Company, the Sponsor, and the Initial Consenting Lenders, including the Ad Hoc Group, executed the Restructuring Support Agreement, which memorialized the key terms of the Restructuring Transactions to be implemented through the Plan. Following execution of the Restructuring Support Agreement, the Company worked to garner support from other key constituents and, on January 25, 2026, distributed the solicitation materials to Holders of Claims entitled to vote on the Plan.

### D.    The ABL Amendments.

In parallel with negotiating the Restructuring Transactions contemplated under the Restructuring Support Agreement, the Company also engaged with its ABL Lenders regarding forbearance, liquidity enhancement, and a potential debtor-in-possession ABL facility. Through a series of amendments to the ABL Credit Agreement, the ABL Lenders agreed to forebear from exercising remedies in connection with the Company's withheld interest payment, allow the Company uninterrupted access to the ABL Facility prepetition, and provide a debtor-in-possession ABL facility during the Chapter 11 Cases to refinance the existing ABL Facility, which may roll into an Exit ABL Facility for the reorganized Company in accordance with the Plan and the Exit ABL Commitment Letter attached to this Disclosure Statement as **Exhibit G**.

Taken together, the Restructuring Support Agreement and the ABL Amendments reflect months of intensive, arm's-length negotiations and a substantial compromise among the Company, the Sponsor and New Money Investor, and the Consenting Lenders. These transactions provide the best available path to address Pretium's overleveraged capital structure, enhance liquidity, and preserve the value of the enterprise as a going concern.

The Restructuring Transactions to be implemented through these Chapter 11 Cases will provide the Debtors with enhanced liquidity and a deleveraged capital structure, providing relief to the Company and a strong foundation for the go-forward business. The reorganized Company will be better able to serve its customers, vendors, and employees, and will be provided with a stable platform for future growth and investment.

## VII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS RELATING TO THE RESTRUCTURING TRANSACTIONS AND POTENTIAL CHAPTER 11 CASES.

### A.    Milestones.[15]

As part of the Restructuring Support Agreement, the Debtors agreed to the following milestones, each of which may be extended or waived with the consent of the Required Consenting Stakeholders, to ensure an orderly, timely implementation of the Restructuring Transactions:

- By no later than five Business Days after the Company commences solicitation of the Plan, the Petition Date shall have occurred;

- By no later than three Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- By no later than thirty-five days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- No later than sixty days after the Petition Date, the Confirmation Order and all other related relief required to be obtained from the Bankruptcy Court to implement the Restructuring Transactions shall have been entered and/or granted, as applicable, by the Bankruptcy Court; and

- No later than thirty days after the Confirmation Date, the Effective Date shall have occurred, *provided*, *however*, that such date shall be automatically extended for one additional three-month period, solely to the extent that the Company and Required Consenting Stakeholders have otherwise complied with the terms of the Restructuring Support Agreement and the Definitive Documents and all other events and actions necessary for the occurrence of the Restructuring Transactions have occurred, other than the receipt of regulatory or other approval of a government entity or unit necessary for the occurrence of the Restructuring Transactions.

### B.    First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors intend to file several motions (the "First Day Pleadings") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, facilitating the continuation of the Debtors' relationships with employees, vendors, and customers in the ordinary course following the commencement of the Chapter 11 Cases. In such event, the First Day Pleadings, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.stretto.com/Pretium.

## VIII.   RISK FACTORS.

**Before taking any action with respect to the Plan, Holders of Claims should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement, the Plan, and the documents delivered together herewith, referred to, or incorporated by reference in this Disclosure Statement, including other documents filed with the Bankruptcy Court**

---

[15]   Capitalized terms used but not defined in this **Article VII.A** shall have the meaning ascribed to such terms in the Restructuring Support Agreement.

in the Chapter 11 Cases. **The risk factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the restructuring and consummation of the Plan. Each of the risk factors discussed in this Disclosure Statement may apply equally to the Debtors and the Reorganized Debtors, as applicable and as context requires.**

### A.     Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1.     The Restructuring Support Agreement May Be Terminated.

The Restructuring Support Agreement contains provisions that give the Restructuring Support Parties (collectively or individually, as applicable) the ability to terminate the Restructuring Support Agreement upon the occurrence of certain events or if certain conditions are not satisfied. To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan—or prior to the chapter 11 filings—which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of the DIP Facilities and/or cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan. In the event that the Restructuring Support Agreement is terminated, the Debtors may seek a non-consensual restructuring alternative, including a potential liquidation of their assets.

### 2.     The Debtors May Consider All Available Restructuring Alternatives if the Restructuring Transactions are Not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against and Interests in the Debtors.

In accordance with their fiduciary duties, the Debtors will continue to evaluate all restructuring alternatives and are expressly permitted to do under the Restructuring Support Agreement. Currently, they believe the Restructuring Transactions outlined in the Plan and the Restructuring Support Agreement represent the best available means of implementing a needed comprehensive restructuring of their business. If the Restructuring Transactions are not implemented or if required by the Debtors' fiduciary duties, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, commencing section 363 sales of the Debtors' assets, seeking to implement an alternative transaction out of court, commencing or otherwise converting their chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, and any other transaction that would maximize the value of the Debtors' Estates. The terms of any Alternative Restructuring Proposal may be less favorable to Holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the determination of the Bankruptcy Court not to confirm the Plan would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect: (a) the Debtors' ability to raise additional capital; (b) the Debtors' liquidity; (c) how the Debtors' business is viewed by regulators, investors, lenders, and credit ratings agencies; (d) the Debtors' enterprise value; and (e) the Debtors' business relationship with customers and vendors.

3.     **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

4.     **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in <u>Article IX</u> of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

5.     **Governmental Regulatory Approval May Not Occur or May be Delayed.**

The Debtors may require regulatory approval to Consummate the Plan and the Restructuring Transactions.  There is a risk that such regulatory approval may not be obtained or may take longer to obtain than anticipated and, as a result, the Consummation of the Plan may not occur and the Company may be forced to pursue alternative restructuring transactions.

6.     **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate.**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).  Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:  (a) solicitation comply with applicable non-bankruptcy law; (b) the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and (c) the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code).  While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

7.     **The Debtors May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the

event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan. Moreover, an alternative plan or transaction could result in the termination of the Restructuring Support Agreement and the loss of support by the Consenting Stakeholders.

### 8. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting holders of claims or interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims or Interests would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement (including the requirement that the Plan be in form and substance reasonably acceptable to the Required Consenting Stakeholders), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 9. The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). *See* **Article X.E** of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes." The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be

no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

**10.     Even if the Restructuring Transactions Are Successful, the Debtors Will Face Continued Risk Upon Consummation.**

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the Debtors' products, and increasing expenses.  *See* **Article VIII.D** of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Business." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

**11.     The Chapter 11 Cases Could Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (i) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (ii) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (iii) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**12.     One of More of the Chapter 11 Cases May Be Dismissed.**

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial Consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be

unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

13.     **The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan, subject to the terms of the Restructuring Support Agreement. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

14.     **The Total Amount of Allowed Administrative and Priority Claims May be Higher than Anticipated by the Debtors.**

The Debtors anticipate that they will have sufficient Cash, including from proceeds of the DIP ABL Facility and the DIP Term Loan Facility, to pay all Allowed Administrative Claims pursuant to the Plan. Nevertheless, the amount of Cash the Debtors ultimately retain prior to and following the Effective Date may be lower than anticipated. Additionally, Allowed Administrative Claims, Professional Fee Claims, and Priority Tax Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims on the Effective Date as is required to confirm a chapter 11 plan of reorganization. In that instance, the Effective Date and prerequisite terms could be delayed and/or modified.

15.     **The Effective Date May Not Occur.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or met, the Effective Date will not take place.

16.     **Releases, Injunctions, and Exculpation Provisions May Not Be Approved.**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization. The Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to reductions in the amounts of their Claims against the Debtors' Estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

17. **The Debtors May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Its Confirmation.**

The Debtors reserve the right, prior to the Confirmation or substantial Consummation thereof, subject to the provisions of Section 1127 of the Bankruptcy Code, applicable law, and the Restructuring Support Agreement, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court.  If, after receiving sufficient acceptances but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected creditors and interest Holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimi*s or purely technical or otherwise did not adversely change the treatment of Holders accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

18. **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan.**

Although the prepackaged Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed.  Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses.  There is a risk, due to uncertainty about the Debtors' futures that, among other things: (a) employees could be distracted from performance of their duties or more easily attracted to other career opportunities; (b) key customers may choose to switch to a competitor; and (c) suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

Even if the Plan is timely confirmed, the Debtors may need additional time to satisfy or seek the waiver of the conditions precedent to the Effective Date of the Plan, including to obtain the applicable regulatory approval.  A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases.  If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed.  A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

19. **The Restructuring Support Agreement, the DIP ABL Credit Agreement, and the DIP Term Loan Credit Agreement Contain Significant Conditions and Milestones That May Be Difficult to Satisfy.**

There are certain material conditions that must be satisfied under the Restructuring Support Agreement, the DIP ABL Credit Agreement, and the DIP Term Loan Credit Agreement, including the timely satisfaction of milestones in the Chapter 11 Cases.  The ability to timely complete such milestones

is subject to risks and uncertainties, many of which are beyond the Debtors' control.  As discussed further in the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B**, failure to meet any of the milestones without the written consent of the Required Consenting First Lien Tranche A-1 Lenders (as defined in the Restructuring Support Agreement) shall amount to a breach of the Restructuring Support Agreement subject to customary cure provisions, including, but not limited to, termination of the Restructuring Support Agreement.  Likewise, failure to meet any of the milestones under the DIP ABL Credit Agreement or DIP Term Loan Credit Agreement, as applicable, without the written consent of the Required DIP ABL Lenders or Required DIP Term Loan Lenders, respectively, shall amount to an event of default under the DIP Credit Agreement subject to customary cure provisions, including, but not limited to, termination, reduction, or restriction of any further DIP Loan Commitment (as defined in the Restructuring Support Agreement).

## B.    Risks Related to Recoveries under the Plan.

### 1.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 2.    The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.

The Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Equity may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 3.    The New Equity is Subject to Dilution.

The New Equity will be distributed as follows:  (i) the New Money Equity, representing 21.9 percent of New Equity, subject to dilution by the MIP Equity only, will be distributed to the New Money Investor on account of the New Money Investment in accordance with the New Equity Subscription Agreement; (ii) the First Lien New Equity, representing 72.5 percent of New Equity, and subject to dilution by the Participation Premium, the Backstop Premium, and the MIP Equity, will be distributed to the Holders of Allowed First Lien Tranche A-1 Claims in accordance with Article III.B of the Plan; (iii) the Second Lien New Equity, representing 5.6 percent of New Equity, and subject to dilution by the MIP Equity only, will be distributed to the Holders of the Allowed Second Lien Claims in accordance with Article III.B of the Plan; (iv) the Participation Premium, representing 23.4 percent of New Equity will be distributed to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents and the Plan; and (v) the

Backstop Premium will be distributed to the Backstop Parties in accordance with the Backstop Commitment Letter and the Plan.  Together, the Participation Premium and Backstop Premium shall dilute the First Lien New Equity, but they shall not dilute the New Money Equity or the Second Lien New Equity, and they shall be subject to dilution by the MIP Equity.

### 4.   Certain Significant Holders of Shares of New Equity May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date.

Assuming that the Effective Date occurs, Holders of Claims who receive distributions representing a substantial percentage of the aggregate outstanding shares of the New Equity may be in a position to influence matters requiring approval by the Holders of shares of New Equity, including, among other things, the election of directors, pursuant to the terms of the New Organizational Documents (including the New Equity Subscription Agreement).  The Holders may have interests that differ from those of the other Holders of shares of New Equity and may vote in a manner adverse to the interests of other Holders of shares of New Equity.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Equity.  Such actions by Holders of a significant number of shares of New Equity may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

### 5.   Estimated Valuations of the Debtors and the New Equity, and Estimated Recoveries to Holders of Allowed Claims Are Not Intended to Represent Potential Market Values.

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (i) the successful reorganization of the Debtors; (ii) an assumed date for the occurrence of the Effective Date; (iii) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (iv) the Debtors' ability to maintain adequate liquidity to fund operations; (v) the assumption that capital and equity markets remain consistent with current conditions; and (vi) the Debtors' ability to maintain critical existing customer relationships, including relationships with key customers.

### 6.   The Terms of the New Organizational Documents Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.

Significant provisions related to the corporate governance of New Premium are set forth in the Governance Term Sheet, attached as Exhibit D to the Restructuring Support Agreement.  Nevertheless, the terms of the New Organizational Documents are subject to change based on ongoing negotiations between the Debtors and certain Consenting Stakeholders and the results of such negotiations may affect the rights of equity holders in the Reorganized Debtors following the Effective Date.  The substantially final form of the New Organizational Documents will be included in the Plan Supplement.

### 7.   Certain Tax Implications may Result from the Plan.

Holders of Allowed Claims should carefully review **Article XII** of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how certain tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and certain Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

8.      **The Debtors May Not Be Able to Accurately Report Their Financial Results.**

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under applicable law or otherwise.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

9.      **Contingencies Could Affect Distributions to Holders of Allowed Claims.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of re-vote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

C.      **Risks Related to the Offer and Issuance of Securities Under the Plan.**

1.      **The Debtors Do Not Intend to Register the Offer or Sale of the New Equity and Holders of the New Equity May Be Restricted in Their Ability to Transfer or Sell Their Securities.**

The New Equity will not be registered under the Securities Act or any state securities laws and, subject to the discussion below and the discussion in **Article XI** of this Disclosure Statement entitled "Certain Securities Law Matters," unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws. In addition, the Reorganized Debtors do not expect to be subject to the reporting requirements promulgated under U.S. federal securities Law, and Holders of the New Equity will not be entitled to any information except as expressly required in the applicable New Organizational Documents.

If shares of New Equity issued under the Plan are issued pursuant to section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, shares of such securities will not be freely tradeable if, at the time of transfer, the Holder is an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1)

under the Securities Act or had been such an "affiliate" within ninety (90) days of such transfer. Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Holders who receive New Equity pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

Any New Equity that cannot be issued in reliance on the exemption set forth in section 1145 of the Bankruptcy Code, including the Management Incentive Plan and New Equity offered prior to the Petition Date, will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Equity Interests in the New Organizational Documents. Generally, Rule 144 of the Securities Act would permit the resale of restricted securities received by a person after a specified holding period if current information regarding the issuer is publicly available and, under certain circumstances, volume limitations, manner of sale requirements and certain other conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer that does not file reports with the United States Securities and Exchange Commission pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the United States Securities and Exchange Commission under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 will not be available for resales of such New Equity by affiliates of the issuer. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Equity.

*See* **Article XI** of this Disclosure Statement, entitled "Certain Securities Law Matters," for additional details.

<h3>2.    The New Organizational Documents May Contain Restrictions on Transfer of the New Equity.</h3>

The New Organizational Documents will contain contractual restriction on holders' ability to transfer the New Equity. In addition, to the extent the New Equity is issued pursuant to Section 4(a)(2) under the Securities Act (or another exemption from registration), such securities will be deemed "restricted securities" (as defined under the Securities Act and the rules promulgated thereunder). Such securities may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. In addition, the New Equity is not expected to be registered

under any local or state securities Laws.  The Debtors make no representation regarding the right of any holder of New Equity Interest to freely transfer or resell the New Equity.  Resale restrictions and other restrictions on transfer are discussed in more detail in **Article XI.C** of this Disclosure Statement, entitled "Resales of New Equity; Definition of 'Underwriter' Under Section 1145(b) of the Bankruptcy Code."

### 3.      A Liquid Trading Market for the Shares of New Equity May Not Develop.

The Debtors do not expect to list the New Equity on a national securities exchange, and even if they make such an application in the future, the Debtors make no assurance that they will be able to obtain this listing or, even if the Debtors do, that liquid trading markets for shares of New Equity will develop. The liquidity of any market for New Equity will depend upon, among other things, the number of Holders of shares of New Equity, the Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Equity will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell shares of New Equity may be substantially limited, and the price for shares of the New Equity may decline or may be considered unfavorable.  You may be required to bear the financial risk of your ownership of the New Equity indefinitely.

In addition, the Reorganized Debtors do not expect to apply to be subject to the reporting requirements of the Securities Act, and Holders of the New Equity will not be entitled to any information except as expressly required by the New Organizational Documents.  As a result, the information which the Debtors are required to provide in order to issue the New Equity may be less than the Debtors would be required to provide if the New Equity were registered.  Among other things, the Debtors may not be required to provide: (i) separate financial information for any subsidiary; (ii) selected annual audited financial data; (iii) selected quarterly financial data; (iv) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (v) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership and the marketability of the New Equity.

### D.      Risks Related to the Debtors' and the Reorganized Debtors' Businesses.

### 1.      The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness, including, without limitation, obligations under the Exit Term Loan Facility upon emergence.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 2.      The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with

bankruptcy. These risks include the following: (i) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (ii) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (iii) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (iv) ability to maintain contracts that are critical to the Debtors' operations; (v) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (vi) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (vii) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**3.      Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.**

While the Debtors intend for the chapter 11 process to be short, the Debtors' future results will be dependent upon the successful Confirmation and Consummation of the Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' business. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the chapter 11 proceedings last longer than anticipated, the Debtors may require debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable to obtain final approval of debtor-in-possession financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP ABL Facility or DIP Term Loan Facility, the chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible

reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends.

The Financial Projections attached hereto as **Exhibit D** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Equity and the ability of the Debtors to make necessary payments. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur. The information included in this Disclosure Statement does not necessarily conform to the information, including with respect to the Financial Projections, that would be required if the Solicitation was made pursuant to a registration statement filed with the SEC or another securities regulator.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses and Claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting may be different from historical trends. The Financial Projections contained herein do not currently reflect the impact of "fresh start" accounting.

### 5. The Reorganized Debtors May Not Be Able to Implement the Business Plan.

While the Debtors believe that consummation of the Plan will put them in a strong position to implement their go-forward business plan, various factors beyond the Reorganized Debtors' control may hinder or prevent their successful implementation of the business plan. In particular, the Reorganized Debtors' successful implementation of the business plan depends significantly on maintaining and growing their customer base. Given the nature of the Debtors' customer arrangements, there can be no assurance that the Reorganized Debtors will maintain and grow their customer base. The erosion of the Reorganized Debtors' customer base may materially and adversely affect their operating results and hinder or prevent their successful implementation of the business plan.

### 6. The Debtors' Business is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business.

The Debtors' operations are subject to various federal, state, and local laws and regulations. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the

Debtors to administrative, civil, and criminal penalties, which could have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Reorganized Debtors.

### 7. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 8. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations.

The Debtors' operations are dependent on a group of key management personnel, including the Debtors' executive officers, and reliable employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel in the imaging and materials industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 9. Deteriorations in Business Relationships May Impact the Ability to Source Raw Materials.

The Debtors' success depends in part on their ability to source various raw materials and supplies necessary to manufacture the Debtors' products. These are sourced from a broad range of suppliers. As a result, the Debtors' business depends on maintaining productive business relationships with their global and dispersed network of third-party suppliers. The Debtors' operations could be disrupted if such business relationships decline, for whatever reason, or if such suppliers go out of business or are unable to provide parts to the Debtors as they have on a historical basis. There is a risk that economic conditions could lead to financial, operational, production, labor, regulatory, or quality assurance difficulties that could result in a reduction or interruption in the Debtors' raw materials and supplies.

### 10. The Debtors Could Fail to Retain or Attract Customers, Which Would Adversely Affect the Debtors' Business and Financial Results.

The Debtors' future revenue is dependent in large part upon the retention and growth of their existing customer base. Existing customers may purchase fewer of the Debtors' products and new customers may avoid purchasing products from the Debtors, which could have a material adverse effect on the Debtors' business and results of operations. There can be no assurance that the Debtors will be able to retain their current customers.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, content, the quality of the Debtors' customer service, and the Debtors' ability to update their products desired by customers. Further, the industry in which the

Debtors operate is highly competitive and the Debtors may not be able to compete effectively. The Debtors' revenue comes from the sale of the Debtors' products. It is impossible to predict with perfect accuracy what market demand for such offerings will be.

## IX.   SOLICITATION, VOTING, AND RELATED MATTERS.

This Disclosure Statement is being distributed to Holders of Claims in Class 4 and Class 5 in connection with the solicitation of votes to accept or reject the Plan. This Disclosure Statement is accompanied by the Ballots to be used for voting on the Plan.

### A.   Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all Holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in **Article III.D** of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 4 and Class 5 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, if the Plan is Confirmed and Consummated, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes on the Plan from Holders of Claims or Interests in Classes 1, 2, 3, 6, 7, 8, 9, or 10 (the "Non-Voting Classes").

### B. Voting Record Date.

Subject to Bankruptcy Court approval, the Voting Record Date is **January 16, 2026** (the "Voting Record Date"). The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.   Voting on the Plan.

Subject to Bankruptcy Court approval, the Voting Deadline is **March 2, 2026 at 5:00 p.m. (prevailing Eastern Time)**. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline. Ballots and consent forms may be delivered to the Solicitation Agent by **one** of the following methods:

**By Regular Mail, Overnight Mail, or Hand Delivery to:**

    Pretium Packaging, L.L.C. Ballot Processing Center
    c/o Stretto
    410 Exchange, Suite 100
    Irvine, CA 92602

**By Electronic, Online Submission via Stretto's Online Portal:**

    By visiting https://forms.stretto.com/. If you choose to submit your Ballot via Stretto's E-Ballot System, you should <u>not</u> also return a hard copy of your Ballot.

---

**If you have any questions about the voting process, please contact the Solicitation Agent at (855) 570-4247 (toll free) or +1 (949) 208-7723 (international) or via electronic mail to TeamPretium@stretto.com.**

---

    **D.    Ballots Not Counted.**

    <u>**No ballot will be counted toward Confirmation of the Plan if, among other things**</u>:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the Ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to any person or entity other than the Solicitation Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to your Ballot for additional requirements with respect to voting to accept or reject the Plan.**

    **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE THAT IS OTHERWISE IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN <u>ARTICLE IX</u> OF THIS DISCLOSURE STATEMENT OR THE DIRECTIONS AND REQUIREMENTS SET FORTH IN YOUR BALLOT WILL <u>NOT</u> BE COUNTED WITH RESPECT TO VOTING ON THE PLAN WITHOUT THE CONSENT OF THE COMPANY.**

**X.    CONFIRMATION OF THE PLAN.**

    **A.    Requirements for Confirmation of the Plan.**

    Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1)  the Plan is in the "best interests" of Holders of Claims or Interests; (2) the Plan is feasible; and (3) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class.

    At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for Confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for Confirmation; and (3) the Plan has been proposed in good faith.

**B.** **Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors and reliance upon the valuation methodologies utilized by the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their business, which is reflected in the New Equity to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**C.** **Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or further reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as **Exhibit D** and incorporated herein by reference. Creditors and other interested parties should review **Article VIII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[16]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that actually vote on the Plan cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that actually vote on the Plan cast their Ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests that are eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

---

[16]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### 1.     No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.     Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to a dissenting class, the test sets different standards depending upon the type of claims or interests in the class.  The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

#### a.   Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

#### b.   Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receive or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled, (B) any fixed redemption price to which such holder is entitled, or (C) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

### F.     Valuation of the Reorganized Debtors.

The Plan provides for the distribution of the New Equity to certain Holders of Claims upon Consummation of the Restructuring Transactions contemplated by the Plan.  Accordingly, Evercore Inc. ("<u>Evercore</u>"), the Company's investment banker, performed an analysis of the estimated implied equity value of the Debtors as of an assumed Effective Date (the "<u>Valuation Analysis</u>") at the Debtors' request. Based on the Valuation Analysis, which is attached hereto as **<u>Exhibit E</u>**, the total enterprise value of the Reorganized Debtors is estimated to be between approximately $1,041 million and $1,430 million.

The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken, should be read in conjunction with **<u>Article VIII</u>** of this Disclosure

Statement entitled "Risk Factors" and the Financial Projections attached hereto as **Exhibit D**.  Evercore makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

## XI.      CERTAIN SECURITIES LAW MATTERS.

### A.      New Equity.

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of New Equity to certain Holders of Claims against the Debtors.  The Debtors believe that the class of New Equity will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable Blue-Sky Law.  Any New Equity issued under the Plan will be issued (i) to the fullest extent permitted and applicable, without registration under the Securities Act or similar federal, state, or local laws in reliance on the exemption set forth in section 1145 of the Bankruptcy Code or (ii) to the extent section 1145 of the Bankruptcy Code is not permitted or applicable, pursuant to other exemptions under the Securities Act.

The following discussion of the issuance and transferability of the New Equity relates solely to matters arising under U.S. federal and state securities laws.  The rights of holders of New Equity, including the right to transfer New Equity, will also be subject to any restrictions in the New Organizational Documents to the extent applicable.  Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws.

### B.      Exemption from Registration Requirements; Issuance of New Equity Under the Plan.

The Debtors believe that the issuance of the New Equity (other than the New Equity issued under the Management Incentive Plan) will be exempt from federal registration requirements under section 1145 of the Bankruptcy Code, except in certain limited circumstances as explained in more detail in this Disclosure Statement and/or the Plan.  For the avoidance of doubt, any securities that may not be issued to persons pursuant to section 1145 of the Bankruptcy Code are expected to be issued in reliance upon the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

Section 1145 of the Bankruptcy Code provides, among other things, that Section 5 of the Securities Act and any other applicable U.S. state or local law requirements for the registration of issuance of a security do not apply to the offering, issuance, distribution, or sale of stock, options, warrants or other securities by a debtor if (1) the offer or sale occurs under a plan of reorganization of the debtor, (2) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor or an affiliate thereof participating in the plan of reorganization, and (3) the securities are (i) issued in exchange for a claim against, interest in, or claim for an administrative expense against a debtor or an affiliate thereof participating in the plan of reorganization, or (ii) issued principally in such exchange and partly for cash or property.  The Debtors believe that all shares of New Equity (other than the New Equity issued under the Management Incentive Plan) issued after the Petition Date in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

The New Equity offered prior to the Petition Date and the New Equity issued under the Management Incentive Plan will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not

be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial offer, issuance, and distribution of any New Equity. Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws. As discussed below, the exemptions provided for in section 1145(a) of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

### C.    Resales of New Equity; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.

#### 1.    Resales of New Equity Issued Pursuant to Section 1145 of the Bankruptcy Code.

The New Equity (other than the New Equity offered prior to the Petition Date or issued under the Management Incentive Plan) to the extent offered, issued, and distributed pursuant to section 1145 of the Bankruptcy Code, (i) will not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (ii) will be transferable without registration under the Securities Act in the United States by the recipients thereof that are not, and have not been within ninety (90) days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the SEC or state or local securities laws, if any, applicable at the time of any future transfer of such securities or instruments.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (2) offers to sell securities offered or sold under a plan for the holders of such securities; (3) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (4) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In

addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10 percent or more of a class of voting securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Equity pursuant to the Plan by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of such New Equity who are deemed to be "underwriters" may be entitled to resell their New Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of "control" securities received by such Person if the requirements for sales of such control securities under Rule 144 have been met, including that current information regarding the issuer is publicly available and volume limitations, manner of sale requirements, and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Equity would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such New Equity and, in turn, whether any Person may freely trade such New Equity under the federal securities laws. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, Rule 144 will not be available for resales of such New Equity by Persons deemed to be underwriters or otherwise.

**IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS AND THE HIGHLY FACT SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATIONS CONCERNING THE ABILITY OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, POTENTIAL RECIPIENTS OF NEW EQUITY ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

**2.      Resales of New Equity Issued Pursuant to Section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, and/or Regulation S under the Securities Act.**

To the extent the exemption set forth in section 1145(a) of the Bankruptcy Code is unavailable (including with respect to New Equity offered prior to the Petition Date or issued under the Management Incentive Plan), New Equity will be offered, issued, and distributed in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will be considered "restricted securities," and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and pursuant to applicable state securities laws.

Generally, Rule 144 of the Securities Act provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the issuer is a reporting issuer and whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities of an issuer

that does not file reports with the SEC pursuant to Rule 144 after a one-year holding period. An affiliate may resell restricted securities of an issuer that does not file reports with the SEC under Rule 144 after such holding period, as well as other securities without a holding period, but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144. The Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, even after the holding period, Rule 144 may not be available for resales of such New Equity by affiliates of the Debtors. Restricted securities (as well as other securities held by affiliates) may be resold without holding periods under other exemptions from registration, including Rule 144A under the Securities Act and Regulation S under the Securities Act, but only in compliance with the conditions of such exemptions from registration.

In addition, in connection with resales of any New Equity offered, issued and distributed pursuant to Regulation S under the Securities Act: (i) the offer or sale, if made prior to the expiration of the one-year distribution compliance period (six months for a reporting issuer), may not be made to a U.S. person or for the account or benefit of a U.S. person (other than a distributor); and (ii) the offer or sale, if made prior to the expiration of the applicable one-year or six-month distribution compliance period, is made pursuant to the following conditions: (A) the purchaser (other than a distributor) certifies that it is not a U.S. person and is not acquiring the securities for the account or benefit of any U.S. person or is a U.S. person who purchased securities in a transaction that did not require registration under the Securities Act; and (B) the purchaser agrees to resell such securities only in accordance with the provisions of Regulation S, pursuant to registration under the Securities Act, or pursuant to an available exemption from registration; and agrees not to engage in hedging transactions with regard to such securities unless in compliance with the Securities Act.

All New Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, will bear a restrictive legend. Each certificate or book-entry interest representing, or issued in exchange for or upon the transfer, sale or assignment of, any New Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration, shall be stamped or otherwise imprinted with a legend in substantially the following form:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION."**

The Reorganized Debtors will reserve the right to require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the New Equity issued in reliance upon section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration. The Reorganized Debtors will also reserve the right to stop the transfer of any such New Equity if such transfer (x) is not effected in compliance with Rule 144 or in compliance with another applicable exemption from registration (including section 1145 of the Bankruptcy Code) or (y) would otherwise make the Debtors subject to the periodic reporting requirements under the Exchange Act.

Notwithstanding anything to the contrary in this Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan or this

Disclosure Statement, including, for the avoidance of doubt, whether the New Equity is exempt from the registration requirements of section 5 of the Securities Act.

In addition to the foregoing restrictions, the New Equity will also be subject to any applicable transfer restrictions contained in the New Organizational Documents.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF NEW EQUITY MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.**

**XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.**

**A.   Introduction.**

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors, the Reorganized Debtors, and to certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of Claims in the Voting Classes. This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and authorities, published administrative rules, positions and pronouncements of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling or determination from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors, the Reorganized Debtors, or certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, brokers, mutual funds, governmental authorities or agencies, pass-through entities (including subchapter S corporations),

beneficial owners of pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. Holders who prepare "applicable financial statements" (as defined in section 451 of the IRC), Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies, and those holding, or who will hold, any property described herein as part of a hedge, straddle, conversion, or other integrated transaction). This summary does not address any aspect of state, local, estate, gift, or non-U.S. taxation or U.S. federal non-income tax considerations (including estate or gift tax or the Medicare tax imposed on certain net investment income). This summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such Claims as "capital assets" within the meaning of section 1221 of the IRC (generally, property held for investment). This summary also assumes that the various debt and other arrangements to which the Debtors and the Reorganized Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, that none of the Allowed Claims is treated as a "short-term" debt instrument or a "contingent payment debt instrument" for U.S. federal income tax purposes, that the Claims constitute Interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC, and that the New Equity will be treated as stock of a corporation for U.S. federal income tax purposes. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from those described below. This summary does not address the U.S. federal income tax consequences to Holders of Allowed Claims (i) that hold 10 percent or more of the equity of the Debtors or that will hold 10 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Plan or (ii) (A) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, (B) that are deemed to reject the Plan, or (C) that are otherwise not entitled to vote to accept or reject the Plan. This summary also does not address the U.S. federal income tax consequences to Holders that are not Holders of Class 4 or Class 5 Claims.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim in the Voting Classes that for U.S. federal income tax purposes is: (i) an individual who is a citizen or resident of the United States; (ii) a corporation created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or such beneficial owner) and the activities of the partner (or such beneficial owner) and the partnership (or other pass-through entity). Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL**

**CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

> **B.** **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Reorganized Debtors.**

> **1.** **Characterization of the Restructuring Transactions.**

The transactions undertaken pursuant to the Plan are expected to be treated as a recapitalization of the existing Debtors (the "Recapitalization Transaction").  As a result, it is not expected that the Debtors will currently recognize gain or loss as a result of the Restructuring Transactions other than as a result of cancellation of indebtedness income ("COD Income").  The Debtors will be subject to the rules discussed below with respect to COD Income and the limitations on net operating losses ("NOLs"), deferred deductions under section 163(j) of the IRC ("163(j) Deductions"), and other tax attributes.

> **2.** **Cancellation of Debt and Reduction of Tax Attributes.**

As a result of the Restructuring Transactions, the Debtors are expected to recognize COD Income. In such case, the U.S. tax attributes of the Debtors may, depending on certain factors, be reduced by the amount of such COD Income excluded from U.S. federal taxable income under section 108 of the IRC.

In general, absent an exception, a taxpayer will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (A) the amount of any Cash, (B) the issue price of any new indebtedness issued by the debtor, and (C) the fair market value of the New Equity and any other consideration, in each case, given in satisfaction of such indebtedness at the time of the exchange.  Unless an exception or exclusion applies, COD Income constitutes U.S. federal taxable income like any other item of taxable income.

Under section 108 of the IRC, however, a taxpayer will not be required to include any amount of COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the taxable income (or loss) for the year in which the debt exchange occurs has been determined.  In general, tax attributes will be reduced in the following order:  (i) NOLs and NOL carryforwards; (ii) general business credit carryovers; (iii) minimum tax credit carryovers; (iv) capital loss carryovers; (v) tax basis in assets (but not below Asset Tax Basis Floor (as defined below)); (vi) passive activity loss and credit carryovers; and (vii) foreign tax credits carryovers.  163(j) Deductions are not subject to reduction under these rules.  Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where a taxpayer-debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

The aggregate tax basis of the Debtors in their assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that the relevant entity will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of any COD Income (if any) that will be realized by the Debtors will not be determinable until the Consummation of the Plan because the amount of COD Income will depend, in part, on the fair market value of the New Equity, the issue price of the Exit Second-Out Term Loans and any other consideration given in satisfaction of any Allowed Claims, none of which can be determined until after the Consummation of the Plan. Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income exclusion rules will have on the Debtors and their U.S. federal income tax attributes.

### 3.   Limitation on 163(j) Deductions and Other Tax Attributes.

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### a.   General Section 382 and 383 Annual Limitation.

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, net unrealized built-in losses ("NUBILs"), 163(j) Deductions, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change and cost recovery deductions) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a NUBIL at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original NUBIL) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000 or (ii) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Equity pursuant to a Restructuring Transaction will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the IRC (described below) applies.

### b.   General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change

occurs, currently 3.51 percent for changes that occur in January 2026). The 382 Limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (the "Recognition Period") or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. If a loss corporation has a NUBIL immediately prior to the ownership change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus may reduce the amount of post-change losses and deductions that could be used by the loss corporation during the Recognition Period. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

Notwithstanding the rules described above, unless the special 382(l)(5) Exception (described below) applies, if the corporation or consolidated group does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (other than any increases due to recognized built-in gains). As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### c. Special Bankruptcy Exceptions.

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, Pre-Change Losses would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety. If the Reorganized Debtors were to undergo another "ownership change" after the expiration of this two-year period, the resulting 382 Limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or (ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its Pre-Change Losses by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. Rather, the resulting limitation would be determined under the regular rules for ownership changes under sections 382 and 383 of the IRC.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application so that the 382(l)(6) Exception applies.  Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if a subsequent "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

## C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote.

The U.S. federal income tax consequences to U.S. Holders of Claims will depend, in part, on whether, for U.S. federal income tax purposes, (a) the Claim surrendered constitutes a "security" of a Debtor, and (b) the consideration received constitutes stock or a "security" of the same entity against which the Claim is asserted (or, an entity that is a "party to a reorganization" with such entity).

Neither the IRC nor the Treasury Regulations define the term "security."  Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

**DUE TO THE INHERENTLY FACTUAL NATURE OF THE DETERMINATION, IF RELEVANT BASED ON THE FORM OF THE RESTRUCTURING TRANSACTIONS, U.S. HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE STATUS OF THEIR CLAIMS OR THE CONSIDERATION RECEIVED UNDER THE PLAN AS "SECURITIES" FOR U.S. FEDERAL INCOME TAX PURPOSES.**

### 1.    Consequences to U.S. Holders of Class 4 Claims of the Restructuring Transactions.

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a Class 4 Claim will receive its Pro Rata share of (i) the Exit Second-Out Term Loans and (ii)(A) the First Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment is available, (B) the First Lien Cash Out Option.

The entity issuing the Exit Second-Out Term Loans under the Plan is the same entity as the Debtor against which the Class 4 Claims are asserted, but the entity issuing the New Equity under the Plan is not the same entity as the Debtor against which the Class 4 Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor). Accordingly, if both the First Lien Tranche A-1 Claims and the Exit Second-Out Term Loans constitute "securities," then a U.S. Holder of such a Claim is expected to be treated as receiving its distribution under the Plan in a transaction treated as a "recapitalization" for U.S. federal income tax purposes, with the receipt of the New Equity and Cash (if any) treated as "boot" in such recapitalization.  A U.S. Holder of such Claim should not recognize loss, but should recognize gain to the extent of the lesser of (a) the sum of the fair market value of the New Equity received and the amount of Cash received (if any), and (b) (i) the sum of (1) the fair market value of the New Equity received, (2) the

amount of Cash received (if any), and (3) the issue price of the Exit Second-Out Term Loans received (determined as discussed below under "—*U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Exit Second-Out Term Loans —Original Issue Discount*"), minus (ii) the U.S. Holder's adjusted tax basis in its First Lien Tranche A-1 Claim.  In general, a U.S. Holder would obtain an initial tax basis in its share of the Exit Second-Out Term Loans received in the exchange equal to its adjusted tax basis in its existing Claim surrendered (excluding any amounts attributable to accrued but untaxed interest on the applicable existing Claim), increased by the amount of any gain recognized pursuant to such exchange and decreased by the fair market value of the New Equity received and the amount of Cash received (if any).  A U.S. Holder's holding period for its interest in the Exit Second-Out Term Loans received should include the holding period for the Claim exchanged therefor.  A U.S. Holder's initial basis in the New Equity would equal its fair market value, and such U.S. Holder's holding period with respect to the New Equity would begin the day after the Effective Date.

If either the First Lien Tranche A-1 Claims or the Exit Second-Out Term Loans do not constitute "securities," then, other than with respect to any amounts received that are attributable to accrued but unpaid interest, each U.S. Holder of a First Lien Tranche A-1 Claim will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC.  Other than with respect to any amounts received that are attributable to accrued but unpaid interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of (i) the issue price of the Exit Second-Out Term Loan received, (ii) the fair market value of the New Equity received, and (iii) the amount of Cash received (if any), and (b) the U.S. Holder's adjusted tax basis in its Claim.  The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below.  If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The holding period for the New Equity received in the exchange should begin on the day following the date the U.S. Holder receives such New Equity.  A U.S. Holder should obtain a tax basis in the Exit Second-Out Term Loan equal to its issue price and in the New Equity equal to the fair market value of such property.

U.S. Holders should consult their own tax advisers regarding the treatment of the Restructuring Transactions for U.S. federal income tax purposes.

**2.      Consequences to U.S. Holders of Class 5 Claims of the Restructuring Transactions.**

Pursuant to the Plan and as described above, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a Class 5 Claim will receive (i) its Pro Rata share of the Second Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment Cap is available, the Second Lien Cash Out Option; and (ii) its Pro Rata share of the Second Lien Cash Recovery.

The entity issuing the New Equity under the Plan is not the same entity as the Debtor against which the Class 5 Claims are asserted (or an entity that is a "party to a reorganization" with such Debtor). Accordingly, the exchange of any Class 5 Claims by a U.S. Holder is expected to be treated as a taxable exchange pursuant to section 1001 of the IRC.  In that case, a U.S. Holder of a Class 5 Claim is expected to recognize gain or loss equal to (i) the sum of (A) the fair market value of the New Equity received, (B) the amount of any Cash received with respect to the Second Lien Cash Out Option, and (C) the amount of its share of the Second Lien Cash Recovery less (ii) the U.S. Holder's adjusted tax basis in its Claim.  The adjusted tax basis of a U.S. Holder's Claims generally will equal such U.S. Holder's actual or deemed

purchase price for such Claims, reduced in the event that such U.S. Holder claimed a bad debt deduction with respect to such Claims, increased by any original issue discount previously accrued and any market discount previously included in income, and reduced by any amortizable bond premium previously amortized and any payments previously received that do not constitute "qualified stated interest." Any gain or loss recognized by a U.S. Holder from the exchange will generally be capital gain or loss, except to the extent described below under "Accrued Interest" and "Market Discount." If recognized gain or loss is capital gain or loss, it would generally constitute long-term capital gain or loss if the U.S. Holder has held such Claim for longer than one year. Non-corporate taxpayers are generally subject to a reduced U.S. federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations. A U.S. Holder should obtain a tax basis in any New Equity received equal to the fair market value of the New Equity as of the date such New Equity is distributed to such U.S. Holder. The holding period for any such New Equity should begin on the day following the receipt of such New Equity.

The treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest or market discount, which differs from the treatment described above, is discussed below.

### 3.    Accrued Interest.

To the extent that the fair market value of the New Equity and the amount of cash received by a U.S. Holder on an exchange of its Allowed Claim under the Plan are attributable to accrued but unpaid interest on such Allowed Claim, the receipt of such amount generally should be taxable to the U.S. Holder as ordinary income (to the extent such amount was not previously included in the gross income of such U.S. Holder), and such amount will be excluded from the U.S. Holder's calculation of gain or loss on such exchange. Conversely, a U.S. Holder of an Allowed Claim may be able to deduct a loss to the extent that any accrued interest on such debt instruments constituting such Allowed Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder of an Allowed Claim under the Plan is not sufficient to fully satisfy all principal and interest on its Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration distributed to U.S. Holders will be allocated first to the principal amount of the Allowed Claim, with any excess allocated to accrued but unpaid interest, if any, on such U.S. Holder's Allowed Claims. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated first to principal, rather than interest. Certain Treasury Regulations, however, allocate payments first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. *U.S. Holders of Allowed Claims are urged to consult their own tax advisors regarding the proper allocation of the consideration received under the Plan*.

### 4.    Market Discount.

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of an Allowed Claim, who exchanges such Allowed Claim under the Plan may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such exchanged Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified

stated interest" or (ii) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a *de minimis* amount (equal 1/4 of 1 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the remaining number of complete years to maturity).

Any gain allocated to a U.S. Holder in connection the taxable disposition of an Allowed Claim (determined as described above) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that a U.S. Holder exchanges any Allowed Claim that was acquired with market discount in a tax-deferred transaction for other property, any market discount that accrued on such Allowed Claim (*i.e.*, up to the time of the exchange), but was not recognized by such U.S. Holder, is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property will be treated as ordinary income to the extent of such accrued, but not recognized, market discount. ***U.S. Holders should consult their own tax advisors concerning the application of the market discount rules to their Allowed Claim***.

### 5. Limitations on Capital Losses.

A U.S. Holder who recognizes capital losses as a result of the exchanges under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (i) $3,000 annually ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 6. U.S. Federal Income Tax Consequences to U.S Holders of Owning and Disposing of the Exit Second-Out Term Loans.

The following discussion assumes that the "contingent payment debt instrument" ("CPDI") rules do not apply to the Exit Second-Out Term Loans. The U.S. Holders should consult their own tax advisors regarding the application of these rules.

### a. Payments of Interest (including OID).

Stated interest paid to a U.S. Holder will be includible in the U.S. Holder's gross income as ordinary interest income at the time interest is received or accrued in accordance with the U.S. Holder's regular method of tax accounting for U.S. federal income tax purposes. If the "stated redemption price at maturity" of the Exit Second-Out Term Loans exceeds the "issue price" of such Loans by an amount equal to or greater than a statutorily defined de minimis amount, then such Loans will be considered to be issued with OID for U.S. federal income tax purposes. The stated redemption price at maturity of the Exit Second-Out Term Loans is the total of all payments due on such Loans other than payments of "qualified stated interest." In general, qualified stated interest is stated interest that is payable unconditionally in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate (or at certain qualifying floating rates).

Because interest on the Exit Second-Out Term Loans is not unconditionally payable in cash at least annually, the Exit Second-Out Term Loans will be treated as issued with OID. As a result, a U.S. Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the Exit Second-Out Term Loans in advance of the receipt of the cash attributable to such OID and regardless of the holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the Exit Second-Out Term Loans that is attributable to previously accrued OID that has been included in its income.

### b.   Issue Price.

As a general matter, and subject to the "investment unit" rules discussed below, in determining the "issue price" of the Exit Second-Out Term Loans, (a) if the Exit Second-Out Term Loans are "publicly traded," then the trading value of the Exit Second-Out Term Loans determines its issue price; (b) if the Exit Second-Out Term Loans are not "publicly traded," but the First Lien Tranche A-1 Claim exchanged therefore is "publicly traded," the trading value of the First Lien Tranche A-1 Claim exchanged therefore determines its issue price (unless such trading values represent mere indicative quotes and a position is established that demonstrates that such indicative quote materially misrepresented the fair market value of such property); and (c) if neither the Exit Second-Out Term Loans nor the First Lien Tranche A-1 Claims exchanged therefor are "publicly traded," the issue price of the Exit Second-Out Term Loan would be its stated redemption price at maturity.

Where, as here, U.S. Holders that receive debt instruments also receive other property (*e.g.*, New Equity) in exchange for their Claims, the "investment unit" rules may apply to the determination of the "issue price" for any such debt instrument received in exchange for their Claims. In general, if all of the components (other than cash) of the "investment unit" are publicly traded, then the issue price of the investment unit, as a whole, is determined as the aggregate of the fair market value of each of the components of the investment unit; the issue price of the investment unit is then allocated to each of the investment unit's components on the basis of each component's fair market value; and that allocation determines the issue price of the debt components of the investment unit.

In the event that none of the components of the investment unit are publicly traded, but the Claim being exchanged is publicly traded, then the trading price of the Claim being exchanged will determine the issue price of the investment unit, with the same allocation process described above ultimately determining the issue price of any debt component of the investment unit.

In the event that some, but not all, of the property composing the investment unit is publicly traded, then the application of the investment unit rules is unclear.  If the Claims being exchanged for the investment unit are publicly traded prior to the exchange, the trading value of such Claims may set the issue price for the investment unit, consistent with the rules described above. Alternatively, if the new debt instrument is publicly traded, the trading price of the new debt instrument may control the issue price of the new debt instrument, without regard to the potential application of the investment unit rules.

The Debtors have not yet determined how they will apply the investment unit rules to the circumstances presented here.  An issuer's allocation of the issue price of an investment unit generally is binding on all U.S. Holders of the investment unit unless a U.S. Holder explicitly discloses a different allocation on a timely filed income tax return for the taxable year that includes the acquisition date of the investment unit.

### c. Acquisition Premium or Amortizable Bond Premium on Exit Second-Out Term Loans

If a U.S. Holder's initial tax basis in the Exit Second-Out Term Loans is greater than the issue price of such debt but less than the stated principal amount of such debt, such Exit Second-Out Term Loans will have an "acquisition premium." Under the acquisition premium rules, the amount of OID that must be included in gross income with respect to the applicable Exit Second-Out Term Loans for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year. Alternatively, if a U.S. Holder's initial tax basis in the Exit Second-Out Term Loan exceeds its stated principal amount, the U.S. Holder will be considered to have acquired the Exit Second-Out Term Loan with "amortizable bond premium" and will not be required to include any OID in income. A U.S. Holder may generally elect to amortize the bond premium over the remaining term of the Exit Second-Out Term Loan on a constant yield method as an offset to stated interest when includible in income under such Holder's regular accounting method. If a U.S. Holder elects to amortize bond premium, such Holder must reduce its tax basis in the Exit Second-Out Term Loan by the amount of the premium used to offset stated interest. If a U.S. Holder does not elect to amortize the bond premium, that premium will decrease the gain or increase the loss otherwise recognized on disposition of the Exit Second-Out Term Loan. If a U.S. Holder's initial tax basis in the Exit Second-Out Term Loan is less than the issue price of such debt, see the "market discount" discussion above.

### d. Sale, Taxable Exchange or other Taxable Disposition.

Upon the disposition of the Exit Second-Out Term Loans by sale, exchange, retirement, redemption or other taxable disposition, a U.S. Holder will generally recognize gain or loss equal to the difference, if any, between (a) the amount realized on the disposition (other than amounts attributable to accrued but untaxed interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (b) the U.S. Holder's adjusted tax basis in the Exit Second-Out Term Loans. The calculation of a U.S. Holder's adjusted tax basis in the Exit Second-Out Term Loans is discussed above. A U.S. Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such U.S. Holder's gross income and decreased by any payments on the Exit Second-Out Term Loans other than qualified stated interest. A U.S. Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the Exit Second-Out Term Loans for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### 7. U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of New Equity.

### a. Dividends on New Equity.

Any distributions made on account of the New Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Equity. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient

earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

### b.  Sale, Redemption, or Repurchase of New Equity.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Equity.  Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has a holding period in the New Equity of more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Equity as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claims or recognized an ordinary loss on the exchange of its Claims for New Equity.

### D.  Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions as contemplated by the Plan and as described above, and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Claims in the Voting Classes. The following discussion also assumes that the "contingent payment debt instrument" rules do not apply to the Exit Second-Out Term Loans.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Equity.

### 1.  U.S. Federal Income Tax Consequences to Non-U.S. Holders of the Restructuring Transactions.

Whether a Non-U.S. Holder realizes gain or loss on the exchange of any Allowed Claims and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders holding the same class of Claims.  Any gain realized by a Non-U.S. Holder of an Allowed Claim on the exchange of its Allowed Claims (other than any gain attributable to accrued but unpaid interest (or original issue discount, if any), which will be taxable in the same manner as described below in "Accrued Interest") generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized

on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In addition, if such a Non -U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.      Accrued Interest.

Subject to the discussion of backup withholding and FATCA below, interest paid by the Debtors (which, for purposes of this discussion of Non-U.S. Holders, includes OID, if any, and accrued but unpaid interest, including in each case any such amounts received by a Non-U.S. Holder under the Plan in respect thereof) that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder will generally qualify for the so-called "portfolio interest exemption" and, therefore, will not be subject to U.S. federal income tax or withholding, *provided* that:

- the Non-U.S. Holder does not own, actually or constructively, a 10 percent or greater interest in the Debtors within the meaning of section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Debtors, actually or constructively through the ownership rules under section 864(d)(4) of the IRC;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives the Debtors an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, the Non-U.S. Holder will generally be subject to U.S. federal income tax and withholding at a 30 percent rate on such payments, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "*Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders—Accrued Interest*," under the Plan, the aggregate consideration to be distributed in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest on such Allowed Claims, if any. The IRS could take the position that the consideration received by a Non-U.S. Holder should be allocated in some way other than as provided in the Plan. Non-U.S. Holders of Allowed Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

If interest income allocable to a Non-U.S. Holder is effectively connected with a trade or business in the United States ("ECI") carried on by the Non-U.S. Holder, the Non-U.S. Holder will be required to pay U.S. federal income tax on that interest on a net income basis generally in the same manner as a U.S. Holder (and the 30 percent withholding tax described above will not apply, *provided* the appropriate statement is provided to Debtors) unless an applicable income tax treaty provides otherwise.  To claim an exemption from withholding, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI

(or suitable substitute or successor form or such other form as the IRS may prescribe).  If a Non-U.S. Holder is eligible for the benefits of any applicable income tax treaty between the United States and its country of residence, any interest income that is ECI will be subject to U.S. federal income tax in the manner specified by the applicable income tax treaty if the Non-U.S. Holder claims the benefit of the applicable income tax treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.  In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional branch profits tax at a 30 percent rate, or, if applicable, a lower applicable income tax treaty rate, on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically.   Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.  Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

**3.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Disposing of Exit Second-Out Term Loans.**

A Non-U.S. Holder will generally not be subject to U.S. federal income tax on any gain realized on a sale, exchange, retirement, redemption or other taxable disposition of the portion of the Exit Second-Out Term Loans (other than any amount representing accrued but unpaid interest on the loan) unless

- the gain is ECI (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment that such Non-U.S. Holder maintains in the United States); or

- in the case of a Non-U.S. Holder who is a nonresident alien individual, such Non-U.S. Holder is present in the United States for 183 or more days in the taxable year of disposition and certain other requirements are met.

If a Non-U.S. Holder falls under the first of these exceptions, unless an applicable income tax treaty provides otherwise, the Non-U.S. Holder will generally be taxed on the net gain derived from the disposition of such portion of the Exit Second-Out Term Loans under the graduated U.S. federal income tax rates that are applicable to U.S. Holders and, if the Non-U.S. Holder is a foreign corporation, it may also be subject to the branch profits tax described above. If an individual Non-U.S. Holder falls under the second of these exceptions, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (unless a lower treaty rate applies) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceeds such Non-U.S. Holder's capital losses allocable to sources within the United States for the taxable year of the disposition.

**4.    U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Equity.**

**a.    Dividends on New Equity.**

Any distributions made with respect to New Equity (other than certain distributions of stock of the Reorganized Debtors) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces such Non- U.S. Holder's basis in such New Equity and then, generally, capital gain).  Except as described below, dividends paid

with respect to New Equity that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an applicable income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under an applicable income tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or suitable substitute or successor form or such other form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower applicable income tax treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Equity that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If New Pretium is considered a "U.S. real property holding corporation" ("USRPHC"), distributions to a Non-U.S. Holder will generally be subject to withholding by New Pretium at a rate of 15 percent to the extent they are not treated as dividends for U.S. federal income tax purposes. In the event the New Equity is regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes New Equity during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations. Although the Debtors have not conducted a formal analysis, the Debtors currently consider it unlikely, based on the Debtors' current business plans and operations, that Poseidon Investment Intermediate, Inc. is, or that New Pretium will become in the future, a "USRPHC".

### b.    Sale, Redemption, or Repurchase of New Equity.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Equity unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition;

- such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an applicable income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

- the issuer of such New Equity is or has been during a specified testing period a USRPHC.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of the New Equity. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits

effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

If the third exception applies, a Non-U.S. Holder of New Equity generally will be subject to U.S. federal income tax on any gain recognized on the disposition of all or a portion of the New Equity under the Foreign Investment in Real Property Tax Act and the Treasury Regulations thereunder. Taxable gain from a disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and the Non-U.S. Holder's adjusted tax basis in such interest) would be treated as effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business. A Non-U.S. Holder would also be subject to withholding tax equal to 15 percent of the amount realized on the disposition and generally required to file a U.S. federal income tax return. The amount of any such withholding may be allowed as a credit against the Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund if the Non-U.S. Holder properly and timely files a tax return with the IRS. In the event the New Equity is regularly traded on an established securities market, withholding would not be required if the Non-U.S. Holder does not directly or indirectly own (and has not directly or indirectly owned) more than 5 percent of the aggregate fair market value of the class of interests that includes New Equity during a specified testing period. Exceptions to such withholding may also be available to the extent a Non-U.S. Holder furnishes a certificate qualifying such Non-U.S. Holder for a reduction or exemption of withholding pursuant to applicable Treasury Regulations.

## 5.      FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that would have applied to payments of gross proceeds from the sale or other disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest have been effectively suspended under proposed Treasury Regulations, which can be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW EQUITY.**

### E.      Information Reporting and Back-Up Withholding.

The Debtors, the Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments to Holders of Claims, whether in connection with distributions under the Plan or in connection with payments made on account of consideration received pursuant to the Plan, and will comply with all applicable information reporting requirements. The IRS may

make the information returns reporting payments and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to payments made pursuant to the Plan unless such Holder: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (ii) timely provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that such number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non- U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

> **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.    RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

[*Remainder of page intentionally left blank*]

Dated:  January 25, 2026

Pretium Packaging, L.L.C.
on behalf of itself and all other Debtors

/s/ J. Federico Barreto

Name:  J. Federico Barreto
Title:    Chief Financial Officer

## Exhibit A

**Plan**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PRETIUM PACKAGING, L.L.C., *et al.*,[1] | ) | Case No. 26-[●] (●) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## JOINT PREPACKAGED CHAPTER 11 PLAN
## OF REORGANIZATION OF PRETIUM PACKAGING, L.L.C. AND ITS DEBTOR AFFILIATES

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE COMMENCEMENT OF THE CHAPTER 11 CASES.**

---

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Jordan E. Elkin (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
steven.serajeddini@kirkland.com
jordan.elkin@kirkland.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
Yusuf Salloum (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com
yusuf.salloum@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

---

[1] The last four digits of Debtor Pretium Packaging, L.L.C.'s tax identification number are 7802. A complete list of each of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Pretium following the commencement of the Chapter 11 Cases. The location of the Debtors' service address in the Chapter 11 Cases is: 2560 White Oak Circle, Suite 120, Aurora, IL 60502.

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ..........................................................................................................1
    A.    Defined Terms. ..............................................................................................................1
    B.    Rules of Interpretation. ...............................................................................................16
    C.    Computation of Time. ..................................................................................................17
    D.    Governing Law. ...........................................................................................................17
    E.    Reference to Monetary Figures. ..................................................................................17
    F.    Reference to the Debtors or the Reorganized Debtors. ...............................................17
    G.    Controlling Document. ................................................................................................17
    H.    Consultation, Information, Notice, and Consent Rights. .............................................17

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ..........................................18
    A.    Administrative Claims. ................................................................................................18
    B.    DIP Claims. .................................................................................................................18
    C.    Priority Tax Claims. ....................................................................................................19
    D.    Professional Fee Claims. .............................................................................................19
    E.    Payment of Statutory Fees. ..........................................................................................20
    F.    Transaction Expenses. .................................................................................................20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................21
    A.    Classification of Claims and Interests. ........................................................................21
    B.    Treatment of Claims and Interests. .............................................................................21
    C.    Special Provision Governing Unimpaired Claims. ......................................................25
    D.    Elimination of Vacant Classes. ....................................................................................25
    E.    Deemed Acceptance If No Votes Cast. ........................................................................25
    F.    Intercompany Interests. ...............................................................................................25
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ..........25
    H.    Controversy Concerning Impairment. ..........................................................................26
    I.    Subordinated Claims and Interests. .............................................................................26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ................................................26
    A.    General Settlement of Claims and Interests. ...............................................................26
    B.    Restructuring Transactions. .........................................................................................26
    C.    Reorganized Debtors. ..................................................................................................27
    D.    Sources of Consideration for Plan Distributions. ........................................................27
    E.    Corporate Existence. ...................................................................................................31
    F.    Vesting of Assets in the Reorganized Debtors. ............................................................31
    G.    Cancelation of Existing Securities and Agreements. ...................................................31
    H.    Corporate Action. ........................................................................................................32
    I.    New Organizational Documents. .................................................................................32
    J.    Indemnification Obligations. .......................................................................................33
    K.    Directors and Officers of the Reorganized Debtors. ...................................................33
    L.    Effectuating Documents; Further Transactions. ..........................................................33
    M.    Certain Securities Law Matters. ..................................................................................33
    N.    Section 1146 Exemption. .............................................................................................34
    O.    Director and Officer Liability Insurance. .....................................................................34
    P.    Management Incentive Plan. ........................................................................................35
    Q.    Preservation of Causes of Action. ...............................................................................35

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............36
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...............36
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. .................37
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .............37
    D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. ..........38

ii

E.    Insurance Policies. ............................................................................................38
F.    Reservation of Rights. .......................................................................................38
G.    Nonoccurrence of Effective Date. ....................................................................38
H.    Employee Compensation and Benefits. ............................................................38
I.    Contracts and Leases Entered Into After the Petition Date. .............................39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................39
A.    Distributions on Account of Claims Allowed as of the Effective Date............39
B.    Disbursing Agent. .............................................................................................40
C.    Rights and Powers of Disbursing Agent. ..........................................................40
D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. ......40
E.    Manner of Payment............................................................................................42
F.    Indefeasible Distributions. ................................................................................42
G.    Compliance with Tax Requirements. ................................................................42
H.    Allocations. .......................................................................................................43
I.    No Postpetition Interest on Claims....................................................................43
J.    Foreign Currency Exchange Rate. ....................................................................43
K.    Setoffs and Recoupment. ..................................................................................43
L.    Claims Paid or Payable by Third Parties...........................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
         DISPUTED CLAIMS .....................................................................................44
A.    Disputed Claims Process....................................................................................44
B.    Allowance of Claims..........................................................................................44
C.    Claims Administration Responsibilities.............................................................45
D.    Estimation of Claims and Interests ....................................................................45
E.    Adjustment to Claims or Interests without Objection. ......................................45
F.    Disallowance of Claims or Interests...................................................................45
G.    No Distributions Pending Allowance.................................................................46
H.    Distributions After Allowance. ..........................................................................46
I.    Single Satisfaction of Claims. ...........................................................................46

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............46
A.    Discharge of Claims and Termination of Interests.............................................46
B.    **Release of Liens.** .............................................................................................46
C.    **Releases by the Debtors.** ...............................................................................47
D.    **Releases by the Releasing Parties.** ...............................................................48
E.    **Exculpation.**...................................................................................................49
F.    **Injunction.**......................................................................................................50
G.    Protections Against Discriminatory Treatment. ................................................51
H.    Document Retention. .........................................................................................51
I.    Reimbursement or Contribution.........................................................................51

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN ...................51
A.    Conditions Precedent to the Effective Date. .....................................................51
B.    Waiver of Conditions.........................................................................................52
C.    Effect of Failure of Conditions. ........................................................................53
D.    Substantial Consummation ................................................................................53

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ...................53
A.    Modification and Amendments...........................................................................53
B.    Effect of Confirmation on Modifications...........................................................53
C.    Revocation or Withdrawal of Plan. ...................................................................53

ARTICLE XI. RETENTION OF JURISDICTION..................................................................54

ARTICLE XII. MISCELLANEOUS PROVISIONS ..................................................................................55
    A.      Immediate Binding Effect..............................................................................................55
    B.      Additional Documents. ..................................................................................................56
    C.      Statutory Committee and Cessation of Fee and Expense Payment ...............................56
    D.      Reservation of Rights.....................................................................................................56
    E.      Successors and Assigns...................................................................................................56
    F.      Notices. ...........................................................................................................................56
    G.      Enforcement of Confirmation Order. ............................................................................58
    H.      Term of Injunctions or Stays..........................................................................................58
    I.      Entire Agreement............................................................................................................58
    J.      Plan Supplement. ............................................................................................................58
    K.      Nonseverability of Plan Provisions. ..............................................................................58
    L.      Votes Solicited in Good Faith. .......................................................................................59
    M.      Closing of Chapter 11 Cases. .........................................................................................59
    N.      Waiver or Estoppel.........................................................................................................59
    O.      Creditor Default. ............................................................................................................59

## INTRODUCTION

Pretium Packaging, L.L.C. and the above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, this "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors.  Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates*.  Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of this Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*ABL Agent*" means Wells Fargo Bank, National Association, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

2.      "*ABL Claims*" means any Claims arising under, derived from, based on, or related to the ABL Facility, including all ABL Loans and ABL Obligations.

3.      "*ABL Credit Agreement*" means that certain Amended and Restated ABL Credit and Guarantee Agreement, dated as October 1, 2021, by and among Poseidon Investment Intermediate, Inc. as holdings, Pretium PKG Holdings, Inc. as the parent borrower, the several borrowers party thereto, the other guarantors party thereto, the ABL Lenders, and the ABL Agent, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

4.      "*ABL Documents*" means, collectively, the ABL Credit Agreement and any other documents governing the ABL Facility, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

5.      "*ABL Facility*" means the secured asset-based revolving loan facility arising under the ABL Documents.

6.      "*ABL Lenders*" means the lenders party to the ABL Credit Agreement from time to time.

7.      "*ABL Loans*" means the "Revolving Loans" as defined in the ABL Credit Agreement.

8.      "*ABL Obligations*," means the "Obligations" as defined in the ABL Credit Agreement and any outstanding adequate protection payments for Prepetition ABL Obligations (as such term is defined in the DIP Orders).

1

9.        "*ABL/Term Loan Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of October 1, 2021, by and among the ABL Agent, the First Lien Agent, the Second Lien Agent, each in its capacity as such, and other persons from time to time party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

10.        "*Ad Hoc Group*" means that certain ad hoc group of Holders of First Lien Term Loans and Second Lien Term Loans represented by the Ad Hoc Group Advisors.

11.        "*Ad Hoc Group Advisors*" means, collectively, Milbank LLP, Moelis & Company LLC, SAI Derecho & Economía, S.C., Gowling WLG, and one other local counsel, and, with the prior consent of the Debtors (such consent not to be unreasonably withheld, conditioned, or delayed), any other professionals and/or consultants for the Ad Hoc Group, if any.

12.        "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) the Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; and (d) the Transaction Expenses.

13.        "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

14.        "*Agents*" means, collectively, the ABL Agent, the First Lien Agent, the Second Lien Agent, the DIP Agents, the Exit Facility Agents, and any other administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Documents, and the Exit Facility Documents, including any successors thereto.

15.        "*Allowed*" means, with respect to a Claim or Interest, any Claim or Interest (or portion thereof) against any Debtor that:  (a) is deemed allowed under the Bankruptcy Code; (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of this Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (c) has been allowed by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, any Claim or Interest (or portion thereof), that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim.  Except as otherwise specified in this Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.

16.        "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties-in-interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer Law and other Law.

17.        "*Backstop Commitment Letter*" means that certain Backstop Commitment Letter between the Debtors and the Backstop Parties, as may be amended, modified, or supplemented from time to time, pursuant to which the Backstop Parties shall have agreed to provide the Backstop Commitments in exchange for receiving the Backstop Premium.

18.        "*Backstop Commitments*" means the commitments to backstop 100 percent of the DIP Term Loans, including the Liquidity Shortfall Funding Amount, up to the Liquidity Shortfall Funding Cap.

19.        "*Backstop Parties*" means the DIP Term Loan Lenders party to the Backstop Commitment Letter.

20.        "*Backstop Premium*" means the New Equity, subject to dilution by the MIP Equity, to be issued to the Backstop Parties in accordance with, or as otherwise payable as set forth in, the Backstop Commitment Letter.

21.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

22.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey.

23.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

24.      "*Blue-Sky Laws*" means any local or state securities law of any securities regulatory authority of any locality or any state.

25.      "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or in fact are closed in, the State of New York.

26.      "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

27.      "*Cash Out Option Investors*" means the New Money Investor and the Lender Cash Out Investors, each in its capacity as an investor with respect to the Cash Out Option Investment.

28.      "*Cash Out Option Equity*" means, collectively, the First Lien New Equity and Second Lien New Equity acquired by the Cash Out Option Investors on account of the Cash Out Option Investment, which shall be distributed to each Cash Out Option Investor proportional to the share of the Cash Out Option Investment it funds.

29.      "*Cash Out Option Investment*" means that certain new money investment, if any, funded by the Cash Out Option Investors in an aggregate amount necessary for the Debtors to fund the First Lien Cash Out Option and the Second Lien Cash Out Option, up to the Cash Out Option Investment Cap, and which shall be allocated to the New Money Investor, on the one hand, and the Lender Cash Out Investors, on the other hand, on a ratable basis based upon their respective *pro forma* holdings of New Equity as of December 30, 2025, which allocation to any Cash Out Option Investor may be increased or decreased by up to five percentage points based upon their respective pro forma holdings of New Equity as of the Cash Out Option Offer Date.

30.      "*Cash Out Option Investment Cap*" means the amount of the Cash Out Option Investment equal to the lower of (a) the Cash Out Option Investment made available by the Cash Out Option Investors and (b) the aggregate Cash Out Option Investment such that the Cash Out Option Investors, after funding their respective shares of such amount, will acquire Cash Out Option Equity in an amount that, following dilution by the Participation Premium and Backstop Premium, but subject to dilution from the MIP Equity, equals no greater than 10.6 percent of New Equity.

31.      "*Cash Out Option Offer Date*" means the date that is 21 days prior to the anticipated Effective Date.

32.      "*Cash Out Value*" means a value to be determined by the Required Consenting Stakeholders prior to the Cash Out Option Offer Date.

33.      "*Causes of Action*" means any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, Liens, guarantees, franchises, Avoidance Actions, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise pursuant to any theory of law.  Causes of Action also include:  (a) all rights of setoff,

counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

34.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

35.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code.

36.    "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

37.    "*Class*" means a class of Claims or Interests as set forth in <u>Article III</u> of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

38.    "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

39.    "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

40.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

41.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

42.    "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and approval of the Disclosure Statement and Solicitation Materials, as such hearing(s) may be adjourned or continued from time to time.

43.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and, if applicable, approving the Disclosure Statement and the Solicitation Materials.

44.    "*Consenting Equity Holders*" means, collectively, the Holders of Existing Interests party to the Restructuring Support Agreement.

45.    "*Consenting Lenders*" means, the "Consenting Creditors," as defined in the Restructuring Support Agreement.

46.    "*Consenting Stakeholders*" means, collectively, the Consenting Lenders, the Consenting Equity Holders, the New Money Investor, and the Backstop Parties.

47.    "*Consummation*" means the occurrence of the Effective Date.

48.    "*Cure*" means all amounts, including an amount of $0, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an

Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

49.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

50.     "*Debtor Release*" means the releases given on behalf of the Debtors and their Estates as set forth in Article VIII.C of this Plan.

51.     "*Debtors*" has the meaning set forth in the preamble.

52.     "*Definitive Documents*" means, collectively and as applicable, all agreements, instruments, pleadings, orders, forms, and other documents (including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto) governing the Restructuring Transactions, including the following:  (a) this Plan; (b) the Disclosure Statement; (c) the Solicitation Materials; (d) the Plan Supplement; (e) the DIP Documents; (f) the Confirmation Order; (g) the Disclosure Statement Order and the motion seeking approval thereof; (h) all material pleadings Filed by the Debtors in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto, except the pleadings (including retention applications and fee applications) related to the retention and compensation of Professionals; (i) the New Equity Documents; (j) the Exit Facility Documents; and (k) with respect to each of the foregoing clauses (a) through (j), subject to the consent, approval, and consultation rights set forth therein and in the Restructuring Support Agreement.

53.     "*DIP ABL Agent*" means Wells Fargo Bank, National Association, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the DIP ABL Credit Agreement, if any.

54.     "*DIP ABL Claims*" means any Claims arising under, derived from, based on, or related to the DIP ABL Facility or the DIP ABL Obligations (as defined in the DIP Orders).

55.     "*DIP ABL Credit Agreement*" means the debtor-in-possession financing credit agreement by and among certain of the Debtors, the DIP ABL Agent, and the DIP ABL Lenders setting forth the terms and conditions of the DIP ABL Facility, as may be amended, supplemented, or otherwise modified from time to time.

56.     "*DIP ABL Documents*" means, collectively, the DIP ABL Credit Agreement, the DIP Orders, and any other documents governing the DIP ABL Facility, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

57.     "*DIP ABL Facility*" means the debtor-in-possession asset-based revolving loan facility, if any, incurred in accordance with the DIP ABL Documents.

58.     "*DIP ABL Lenders*" means the lenders party to the DIP ABL Credit Agreement from time to time.

59.     "*DIP Agents*" means, collectively, the DIP ABL Agent and the DIP Term Loan Agent.

60.     "*DIP Claims*" means, collectively, the DIP ABL Claims and DIP Term Loan Claims.

61.     "*DIP Documents*" means, collectively, the DIP ABL Documents and the DIP Term Loan Documents.

62.     "*DIP Lenders*" means, collectively, the DIP ABL Lenders and the DIP Term Loan Lenders.

63.     "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

64.     "*DIP Term Loan Agent*" means Wilmington Savings Fund Society, FSB, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

65.     "*DIP Term Loan Amount*" means $451,000,000.00 *plus* any Liquidity Shortfall Funding Amount.

66.     "*DIP Term Loan Claims*" means any Claims arising under, derived from, based on, or related to the DIP Term Loan Facility or the DIP Term Loan Obligations (as defined in the DIP Orders).

67.     "*DIP Term Loan Credit Agreement*" means that certain senior secured superpriority debtor-in-possession term loan credit agreement by and among the Debtors, the DIP Term Loan Agent, and the DIP Term Loan Lenders setting forth the terms and conditions of the DIP Term Loan Facility.

68.     "*DIP Term Loan Documents*" means, collectively, the DIP Term Loan Credit Agreement, the DIP Orders, the Backstop Commitment Letter, and any other documents governing the DIP Term Loan Facility, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

69.     "*DIP Term Loan Facility*" means the superpriority senior secured multi-draw debtor-in-possession term loan credit facility incurred in accordance with the DIP Term Loan Documents.

70.     "*DIP Term Loan Lenders*" means the lenders party to the DIP Term Loan Credit Agreement from time to time.

71.     "*DIP Term Loans*" means the term loans in an aggregate principal amount equal to the DIP Term Loan Amount issued under the DIP Term Loan Facility.

72.     "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions pursuant to this Plan.

73.     "*Disclosure Statement*" means the disclosure statement for this Plan, including all exhibits and schedules thereto, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, rule 3018 of the Bankruptcy Rules, and any other applicable Law, as may be amended, supplemented, or otherwise modified from time to time, to be approved by the Disclosure Statement Order.

74.     "*Disclosure Statement Order*" means the order of the Bankruptcy Court (which may be the Confirmation Order) approving the Disclosure Statement and the other Solicitation Materials.

75.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest (or portion thereof):  (a) that is not Allowed; (b) that is not disallowed by this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party-in-interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

76.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Disbursing Agent shall make distributions to Entities entitled to receive distributions under this Plan.

77.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under this Plan, which date shall be the first day of the Confirmation Hearing, or such other date to be determined by the Debtors.

78.     "*DTC*" means the Depository Trust Company.

79.    "*Effective Date*" means the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan and (b) this Plan is declared effective by the Debtors.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

80.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

81.    "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

82.    "*Exculpated Parties*" means, collectively and in each case in its capacity as such, (a) the Debtors; (b) the Reorganized Debtors; and (c) each Related Party of the Debtors and the Reorganized Debtors.

83.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

84.    "*Existing Interests*" means any Interest in Pretium Parent existing immediately prior to the occurrence of the Effective Date.

85.    "*Exit ABL Agent*" means, if any, the administrative agent and collateral agent under the Exit ABL Documents or any assign or successor thereto.

86.    "*Exit ABL Credit Agreement*" means the asset-backed revolving loan credit agreement, to be dated on or about the Effective Date, by and among certain of the Reorganized Debtors, the Exit ABL Agent, and the Exit ABL Lenders setting forth the terms and conditions of the Exit ABL Facility (which may, at the election of the Debtors or the Reorganized Debtors, as applicable, and with the reasonable consent of the DIP ABL Agent and/or the ABL Agent, take the form of an amendment or amendment & restatement to the ABL Credit Agreement so long as such amendment or amendment & restatement is in accordance with the Exit ABL Commitment Letter).

87.    "*Exit ABL Commitment Letter*" means that certain Exit ABL Commitment Letter, dated January 25, 2026, by and between Wells Fargo Bank, National Association and the Debtors.

88.    "*Exit ABL Documents*" means, collectively, the documents governing the Exit ABL Facility, including the Exit ABL Credit Agreement and any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

89.    "*Exit ABL Facility*" means the asset-backed revolving facility, if any, entered into by the Reorganized Debtors on the Effective Date in accordance with the Exit ABL Documents.

90.    "*Exit ABL Lenders*" means, the lenders party to the Exit ABL Credit Agreement from time to time.

91.    "*Exit ABL/Term Loan Intercreditor Agreement*" means an intercreditor agreement, to be dated on or about the Effective Date, by and among the applicable Debtors or Reorganized Debtors, the Exit ABL Agent, and the Exit Term Loan Agent.

92.    "*Exit Facilities*" means, collectively, the Exit ABL Facility, and the Exit Term Loan Facility.

93.    "*Exit Facility Agents*" means, collectively, the Exit ABL Agent, and the Exit Term Loan Agent.

94.    "*Exit Facility Documents*" means, collectively, the Exit ABL Documents the Exit Term Loan Documents, and the Exit ABL/Term Loan Intercreditor Agreement.

95.    "*Exit Facility Lenders*" means, collectively, the Exit ABL Lenders and the Exit Term Loan Lenders.

96.     "*Exit First-Out Term Loans*" means the senior secured first-lien first-out term loans in an aggregate principal amount equal to the DIP Term Loan Amount incurred by the Reorganized Debtors under the Exit Term Loan Facility.

97.     "*Exit Second-Out Adjustment*" means the lesser of (i) $26,757,642.30, and (ii) the amount necessary such that the Reorganized Debtors' pro forma net debt immediately following the Effective Date is $870,000,000.00.

98.     "*Exit Second-Out Term Loans*" means the senior secured first-lien second-out term loans in an aggregate principal amount equal to $526,000,000.00 *less* the Exit Second-Out Adjustment, if any, incurred by the Reorganized Debtors under the Exit Term Loan Facility.

99.     "*Exit Term Loan Agent*" means the administrative agent and collateral agent under the Exit Term Loan Documents.

100.    "*Exit Term Loan Credit Agreement*" means the term loan credit agreement, to be dated on or about the Effective Date, by and among certain of the Debtors or Reorganized Debtors, the Exit Term Loan Agent, and the Exit Term Loan Lenders setting forth the terms and conditions of the Exit Term Loan Facility.

101.    "*Exit Term Loan Documents*" means the documents governing the Exit Term Loan Facility, including the Exit Term Sheet, the Exit Term Loan Credit Agreement, the Backstop Commitment Letter, and any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, which shall be consistent with the Restructuring Support Agreement.

102.    "*Exit Term Loan Facility*" means the senior secured first-lien term loan facility incurred by the Reorganized Debtors in accordance with the Exit Term Loan Documents.

103.    "*Exit Term Loan Lenders*" means the lenders party to the Exit Term Loan Credit Agreement from time to time.

104.    "*Exit Term Sheet*" means that certain Exit Term Loan Facility Term Sheet attached as <u>Exhibit C</u> to the Restructuring Support Agreement.

105.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

106.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

107.    "*Final DIP Order*" means the order of the Bankruptcy Court approving the DIP Documents, the DIP ABL Facility, and the DIP Term Loan Facility, and authorizing the use of cash collateral on a final basis.

108.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, vacated, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken; or as to which, any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought, or the new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

109.     "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

110.     "*First Lien Agent*" means UBS AG, Stamford Branch, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement.

111.     "*First Lien Cash Out Option*" means the potential right of each Holder of an Allowed First Lien Tranche A-1 Claim to receive, subject to the Cash Out Option Investment Cap, Cash in an amount equal to the Cash value of its Pro Rata share of First Lien New Equity based on the Cash Out Value, in lieu of its Pro Rata share of First Lien New Equity.

112.     "*First Lien Credit Agreement*" means that certain First Lien Term Loan Credit Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as the borrower, Poseidon Investment Intermediate, Inc., as holdings, the First Lien Agent, the subsidiary guarantors, and the First Lien Lenders, as may be amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

113.     "*First Lien Documents*" means, collectively, the First Lien Credit Agreement and any other documents governing the First Lien Term Loans, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

114.     "*First Lien Lenders*" means the lenders party to the First Lien Credit Agreement from time to time.

115.     "*First Lien New Equity*" means 72.5 percent of the New Equity, subject to dilution by the Participation Premium, the Backstop Premium, and the MIP Equity, to be provided to Holders of First Lien Tranche A-1 Claims as set forth in Article III.B hereof.

116.     "*First Lien Term Loans*" means, collectively, the First Lien Tranche A Term Loans and the First Lien Tranche A-1 Term Loans.

117.     "*First Lien Tranche A Claims*" means any Claims against the Debtors arising under, derived from, based on, or related to the First Lien Tranche A Term Loans.

118.     "*First Lien Tranche A Term Loans*" means the senior secured first-lien first-out term loans defined as the "Third Amendment Tranche A Term Loans" in the First Lien Documents.

119.     "*First Lien Tranche A-1 Claims*" means any Claims against the Debtors arising under, derived from, based on, or related to the First Lien Tranche A-1 Term Loans.

120.     "*First Lien Tranche A-1 Term Loans*" means the senior secured first-lien second-out term loans defined as the "Third Amendment Tranche A-1 Term Loans" in the First Lien Documents.

121.     "*First Lien/Second Lien Intercreditor Agreement*" means that certain First Lien/Second Lien Intercreditor Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as borrower, Poseidon Investment Intermediate, Inc., as holdings, the other grantors from time to time party thereto, the First Lien Agent, as senior priority representative for the First Lien Credit Agreement secured parties, the Second Lien Agent, as senior priority representative for the initial second priority debt secured parties, and each additional representative from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

122.     "*First Out/Second Out Intercreditor Agreement*" means that certain Agreement Among Lenders, attached as Annex A to the First Lien Credit Agreement, governing the rights, relationship, and relative payment priorities between the holders of First Lien Tranche A Term Loans and the holders of First Lien Tranche A-1 Term Loans.

123.    "*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors, other than: (a) an Administrative Claim; (b) a First Lien Tranche A-1 Claim; (c) a Second Lien Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; or (f) an Intercompany Claim.

124.    "*Glenn Agre Group*" means that certain ad hoc group of Holders of First Lien Term Loans and Second Lien Term Loans represented by Glenn Agre.

125.    "*Glenn Agre*" means Glenn Agre Bergman & Fuentes LLP, in its capacity as counsel to the Glenn Agre Group.

126.    "*Governance Term Sheet*" means that certain Governance Term Sheet attached as <u>Exhibit D</u> the Restructuring Support Agreement.

127.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

128.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

129.    "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

130.    "*Intercompany Claim*" means any Claim against any Debtor held by a Debtor or an Affiliate of a Debtor.

131.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

132.    "*Intercreditor Agreements*" means, collectively, the ABL/Term Loan Intercreditor Agreement, the First Lien/Second Lien Intercreditor Agreement, and the First Out/Second Out Intercreditor Agreement.

133.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit or share in any Debtor and any other rights, options, warrants, rights, restricted stock awards, performance share awards, performance share units, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, stock-settled restricted stock units, cash-settled restricted stock units, other securities, agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor or any other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of a Debtor as of the Petition Date and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security).

134.    "*Interim DIP Order*" means the order of the Bankruptcy Court approving the DIP Documents, the DIP ABL Facility, and the DIP Term Loan Facility, and authorizing the Debtors' use of cash collateral on an interim basis.

135.    "*IRC*" means the Internal Revenue Code of 1986, as amended.

136.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

137.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

138.    "*Lender Cash Out Investors*" means the members of the Ad Hoc Group providing the Cash Out Option Investment.

139.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

140.    "*Liquidity Shortfall Funding Amount*" means the aggregate principal amount of DIP Term Loans funded by the DIP Term Loan Lenders and the Backstop Parties, as applicable, immediately before the occurrence of the Effective Date in accordance with the DIP Term Loan Documents, up to the Liquidity Shortfall Funding Cap, and solely to the extent necessary to satisfy the Minimum Liquidity Condition.

141.    "*Liquidity Shortfall Funding Cap*" means $82,500,000.00, which shall be the maximum Liquidity Shortfall Funding Amount.

142.    "*Management Incentive Plan*" means a post-Effective Date incentive plan of the Reorganized Debtors to be established and implemented in accordance with Article IV.P of this Plan.

143.    "*Minimum Liquidity Condition*" means the Reorganized Debtors having no less than $100,000,000.00 of Cash on their consolidated balance sheet after giving effect to the Restructuring Transactions contemplated on the Effective Date, without giving effect to any availability under the Exit ABL Facility, if any, which shall be a condition to the occurrence of the Effective Date, as set forth in Article IX.A.1 herein and subject to the modifications set forth herein.

144.    "*MIP Equity*" means up to 8 percent of the fully-diluted New Equity reserved for issuance pursuant to the Management Incentive Plan.

145.    "*New Board*" means the board of directors or the board of managers, as applicable, of New Pretium.

146.    "*New Equity*" means the common equity interests of New Pretium, issued in accordance with this Plan and the New Equity Documents.

147.    "*New Equity Documents*" means, collectively, the New Organizational Documents and the New Equity Subscription Agreement, which shall be consistent with the Restructuring Support Agreement.

148.    "*New Equity Subscription Agreement*" means that certain subscription agreement by and between New Pretium and the New Money Investor, pursuant to which the New Money Investor will subscribe for the New Money Equity in connection with the New Money Investment.

149.    "*New Investor Agreement*" means the definitive shareholders agreement, limited liability company agreement, or other applicable agreement (including all annexes, exhibits, and schedules thereto) governing the New Equity and associated governance rights.

150.    "*New Money Equity*" means 21.9 percent of the New Equity, subject to dilution by the MIP Equity.

151.    "*New Money Investment*" means that certain new money investment in the amount of $50,000,000.00 in New Pretium to be made by the New Money Investor on the Effective Date in exchange for the New Money Equity, on the terms set forth in the Restructuring Support Agreement, New Equity Subscription Agreement, and subject to the execution and delivery of the New Equity Documents.

152.    "*New Money Investor*" means the party providing the New Money Investment pursuant to the New Equity Subscription Agreement.

153.    "*New Money Investor Wind-Down Investment*" has the meaning set forth in Article IV.D.3 herein.

154.    "*New Money Investor Advisors*" means (i) one lead counsel and one additional local counsel employed by the New Money Investor in connection with the Restructuring Transactions, and (ii) with the prior consent of the Required Consenting First Lien Tranche A-1 Lenders (as defined in the Restructuring Support Agreement), such consent not to be unreasonably withheld, conditioned, or delayed, any other legal counsel employed by the New Money Investor in connection with the Restructuring Transactions.

155.    "*New Organizational Documents*" means, collectively, and as applicable, the documents providing for the formation, organization, and corporate governance of each of the Reorganized Debtors, including, without limitation, any charters, bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, the New Investor Agreement, or other organizational documents or shareholders' agreements, which shall be consistent with the Restructuring Support Agreement.

156.    "*New Pretium*" means either (i) Poseidon Investment Intermediate, Inc., as reorganized pursuant to this Plan, or any successor or assign thereto, by merger, consolidation, or otherwise after the Effective Date, or (ii) a new Entity, which in either case shall be the ultimate parent of the other Reorganized Debtors (other than Pretium Parent) on and after the Effective Date.

157.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

158.    "*Other Secured Claim*" means any Secured Claim other than (a) a First Lien Tranche A-1 Claim that is a Secured Claim, (b) a Second Lien Claim that is a Secured Claim, (c) a DIP Claim, or (d) an ABL Claim.

159.    "*Participation Premium*" means 23.4 percent of New Equity, subject to dilution by the MIP Equity, which shall be issued to the DIP Lenders in accordance with the DIP Term Loan Documents.

160.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

161.    "*Petition Date*" means the first date on which any of the Debtors commence a Chapter 11 Case.

162.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims or other eligible Entities in accordance with this Plan.

163.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and subject to (i) the reasonable consent of the Exit ABL Agent, DIP ABL Agent or ABL Agent, as applicable: (x) to the extent any is a party to any Plan Supplement document, or (y) solely with respect to any Plan Supplement document (or portion thereof) that materially affects the rights, remedies, or obligations of such party, and (ii) the Bankruptcy Code and Bankruptcy Rules), and any additional documents Filed as amendments to the Plan Supplement, to be Filed by the Debtors prior to the Confirmation Hearing to the extent reasonably practicable, including the following, as applicable: (a) the New Equity Documents; (b) the Exit Facility Documents; (c) to the extent known, the identities of the members of the New Board; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Proposed Cure Amounts; (f) the Schedule of Retained Causes of Action; and (g) the Restructuring Steps Memorandum.  To the extent any document to be set forth in the Plan Supplement is an exhibit to the Disclosure Statement, the Plan Supplement may cross-refer to such exhibit.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement in accordance with this Plan, the Restructuring Support Agreement, or such documents included therein on or before the Effective Date.  The Plan Supplement shall be deemed incorporated into and part of this Plan as if set forth herein in full; *provided* that in the event of a conflict between this Plan and the Plan Supplement, the Plan Supplement shall control in accordance with Article I.G.

164.    "Pretium Parent Wind-Down Costs and Distributions" has the meaning set forth in Article IV.D.3 herein.

165.    "*Pretium Parent*" means Poseidon Parent, L.P.

166.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

167.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

168.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

169.    "*Professional Escrow Account*" means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

170.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

171.    "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.  For the avoidance of doubt, the Transaction Expenses shall not be considered Professional Fee Claims, and any such amounts shall be paid in accordance with the Restructuring Support Agreement, the DIP Orders, and this Plan, as applicable.

172.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

173.    "*Quarterly Fees*" means fees payable pursuant to section 1930(a) of the Judicial Code, including fees payable to the U.S. Trustee and any interest thereon pursuant to 31 U.S.C. § 3717.

174.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

175.    "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan, if any, which schedule shall be included in the Plan Supplement.

176.    "*Related Parties*" means, with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

177.    "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Agents; (e) the ABL Lenders and each Holder of an ABL Claim; (f) the DIP Lenders and each Holder of a DIP Claim; (g) the New Money Investor; (h) the Backstop Parties; (i) the Exit Facility Lenders; (j) all Releasing Parties; and (k) each Related Party of each Entity in clause (a) through (i); *provided* that any Holder of a Claim or Interest that opts out of the releases contained in this Plan shall not be a "Released Party."

178.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Agents; (e) the ABL Lenders and each Holder of an ABL Claim; (f) the DIP Lenders and each Holder of a DIP Claim; (g) the New Money Investor; (h) the Backstop Parties; (i) the Exit Facility Lenders; (j) all Holders of Claims that vote to accept this Plan; (k) all Holders of Claims or Interests that are deemed to accept this Plan and who do not affirmatively opt out of the releases provided by this Plan; (*l*) all Holders of Claims or Interests that are deemed to reject this Plan and who do not affirmatively opt out of the releases provided by this Plan; (m) all Holders of Claims who abstain from voting on this Plan and who do not affirmatively opt out of the releases provided by this Plan; (n) all Holders of Claims who vote to reject this Plan and who do not affirmatively opt out of the releases provided by this Plan; and (o) each Related Party of each Entity in clause (a) through (n); *provided* that, for the avoidance of doubt, each Holder of Claims and/or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the releases; *provided*, *further*, that notwithstanding anything contrary herein, with respect to funds and accounts managed by HPS Investment Partners, LLC or its Affiliates that are Consenting Lenders (the "HPS Consenting Creditors"), the defined terms "Releasing Parties" shall be limited to (i) the HPS Consenting Creditors, (ii) any trading desk(s), fund(s), account, branch, unit, and/or business group(s) of the HPS Consenting Creditors that have a beneficial interest in the Claims held by HPS Consenting Creditors, or are otherwise acting for the benefit of or at the direction of the HPS Consenting Creditors, against the Debtors, and (iii) any Affiliates and Related Parties of HPS Consenting Creditors for which the HPS Consenting Creditors are legally entitled to bind under applicable law.

179.    "*Reorganized Debtors*" means, collectively, the Debtors, as reorganized pursuant to and under this Plan, on and after the Effective Date, or any successor or assign thereto, by merger, consolidation, or otherwise, including any new Entity established in connection with the implementation of the Restructuring Transactions.

180.    "*Required Consenting Stakeholders*" means the "Required Consenting Stakeholders," as such term is defined in the Restructuring Support Agreement.

181.    "*Restructuring Steps Memorandum*" means the summary of transaction steps to consummate the Restructuring Transactions, which shall be included in the Plan Supplement, and which shall be acceptable to the Required Consenting Stakeholders.  The Restructuring Transactions Memorandum shall, among other things, designate New Pretium and the borrower of the Exit Facilities.

182.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, entered into and dated as of December 30, 2025, by and among the Debtors and the Consenting Stakeholders, including all exhibits, schedules, and other attachments thereto, as such agreement may be further amended, modified, or supplemented from time to time, solely in accordance with its terms, which is attached as Exhibit B to the Disclosure Statement.

183.    "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in this Plan and the Restructuring Support Agreement, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to this Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of this Plan and consistent with the Restructuring Steps Memorandum.

184.    "*Schedule of Proposed Cure Amounts*" means any schedule (including any amendments, supplements, or modifications thereto) of the Debtors' proposed Cure amounts (if any) with respect to each of the Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan.

185.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

186.    "*Second Lien Agent*" means UBS AG, Stamford Branch, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement.

187.    "*Second Lien Cash Out Option*" means the potential right of each Holder of an Allowed Second Lien Claim to receive, subject to the Cash Out Option Investment Cap, Cash in an amount equal to the Cash value of its Pro Rata share of Second Lien New Equity based on the Cash Out Value, in lieu of its Pro Rata share of Second Lien New Equity.

188.    "*Second Lien Cash Recovery*" means $5,784,220.72, to be distributed Pro Rata to Holders of Allowed Second Lien Claims as set forth in Article III.B hereof.

189.    "*Second Lien Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Second Lien Term Loans and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Second Lien Documents.

190.    "*Second Lien Credit Agreement*" means that certain Second Lien Term Loan Credit Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as borrower, Poseidon Investment Intermediate, Inc., as borrower, the Second Lien Agent, the guarantors party thereto, and the Second Lien Lenders, as may be amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

191.    "*Second Lien Documents*" means, collectively, the Second Lien Credit Agreement and any other documents governing the Second Lien Term Loans, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

192.    "*Second Lien Lenders*" means the lenders party to the Second Lien Credit Agreement from time to time.

193.    "*Second Lien New Equity* " means 5.6 percent of the New Equity, subject to dilution by the MIP Equity, to be provided to Holders of Second Lien Claims as set forth in Article III.B hereof.

194.    "*Second Lien Term Loans*" means those certain senior secured second-lien term loans defined as the "Initial Term Loans" under the Second Lien Credit Agreement.

195.    "*Section 510(b) Claims*" means any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

196.    "*Secured Claim*" means a Claim that is:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

197.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

198.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

199.    "*Solicitation Agent*" means Stretto, Inc., the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

200.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

201.    "*Third-Party Release*" means the releases set forth in Article VIII.D of this Plan.

202.    "*Transaction Expenses*" means, collectively, all prepetition and postpetition reasonable and documented fees, expenses, and disbursements (including success fees, transaction fees, or similar fees) of the advisors to the Ad Hoc Group, the New Money Investor, and the Glenn Agre Group with respect to the efforts to implement the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors or Reorganized Debtors, as applicable, including:  (a) the Ad Hoc Group Advisors, (b) the New Money Investor Advisors, and (c) Glenn Agre in an amount not to exceed $150,000.00 and payable solely to the extent each member of the Glenn Agre Group becomes a Consenting Lender and does not breach the Restructuring Support Agreement, in each case subject to (x) the terms of any applicable engagement letter or reimbursement letter with any of the Debtors and (y) the terms and conditions in the Restructuring Support Agreement.

203.    "*U.S. Trustee*" means the United States Trustee for the District of New Jersey.

204.    "*Unclaimed Distribution*" means any distribution under this Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 180 calendar days of receipt; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution within 180 calendar days of receipt; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

205.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

206.    "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

207.    "*Unsecured Claim*" means any Claim that is not a Secured Claim.

*B.      Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any party's consent rights over any of the Definitive Documents or any amendments thereto as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (7) subject to the provisions of any contract, charter, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) the words "include" and "including," and variations thereof, shall not be deemed to be terms of

limitation, and shall be deemed to be followed by the words "without limitation"; (14) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (16) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of Laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to this Plan, and the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other

modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims.*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such Allowance or as soon as reasonably practicable thereafter, but in any event no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.    *DIP Claims.*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP ABL Facility (including the amount of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP ABL Documents) and the DIP Term Loan Facility, as applicable, on such date, (ii) all interest and other obligations accrued and unpaid thereon to the date of payment (which shall not include any fees, premiums, or original issue discount), (iii) all premiums earned and payable thereon, including the Backstop Premium and the Participation Premium, and (iv) all accrued fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP ABL Claim:  (i)(a) all Holders of Allowed DIP ABL Claims (other than with respect to Letters of Credit and all Bank Product Obligations issued and outstanding under the DIP ABL Documents) shall be paid in full in Cash, (b) the issued and undrawn Letters of Credit and all Bank Product Obligations shall be canceled, replaced, or cash collateralized in accordance with the terms and in the amounts specified under the DIP ABL Documents, and (c) following the occurrence of subsections (a) and (b), all Liens on the collateral that secures the DIP ABL Claims under the DIP ABL Documents shall be released or canceled and no longer in effect, in each case in accordance with the terms and in the amounts specified under the DIP ABL Documents; or, to the extent the Exit ABL Facility is provided by the DIP ABL Agent and the DIP ABL Lenders (or their affiliate(s)) and consistent with the terms set forth in the Exit ABL Commitment Letter and at the election of the Debtors or the Reorganized Debtors, (ii)(a) all Holders

of Allowed DIP ABL Claims shall be refinanced by conversion on a cashless, dollar-for-dollar basis, into Obligations (as defined in the Exit ABL Documents) under the Exit ABL Facility; (b) the Letters of Credit and all Bank Product Obligations issued and outstanding under the DIP ABL Documents shall be converted to Letters of Credit and Bank Product Obligations, as applicable, deemed to be issued and outstanding under the Exit ABL Documents; and (c) all Liens on the collateral that secures the DIP ABL Claims under the DIP ABL Documents shall be reaffirmed, ratified, and shall automatically secure all Obligations (as defined in the Exit ABL Documents) under the Exit ABL Facility, subject to the priorities and extent of Liens set forth in the Exit Facility Documents.

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Term Loan Claim, (i) the principal amount of the DIP Term Loans giving rise to such Claim shall be refinanced by conversion on a cashless, dollar-for-dollar basis into the Exit First-Out Term Loans in accordance with the DIP Term Loan Documents and the Exit Term Loan Documents; (ii) accrued and unpaid interest and other obligations giving rise to such Allowed DIP Term Loan Claim, excluding fees, premiums, and original issue discount, if any, shall be paid in full in Cash; and (iii) the Participation Premium will be distributed on a Pro Rata basis to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents; and (iv) the Backstop Premium will be distributed to the Backstop Parties in accordance with the DIP Term Loan Documents.

Following the satisfaction of the Allowed DIP Claims, the DIP ABL Facility, the DIP Term Loan Facility in accordance with this Article II.B, the DIP Documents, and all related loan documents shall be deemed canceled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP ABL Facility or DIP Term Loan Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agents or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders. The DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

C.       *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.       *Professional Fee Claims.*

1.       Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

2.       Professional Escrow Account.

No later than the Effective Date, the Debtors shall establish and fund the Professional Escrow Account with Cash equal to the Professional Fee Amount. The Professional Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable

after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Escrow Account, and to the extent that funds held in the Professional Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with <u>Article II.A</u> of this Plan. When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

       3.   <u>Professional Fee Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than one (1) day before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

       4.   <u>Post-Confirmation Date Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Payment of Statutory Fees.*

All Quarterly Fees, to the extent applicable, due prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, all Quarterly Fees shall be paid to the U.S. Trustee when due and payable, until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first. Nothing in this Plan shall discharge or release any Quarterly Fees. The U.S. Trustee shall not be required to file a Proof of Claim or request for payment for Quarterly Fees. The Reorganized Debtors shall timely file all required monthly operating reports and post-confirmation quarterly reports in a form prescribed by the U.S. Trustee until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

F.      *Transaction Expenses.*

To the extent not previously paid prior to or during the course of the Chapter 11 Cases in accordance with, and subject to, the terms of the Restructuring Support Agreement, the DIP Orders, or any other Final Order of the Bankruptcy Court, and subject to the Debtors' receipt of an invoice with reasonable detail from the applicable Entity entitled to such Transaction Expenses in accordance with, if applicable, such Entity's respective engagement letter or fee letter, the Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date without any requirement (1) to file a fee application with the Bankruptcy Court or (2) for review or approval by the Bankruptcy Court or any other party. All Transaction Expenses to be paid on the Effective Date shall be estimated as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses; *provided*, *further*, that any difference in (a) estimated Transaction Expenses on and including the Effective Date as compared to (b) Transaction Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity following the Effective Date. In addition, the Debtors and Reorganized Debtors (as applicable) shall continue to pay, on the day that is the later of (i) ten (10) Business Days after the day such Transaction Expenses are invoiced under the applicable engagement letter or fee letter and (ii) the day such Transaction Expenses are due

under the applicable engagement letter or fee letter, Transaction Expenses related to implementation, Consummation, and defense of this Plan after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and solely upon receipt of an invoice from any Entity requesting such Transaction Expenses with reasonable detail (but without the need for time detail).

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan proposed by each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors (except for Class 10 Existing Interests, which shall only apply to Pretium Parent).  All of the potential Classes for the Debtors are set forth herein.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | First Lien Tranche A-1 Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Stakeholders, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due,

in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1. <u>Class 1 – Other Secured Claims</u>

   (a) *Classification*: Class 1 consists of all Other Secured Claims.

   (b) *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor or Reorganized Debtor, either:

      (i) payment in full in Cash of its Allowed Other Secured Claim;

      (ii) the collateral securing its Allowed Other Secured Claim;

      (iii) Reinstatement of its Allowed Other Secured Claim; or

      (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c) *Voting*: Class 1 is Unimpaired under this Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2. <u>Class 2 – Other Priority Claims</u>

   (a) *Classification*: Class 2 consists of all Other Priority Claims.

   (b) *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, which renders such Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

   (c) *Voting*: Class 2 is Unimpaired under this Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3. <u>Class 3 – ABL Claims</u>

   (a) *Classification*: Class 3 consists of all ABL Claims.

   (b) *Allowed Amount*: As of the Effective Date, the ABL Claims shall be Allowed and deemed to be Allowed Claims in the aggregate principal amount outstanding under the ABL Credit Agreement, *plus* through the Petition Date, accrued and unpaid interest, fees, and costs owed under the ABL Credit Agreement, *less* the amount satisfied in accordance with the DIP Documents.

   (c) *Treatment*: Each Holder of an Allowed ABL Claim (to the extent such Allowed ABL Claim is not a DIP ABL Claim) shall receive, in full and final satisfaction of such Allowed ABL Claim on the Effective Date, (i)(a) payment in full in Cash (other than with respect to Letters of Credit and all Bank Product Obligations issued and outstanding under the ABL Documents) and (b) the cancelation, replacement, or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in

the ABL Documents) in accordance with the terms and in the amounts specified under the ABL Documents; or, to the extent the Exit ABL Facility is provided by the ABL Agent and the ABL Lenders (or their Affiliate(s)) and consistent with the terms set forth in the Exit ABL Commitment Letter and at the election of the Debtors or the Reorganized Debtors, (ii)(a) all Holders of Allowed ABL Claims shall be refinanced by conversion on a cashless, dollar-for-dollar basis, into Obligations (as defined in the Exit ABL Documents) under the Exit ABL Facility; (b) the Letters of Credit and all Bank Product Obligations issued and outstanding under the ABL Documents shall be converted to Letters of Credit and Bank Product Obligations, as applicable, deemed to be issued and outstanding under the Exit ABL Documents.

(d)      *Voting*:  Class 3 is Unimpaired under this Plan.  Holders of Allowed ABL Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

4.   Class 4 – First Lien Tranche A-1 Claims

(a)      *Classification*:  Class 4 consists of all First Lien Tranche A-1 Claims.

(b)      *Allowed Amount*:  As of the Effective Date, the First Lien Tranche A-1 Claims shall be Allowed and deemed to be Allowed Claims in the principal amount of $1,237,395,831.42, *plus*, through the Petition Date, accrued and unpaid interest, fees, and costs owed under the First Lien Credit Agreement in connection with the First Lien Tranche A-1 Term Loans.

(c)      *Treatment*:  Each Holder of an Allowed First Lien Tranche A-1 Claim shall receive, in full and final satisfaction of such Allowed First Lien Tranche A-1 Claim:  (i) its Pro Rata share of the Exit Second-Out Term Loans; and (ii)(A) its Pro Rata Share of the First Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment is available, (B) the First Lien Cash Out Option.

(d)      *Voting*:  Class 4 is Impaired under this Plan.  Holders of Allowed First Lien Tranche A-1 Claims are entitled to vote to accept or reject this Plan.

5.   Class 5 – Second Lien Claims

(a)      *Classification*:  Class 5 consists of all Second Lien Claims.

(b)      *Allowed Amount*:  As of the Effective Date, the Second Lien Claims shall be Allowed and deemed to be Allowed Claims in the principal amount of $201,404,401.13, *plus*, through the Petition Date, accrued and unpaid interest, fees, and costs owed under the Second Lien Credit Agreement in connection with the Second Lien Term Loans.

(c)      *Treatment*:  Each Holder of an Allowed Second Lien Claim shall receive, in full and final satisfaction of such Allowed Second Lien Claim:  (i) its Pro Rata share of the Second Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment is available, the Second Lien Cash Out Option; and (ii) its Pro Rata share of the Second Lien Cash Recovery.

(d)      *Voting:* Class 5 is Impaired under this Plan.  Holders of Allowed Second Lien Claims are entitled to vote to accept or reject this Plan.

6.   Class 6 – General Unsecured Claims

(a)      *Classification*:  Class 6 consists of all General Unsecured Claims.

(b)  *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, at the option of the applicable Debtor or Reorganized Debtor, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code or (ii) payment in full in Cash on the Effective Date.

(c)  *Voting*: Class 6 is Unimpaired under this Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

7.  Class 7 – Intercompany Claims

(a)  *Classification*: Class 7 consists of all Intercompany Claims.

(b)  *Treatment*: Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Reorganized Debtor with the consent of the Required Consenting Stakeholders, either Reinstated, converted to equity, otherwise set off, settled, distributed, contributed, canceled, or released, in each case, in accordance with the Restructuring Steps Memorandum.

(c)  *Voting*: Class 7 is Unimpaired under this Plan if Intercompany Claims are Reinstated or Impaired under this Plan if Intercompany Claims are canceled. Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8.  Class 8 – Intercompany Interests

(a)  *Classification*: Class 8 consists of all Intercompany Interests.

(b)  *Treatment:* On the Effective Date, Intercompany Interests shall be (i) Reinstated, (ii) set off, settled, discharged, contributed, canceled, released, and extinguished, or (c) otherwise addressed, in each case, at the option of the applicable Debtor or Reorganized Debtor with the consent of the Required Consenting Stakeholders.

(c)  *Voting*: Class 8 is Unimpaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

9.  Class 9 – Existing Interests

(a)  *Classification*: Class 9 consists of all Existing Interests.

(b)  *Treatment*: All Existing Interests shall be canceled, released, and extinguished and will be of no further force or effect. Holders of Existing Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Interest shall not receive or retain any distribution, property, or other value on account of such Existing Interest.

     (c)       *Voting*:  Class 9 is Impaired under this Plan.  Holders of Existing Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Interests are not entitled to vote to accept or reject this Plan.

10.    <u>Class 10 – Section 510(b) Claims</u>

     (a)       *Classification*:  Class 10 consists of all Section 510(b) Claims.

     (b)       *Allowed Amount*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

     (c)       *Treatment*:  On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

     (d)       *Voting*:  Class 10 is Impaired under this Plan.  Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders (if any) are not entitled to vote to accept or reject this Plan.

C.     *Special Provision Governing Unimpaired Claims.*

     Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.     *Elimination of Vacant Classes.*

     Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Deemed Acceptance If No Votes Cast.*

     If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

F.     *Intercompany Interests.*

     To the extent Reinstated under this Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, unless otherwise set forth in the Restructuring Steps Memorandum, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

     Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to <u>Article III.B</u> of this Plan.  The Debtors shall

seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests or reclassifying Claims to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.        *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.        *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including the First Lien Credit Agreement and the Intercreditor Agreements. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, with the consent of the Required Consenting Stakeholders, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.        *General Settlement of Claims and Interests.*

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan. To the greatest extent permissible under the Bankruptcy Code, this Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.        *Restructuring Transactions.*

On or before the Effective Date, with the consent of the Required Consenting Stakeholders (to the extent set forth in the Restructuring Support Agreement or the applicable Definitive Documents), the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions, including the actions set forth in the Restructuring Steps Memorandum, as may be necessary or appropriate to effect the Restructuring Transactions, which may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, the Restructuring Support Agreement, and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the Restructuring Support Agreement, and having other terms for which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement,

continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Equity Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation, organizational, governance, or constitutive documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, reservation, or dilution of the New Equity, as applicable and as set forth herein, including pursuant to the New Equity Subscription Agreement; (5) the execution and delivery of the Exit Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (6) the reservation of equity under the Management Incentive Plan to the participants in the Management Incentive Plan; and (7) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with this Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan, including the Restructuring Transactions.

Notwithstanding anything to the contrary set forth herein, the treatment of Claims, distributions, and other transactions contemplated hereby including, without limitation, the funding of the Exit Facilities, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

C.    *Reorganized Debtors.*

On the Effective Date, the New Board shall be established in accordance with the Governance Term Sheet, and the Reorganized Debtors shall adopt their New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan, in each case consistent with the Restructuring Steps Memorandum.  Cash payments to be made pursuant to this Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under this Plan.  Except as set forth herein or the Restructuring Steps Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, including the Exit Facility Documents, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents, as the boards of directors or boards of managers of the applicable Reorganized Debtors deem appropriate.

D.    *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan with:  (1) the Debtors' Cash on hand as of the Effective Date, (2) the proceeds of the Exit Facilities, the New Money Investment, and the Cash Out Option Investment, and (3) the New Money Investor Wind Down Investment, if any.

1.    Exit Facilities.

On and as of the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, pursuant to the Exit Facility Documents and the Restructuring Steps Memorandum.

Solely to the extent the Debtors reasonably determine, ten (10) Business Days prior to the anticipated Effective Date, they will not satisfy the Minimum Liquidity Condition on the Effective Date, after accounting for satisfaction in full in cash of all (a) closing costs in connection with the occurrence of the Effective Date and (b) DIP ABL Claims or ABL Claims, as applicable (in each case, excluding Letters of Credit and all Bank Product Obligations) (collectively, the "Exit Funding Need"), (i) immediately before the occurrence of the Effective Date, the Debtors shall draw, and the DIP Term Loan Lenders shall fund, additional DIP Term Loans in a principal amount equal to such

shortfall subject to the Liquidity Shortfall Funding Cap, which, together with the then-outstanding principal amount of the DIP Term Loans, shall be used to satisfy the Exit Funding Need and be converted to Exit First-Out Term Loans on the Effective Date in accordance with Article II.B hereof; and (ii) the principal amount of the Exit Second-Out Term Loans shall be reduced by the Exit Second-Out Adjustment, if any; *provided* that if the Liquidity Shortfall Funding Cap is met prior to satisfaction of the Exit Funding Need, the Debtors shall pay down the ABL Claims in accordance with Article III.B.3 hereof or DIP ABL Claims in accordance with Article II.B hereof to the extent required to meet any "minimum excess availability" requirement under the Exit ABL Facility in accordance with the Exit ABL Commitment Letter, accounting for "qualified cash" allowance under such facility, and the Minimum Liquidity Condition shall be reduced on a dollar for dollar basis to the Debtors' pro forma Cash on hand.  The DIP Term Loan Lenders shall not be obligated to fund the Debtors in excess of the lower of (x) the maximum principal amount of the DIP Term Loan Facility, including the Liquidity Shortfall Funding Cap and (y) the amount necessary to satisfy the Minimum Liquidity Condition, after giving effect to satisfaction of the Exit Funding Need; *provided, further,* that notwithstanding the foregoing, (i) in no event shall the treatment set forth in Article II.B of the DIP ABL Claims or Article III.B.3 of the ABL Claims be modified without the consent of the applicable DIP ABL Agent, DIP ABL Lenders, ABL Agent, or ABL Lenders, and (ii) this paragraph shall not be modified without the consent of the DIP ABL Agent or the ABL Agent (as applicable).

To the extent that the Exit ABL Facility is not available on the Effective Date in accordance with the Exit ABL Commitment Letter, the Debtors shall satisfy the treatment of DIP ABL Claims set forth in Article II.B and/or Allowed ABL Claims set forth in Article III.B.3 (as applicable) with sources of considerations acceptable to the Required Consenting Stakeholders; *provided* that notwithstanding the foregoing or anything else to the contrary in this Plan, in no event shall the treatment set forth in Article II.B of the DIP ABL Claims or Article III.B.3 of the ABL Claims be modified without the consent of the applicable DIP ABL Agent, DIP ABL Lenders, ABL Agent, or ABL Lenders.

To the extent applicable, Confirmation of this Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), including the Liquidity Shortfall Funding Amount, the Exit Second-Out Adjustment, if any, to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents:  (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit Facility Documents; (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever; and (d) shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  As of the Effective Date, the Exit Facility Agents for the benefit of the applicable lenders under the Exit Facility Documents shall have a valid, binding, perfected, non-avoidable, and enforceable lien on and security interest in the collateral and with priority specified in the Exit Facility Documents, and valid, binding, non-avoidable, and enforceable guarantee from each guarantor specified in the Exit Facility Documents.  To the extent provided in the Exit Facility Documents, the Exit Facility Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Reorganized

Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

    2.   <u>New Equity</u>.

On the Effective Date, New Pretium shall issue the New Equity in accordance with the Restructuring Steps Memorandum. The issuance of the New Equity, including the MIP Equity, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or equity interests (as the case may be based on how the New Equity is denominated and the identity of New Pretium issuing such shares, units, or equity interests) of New Equity required to be issued under this Plan and pursuant to their New Organizational Documents and otherwise consistent with the Restructuring Support Agreement (and the exhibits thereto).

All of the shares, units, or equity interests (as the case may be based on how the New Equity is denominated) of New Equity issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in <u>Article VI</u> hereof shall be governed by the terms and conditions set forth in this Plan and the New Organizational Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Equity shall be deemed as its agreement to the applicable New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. As a condition to receiving the New Equity, all recipients of the First Lien New Equity and the Second Lien New Equity shall be required to execute and deliver the New Investor Agreement; *provided*, *however*, that acceptance of such New Equity constitutes deemed acceptance and consent to the terms of the New Investor Agreement, without the need for execution by any party thereto. For the avoidance of doubt, the Reorganized Debtors may waive the requirement to receive an executed signature page to the New Investor Agreement. The New Investor Agreement will be effective as of the Effective Date, and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Equity will be bound thereby in all respects.

The New Equity will be distributed as follows: (i) the New Money Equity, representing 21.9 percent of New Equity, subject to dilution by the MIP Equity only, will be distributed to the New Money Investor on account of the New Money Investment in accordance with the New Equity Subscription Agreement; (ii) the First Lien New Equity, representing 72.5 percent of New Equity, subject to dilution by the Participation Premium, the Backstop Premium, and the MIP Equity, will be distributed to the Holders of Allowed First Lien Tranche A-1 Claims in accordance with <u>Article III.B</u> hereof; (iii) the Second Lien New Equity, representing 5.6 percent of New Equity, subject to dilution by the MIP Equity only, will be distributed to the Holders of the Allowed Second Lien Claims in accordance with <u>Article III.B</u> hereof; (iv) the Participation Premium, representing 23.4 percent of New Equity will be distributed to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents and this Plan; and (v) the Backstop Premium will be distributed to the Holders of Backstop Parties in accordance with the DIP Term Loan Documents. Together, the Participation Premium and Backstop Premium shall dilute the First Lien New Equity, but they shall not dilute the New Money Equity or the Second Lien New Equity, and they shall be subject to dilution by the MIP Equity.

In respect of the Cash Out Option Investment, the Cash Out Option Investors may make a proposal in respect of the First Lien Cash Out Option and/or the Second Lien Cash Out Option to the Holders of Allowed First Lien Tranche A-1 Claims and Allowed Second Lien Claims on the Cash Out Option Offer Date. If such a proposal is made, within 10 days thereafter, each Holder of an Allowed First Lien Tranche A-1 Claim or an Allowed Second Lien Claim may elect the First Lien Cash Out Option or the Second Lien Cash Out Option, in lieu of receiving its Pro Rata share of the First Lien New Equity or the Second Lien New Equity, respectively. If a Holder of an Allowed First Lien Tranche A-1 Claim or an Allowed Second Lien Claim makes such an election, then, subject to the Cash Out Option Investment Cap, in lieu of its Pro Rata share of First Lien New Equity or Second Lien New Equity, it will receive

Cash in an amount equal to the value of such First Lien New Equity or Second Lien New Equity based on the Cash Out Value.

In the event that the aggregate effect of all First Lien Cash Out Options and Second Lien Cash Out Options would cause the Cash Out Option Investment to exceed the Cash Out Option Investment Cap, the Cash distributed to each Holder of a First Lien Tranche A-1 Claim and/or Second Lien Claim who has elected the First Lien Cash Out Option and/or the Second Lien Cash Out Option, as applicable, shall be reduced on a Pro Rata basis such that the aggregate Cash Out Option Investment is reduced to the Cash Out Option Investment Cap. On account and in lieu of such reduced Cash distribution, each such Holder shall retain First Lien New Equity or Second Lien New Equity that is equal in value to such reduced Cash distribution based on the Cash Out Value.

To the extent applicable, Confirmation of this Plan shall be deemed (a) approval of (i) the issuance of New Money Equity to the New Money Investor pursuant to the New Equity Subscription Agreement (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), (ii) the Cash Out Option Investors' purchase of Cash Out Option Equity through the Cash Out Option Investment, (iii) the issuance of the Backstop Premium to the Backstop Parties in accordance with the Backstop Commitment Letter, and (iv) the issuance of the Participation Premium to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents, each to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the New Money Investment and, if applicable, the Cash Out Option Investment, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the New Money Investment and, if applicable, the Cash Out Option Investment, and effectuate the Backstop Commitment Letter.

     3.   New Money Investor Wind-Down Investment.

In addition to the New Money Investment, the New Money Investor shall be responsible for funding, whether arising prior to or after the Effective Date, the following costs and amounts with respect to Pretium Parent (the "Pretium Parent Wind-Down Costs and Distributions"): (1) any distributions required to be made under this Plan on account of any Allowed Claims in respect of Pretium Parent; and (2) all wind-down costs of Pretium Parent, including, without limitation, (a) the costs and expenses of preparing and filing tax returns and other required filings, (b) U.S. Trustee Quarterly Fees, (c) any reasonable and documented fees and expenses of Professionals and other advisors incurred in connection with the wind-down of Pretium Parent, and (d) any other expenses associated with the dissolution, liquidation, or case closing of Pretium Parent (including, for the avoidance of doubt, any Transaction Expenses of the New Money Investor incurred in connection with such matters); provided that any costs or expenses incurred in connection with an action taken on behalf of all or nearly all Debtors collectively, rather than Pretium Parent individually, including the closing of the Chapter 11 Cases in accordance with Article XII.M, shall not constitute Pretium Parent Wind-Down Costs and Distributions; provided further that, in the aggregate, the Debtors and Reorganized Debtors shall fund up to the first $350,000 of the Pretium Parent Wind-Down Costs and Distributions, and the New Money Investor shall fund the amount by which the Pretium Parent Wind-Down Costs and Distributions exceed $350,000 (the "New Money Investor Wind-Down Investment"), if any.

The Debtors or Reorganized Debtors, as applicable, shall make all distributions and payments contemplated by this Plan in respect of Pretium Parent in accordance with Article VI through the Disbursing Agent. On the Effective Date and on a quarterly basis thereafter until all Pretium Parent Wind-Down Costs and Distributions have been paid in full, the New Money Investor shall pay to the Reorganized Debtors the New Money Investor Wind-Down Investment, if any.

Upon request by the Ad Hoc Group, the Debtors or Reorganized Debtors shall provide the Ad Hoc Group Advisors with an accounting of Pretium Parent Wind-Down Costs and Distributions and any New Money Investor Wind-Down Investment.

E.      *Corporate Existence.*

Except as otherwise provided in this Plan, the Confirmation Order, the Plan Supplement, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation or organization documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation or organization documents) are amended under this Plan or otherwise, in each case, consistent with the Restructuring Support Agreement (which are incorporated herein pursuant to <u>Article I.H</u>), and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation or organization documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.      *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, this Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated therein, or entered into in connection therewith or pursuant thereto, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound-down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to this Plan.

G.      *Cancelation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in this Plan or the Confirmation Order (including to the extent any DIP ABL Claim or ABL Claim is refinanced and/or converted into the Exit ABL Facility in accordance with the provisions herein), all notes, instruments, certificates, and other documents evidencing Claims or Interests (including Existing Interests) shall be canceled, and all present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent) of the Debtors and any non-Debtor Affiliates thereunder or in any way related thereto, shall be deemed satisfied in full, released, canceled, discharged, and of no force or effect, without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action, and the Agents shall be released from all duties thereunder.

Holders of or parties to such canceled instruments, Existing Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancelation thereof, except the rights provided for or reserved pursuant to this Plan.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of <u>Article VI</u> hereof, the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents shall continue in effect after the Effective Date to the extent necessary to, and solely for the purposes of, (a) allowing Holders of Allowed Claims arising under the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents to receive distributions under this Plan on account of such Claims, if any, (b) allowing and preserving the rights of the Agents to receive and make distributions on account of the Allowed Claims arising under the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents pursuant to this Plan, (c) permitting the Agents to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce any obligation (if any) owed to such Agents or their

respective Holders of Allowed Claims under this Plan in accordance with the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents, as applicable, and (d) permitting the Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests and the releases pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in this Plan, and (2) except as otherwise provided in this Plan, the terms and provisions of this Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under this Plan. The Agents shall be discharged and shall have no further obligation or liability except as provided in this Plan and Confirmation Order, and after the performance by the Agents and their representatives and professionals of any obligations and duties required under or related to this Plan or Confirmation Order, the Agents shall be relieved of and released from any obligations and duties arising thereunder. For the avoidance of doubt, nothing in this Article V.G modifies section 524(e) of the Bankruptcy Code.

H.      *Corporate Action.*

On or before the Effective Date, as applicable, all actions contemplated under this Plan (including the Restructuring Steps Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefits Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Equity; (4) implementation of the Restructuring Transactions; (5) entry into the Exit Facility Documents, as applicable; (6) entry into the New Equity Documents; (7) adoption of the New Organizational Documents; (8) the reservation of the MIP Equity; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated by this Plan or reasonably necessary or appropriate to consummate this Plan or the Restructuring Transactions (whether to occur before, on, or after the Effective Date). On the Effective Date, all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity, the New Equity Documents, the Exit Facility Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.      *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors and shall supersede any existing organizational documents. To the extent required under this Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization. The New Organizational Documents will (a) authorize the issuance of the New Equity, and (b) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On the Effective Date, New Pretium shall enter into and deliver the New Investor Agreement to each Holder of New Equity, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Holders of New Equity shall be deemed to have executed the New Investor Agreement and be parties thereto, without the need to deliver signature pages thereto.

J.      *Indemnification Obligations.*

All indemnification provisions currently in place consistent with applicable law (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) as of the Petition Date for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall, to the fullest extent permitted by applicable law, be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

K.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents.  To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents.  Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

L.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Exit Facility Documents entered into, and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.      *Certain Securities Law Matters.*

The offering, issuance and distribution of any New Equity before the Petition Date and any New Equity issuable in the form of MIP Equity shall be exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

The offering, issuance and distribution of New Equity (other than MIP Equity) after the Petition Date shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S., state, or local law requiring registration prior to the offering, issuance, distribution, or sale of securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code, and to the extent such exemption is not available, then such New Equity will be offered, issued and distributed under the Plan pursuant to section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

The shares of New Equity to be issued under this Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Equity in the New Organizational Documents.

The shares of New Equity (including the New Money Equity and MIP Equity) that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Equity in the New Organizational Documents.

Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Equity.

The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the New Equity) with respect to the treatment of the New Equity to be issued under this Plan under applicable securities laws.  DTC and any transfer agent for the New Equity shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).  Notwithstanding anything to the contrary in this Plan, no Entity (including DTC and any transfer agent for the New Equity) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Equity shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the United States Securities and Exchange Commission, and (iii) shall not be required to list the New Equity on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the New Organizational Documents.

N.      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Equity; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.      *Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval

of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

P.      *Management Incentive Plan.*

On the Effective Date, the MIP Equity shall be reserved.  The terms and conditions of the Management Incentive Plan, including with respect to the form, terms, allocation, and vesting of the MIP Equity or other equity-based awards, shall be determined at the discretion of the New Board within 120 days of the Effective Date.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in this Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including Article VIII hereof.**  The Reorganized Debtors may settle any such Causes of Action without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objecting party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in this Plan, including Article VIII hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the

foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in <u>Article V.H.1</u> and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are:  (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date, in the case of (1) and (3) through (5), with the consent of the Required Consenting Stakeholders.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, and related Cure amounts with respect thereto, or rejections of the Executory Contracts or Unexpired Leases as set forth in this Plan or the Rejected Executory Contracts and Unexpired Leases Schedule or Schedule of Proposed Cure Amounts, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule or Schedule of Proposed Cure Amounts, at any time up to forty-five (45) days after the Effective Date, subject to the applicable counterparty's right to object and the consent of the Required Consenting Stakeholders.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to this Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to this Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to this Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to this Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including pursuant to this Plan or the Confirmation Order, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be treated in accordance with Article III.B of this Plan and shall be subject to the Debtors' objection and dispute in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts pay all Cure costs (if any) relating to Executory Contracts and Unexpired Leases that are being assumed under this Plan in the ordinary course of business. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed on or before fourteen (14) days after the Filing of the Schedule of Proposed Cure Amounts. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to file such request for payment of such Cure costs. The Reorganized Debtors also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under this Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or as otherwise scheduled for hearing by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory

Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts, the Debtors shall have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan. Unless otherwise provided in this Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.    *Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Employee Compensation and Benefits.*

1.    Compensation and Benefits Programs.

Except as otherwise set forth herein or on the Rejected Executory Contracts and Unexpired Leases Schedule, on the Effective Date and subject to the provisions of this Plan, the Debtors shall (a) assume employment agreements or letters, severance agreements, or other agreements entered into with current and former officers and other employees or (b) to the extent agreed, enter into new agreements with such officers and other employees on terms and

conditions acceptable to (i) the Debtors, (ii) such officers and other employees, and (iii) with respect to such new agreements with the Debtors' executive officers or other insiders (as defined in section 101(31) of the Bankruptcy Code), the Required Consenting Stakeholders, as applicable. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)     all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Existing Interests in any of the Debtors;

(b)     Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

(c)     Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

None of Confirmation of the Plan, Consummation of any of the Restructuring Transactions, or any assumption or assumption and assignment of compensation and benefits agreements, plans, programs, or arrangements pursuant to the terms herein shall be deemed to trigger any applicable change of control, sale of business, assignment, vesting, termination, constructive termination, acceleration, or similar provisions in any compensation and benefits agreements, plans, programs, or arrangements. No counterparty shall have rights under any compensation or benefits agreement, plan, program, or arrangement assumed or assumed and assigned pursuant to the Plan other than those applicable immediately prior to such assumption or assumption and assignment.

2.     <u>Workers' Compensation Programs</u>.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

I.     *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the first Distribution

Date, the Reorganized Debtors shall make initial distributions under this Plan on account of Claims Allowed on or as soon as reasonably practicable after the Effective Date, subject to the Reorganized Debtors' right to object to Claims. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  Except as otherwise provided in this Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the preceding paragraph, (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C of this Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.4 of this Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

B.      Disbursing Agent.

All distributions under this Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register shall be deemed completed by the Debtors when received by such Disbursing Agent.  This Plan Distributions shall be made to any such Holders at the direction of the applicable Disbursing Agent.

C.      Rights and Powers of Disbursing Agent.

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the

extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.  Delivery of Distributions in General.

Except as otherwise provided herein, distributions payable to Holders of Allowed Claims shall be made by the Disbursing Agent to each such Holder as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.  Designation of Alternative Distribution Recipient.

A Holder of an Allowed Claim entitled to receive any distribution under this Plan may, at its sole election, irrevocably designate in writing one or more other Persons to receive, on such Holder's behalf, any distribution otherwise payable to such Holder under this Plan (such Holder, the "Designating Holder", and such recipient, a "Designated Recipient").

A Designating Holder must deliver to the Debtors and the Disbursing Agent a duly executed direction letter (a "Direction Letter") in form and substance reasonably acceptable to the Debtors and the Disbursing Agent, which shall (i) identify with particularity the Designating Holder, the Allowed Claim(s), and the Designated Recipient(s), (ii) provide complete payment instructions and delivery details, including any wire, check, or book-entry account information, and (iii) be received no later than six (6) Business Days prior to the Effective Date unless such deadline is extended by the Debtors or the Reorganized Debtors.  The Disbursing Agent may rely conclusively upon any Direction Letter that it reasonably believes to be genuine and duly authorized without further duty of inquiry.

With respect to any distribution of New Equity or other Securities under this Plan, any Designated Recipient must be eligible to receive such Securities under the Plan and applicable securities laws and must execute, deliver, or be deemed to have accepted any agreements, instruments, or organizational documents required as a condition to receipt thereof, including, without limitation, the New Investor Agreement and any applicable New Organizational Documents and provide customary securities laws representations.  No distribution of Securities shall be made to any Designated Recipient unless and until all such conditions are satisfied to the reasonable satisfaction of the Reorganized Debtors

A Direction Letter shall become effective only upon written acknowledgment by the Disbursing Agent, may be rejected if incomplete or untimely, and, once accepted, shall be irrevocable except with the consent of the Reorganized Debtors and the Disbursing Agent. The Reorganized Debtors and the Disbursing Agent shall have no obligation to accommodate partial, conditional, or inconsistent directions.

Recognition of a Designated Recipient is an administrative accommodation only and shall not expand, diminish, or otherwise modify any rights, defenses, or obligations under this Plan, including setoff, recoupment, compliance with tax requirements, the Claims reconciliation and objection process, or the treatment and satisfaction of Claims.

Any distribution made to a Designated Recipient on behalf of a Designating Holder pursuant to a Direction Letter shall be deemed to have been made to the Designating Holder in full and final satisfaction of such Designating Holder's applicable Allowed Claim.

4.  Minimum Distributions.

No fractional shares of New Equity shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of shares of New Equity shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no

further payment therefor.  The total number of authorized shares of New Equity to be distributed to Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

5.  Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of New Equity, such New Equity shall be canceled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  The Disbursing Agent shall adjust the number of shares of New Equity outstanding as of the date of such cancelation to ensure that the distributions of New Equity contemplated under this Plan are given full force and effect.

6.  Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been canceled in accordance with Article IV.G hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under this Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

E.  *Manner of Payment.*

1.  Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated by this Plan or the Plan Supplement, all distributions of the New Equity to the Holders of the applicable Allowed Claims under this Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

2.  All distributions of Cash to the Holders of the applicable Allowed Claims under this Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

3.  At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.  *Indefeasible Distributions.*

Any and all distributions made under this Plan shall be indefeasible and not subject to clawback or turnover provisions.

G.  *Compliance with Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized

to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Orders, this Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Petition Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with <u>Article XII.F</u> hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.      <u>Claims Paid by Third Parties</u>.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt

thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.   Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.   *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of this Plan, except as provided in Article V.B of this Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary course of business of the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.   *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy law.

C.       *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided* that the U.S. Trustee shall also have the authority to object to Claims or Interests after the Effective Date.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to <u>Article IV.Q</u> of this Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute may be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced, provided that, for the avoidance of doubt, the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code to the extent applicable.

D.       *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.       *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.       *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of this Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *Single Satisfaction of Claims.*

Holders of Allowed Claims may assert such Claims against the Debtor(s) obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the applicable Debtor(s) based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, this Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facility Documents, this Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created or entered into pursuant to this**

Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, title, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (or the applicable Agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the applicable Agents for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the Exit Facility Agents that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      *Releases by the Debtors.*

Except as expressly set forth herein, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Debtors, their Estates, and if applicable, the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, their Estates, or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the

Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, Avoidance Actions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.

Notwithstanding anything to the contrary herein, the Debtors do not, pursuant to the releases set forth above, release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transactions, the Exit Facility Documents, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, or (iii) any Claims or Causes of action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, *provided* that a party's compliance with, or execution, or implementation of the Restructuring Support Agreement or this Plan shall not be deemed actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) given in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (ii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after due notice and opportunity for a hearing; and (vi) a bar to any of the Debtors, their Estates, or the Reorganized Debtors asserting any Claim or Cause of Action released pursuant to the Debtor Release against any of the Released Parties.

D.    *Releases by the Releasing Parties.*

Except as expressly set forth herein, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11

Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, their Estates, or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.

Notwithstanding anything to the contrary herein, the Releasing Parties do not, pursuant to the releases set forth above, release (i) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transactions, the Exit Facility Documents, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, (ii) the rights of any Holder of Allowed Claims to receive distributions under this Plan, or (iii) any Claims or Causes of action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, *provided* that a party's compliance with, or execution, or implementation of the Restructuring Support Agreement or this Plan shall not be deemed actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of this Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release against any of the Released Parties.

E.      *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the solicitation of votes (before and after the Petition Date) for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is determined by a Final Order to have constituted actual

fraud, willful misconduct, or gross negligence, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.      *Injunction.*

Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities or the Estates on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Effective Date obligations of any Person or Entity under this Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facilities), or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this **Article VIII.F.**

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to **Article VIII.C**, **Article VIII.D**, and **Article VIII.E** without first (a) requesting a determination from the

**Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, or Released Party and is not a Claim that the Debtors released under this Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.  the Minimum Liquidity Condition, subject to the adjustment set forth in Article IV.D.1 herein, shall have been satisfied;

2.  the Restructuring Support Agreement shall not have been terminated as to all parties thereto and shall be in full force and effect;

3.  the Bankruptcy Court shall have entered the Disclosure Statement Order, which shall not have been reversed, stayed, modified, or vacated on appeal;

4.  the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

5.  the Definitive Documents shall be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto, consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement;

6.  all actions, documents, and agreements necessary to implement and consummate this Plan shall have been effected and executed;

7.  the Bankruptcy Court shall have entered the DIP Orders, and the Final DIP Order shall be a Final Order, the DIP Documents shall be in full force and effect in accordance with their terms, the DIP Termination Date (as defined in the DIP Orders) shall not have occurred, no Event of Default (as defined in the DIP Documents) shall have occurred or be continuing, and the obligations outstanding under the DIP Documents shall not have been accelerated;

8.  all fees, expenses, and premiums payable pursuant to the DIP Orders shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

9.  all Exit Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto, other than the occurrence of the Effective Date, shall have been satisfied or waived;

10. all conditions precedent to the issuance of the New Equity, other than the occurrence of the Effective Date, shall have occurred;

11. all organizational documents and bylaws for New Pretium shall have been adopted on terms consistent with the Restructuring Support Agreement;

12. all fees and expenses of retained Professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Escrow Account pending the Bankruptcy Court's approval of such fees and expenses;

13. all Transaction Expenses shall have been paid as set forth in Article II.F herein;

14. all governmental and third-party authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan and the Restructuring Transactions, and are contemplated by the Restructuring Support Agreement, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on this Plan and the Restructuring Transactions; and

15. the Restructuring Transactions shall have been consummated or are anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Restructuring Support Agreement (including the consent rights therein) and this Plan.

B.      *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX.A may be waived by the Debtors with the consent of (i) the Required Consenting Stakeholders and (ii) solely with respect to the conditions set forth in clauses (4), (7), (8), and (9) of this Article IX.A, the ABL Agent, the DIP ABL Agent, and the Exit ABL Agent (with respect to the conditions set forth in clauses (9), solely to the extent the ABL Agent or DIP ABL Agent is the Exit ABL Agent), in each case, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, or any Holders of Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims against or Interests in the Debtors, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement (which are incorporated herein pursuant to Article I.H), the Debtors reserve the right to modify this Plan (other than with respect to the DIP ABL Facility and the DIP ABL Claims without the consent of the DIP ABL Agent, the ABL Facility and the ABL Claims without the consent of the ABL Agent, or the Exit ABL Facility without the consent of the Exit ABL Agent), whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to this Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement and subject to the consent rights therein (which are incorporated herein pursuant to Article I.H), the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3.  resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.  ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.  enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan or the Disclosure Statement, including the Restructuring Support Agreement;

8.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan (including in connection with the New Money Investor Wind-Down Investment, if any);

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15. enter an order concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under this Plan;

17. consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22. enforce all orders previously entered by the Bankruptcy Court; and

23. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents, the Exit Facility Documents, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims against or Interests in the Debtors (irrespective of whether such Holders have, or are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

B.     *Additional Documents.*

Subject to and in accordance with the Restructuring Support Agreement, on or before the Effective Date, (x) the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan and the Restructuring Support Agreement and (y) the Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims against the Debtors receiving distributions pursuant to this Plan and all other parties-in-interest, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.     *Statutory Committee and Cessation of Fee and Expense Payment*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members or advisors to any statutory committee after the Confirmation Date.

D.     *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity; *provided* that nothing in this Article XIII.E modifies section 524(e) of the Bankruptcy Code.

F.     *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Pretium Packaging, L.L.C.<br>1555 Page Industrial Blvd.<br>St. Louis, MO 63132<br>Attention:  J. Federico Barreto<br>            Chief Financial Officer | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Steven N. Serajeddini, P.C.<br>            Jordan E. Elkin<br>            (steven.serajeddini@kirkland.com)<br>            (jordan.elkin@kirkland.com)<br><br>and<br><br>Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654 |

|  | Attention:  Anup Sathy, P.C.<br>Yusuf Salloum<br>(anup.sathy@kirkland.com)<br>(yusuf.salloum@kirkland.com)<br>and<br><br>COLE SCHOTZ P.C.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attention: Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com |
|---|---|
| **Counsel to the Ad Hoc Group** | **Sponsor / New Money Investor** |
| Milbank LLP<br>55 Hudson Yards<br>New York, New York 10001<br>Attention:  Evan Fleck<br>Matthew Brod<br>(efleck@milbank.com)<br>(mbrod@milbank.com) | Clearlake Capital Group, L.P.<br>233 Wilshire Boulevard, Suite 800<br>Santa Monica, CA 90401<br>Attention: John Cannon<br>jcannon@clearlake.com |
| **Counsel to the ABL Agent, DIP ABL Agent, and Exit ABL Agent** | **United States Trustee** |
| Morgan, Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attention:  Jennifer Feldsher<br>Elizabeth R. Khoury Ali<br>Ryan C. Hibbard<br>(jennifer.feldsher@morganlewis.com)<br>(elizabeth.ali@morganlewis.com)<br>(ryan.hibbard@morganlewis.com)<br>and<br><br>Morgan, Lewis & Bockius LLP<br>One Federal Street<br>Boston, Massachusetts 02110<br>Attention:  Christopher L. Carter<br>(christopher.carter@morganlewis.com) | Office of The United States Trustee<br>One Newark Center<br>1085 Raymond Boulevard, Suite 21000<br>Newark, New Jersey 07102<br>Attention:  Jeffery M. Sponsor<br>Benjamin A. Hackman<br>Jeffrey.M.Sponder@usdoj.gov<br>Benjamin.A.Hackman@usdoj.gov |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests. Notwithstanding anything herein to the contrary, the Reorganized Debtors shall provide notice of any documents to all Entities whose rights are affected by any such document Filed by the Reorganized Debtors.

G.      *Enforcement of Confirmation Order.*

On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to enforce the terms of the Confirmation Order and this Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

H.      *Term of Injunctions or Stays.*

**Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I.      *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

J.      *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/Pretium or the Bankruptcy Court's website at https://ecf.njb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however*, any such alteration or interpretation shall be acceptable to the Debtors and the Required Consenting Stakeholders. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.       *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors and the Consenting Stakeholders (as applicable) will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Stakeholders, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

M.       *Closing of Chapter 11 Cases.*

On and after the Effective Date, the Debtors, or the Reorganized Debtors shall be permitted to classify all of the Chapter 11 Cases of the Debtors as closed, except for the Chapter 11 Case(s) of any Debtor(s) identified in the Restructuring Steps Memorandum as having its Chapter 11 Case(s) remaining open following the Effective Date, and all contested matters relating to any of the Debtors, including objections to Claims and any adversary proceedings, shall be administered and heard in the Chapter 11 Case of a Debtor identified in the Restructuring Steps Memorandum as having its Chapter 11 Case remaining open following the Effective Date, irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

N.       *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.       *Creditor Default.*

An act or omission by a Holder of a Claim or Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may: (a) designate a party to appear, sign, and/or accept the documents required under this Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce this Plan by order of specific performance; (c) award a judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtors in an amount, including interest, if applicable, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of this Plan.

P.       *No Group*

The Ad Hoc Group shall not include any Holders who are not represented by the Ad Hoc Group Advisors. Such Holders did not jointly negotiate the Restructuring Support Agreement or this Plan with the Ad Hoc Group and shall not constitute part of a "group" with the Ad Hoc Group for any purpose, including under foreign law.

Dated: January 25, 2026

Pretium Packaging, L.L.C.
on behalf of itself and all other Debtors

*/s/ J. Federico Barreto*

Name:  J. Federico Barreto
Title:    Chief Financial Officer

## Exhibit B

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED EITHER PURSUANT TO AN OUT-OF-COURT EXCHANGE OFFER (AS DEFINED BELOW) OR PURSUANT TO AN IN-COURT RESTRUCTURING THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT (AS DEFINED BELOW).

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of December 30, 2025 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (v) of this preamble, collectively, the "**Parties**"):[1]

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

i.    Poseidon Parent, L.P., a company incorporated under the Laws of Delaware ("**Pretium**"), and each of its subsidiaries and affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**");

ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold, (A) First Lien Tranche A Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii)(A), collectively, the "**Consenting First Lien Tranche A Lenders**"), and (B) First Lien Tranche A-1 Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii)(B), collectively, the "**Consenting First Lien Tranche A-1 Lenders**", and together with the Consenting First Lien Tranche A Lenders, the "**Consenting First Lien Lenders**");

iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold, Second Lien Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Second Lien Lenders**," and together with the Consenting First Lien Lenders, the "**Consenting Creditors**");

iv.    the undersigned holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold Equity Interests in Pretium and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties and counsel to the Ad Hoc Group (the Entities in this clause (iv), collectively, the "**Sponsor**"); and

v.    the New Money Investor, in its capacity as such (together with the Consenting Creditors and the Sponsor, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's-length negotiated certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Restructuring Term Sheet, attached hereto as **Exhibit B**, (such transactions as described in this Agreement, the Plan, the Backstop Commitment Letter, and the Definitive Documents, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement, and including any exhibits, annexes, and schedules thereto, collectively, the "**Restructuring Transactions**");

**WHEREAS**, the Restructuring Transactions shall be implemented through, among other things, the solicitation of votes for the Plan, to be accompanied by the Disclosure Statement, to be implemented through prepackaged bankruptcy cases (the "**In-Court Restructuring**") to be

commenced by the Company Parties under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**", such cases, the "**Chapter 11 Cases**");

**WHEREAS**, the Restructuring Transactions shall include, among other things, repayment in full of the First Lien Tranche A Term Loan Claims using the proceeds of the DIP Term Loans as set forth in the DIP Term Loan Credit Agreement (the "**DIP Financing**"), pursuant to the terms and conditions set forth in this Agreement, and with such financing to be backstopped by the Backstop Parties pursuant to the terms and conditions of this Agreement and the Backstop Commitment Letter; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Definitive Documents.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.    Definitions.  Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Definitive Documents, as applicable.  The following terms shall have the following definitions:

"**ABL Agent**" means Wells Fargo Bank, National Association, as administrative agent and collateral agent under the ABL Credit Agreement.

"**ABL Credit Agreement**" means that certain Amended and Restated ABL Credit and Guarantee Agreement, dated as of October 21, 2021, by and among Pretium Intermediate as holdings, Pretium PKG Holdings, Inc. as the parent borrower, the several borrowers party thereto, the other guarantors party thereto, the ABL Lenders, and the ABL Agent, as may be further amended, restated, amended and restated, supplemented, otherwise modified from time to time.

"**ABL Lenders**" means the lenders party to the ABL Credit Agreement from time to time.

"**Ad Hoc Group**" means that certain ad hoc group of holders of First Lien Term Loans and Second Lien Term Loans represented by the Ad Hoc Group Advisors.

"**Ad Hoc Group Advisors**" means, collectively, Milbank LLP, Moelis & Company LLC, SAI Derecho & Economía, S.C., Gowling WLG, and one other local counsel, and, with the prior consent of the Company Parties (such consent not to be unreasonably withheld, conditioned, or delayed), any other professionals and/or consultants for the Ad Hoc Group, if any.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means, collectively, any administrative agent, collateral agent, and/or similar Entity, under the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Term Loan Credit Agreement, and the New First Lien Credit Agreement, including, in each case, any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Stakeholder that becomes a party hereto after the Agreement Effective Date, the date as of which such Consenting Stakeholder becomes a party hereto) to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Backstop**" means the backstop of the DIP Term Loans equal to 100 percent of the New Funding Principal Amount, to be converted upon the Transaction Effective Date into New Term Loans by the Backstop Parties pursuant to the Backstop Commitment Letter.

"**Backstop Commitment Letter**" means the backstop commitment letter, as may be amended, supplemented, or otherwise modified from to time in accordance with its terms, to be entered into between certain of the Company Parties and the Backstop Parties prior to the Petition Date, and which shall be in form and substance acceptable to each party thereto and the New Money Investor.

"**Backstop Parties**" means, collectively, certain holders of First Lien Tranche A-1 Term Loan Claims (or their affiliated or related funds) that agree to backstop the DIP Term Loans and the Liquidity Shortfall Funding (which shall not exceed the Liquidity Shortfall Funding Cap) by becoming a party to this Agreement and the Backstop Commitment Letter, in their capacity as such.

"**Bankruptcy Code**" has the meaning set forth in the Recitals to this Agreement.

4

"**Bankruptcy Court**" has the meaning set forth in the Recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Chosen Forum**" means (a) after the Chapter 11 Cases are filed, the Bankruptcy Court; and (b) in all other cases, including if the Bankruptcy Court abstains from hearing a dispute or finds it lacks jurisdiction, the state and federal courts sitting in the Borough of Manhattan, State of New York.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions, including those certain Confidentiality Agreements between the Company Parties and each of the members of the Ad Hoc Group, as applicable.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Second Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that are debtors and debtors in possession in the event the Company Parties commence Chapter 11 Cases.

"**Definitive Documents**" means, collectively, each of the documents listed in Section 3.01 of this Agreement.

"**DIP ABL Credit Agreement**" means that certain debtor-in-possession financing credit agreement, if any, with respect to the DIP ABL Facility, as may be amended, supplemented, or otherwise modified from time to time.

"**DIP ABL Facility**" means that certain debtor-in-possession asset-based revolving loan facility, if any, incurred by the Debtors in accordance with the DIP Documents.

"**DIP ABL Term Sheet**" means the term sheet, if any, setting forth the terms and conditions of the DIP ABL Facility.

"**DIP Documents**" means (a) the DIP Term Sheets; (b) the DIP Orders; (c) the DIP ABL Credit Agreement, the DIP Term Loan Credit Agreement, and the related ancillary documents; (d) the Backstop Commitment Letter, and (e) Debtors' motion seeking entry of the DIP Orders, in each case, including any associated documents, notices, pleadings, and orders related to or required in order to give effect to any of the foregoing.

"**DIP Facilities**" means, collectively, the DIP ABL Facility, if any, and the DIP Term Loans.

"**DIP Financing**" has the meaning set forth in the recitals to this Agreement.

"**DIP Orders**" means orders entered by the Bankruptcy Court approving the DIP ABL Facility, the DIP Term Loans and the Backstop on an interim or final basis.

"**DIP Term Loan Credit Agreement**" means that certain debtor-in-possession financing credit agreement with respect to the DIP Term Loans, as may be amended, supplemented, or otherwise modified from to time.

"**DIP Term Loan Term Sheet**" means the term sheet setting forth the terms and conditions of the DIP Term Loans.

"**DIP Term Loans**" means those certain super senior secured debtor-in-possession term loans in a principal amount equal to the New Funding Principal Amount incurred by the Debtors in accordance with the DIP Documents.

"**DIP Term Sheets**" means, collectively, the DIP ABL Term Sheet and the DIP Term Loan Term Sheet, if any.

"**Disclosure Statement**" means that certain Disclosure Statement disclosing the terms and conditions of the Plan, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement, that is prepared and distributed to holders of First Lien Tranche A-1 Term Loan Claims and Second Lien Term Loan Claims in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure, and other applicable Law.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits

6

interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended and including any rule or regulation promulgated thereunder.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Exit ABL Agent**" means the administrative agent and collateral agent under the Exit ABL Credit Agreement.

"**Exit ABL Credit Agreement**" means the credit agreement with respect to the Exit ABL Facility, as may be amended, supplemented, or otherwise modified from to time (which may, at the election of the Company Parties, take the form of an amendment or amendment and restatement to the ABL Credit Agreement in connection with the Exit ABL Facility), reasonably acceptable to the Company Parties, the Required Consenting Stakeholders, the Exit ABL Lenders, and the Exit ABL Agent.

"**Exit ABL Facility**" means the asset-backed revolving facility, if any, entered into by the Company Parties on or after the Transaction Effective Date in accordance with the Exit ABL Credit Agreement.

"**Exit ABL Lenders**" means lenders party to the Exit ABL Credit Agreement from time to time.

"**Fee Letters**" means the engagement or fee letters of the Ad Hoc Group Advisors.

"**Final DIP Order**" means an order entered by the Bankruptcy Court approving the DIP Term Loans and the Backstop on a final basis.

"**First Day Pleadings**" means the first-day motions and related pleadings that the Debtors file upon the commencement of the Chapter 11 Cases in the event of an In-Court Restructuring.

"**First Lien Credit Agreement**" means that certain First Lien Term Loan Credit Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as the borrower, Pretium Intermediate, as holdings, Credit Suisse AG, Cayman Islands Branch, as agent, the subsidiary guarantors, and the lenders party thereto from time to time, as amended by that certain First Amendment, dated as of December 15, 2021, that certain Second Amendment, dated as of May 25, 2023, that certain Third Amendment, dated as of October 2, 2023, and as further amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

"**First Lien Term Loan Claims**" means, collectively, the First Lien Tranche A Term Loan Claims and the First Lien Tranche A-1 Term Loan Claims.

"**First Lien Term Loans**" means, collectively, the First Lien Tranche A Term Loans and the First Lien Tranche A-1 Term Loans.

"**First Lien Tranche A Term Loan Claims**" means any Claim on account of the First Lien Tranche A Term Loans.

"**First Lien Tranche A Term Loans**" means the senior secured first-lien first-out term loans defined as the "Third Amendment Tranche A Term Loans" in the First Lien Credit Agreement.

"**First Lien Tranche A-1 Term Loans**" means the senior secured first-lien second-out term loans defined as the "Third Amendment Tranche A-1 Term Loans" in the First Lien Credit Agreement.

"**First Lien Tranche A-1 Term Loan Claims**" means any Claim on account of the First Lien Tranche A-1 Term Loan.

"**Governance Documents**" means, as applicable, the organizational and governance documents for New Pretium and the Company Parties (and the issuers of the New First Lien Term Loans, if not a Company Party), and their respective direct and indirect subsidiaries, giving effect to the Restructuring Transactions, including without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements, (or equivalent governing documents), and the identities of proposed members of the board of directors of New Pretium.

"**Interim DIP Order**" means an order entered by the Bankruptcy Court approving the DIP Term Loans and the Backstop on an interim basis.

"**In-Court Restructuring**" has the meaning set forth in the recitals to this Agreement.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Liquidity Shortfall Funding**" has the meaning set forth in the Restructuring Term Sheet.

"**Liquidity Shortfall Funding Cap**" has the meaning set forth in the Restructuring Term Sheet.

"**Milestones**" means the milestones set forth on **Schedule 1** of this Agreement, as such may be extended in accordance with the terms of this Agreement.

"**New Equity Interests**" means equity or membership interests in New Pretium after consummation of the Restructuring Transactions.

8

"**New Equity Subscription Agreement**" means that certain subscription agreement by and between New Pretium and the New Money Investor, pursuant to which the New Money Investor will subscribe for New Equity Interests in connection with the New Money Investment.

"**New First Lien Agent**" means the administrative agent and the collateral agent under the New First Lien Credit Agreement.

"**New First Lien Credit Agreement**" means the credit agreement with respect to the New First Lien Term Loans and Takeback Term Loans, as may be amended, supplemented, or otherwise modified from time to time (which may take the form of an amendment or amendment and restatement to the First Lien Credit Agreement).

"**New Funding Principal Amount**" has the meaning set forth in the Restructuring Term Sheet.

"**New Term Loans**" has the meaning set forth in the Restructuring Term Sheet.

"**New First Lien Term Loans**" means, collectively, the New Term Loans and Takeback Term Loans.

"**New Intercreditor Agreement**" has the meaning set forth in the Restructuring Term Sheet.

"**New Money Investment**" means the new money investment in the amount of $50,000,000 in New Pretium to be made by the New Money Investor in accordance with the New Equity Subscription Agreement.

"**New Money Investor**" means Sponsor, in its capacity as the subscriber or similar term under the New Equity Subscription Agreement.

"**New Money Investor Advisors**" means one lead counsel and one other local counsel employed by the Sponsor and the New Money Investor in connection with the Restructuring Transactions and, with the prior consent of the Required Consenting First Lien Tranche A-1 Lenders (such consent not to be unreasonably withheld, conditioned, or delayed), any other legal counsel for the New Money Investor.

"**New Pretium**" has the meaning set forth in the Restructuring Term Sheet.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each transfer of any Company Claims/Interests that meets the requirements of Section 8.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case in the event of an In-Court Restructuring.

"**Plan**" means the joint prepackaged plan of reorganization contemplated to be filed by the Debtors under chapter 11 of the Bankruptcy Code to implement the Restructuring Transactions in accordance with, and subject to the terms and conditions of, this Agreement and the Definitive Documents.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that, subject to the terms and conditions provided in this Agreement, will be filed by the Debtors with the Bankruptcy Court, including (a) the Governance Documents, (b) the New First Lien Credit Agreement and related ancillary documentation, (c) the Exit ABL Credit Agreement and related ancillary documentation; (d) the Restructuring Transactions Memorandum, and (e) the schedule of retained causes of action.

"**Pretium**" means Poseidon Parent, L.P.

"**Pretium Intermediate**" means Poseidon Investment Intermediate, Inc.

"**Professional**" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Required Accepting Consenting Second Lien Lenders**" means, as of the relevant date, in each case excluding the Sponsor and any other Affiliates of the Company Parties, Accepting Consenting Second Lien Lenders holding, collectively, in excess of 50% of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Accepting Consenting Second Lien Lenders.

"**Required Consenting First Lien Tranche A-1 Lenders**" means, as of the relevant date, in each case excluding the Sponsor and any other Affiliates of the Company Parties, Consenting First Lien Tranche A-1 Lenders holding, collectively, in excess of 50% of the aggregate outstanding principal amount of First Lien Tranche A-1 Term Loans that are held by Consenting First Lien Lenders, *provided* that such threshold shall increase to 66 2/3% with respect to any amendments or modifications to the economic terms set forth in this Agreement (including the Restructuring Term Sheet).

"**Required Consenting Second Lien Lenders**" means, as of the relevant date, in each case excluding the Sponsor and any other Affiliates of the Company Parties, Consenting Second Lien Lenders holding, collectively, in excess of 50% of the aggregate outstanding principal amount of Second Lien Term Loans that are held by Consenting Second Lien Lenders.

"**Required Consenting Stakeholders**" means the Required Consenting First Lien Tranche A-1 Lenders and the New Money Investor.

"**Restructuring Term Sheet**" means the term sheet attached hereto as **Exhibit B**.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement, in each case consistent with the Restructuring Term Sheet.

"**Restructuring Transactions Memorandum**" means the summary of transaction steps to complete the Restructuring Transactions contemplated by the Plan, which shall be consistent with this Agreement, the Plan, and otherwise acceptable to the Required Consenting Stakeholders. The Restructuring Transactions Memorandum shall, among other things, designate New Pretium.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Second Lien Credit Agreement**" means that certain Second Lien Term Loan Credit Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as borrower, Pretium Intermediate, as borrower, the Credit Suisse AG, Cayman Islands Branch, as agent, the guarantors party thereto, and the lender parties thereto from time to time, as amended by that certain First Amendment, dated as of May 25, 2023, and as further amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

"**Second Lien Lender Consent Fee**" means cash in an amount up to the Second Lien Lender Consent Fee Amount, to be paid to certain holders of the Second Lien Term Loan Claims in accordance with Section 6.01(m) hereof.

"**Second Lien Lender Consent Fee Amount**" means $5,784,220.72.

"**Second Lien Term Loan Claims**" means any Claim on account of the Second Lien Term Loans.

"**Second Lien Term Loans**" means those certain senior secured second lien term loans defined as the "Initial Term Loans" under the Second Lien Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means all documents, forms and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code (other than the Disclosure Statement).

"**Takeback Term Loans**" has the meaning set forth in the Restructuring Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with this Agreement.

"**Transaction Effective Date**" means the effective date of the Plan.

"**Transaction Expenses**" means all reasonable and documented fees and out-of-pocket expenses of (a) the Ad Hoc Group Advisors and (b) the New Money Investor Advisors, each subject to the terms of the applicable Fee Letters.

"**<u>Transfer</u>**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); *provided*, *however*, that any pledge in favor of a bank or broker dealer at which a Consenting Creditor maintains an account, where such bank or broker dealer holds a security interest or other encumbrance over property in the account generally shall not be deemed a "Transfer" for any purposes hereunder.

"**<u>Transfer Agreement</u>**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **<u>Exhibit F</u>**.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 14.10 other than counsel to the Company Parties.

**Section 2.**      *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties upon satisfaction or waiver of the following conditions in accordance with this Agreement:

(a)      each of the Company Parties (as set forth in **Exhibit A**) shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)      the following shall have executed and delivered counterpart signature pages of this Agreement to the Company Parties (or counsel thereto):

(i)      holders of at least 66 2/3% of the aggregate outstanding principal amount of First Lien Tranche A-1 Term Loans;

(ii)      holders of at least 66 2/3% of the aggregate outstanding principal amount of Second Lien Term Loans; and

(iii)      the Sponsor;

(c)      the Company Parties shall have entered into the Fee Letters and the Fee Letters shall be in full force and effect; and

(d)      the Company Parties shall have paid all accrued and unpaid Transaction Expenses, to the extent invoiced in accordance with the Fee Letters at least two Business Days before the Agreement Effective Date.

Upon satisfaction of the foregoing conditions, counsel to the Company Parties shall give notice to counsel to the Ad Hoc Group and counsel to the Sponsor in the manner set forth in Section 14.10 hereof (by email or otherwise) that the conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.**      *Definitive Documents*.

3.01.    The Definitive Documents governing the Restructuring Transactions shall include the following:

(i)      the Restructuring Term Sheet;

(ii)      the Plan (and all exhibits thereto);

(iii)      the Disclosure Statement;

(iv)      the Solicitation Materials;

(v)      the Plan Supplement;

(vi)      the DIP Documents;

(vii)      the Confirmation Order;

(viii)     the order of the Bankruptcy Court (which may be the Confirmation Order) approving the Disclosure Statement and the other Solicitation Materials (and motion(s) seeking approval thereof); and

(ix)       all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto, except the pleadings (including retention applications and fee applications) related to the retention and compensation of Professionals;

(x)        any other documents related to the issuance of the New Equity Interests;

(xi)       the Governance Documents;

(xii)      the New First Lien Credit Agreement and all other documents related to the New First Lien Term Loans and the Takeback Term Loans;

(xiii)     the Exit ABL Credit Agreement and all other documents related to the Exit ABL Facility, to the extent entered into on or before the Transaction Effective Date;

(xiv)      the New Intercreditor Agreement, to the extent entered into on the Transaction Effective Date;

(xv)       any and all material filings with or requests for regulatory or other approvals from any governmental entity or unit; and

(xvi)      any and all, in each case material, other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments, or other documents reasonably necessary or desirable to consummate and document the transactions contemplated by this Agreement or the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements from time to time).

3.02.    The Definitive Documents not executed as of the Execution Date remain subject to negotiation and completion.   Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13.   Unless otherwise set forth herein, the Definitive Documents not executed as of the Execution Date shall be consistent with terms and provisions set forth in the applicable annex hereto (unless otherwise agreed by the Parties set forth below) and otherwise be in form and substance reasonably acceptable to each of:

(a)       the Company Parties; and

(b)      the Required Consenting Stakeholders;

(c)      *provided* that with respect to the DIP Documents, the Required Consenting Stakeholders' consent may be withheld in their respective sole discretion.

**Section 4.      *Commitments of the Consenting Stakeholders*.**

4.01.   <u>General Commitments, Forbearances, and Waivers</u>.

(a)      During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees, in respect of all of its Company Claims/Interests, to:

(i)      with respect to the Consenting Stakeholders that hold First Lien Term Loan Claims and/or Second Lien Term Loan Claims, give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions;

(ii)      with respect to the Consenting Stakeholders that elect to fund the New Term Loans (including, for the avoidance of doubt, the Backstop Parties, in accordance with the Backstop Commitment Letter), participate (including through one or more affiliates) in the DIP Financing by funding the DIP Term Loans in a principal amount equal to the product of (A) the ratio where such Consenting Stakeholder's First Lien Tranche A-1 Term Loan Claims is the numerator and the aggregate amount of First Lien Tranche A-1 Term Loan Claims is the denominator and (B) the New Funding Principal Amount;

(iii)      with respect to the New Money Investor, fund the New Money Investment in accordance with the New Equity Subscription Agreement;

(iv)      vote or consent and not object, to the extent applicable, all Company Claims/Interests owned by or held by such Consenting Stakeholder and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions and use commercially reasonable efforts to support the Restructuring Transactions;

(v)      use commercially reasonable efforts to support the Company Parties' efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(vi)      with respect to the Backstop Parties, negotiate the Backstop Commitment Letter in good faith and consistent with the terms set forth herein and in the Restructuring Term Sheet;

(vii)      negotiate in good faith and use commercially reasonable efforts to execute, deliver, and implement the Definitive Documents and any other necessary agreements that are consistent with this Agreement to which it is a party in a timely manner to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement; and

(viii)      support approval of the DIP Orders.

(b)     During the Agreement Effective Period, each Consenting Stakeholder severally, and not jointly, agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)     seek, solicit, propose, support, assist, engage in negotiations in connection with, or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal;

(iii)     modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement or the Plan; or

(iv)     exercise, or direct any other person, including the applicable Agents, to, exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties that are subject to forbearance hereunder.

4.02.   <u>Commitments with Respect to the Chapter 11 Cases.</u>

(a)     In addition to the obligations set forth in Section 4.01, during the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis in accordance with the procedures set forth in the Disclosure Statement following the commencement of the solicitation of the Plan;

(ii)     to the extent it is permitted to elect whether to (A) opt out of the releases set forth in the Plan, elect not to opt out of such releases, or (B)  opt in to the releases set forth in the Plan, elect to opt in to such releases, in each case by timely delivering its duly executed and completed ballot(s) indicating such election in accordance with the procedures set forth in the Disclosure Statement;

(iii)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above;

(iv)     not directly or indirectly, and shall not direct any other person to, file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement and the Definitive Documents;

(v)     not directly or indirectly, and shall not direct any other person to, or object to or take any other action that would reasonably be expected to prevent, materially interfere with, or impede the approval of the Disclosure Statement or the confirmation and consummation of the Plan and the Restructuring Transactions;

(vi)     not directly or indirectly, and shall not direct any other person to, initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties prohibited under this Agreement; or

(vii)    not directly or indirectly, and shall not direct any other person to take any other action with the intent to interfere with the Company Parties' ownership and possession of their assets, wherever located, or violate the automatic stay arising under section 362 of the Bankruptcy Code.

(b)     During the Agreement Effective Period, each Consenting Stakeholder, with respect to its First Lien Term Loan Claims and Second Lien Term Loan Claims, hereby consents to, and directs the applicable Agents to consent to, the Debtors' use of their cash collateral and the incurrence of the DIP Facilities, including the priming of the applicable liens, encumbrances, or security interests securing the First Lien Term Loan Claims and the Second Lien Term Loan Claims, in accordance with, and solely to the extent set forth in, the DIP Documents.

4.03.   [Reserved]

**Section 5.**     *Additional Provisions Regarding the Consenting Stakeholders' Commitments*.

Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, the Debtors or any other party in interest in the Chapter 11 Cases (including, if applicable, any official committee and the United States Trustee), subject to applicable confidentiality obligations; (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (c) prevent any Consenting Stakeholder from enforcing this Agreement or any Definitive Document or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document; (d) prevent a Consenting Stakeholder from taking any action that is not inconsistent with this Agreement or the Restructuring Transactions; (e) subject to Section 4.03, constitute a waiver or amendment of any term or provision of the First Lien Credit Agreement or Second Lien Credit Agreement; (f) require any Consenting Creditor (i) to incur, assume, or become liable for any financial or other liability or obligation, or (ii) agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in a Consenting Creditor incurring, assuming, or becoming liable for any financial or other liability or obligation, in each case, other than as expressly described in this Agreement or the Definitive Documents; (g)(i) prevent any Consenting Stakeholder from taking any action that is required by applicable Law or (ii) require any Consenting Stakeholder to take any action that is prohibited by applicable Law or to waive or forgo the benefit of any applicable legal privilege; (h) except as otherwise provided in this Agreement or the Definitive Documents, be construed to limit the Consenting Stakeholders' rights, directly or indirectly, with respect to any Claim against the Company Parties; (i) be construed to prevent the Consenting Stakeholders from exercising any consent rights provided to the Consenting Stakeholders or their rights or remedies specifically reserved herein or in the Definitive Documents; (j) waive, limit, impair, or restrict the ability of the Consenting Stakeholders to protect

17

and preserve their rights, remedies, and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), other than as expressly described in this Agreement or the Definitive Documents; or (k) require the Consenting Stakeholders to pursue, or become a plaintiff in, any legal action, litigation or other adversarial proceeding.

**Section 6.**     *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with the terms, conditions, and applicable deadlines set forth in this Agreement and in accordance with the Milestones set forth in this Agreement and instruct each of their applicable subsidiaries to do the same;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders;

(f)     upon reasonable request, inform the Ad Hoc Group Advisors (as well as to any Consenting First Lien Lender that has executed a confidentiality agreement acceptable to the Debtors and such Consenting First Lien Lender) as to (A) the material business and financial performance (including liquidity position) of the Company Parties and their businesses and (B) the status of obtaining any necessary or desirable authorizations (including consents) from each Consenting Stakeholder, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body;

(g)     provide prompt written notice to the Ad Hoc Group Advisors, the New Money Investor, and any Consenting Creditor identified by the Ad Hoc Group Advisors by prior written notice to the Company Parties' advisors as having requested such notice as soon as reasonably practicable after becoming aware (and in any event within two (2) Business Days after becoming so aware) of (A) the occurrence of a Required Consenting Stakeholders Termination Event or Required Consenting First Lien Tranche A-1 Lender Termination Event; (B) any matter or circumstance that is, or is reasonably likely to be a material impediment to the implementation or consummation of the Restructuring Transactions, (C) any notice of any commencement of any insolvency proceeding or legal suit, or enforcement action from or by any person or entity in respect of any Debtor or subsidiary thereof, in each case to the extent that it would materially

impede or frustrate the Restructuring Transactions, and (D) any representation made by the Debtors under this Agreement being incorrect in any material respect when made;

(h)      provide the Ad Hoc Group Advisors with, and direct its employees, officers, directors, consultants, attorneys, accountants and other advisors and representatives to provide the Ad Hoc Group Advisors with, (i) reasonable access, upon reasonable prior notice, during normal business hours, and without any material disruption to the conduct of its business, to (A) the Company Parties' non-privileged facilities, properties, assets, contracts, books, records and other information concerning the business and operations of the Company Parties which are not subject to a binding confidentiality agreement with a non-Party, and (B) the officers, management, employees, advisors and representatives of the Company Parties, in each case for the purposes of evaluating the Company Parties' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs, *provided* that any on-site or in-person meetings or access shall not be required more than once per 90 days without the Company Parties' prior written consent, (ii) timely and reasonable responses to all reasonable diligence requests, (iii) non-privileged information with respect to all material executory contracts and unexpired leases of the Company Parties which is not subject to a binding confidentiality agreement with a non-Party, and (iv) updates regarding any material developments regarding the Company Parties' liquidity, assets, liabilities, operations, businesses, finances, strategies, prospects and affairs;

(i)      pay all Transaction Expenses on the date that is the later of (i) ten (10) Business Days after the day such Transaction Expenses are invoiced under the applicable Fee Letters or (ii) the day such Transaction Expenses are due under the Fee Letters; *provided* that the Company Parties shall pay the Transaction Expenses of the Ad Hoc Group Advisors in an aggregate amount not to exceed $2,400,000 prior to the funding of the DIP Term Loans to the Company Parties;

(j)      except as otherwise expressly set forth in this Agreement, (i) use commercially reasonable efforts to conduct its businesses and operations in the ordinary course in a manner that is materially consistent with past practices and in compliance with applicable law (taking into account the Restructuring Transactions and the pendency, if applicable, of the Chapter 11 Cases) and (ii) use commercially reasonable efforts to preserve intact its businesses and relationships with third parties (including creditors, lessors, licensors, suppliers, distributors, and customers) and employees;

(k)      maintain good standing under the laws of the state or other jurisdiction in which each Company Party or subsidiary is formed, incorporated or organized, except where failure to do so would not be reasonably expected to have a material adverse effect on the Company parties' operations, taken as a whole;

(l)      provide the Ad Hoc Group Advisors with (A) copies of written proposals or summaries to the extent required under Section 7.02 hereof, and (B) draft copies of all Definitive Documents and all other pleadings, motions, declarations, supporting exhibits and proposed orders and any other document that the Company Parties intend to file with the Bankruptcy Court, in each case to the extent (x) material or related to relief material to the Debtors' business or assets, or (y) concerning (1) any Consenting Creditor or its rights or recoveries (or any financial or other analysis in respect hereof) in respect of its Company Claims/Interests, (2) the ability of any Debtor to implement and consummate the Restructuring Transactions, or (3) the rights or obligations of any

of the Parties under this Agreement, in any case, at least two (2) calendar days prior to the date when the Company Parties intend to file or execute such documents or as soon as reasonably practicable thereafter, and, if requested by Ad Hoc Group Advisors, consult in good faith regarding the form and substance of such documents; and

(m)    pay the Second Lien Lender Consent Fee to each holder of Second Lien Term Loans who becomes a Consenting Second Lien Lender by no later than 11:59 P.M., prevailing Eastern Time, on the day that is seven days after the Execution Date (such holders of Second Lien Term Loan Claims, the "**Accepting Consenting Second Lien Lenders**") on the Transaction Effective Date in an amount equal to the product of (i) the Second Lien Lender Consent Fee Amount and (ii) the ratio where the numerator is the principal amount of Second Lien Term Loans held by each Accepting Consenting Second Lien Lender and the denominator is the aggregate principal amount of Second Lien Term Loans; *provided* that the Company Parties in their sole discretion may modify the Second Lien Lender Consent Fee to be payable to additional holders of Second Lien Term Loans; *provided*, *further*, that any such modification does not adversely affect the Second Lien Lender Consent Fee payable to the Accepting Consenting Second Lien Lenders or provide such additional holders with more favorable terms relative to the Accepting Consenting Second Lien Lenders; and

(n)    support approval of the DIP Orders.

6.02.    <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent with, or is intended, or would be reasonably expected, to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions or any of the other transactions described in, this Agreement or the Definitive Documents;

(c)    without the prior written consent of the Required Consenting Stakeholders, (A) engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness, or other similar transaction outside the ordinary course of business, *provided* that the Company Parties may incur obligations under the ABL Credit Agreement in accordance therewith; (B) enter into any material contract or agreement, or amend, waive, or terminate any such agreement outside the ordinary course of business; (C) enter into or amend any employee benefit, deferred compensation, incentive, retention, bonus, transition services, or other compensatory arrangements, policies, programs, practices, plans (including key employee incentive programs, key employee retention plans, or plans of similar nature), or agreements, including offer letters, employment agreements, consulting agreements, severance agreements, or change in control agreements with respect to the Company Parties' executive officers or other insiders or file a motion or seek other approval with respect to any of the foregoing; or (D) reject and, other than pursuant to the Plan, assume any agreement, contract, or lease agreement pursuant to section 365 of the Bankruptcy Code;

(d)      seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Plan in all material respects;

(e)      subject to Section 7, seek, solicit, propose, support, assist, engage in negotiations in connection with, or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal;

(f)      subject to Section 7, announce publicly or announce to any of the Consenting Stakeholders or other holders of Company Claims/Interests, its intention not to support the Restructuring Transactions;

(g)      make or change any material tax election, change the tax classification of any Company Entity, file any material amended tax return, enter into any "closing agreement" (within the meaning of Section 7121 of the Code or similar provision of state or local tax law) with respect to a material tax, surrender any right to claim a material tax refund, offset, or other reduction in tax liability, or seek any private letter ruling from the U.S. Internal Revenue Service, in each case, inconsistent with past practice except to the extent needed to comply with the terms of this Agreement or any Definitive Document, without the written consent of the Required Consenting Stakeholders;

(h)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court (if applicable) or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement, including (A) a motion, application, pleading, or proceeding challenging the amount, validity, enforceability, extent, perfection, or priority of, or seeking avoidance or subordination of, any Claim held by any Consenting Stakeholder against the Debtor or any liens or security interests securing such Claim, or (B) a motion, application, pleading or proceeding asserting (or seeking standing to assert) any purported Claims or causes of action against any of the Consenting Stakeholder, or take or support any corporate action for the purpose of authorizing any of the foregoing, except to enforce this Agreement or the Definitive Documents; or

(i)      terminate the Fee Letters, except for the fraud, gross negligence, willful misconduct of the applicable Ad Hoc Group Advisors thereunder as determined in a non-appealable order by a court of competent jurisdiction.

6.03.   Commitments with Respect to the Chapter 11 Cases.

(a)      In addition to the obligations set forth in Sections 6.01 and 6.02, and except as set forth in Section 7, during the Agreement Effective Period, each Company Party agrees that it shall:

(i)      timely file a formal written objection or response to (1) any motion filed with the Bankruptcy Court by a third party seeking entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) modifying or terminating the Company Parties' exclusive right to file or solicit acceptances for a plan of reorganization; or (2) any objection to the Disclosure Statement, the Solicitation Materials, the Plan, the DIP Documents, the Backstop, or any of the other Definitive Documents or to any motion of the Company Parties

seeking to extend the time periods governing the Company Parties' exclusive right to file or solicit acceptances for a plan of reorganization; and

(ii)    use commercially reasonable efforts to obtain and maintain Bankruptcy Court approval of the DIP Orders, the Disclosure Statement, the Solicitation Materials, the Plan, the Backstop, the DIP Documents, and any of the other Definitive Documents, including, for the avoidance of doubt, by filing and prosecuting one or more motions to approve the Backstop and the DIP Documents, in each case, within the timeframes contemplated in this Agreement, as applicable.

**Section 7.**    *Additional Provisions Regarding Company Parties' Commitments*.

7.01.    Notwithstanding anything to the contrary in this, on and after the Petition Date, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement, *provided* that (i) within forty-eight (48) hours following any determination by the Company Parties to take or refrain from taking any such action, the Company Parties shall provide notice to the Consenting Stakeholders of such determination; and (ii) any such inaction or action shall not impede any Party's rights to terminate this Agreement pursuant to Section 12.

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity which would permit the sharing of proposals as required pursuant to the last sentence of this Section 7.02; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.  Within forty-eight (48) hours of receiving an Alternative Restructuring Proposal or determining to pursue an Alternative Restructuring Proposal, the Company Parties shall notify (with email being sufficient) the Ad Hoc Group Advisors of such determination and a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Exchange Act) in any Company Claims/Interests (including First Lien Term Loans and Second Lien Term Loans) to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless (a) in the case of the Company's Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. Person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; (b) either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder or an affiliate thereof bound by the terms of this Agreement and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties by the close of business on the second Business Day following such Transfer, or (c) in the case of a Transfer by a Backstop Party, such transfer is made pursuant to the terms of the Backstop Commitment Letter.

8.02.    Upon compliance with the requirements of Section 8.01, the transferee shall be deemed a Consenting Stakeholder, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of this Section 8 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided*, *however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the other Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to the Company Parties within five (5) Business Days of such acquisition.

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements, including any cleansing obligation thereunder.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall be permitted to be a transferee of Company Claims/Interests without being required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company

Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an Entity that is not an affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01. To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee. For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims/Interests from a Consenting Stakeholder and is unable to transfer such Company Claims/Interests within the five (5) Business Day-period referred to above, the Qualified Marketmaker shall execute and deliver a Transfer Agreement in respect of such Company Claims/Interests.

8.06. Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to (i) the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests or (ii) the grant of any liens or encumbrances in favor of any lender, noteholder, agent or trustee to secure obligations under indebtedness issued or held by a managed fund or account, including any collateralized loan obligation or collateralized debt obligation.

8.07. During the Agreement Effective Period, the Sponsor, on behalf of itself and each of its affiliates and their respective investment funds that are direct or indirect holders of existing Equity Interests (in respect of all such Company Claims/Interests presently owned and hereafter acquired) agrees to not, directly or indirectly, and shall cause the Company Parties not to, (i) make any tax classification election with respect to any Company Party (and any Company Party subsidiary); (ii) pledge, encumber, assign, sell or otherwise transfer, offer or contract to pledge, encumber, assign, sell or otherwise transfer, in whole or in part, directly or indirectly, any portion of its direct or indirect right, title, or interests in any shares, stock or other interests treated as stock for purposes of section 382 of the Internal Revenue Code of 1986, as amended (the "**Code**") with respect to any Company Party (and any Company Party subsidiary), (iii) claim a worthlessness loss for U.S. federal income tax purposes with respect to any Equity Interests; or (iv) take any other action that would result in an "owner shift" within the meaning of section 382(g) of the Code with respect to the Company Parties; in each case, with respect to any taxable period (or portion thereof) ending on or before the Transaction Effective Date, in each case, except to the extent contemplated by the terms of this Agreement or any Definitive Document.

**Section 9.** *Representations and Warranties of Consenting Stakeholders*. Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Transaction Effective Date:

(a) it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in such Consenting Stakeholder's signature page to this

Agreement, a Joinder Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)      it has the full power and authority to tender, act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)      such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, tender, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)      solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**      [Reserved]

**Section 11.**      ***Mutual Representations, Warranties, and Covenants***.      Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, a Joinder or a Transfer Agreement, as applicable, and as of the Transaction Effective Date:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, if applicable, no consent or approval is required by any other person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this

Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.** *Termination Events*.

12.01.  <u>Required Consenting Stakeholder Termination Events</u>.  This Agreement may be terminated (A) with respect to the Consenting First Lien Tranche A-1 Lenders, by the Required Consenting First Lien Tranche A-1 Lenders, or (B) with respect to the New Money Investor, by the New Money Investor, in each case by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events (each, a "**Required Consenting Stakeholders Termination Event**"):

(a)      the breach in any material respect by a Company Party, the Consenting First Lien Tranche A Lenders, or the Consenting Second Lien Lenders of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured (to the extent curable) for fifteen (15) Business Days after such terminating Required Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof detailing any such breach;

(b)      any of the Milestones set forth in **<u>Schedule 1</u>** (as may have been extended with the approval of the Required Consenting Stakeholders) is not achieved, except where such Milestone has been waived or extended by the Required Consenting Stakeholders; *provided* that the right to terminate this Agreement under this Section 12.01(b) shall not be available to any Consenting Stakeholder if the failure of such Milestone to be achieved is primarily and directly caused by the breach by the terminating Consenting Stakeholder (or, in the case of the New Money Investor, the Sponsor) of its respective covenants, agreements or other obligations under this Agreement;

(c)      this Agreement or any Definitive Document is amended, waived, or modified in any manner not consistent in any material respect with the terms of this Agreement;

(d)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for twenty (20) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Consenting Stakeholders that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(e)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders) (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in

sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iv) rejecting this Agreement, (v) disapproving or failing to approve the DIP Orders, the New Money Investment, the Disclosure Statement, the Plan, or any of the other Definitive Documents that are subject to approval of the Bankruptcy Court, or any order approving the foregoing is stayed, modified, or reversed in connection with appeal thereof; or (vi) that is otherwise materially inconsistent with this Agreement or the Plan;

(f)     any Company Party (i) files, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Consenting Stakeholders under this Agreement) without the prior written consent of a terminating Party who has an applicable consent right with respect to such Definitive Document, (ii) revokes the Restructuring Transactions without the prior consent of the Required Consenting Stakeholders, including the withdrawal of the Plan, or support therefor, or (iii) publicly announces its intention to take any such acts listed in the foregoing clauses (i) or (ii) or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(g)     entry by any of the Company Parties, or announcement of their intention to enter into, a term sheet or definitive documentation relating to any Alternative Restructuring Proposal; or

(h)     (A) any Company Party (i) commences a voluntary case under chapter 11 of the Bankruptcy Code other than as provided for under this Agreement, (ii) consents to the appointment of, or taking possession by, a receiver, liquidator, assignee, custodian, trustee, or sequestrator (or similar official) of any Company Party or the property or assets of any Company Party, (iii) seeks any arrangement, adjustment, protection, or relief of its debtors, or (iv) makes any general assignment for the benefit of its creditors, or (B) the commencement of an involuntary case against any Company Party or the filing of an involuntary petition or application seeking bankruptcy, insolvency, winding up, dissolution, liquidation, administration, moratorium, reorganization, corporate reorganization, any stay of enforcement and/or proceedings, or other relief in respect of any Company Party, or their debts, or of a substantial part of their assets, under any federal, state, provincial, or other foreign bankruptcy, insolvency, corporate restructuring, administrative receivership, or similar law now or hereafter in effect (provided that such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof) or if any court grants the relief sought in such involuntary proceeding; or

(i)     the acceleration of any obligations under the DIP Documents.

12.02.  <u>Required Consenting First Lien Tranche A-1 Lender Termination Events</u>.  This Agreement may be terminated with respect to the Consenting First Lien Tranche A-1 Lenders, by the Required Consenting First Lien Tranche A-1 Lenders by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events (each, a "**Required Consenting First Lien Tranche A-1 Lender Termination Event**"):

(a)     the termination of the Fee Letters by the Company Parties or failure by the Company Parties to pay the Transaction Expenses as and when required under this Agreement and subject to Section 6.01(i);

(b) the breach in any material respect by the Sponsor or the New Money Investor of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that remains uncured (to the extent curable) for fifteen (15) Business Days after the Required Consenting First Lien Tranche A-1 Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such breach; or

(c) the Company Parties provide notice as required by Section 7.01 hereof or fail to provide notice in violation of Section 7.01 hereof.

12.03.  <u>Sponsor Termination Event</u>.  The Sponsor may terminate this Agreement as to itself upon the occurrence of any of the following events:

(a) a material breach of this Agreement by any Party (other than the terminating Sponsor or the New Money Investor), which material breach is (i) adverse to the Sponsor or the New Money Investor, and (ii) has not been cured (if susceptible to cure) within fifteen (15) Business Days after written notice in accordance with Section 14.10 hereof to the Company Parties and the Consenting Creditors of such material breach;

(b) any Definitive Document adversely modifies or affects the release, exculpation, injunction, indemnification, insurance, or tax provisions related to the Sponsor as identified in this Agreement or implemented pursuant to the Plan without the prior written consent of the Sponsor.

12.04.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a) the breach in any material respect by one or more Consenting Stakeholders of any provision set forth in this Agreement that remains uncured (to the extent curable) for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach; *provided*, *however*, that (i) so long as the non-breaching Consenting First Lien Tranche A-1 Lenders continue to hold or control at least 66 2/3% of the aggregate outstanding principal amount of the First Lien Tranche A-1 Term Loans, such termination shall be effective only with respect to such breaching Consenting Creditors, and (ii) so long as the non-breaching Backstop Parties continue to commit to backstop 100% of the New Funding Principal Amount, such termination shall be effective only with respect to such breaching Backstop Party;

(b) the Milestone in respect of the Outside Date set forth in **<u>Schedule 1</u>** (as may be extended with the approval of the Required Consenting Stakeholders) is not achieved; *provided* that the right to terminate this Agreement under this Section 12.04(b) shall not be available to any Company Party if the failure of such Milestone to be achieved is primarily and directly caused by the breach by the terminating Company Party of its respective covenants, agreements or other obligations under this Agreement;

(c) the termination of this Agreement by any of the Required Consenting Stakeholders;

(d) the board of directors, board of managers, or such similar governing body of any Company Party determines in good faith, after consulting with counsel, that proceeding with any

of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law;

(e)      the acceleration of any obligations under the DIP Documents;

(f)      the Bankruptcy Court enters an order denying Confirmation of the Plan and such order remains in effect for seven (7) Business Days after entry of such order;

(g)      the filing of any motion or pleading by any Consenting Creditor with the Bankruptcy Court that (i) is inconsistent in any material respect with this Agreement or the Definitive Documents or (ii) seeks approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Company Parties under this Agreement) without the consent of the Company Parties, and such motion or pleading has not been withdrawn within five (5) Business Days of such filing; *provided*, *however*, that (i) so long as the non-breaching Consenting First Lien Tranche A-1 Lenders continue to hold or control at least 66 2/3% of the aggregate outstanding principal amount of the First Lien Tranche A-1 Term Loans, such termination shall be effective only with respect to such breaching Consenting Creditors, and (ii) so long as the non-breaching Backstop Parties continue to commit to backstop 100% of the New Funding Principal Amount, such termination shall be effective only with respect to such breaching Backstop Party;

(h)      the entry of an order by the Bankruptcy Court (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iv) rejecting this Agreement, or (v) disapproving or failing to approve the DIP Orders, the New Money Investment, the Disclosure Statement, the Plan, or any of the other Definitive Documents that are subject to approval of the Bankruptcy Court and the applicable Consenting Stakeholders do not agree to modifications to address the Bankruptcy Court's objections; and

(i)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance.

12.05.   <u>Consenting Second Lien Lender Termination Event</u>.  The Required Consenting Second Lien Lenders may terminate this Agreement as to all Second Lien Term Loan Claims held by the Consenting Second Lien Lenders upon prior written notice to all Parties in accordance with Section 14.10 hereof if (i) the treatment of Second Lien Term Loan Claims set forth in this Agreement (including the Restructuring Term Sheet) is modified adversely to the Consenting Second Lien Lenders, (ii) the Company Parties fail to timely pay the Second Lien Lender Consent Fee, (iii) if any of the Company Parties enter into, or announcement of their intention to enter into, a term sheet or definitive documentation relating to any Alternative Restructuring Proposal which

29

(y) to the extent that the Second Lien Lender Consent Fee has not been paid, does not contemplate payment of the Second Lien Lender Consent Fee and/or (z) contemplates treatment of Second Lien Term Loan Claims in a manner that is worse than the treatment of Second Lien Term Loan Claims set forth in this Agreement (including the Restructuring Term Sheet), or (iii) if any Definitive Document is inconsistent with such treatment in a manner that is adverse to the Consenting Second Lien Lenders.

12.06. <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following: (a) the Required Consenting Stakeholders; (b) the Sponsor; and (c) any Company Party.

12.07. <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Transaction Effective Date.

12.08. <u>Effect of Termination</u>.

(a)    Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action, and no rights or remedies will be deemed waived pursuant to a claim of laches, estoppel or otherwise; *provided, however*, that in no event shall any such termination relieve any Party from liability for its breach or non-performance of its obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by the Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, *however*, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 12.08 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.   No purported termination of this Agreement shall be effective under this Section 12.08 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement or if such Party's failure to perform or comply with this Agreement, or such Party's actions, omissions, or delays that violated their obligations under this Agreement, directly or indirectly caused or resulted in the occurrence of one or more Termination Events.  Nothing in this Section 12.08 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.04(d).  Upon termination of this Agreement, the Company Parties shall

promptly pay all Transaction Expenses through the date of such termination (and such obligation shall survive termination of this Agreement).

## Section 13.    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (i) each Company Party and (ii) the Required Consenting Stakeholders; *provided* that if the proposed modification, amendment, waiver or supplement materially and adversely affects the rights of the Sponsor, then the consent of the Sponsor shall be required to effectuate such amendment, waiver, or supplement; *provided*, *further*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Claims held by a Consenting Creditor as compared to similarly situated Consenting Creditors, then the consent of each such affected Consenting Creditor shall also be required to effectuate such modification, amendment, waiver, or supplement; *provided*, *further*, that (w) any modification or amendment to (i) the treatment of the Second Lien Term Loan Claims under the Restructuring Term Sheet or the Plan, (ii) Section 6.01(m), or (iii) the definitions of "Second Lien Lender Consent Fee" and "Second Lien Lender Consent Fee Amount" shall require the consent of each Accepting Consenting Second Lien Lender; (x) any modification, amendment, or supplement to the definition of "Outside Date" that extends such date beyond the date that is 240 days after the Confirmation Date shall not be binding on any Consenting Creditor that has not provided its prior written consent to such amendment; (y) any modification or amendment to Section 12.05 shall require the prior written consent of each Consenting Second Lien Lender; and (z) any modification or amendment to this Section 12 shall require the consent of all Consenting Stakeholders.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

## Section 14.    *Miscellaneous*

14.01.    <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance

with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, the exhibits, annexes, and schedules hereto shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement solely and exclusively in the Chosen Forum:  (a) irrevocably submits to the exclusive jurisdiction of the Chosen Forum; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Forum; and (c) waives any objection that the Chosen Forum is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06.  TRIAL BY JURY WAIVER.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  Rules of Construction.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or

any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and, except as set forth in Section 8, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity.

14.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Poseidon Investment Intermediate, Inc.
1555 Page Industrial Blvd.
St. Louis, MO 63132
Attention: James Rooney, Chief Executive Officer

with copies to:

Kirkland & Ellis LLP
333 W Wolf Point Plaza
Chicago, IL 60654
Attention:  Anup Sathy
            Yusuf Salloum
E-mail address:  anup.sathy@kirkland.com
                 yusuf.salloum@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Steven Serajeddini
            Jordan Elkin
E-mail address:  steven.serajeddini@kirkland.com
                 jordan.elkin@kirkland.com

(b)     if to the Ad Hoc Group, to:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  Evan Fleck
            Matthew Brod

E-mail address:  efleck@milbank.com
mbrod@milbank.com

(c)      if to the Sponsor and the New Money Investor, to:

Clearlake Capital Group, L.P.
233 Wilshire Boulevard, Suite 800
Santa Monica, CA 90401
Attention:      Fred Ebrahemi
John Cannon
E-mail address:  febrahemi@clearlake.com
jcannon@clearlake.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and neither joint nor joint and several.

14.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  <u>Capacities of Consenting Stakeholders</u>.  Subject to Section 12.05, each Consenting Stakeholder has entered into this agreement on account all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 14 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated pursuant to Section 12.07, Section 14 shall survive such termination.

14.20.  <u>Confidentiality and Publicity</u>.  Other than as may be required by applicable Law and regulation or by any governmental or regulatory authority, no Party or its advisors shall disclose to any person (including for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), (i) the principal amount or percentage of the Company Claims/Interests held by any Consenting Stakeholder or any of its respective subsidiaries (including, for the avoidance of doubt, any Company Claims/Interests acquired pursuant to any Transfer), or (ii) the name of any Consenting Creditor; *provided*, *however*, that any Party shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims/Interests held by the Consenting Stakeholders collectively.   Notwithstanding the foregoing, the Consenting Stakeholders hereby consent to the disclosure of the execution, terms and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by law or regulation; *provided*, *however*, that (i) if any of the Company Parties determines that they are required to attach a copy of this Agreement, any Joinder or Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will redact any reference to or concerning a specific Consenting Stakeholder's holdings of Company Claims/Interests (including before filing any pleading with the Bankruptcy Court) and (ii) if disclosure of additional identifying information of any Consenting Stakeholders is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each Consenting Stakeholder (who shall have the right to seek a protective order prior to disclosure). The Company Parties further agree that such

information shall be redacted from "closing sets" or other representations of the fully executed Agreement, any Joinder or Transfer Agreement. The Company Parties will submit to the Ad Hoc Group Advisors all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days (it being understood that such period may be shortened to the extent there are exigent circumstances that require such public communication to be made to comply with applicable Law) in advance of release. Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

14.21.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13 or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, as applicable, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature pages follow]*

## **EXHIBIT A**

### **Company Parties**

Poseidon Parent, L.P.
Poseidon Investment intermediate, Inc.
Pretium PKG Holdings, Inc.
Pretium Holding, LLC
Pretium Packaging, L.L.C.
Olcott Plastics, LLC
Alpha Consolidated Holdings, LLC
Mont Royal, L.L.C.
Starplex Scientific Corp.
Pretium Canada Packaging ULC

# EXHIBIT B

## Restructuring Term Sheet

**POSEIDON INVESTMENT INTERMEDIATE, INC., ET AL.**

**RESTRUCTURING TRANSACTION TERM SHEET**

This term sheet (the "**Term Sheet**") sets forth the principal terms of a comprehensive Restructuring Transaction involving the existing debt and other obligations of the Company Parties (on the terms set forth herein, the "**Restructuring Transactions**"). The Restructuring Transaction will be consummated through prepackaged cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of New Jersey (the "**Bankruptcy Court**") and as otherwise set forth in the restructuring support agreement to which this Term Sheet is attached as Exhibit B (the "**RSA**").[1]

THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAW.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THIS TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Material Terms of the Restructuring Transaction | |
|---|---|
| **Term** | **Description** |
| Overview of the Restructuring Transaction | This Term Sheet contemplates a Restructuring Transaction with respect to Poseidon Parent, L.P. ("**Pretium**") and its direct and indirect subsidiaries (collectively, the "**Company Parties**" and after emergence from the Chapter 11 Cases, the "**Reorganized Company Parties**", and Poseidon Investment Intermediate, Inc. after emergence from the Chapter 11 Cases (or, if applicable, a newly-formed parent entity), "**New Pretium**"). |
| | The Company Parties will consummate the Restructuring Transactions set forth in this Term Sheet, which include the Company Parties filing voluntary petitions for relief under the Bankruptcy Code (the date of commencement of the Chapter 11 Cases, the "**Petition Date**") and obtaining confirmation from the Bankruptcy Court of a prepackaged chapter 11 plan consistent with this Term Sheet (the "**Plan**") in accordance with the RSA. |
| | The initial parties to the RSA will be: |
| | (a)  the Company Parties; |
| | (b)  the beneficial holders, or investment advisors or managers for the account of beneficial holders of First Lien Tranche A Term Loans, First Lien Tranche A-1 Term Loans, or Second Lien Term Loans who have signed the RSA as of its effective date (as applicable, the "**Initial Consenting First Lien Tranche A Lenders**", the "**Initial Consenting First Lien Tranche A-1 Lenders**", and the "**Initial Consenting Second Lien Lenders**" and together with any such beneficial holders, or investment advisors or managers for the account of beneficial holders who join the RSA after its effective date, as applicable, the "**Consenting First Lien Tranche A Lenders**", the "**Consenting First Lien Tranche A-1 Lenders**", and the "**Consenting Second Lien Lenders**", and collectively, the "**Consenting Creditors**"); and |

---

[1]   Capitalized terms used herein but not otherwise defined have the meanings given to them in the RSA.

| | |
|---|---|
| | (c) the holders of, or investment advisors, sub-advisors, or managers of funds or accounts that hold Equity Interests in Pretium who have signed the RSA as of its effective date (the "**Sponsor**" and in its capacity as the provider of the New Money Investment, the "**New Money Investor**" and together with the Required Consenting First Lien Tranche A-1 Lenders, the "**Required Consenting Stakeholders**").<br><br>As of the date hereof, the Initial Consenting Creditors and Sponsor collectively beneficially hold or control:<br><br>(a) approximately 12.9% of the Third Amendment Tranche A Term Loans (the "**First Lien Tranche A Term Loans**") under the *First Lien Term Loan Credit Agreement*, dated as of October 1, 2021 (as amended, the "**First Lien Term Loan Agreement**"), among Pretium PKG Pretium, Inc., Poseidon Investment Intermediate, Inc., the Third Amendment Tranche A Term Lenders party thereto (the "**Tranche A Lenders**"), the Third Amendment Tranche A-1 Term Lenders party thereto (the "**Tranche A-1 Lenders**") and UBS AG, Stamford Branch as administrative agent and collateral agent (in such capacity, the "**First Lien Agent**");<br><br>(b) approximately 80.9% of the Third Amendment Tranche A-1 Term Loans (the "**First Lien Tranche A-1 Term Loans**") under the First Lien Term Loan Agreement;<br><br>(c) approximately 76.5% of the Term Loans (the "**Second Lien Term Loans**") under the *Second Lien Term Loan Credit Agreement*, dated as of November 5, 2020 (as amended, the "**Second Lien Term Loan Agreement**"), among Pretium PKG Pretium, Inc., Poseidon Investment Intermediate, Inc., the Lenders party thereto (the "**Second Lien Term Lenders**") and UBS AG, Stamford Branch as administrative agent and collateral agent (in such capacity, the "**Second Lien Agent**"); and<br><br>(d) approximately 77.4% of the Equity Interests issued by Pretium (the "**Existing Equity Interests**"). |
| Plan Value | Distributions of equity interests in New Pretium (or its successor) ("**New Equity Interests**") hereunder and the New Money Investment have been calculated based upon an enterprise value of the Reorganized Company Parties of $1,098,000,000.00 (the "**Plan Value**"), subject to increase as set forth in the row labeled "Liquidity Shortfall". |
| **Financing** | |
| DIP Financing | The Company Parties will enter into a credit agreement (the "**DIP Term Loan Credit Agreement**" and the administrative agent under the DIP Term Loan Credit Agreement, the "**DIP Term Loan Agent**") with certain Consenting First Lien Tranche A-1 Lenders (in their capacity as lenders of the DIP Term Loans, the "**DIP Term Loan Lenders**") providing for a multi-draw debtor-in-possession term loan facility (the term loans thereunder, the "**DIP Term Loans**") on the terms set forth in this Term Sheet and otherwise in form and substance reasonably acceptable to the Company Parties, and acceptable to the Required Consenting Stakeholders in their sole discretion.  On the effective date of the Plan (the "**Effective Date**"), the DIP Term Loans will be converted into New Term Loans as set forth herein, the Plan, and in the DIP Term Loan Credit Agreement.<br><br>The material terms of the DIP Term Loans shall include:<br><br>(a) Principal Amount:  $451,000,000.00, subject to upsizing to the extent applicable as set forth in the row labeled "Liquidity Shortfall" (the "**New Funding Principal Amount**")<br><br>(b) Initial and subsequent draw amounts to be agreed among the Company Parties and the Required Consenting Stakeholders<br><br>(c) Tenor: No less than 6 months<br><br>(d) Interest Rate:  No more expensive than rate on the New Term Loans |

|  | |
|---|---|
|  | (e) <u>Participation Premium</u>: 10% of the commitments under the DIP Term Loan Credit Agreement (including the commitment in respect of any Liquidity Shortfall), which shall be payable in 23.4% of the New Equity Interests (the "**Participation Premium**"), which (i) shall not dilute New Equity Interests distributable to the New Money Investor on account of the New Money Investment and (ii) will be subject to dilution by New Equity Interests issued pursuant to the post-Effective Date MIP and shall be earned upon entry of the Interim DIP Order.  There shall be no other premiums or fees payable to the DIP Term Loan Lenders for funding the DIP Term Loans. |
|  | (f) <u>Priority and Liens</u>: In each case, subject to a professional fee carve-out and customary excluded collateral to be agreed by the Company and the Required Consenting Stakeholders, all obligations under the DIP Term Loan Credit Agreement shall at all times: |
|  | a.  pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status having priority over any and all other claims; |
|  | b.  pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all unencumbered now owned or after acquired assets of the Company Parties that are not otherwise subject to any lien; |
|  | c.  pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on (a) all ABL Priority Collateral (as defined in the ABL Intercreditor Agreement), subject to any liens securing the obligations arising under the ABL Credit Agreement, and (b) all now owned or after acquired assets of the Company Parties that are subject to (x) any valid, perfected and non-avoidable lien in existence on the Petition Date or (y) any valid lien in existence on the petition date that is perfected subsequent to the Petition Date by Section 546(b) of the Bankruptcy Code, in each case, which is permitted under the terms of the First Lien Term Loan Agreement and Second Lien Term Loan Agreement (such liens, the "**Permitted Prior Liens**"); and |
|  | d.  pursuant to Section 364(d) of the Bankruptcy Code, be secured by a perfected first priority priming lien on all now owned or after acquired assets of the Credit Parties constituting Term Priority Collateral (as defined in the ABL Intercreditor Agreement), subject to any Permitted Prior Liens. |
|  | (g) <u>No "Staple" of Backstop Premium or Participation Premium</u>: Nothing herein or in the Definitive Documents shall prohibit the DIP Term Loans or commitments in respect thereof from being assigned without the right to receive Backstop Premium or Participation Premium. |
|  | The Company Parties may enter into a credit agreement (the "**DIP ABL Credit Agreement**") with the ABL Agent and the ABL Lenders (in their capacity as collateral agent and administrative agent and lenders party to the DIP ABL Credit Agreement, respectively, the "**DIP ABL Agent**" and the "**DIP ABL Lenders**") providing for a debtor-in-possession asset-based revolving loan facility (the "**DIP ABL Facility**") on the terms to be agreed among the Company Parties, the DIP ABL Agent, and the Required Consenting Stakeholders.  On the Effective Date, the DIP ABL Facility will be paid off or converted to the Exit ABL Facility, if any, with the consent of the Required Consenting Stakeholders. |
| Adequate Protection | During the Chapter 11 Cases, the Company Parties will provide adequate protection to secured parties under the First Lien Term Loan Agreement, the Second Lien Term Loan Agreement, and the ABL Credit Agreement as set forth in the form of the Interim DIP Order in form and substance reasonably acceptable to the Company Parties and the New Money Investor, and acceptable to the Required Consenting First Lien Tranche A-1 Lenders in their sole discretion. |

| Chapter 11 Plan Implementation | |
| --- | --- |
| DIP Term Loans to New Term Loans | Prior to or on the Petition Date, the Initial Consenting First Lien Tranche A-1 Lenders (in such capacity, the "**Backstop Parties**") will execute the Backstop Commitment Letter in a form reasonably acceptable to the Company Parties and acceptable to the Required Consenting Stakeholders in their sole discretion, pursuant to which the Backstop Parties will commit to provide DIP Term Loans, severally and not jointly, in the allocations set forth on Schedule I of the Backstop Commitment Letter, in an aggregate principal amount equal to the New Funding Principal Amount, which on the Effective Date the principal amount will be converted into new senior secured first lien term loans (the "**New Term Loans**") on terms consistent with the DIP Term Loan Credit Agreement, the exit term sheet attached to the RSA as Exhibit C (the "**Exit Term Sheet**"), and the credit agreement consistent therewith (such agreement, the "**New Term Credit Agreement**", and the lenders thereunder, the "**New Term Lenders**"). |
| | **Additional Terms** |
| | (a) Additional Joinders to RSA: The Company Parties will permit the Tranche A-1 Lenders to participate in syndication of the DIP Term Loans by executing a joinder to the RSA and becoming a party thereto by the date that is 5 business days after the commencement of the syndication period (such date, as may be extended in accordance with the RSA, the "**Election Date**"). |
| | (b) Allocation of DIP Term Loans: Each Tranche A-1 Lender that subsequently joins the RSA by the Election Date may elect to acquire its *pro rata* share of the DIP Term Loans, with the numerator of the *pro rata* share being such holder's share as of the Election Date of First Lien Tranche A-1 Term Loan Claims and the denominator being the aggregate amount of all allowed First Lien Tranche A-1 Term Loan Claims. Any unallocated DIP Term Loans will be allocated in accordance with the Backstop Commitment Letter. |
| | (c) Use of Proceeds: Proceeds of the DIP Term Loans, together with cash on hand, will be used to (a) refinance in full the First Lien Tranche A Term Loans upon entry of the Interim DIP Order, (b) fund the costs arising from the administration of the Chapter 11 Cases (including "emergence" costs), (c) for working capital requirements, and (d) for general corporate purposes. |
| Liquidity Shortfall | Solely to the extent that the Company has insufficient cash on the Effective Date to satisfy the Minimum Liquidity Condition to emergence (a "**Liquidity Shortfall**"), which shall be determined on the date that is ten (10) Business Days prior to the Effective Date, such additional cash shall be funded on the Effective Date in the form of DIP Term Loans by the DIP Term Loan Lenders, on a pro rata basis, or, to the extent that the DIP Financing is not fully subscribed by non-Backstop Parties, the Backstop Parties, up to an additional aggregate funding amount of $82,500,000.00 (the "**Liquidity Shortfall Funding Cap**"), which DIP Term Loans shall immediately convert into New Term Loans, subject to the following adjustments to the other terms set forth in this Term Sheet (the "**Liquidity Shortfall Funding**"): |
| | (a) Potential Reduction of Takeback Term Loans: The principal amount of the Takeback Term Loans shall be reduced by the lesser of (i) $26,757,642.30, and (ii) the amount necessary such that the Company Parties has $870,000,000.00 of net debt immediately following the Effective Date. |
| | (b) Potential Increase of Plan Value: The Plan Value shall be increased dollar-for-dollar by the difference between (i) the amount of pro forma net debt of the Company Parties on the Effective Date, and (ii) $870,000,000.00. |
| | To the extent the Liquidity Shortfall exceeds the Liquidity Shortfall Funding Cap, the Company Parties and Required Consenting First Lien Tranche A-1 Lenders may agree to the funding of |

| | |
|---|---|
| | additional New Term Loans by the DIP Term Loan Lenders in an amount necessary to satisfy the Minimum Liquidity Condition. |
| Backstop Commitment | Pursuant to the Backstop Commitment Letter, the Initial Consenting First Lien Tranche A-1 Lenders, in their capacity as the Backstop Parties, will, in the allocations set forth on Schedule I to the Backstop Commitment Letter, backstop 100% of the DIP Term Loans by providing any DIP Term Loans not provided by other Tranche A-1 Lenders (including any Liquidity Shortfall (but not to exceed the Liquidity Shortfall Funding Cap)) (the "**Backstop Commitments**"). |
| | The Backstop Parties will receive, in the allocations set forth in Schedule I to the Backstop Commitment Letter, a backstop premium (the "**Backstop Premium**") earned upon execution of the Backstop Commitment Letter in an amount equal to 11.5% of the commitments under the Backstop Commitment Letter (including with respect to any Liquidity Shortfall), which shall be payable in 26.9% of the New Equity Interests, which shall be issued on the Effective Date and which (i) shall not dilute New Equity Interests distributable to the New Money Investor on account of the New Money Investment and (ii) will be subject to dilution by New Equity Interests issued pursuant to the post-Effective Date MIP, *provided* in the event of the termination of the Backstop Commitment Letter in connection with the termination of the RSA in connection with (i) the exercise of a fiduciary out by the Company Parties (or the Company Parties' failure to provide notice of such exercise), or  (ii) for a breach thereof by the Company Parties, an exit fee equal to $16,005,000.00 will be due and payable in cash in lieu of the Backstop Premium. |
| | The Backstop Commitment Letter shall permit assignment of the Backstop Commitments from the Backstop Parties to the New Money Investor and joinder to the Backstop Commitment Letter and uptake of the applicable Backstop Commitments by the New Money Investor in respect of First Lien Tranche A-1 Term Loans purchased by the New Money Investor from any Backstop Party or held or beneficially owned by the New Money Investor as of the Agreement Effective Date (the Backstop Commitment and First Lien Tranche A-1 Term Loans so acquired, held, or beneficially owned by the New Money Investor, the "<u>NMI Backstop Commitment</u>" and the "<u>NMI A-1 Term Loans</u>", respectively). The New Money Investor shall receive Backstop Premium, Participation Premium, and A-1 Equity Recovery on account of such NMI Backstop Commitment or NMI A-1 Term Loans on the same term as other Backstop Parties, and any Backstop Premium, Participation Premium, or A-1 Equity Recovery paid to the New Money Investor on account of such NMI Backstop Commitment or the NMI A-1 Term Loans shall not count towards the Equity Cash Out / ROFR Cap set forth in this Restructuring Term Sheet. |
| New Term Loans | Material terms for the New Term Loans include:[2]<br><br>(a)  <u>Principal Amount</u>: the New Funding Principal Amount<br><br>(b)  <u>Tenor</u>: 5 years from the Effective Date<br><br>(c)  <u>Interest Rate</u>:  S + 5.25%, subject to 25 bps of discretionary flex and 75 bps flex based on Single-B U.S. High Yield / Leverage Loan index.  Any flex shall only apply to the cash interest rate on the New Term Loans, and shall reduce the cash interest rate on the Takeback Term Loans in an amount sufficient to offset such increase in cash interest expense on account of the flex.<br><br>(d)  <u>OID</u>: None<br><br>(e)  <u>Call Protection</u>: Par / 102 / 101 / Par, with an exclusion for mandatory prepayments<br><br>(f)  <u>Collateral</u>: The New Term Loans will be secured by a first lien on all of the Company Parties' assets, subject to customary exceptions and exclusions, and a second lien on assets constituting "ABL Priority Collateral" (to be defined in the New Intercreditor |

---

[2]   In the event of any inconsistency between this Term Sheet and the Exit Term Sheet, the Exit Term Sheet shall control.

| | |
|---|---|
| | Agreement) with respect to the Exit ABL Facility (the "**ABL Priority Collateral**").<br><br>(g) <u>Priority</u>: The New Term Loans will be senior in payment priority to the Takeback Term Loans but shall have the same lien priority as such loans.<br><br>The terms for the New Term Loans will be consistent with this Term Sheet and the Exit Term Sheet and otherwise reasonably acceptable to the Company Parties and the Required Consenting Stakeholders. |
| Takeback Term Loans | As part of the distribution to holders of First Lien Tranche A-1 Term Loan Claims pursuant to the Plan, the Reorganized Company Parties will enter into the New Term Credit Agreement providing for the issuance of term loans to such holders (such term loans, the "**Takeback Term Loans**").[3]<br><br>Material terms for the Takeback Term Loans include:<br><br>(a) <u>Principal Amount</u>: $526,000,000.00, subject to adjustment to the extent applicable as set forth in the row labeled "Liquidity Shortfall"<br><br>(b) <u>Tenor</u>: 6 years from the Effective Date<br><br>(c) <u>Interest Rate</u>: S + 4.80% cash plus 1.20% PIK (S + 6.00% total), or S + 5.75% cash. The cash interest rate on the Takeback Term Loans shall be reduced by an amount sufficient to offset any increase in cash interest expense on the New Term Loans, on account of any interest rate flex with respect to the New Term Loans, as further described herein.<br><br>(d) <u>OID</u>: None<br><br>(e) <u>Call Protection</u>: None<br><br>(f) <u>Collateral</u>: The Takeback Term Loan will be secured by a first lien on substantially all of the Company Parties' assets, subject to customary exceptions and exclusions, and a second lien on assets constituting ABL Priority Collateral.<br><br>(g) <u>Priority</u>: The Takeback Term Loan will be junior in payment priority to the New Term Loans but shall have the same lien priority as such loans.<br><br>The terms for the Takeback Term Loans will be consistent with this Term Sheet and the Exit Term Loan Term Sheet and otherwise reasonably acceptable to the Company Parties and the Required Consenting Stakeholders. |
| New Money Investment | On the Effective Date, the New Money Investor shall provide a new money cash capital contribution (the "**New Money Investment**") in an aggregate amount of net cash proceeds of $50,000,000.00 in exchange for 21.9% of the New Equity Interests, subject to dilution from New Equity Interest issued pursuant to the post-Effective Date MIP. |
| Equity Cash Out | The New Money Investor and the members of the Ad Hoc Group as of the Execution Date (collectively, the "**Equity Cash Out Investors**") may provide a new money cash capital contribution (the "**Equity Cash Out Investment**") to purchase New Equity Interests otherwise distributable to the holders of First Lien Tranche A-1 Term Loan Claims and Second Lien Term Loan Claims (the "**Equity Cash Out**", and the New Equity Interests acquired through the Equity Cash Out, the "**Equity Cash Out Equity**"), *provided* that no more than 10.6% of the New Equity Interests (subject to dilution from the post-Effective Date MIP) shall be acquired on account of the Equity Cash Out and/or the ROFR (the "**Equity Cash Out / ROFR Cap**").<br><br>The Equity Cash Out Investors who elect to participate in the Equity Cash Out shall acquire such New Equity Interests at a value to be determined by the Required Consenting Stakeholders (the "**Equity Cash Out Value**") and subject to dilution from New Equity Interest issued pursuant to |

---

[3]    In the event of any inconsistency between this Term Sheet and the Exit Term Sheet, the Exit Term Sheet shall control.

| | |
|---|---|
| | the post-Effective Date MIP, and the Equity Cash Out / ROFR Cap shall not cap or otherwise limit any person's ownership of the Reorganized Company Parties after the Effective Date.<br><br>The Equity Cash Out shall be allocated to the Equity Cash Out Investors on a ratable basis based upon their respective *pro forma* holdings of New Equity Interests as of the Execution Date, which allocation to any Equity Cash Out Investor may be increased or decreased by up to five percentage points based upon their respective *pro forma* holdings of New Equity Interests as of the Equity Cash Out Offer Date (the "**Equity Cash Out Split**").<br><br>Any proposal with respect to the Equity Cash Out shall be made to all holders of First Lien Tranche A-1 Term Loan Claims and Second Lien Term Loan Claims no later than the day that is 21 days before the anticipated Effective Date (the "**Equity Cash Out Offer Date**"), and such holders shall have 10 days thereafter to decide whether to elect to participate in the Equity Cash Out.<br><br>To the extent any Equity Cash Out Investors decline to fund the Equity Cash Out Investment, the participating Equity Cash Out Investors may fund the resulting unsubscribed portion of the Equity Cash Out Investment in accordance with the Equity Cash Out Split. |
| Conditions Precedent to Emergence | The occurrence of the Effective Date will be subject to the following conditions precedent; *provided* that any condition can be waived with the prior written consent of the Company Parties and the Required Consenting Stakeholders:<br><br>(a) the Reorganized Company Parties shall have no less than $100,000,000.00 of cash and cash equivalents on their balance sheet after giving effect to the Restructuring Transactions contemplated on the Effective Date, without giving effect to any availability under the Exit ABL Facility, if any (the "**Minimum Liquidity Condition**");<br><br>(b) the RSA shall not have been terminated and remains in full force and effect;<br><br>(c) the Bankruptcy Court shall have entered an order approving the disclosure statement with respect to the Plan, and such order shall not have been reversed, stayed, modified, or vacated on appeal;<br><br>(d) the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a final non-appealable order;<br><br>(e) the Definitive Documents (including the Plan) shall be consistent with the RSA and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the RSA;<br><br>(f) all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected and executed;<br><br>(g) the Bankruptcy Court shall have entered the DIP Orders, which shall be final and non-appealable (unless waived by the Required Consenting Stakeholders), the DIP Term Loan Documents[4] shall be in full force and effect in accordance with their terms, the DIP Termination Date (as defined in the DIP Orders) shall not have occurred, no Event of Default (as defined in the DIP Term Loan Documents) shall have occurred or be continuing, and obligations outstanding under the DIP Term Loan Credit Agreement shall not have been accelerated;<br><br>(h) all documentation related to the Exit ABL Facility, if any, (including the New Intercreditor Agreement) shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived; |

---

[4]   "**DIP Term Loan Documents**" means, collectively, the DIP Term Loan Credit Agreement and all other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents.

|  | (i) all documentation related to the New Term Credit Agreement shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived;<br><br>(j) all conditions precedent to the issuance of the New Equity Interests, other than the occurrence of the Effective Date, shall have occurred;<br><br>(k) the organizational documents and bylaws for New Pretium will be adopted on terms consistent with this Term Sheet, the Governance Term Sheet and otherwise reasonably acceptable to the Company Parties and the Required Consenting Stakeholders; and<br><br>(l) all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the Restructuring Transactions contemplated by the RSA shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or been terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such Restructuring Transactions, the Consenting Stakeholders or the Company Parties. |
| Exit ABL Facility | The Company Parties or Reorganized Company Parties, as applicable, will seek to enter into an asset-based lending facility (the "**Exit ABL Facility**"), which facility will be on terms consistent with this Term Sheet and otherwise acceptable to the Company Parties and Required Consenting Stakeholders and will provide that:<br><br>(a) the Exit ABL Facility will be secured by (i) a first lien on assets constituting "ABL Priority Collateral" (as defined in the *Intercreditor Agreement* dated as of October 1, 2021, between Wells Fargo Bank, National Association as administrative agent for the ABL (the "**ABL Agent**"), the First Lien Agent, and the Second Lien Agent (such agreement, the "**ABL Intercreditor Agreement**")) and (ii) a second lien on other assets securing the New Term Loans, in each case subject to customary exceptions and exclusions; and<br><br>(b) the relative rights of the secured parties under the Exit ABL Facility, the New Term Loans, and Takeback Term Loans will governed by an intercreditor agreement (the "**New Intercreditor Agreement**") in form and substance acceptable to the Company Parties, the Required Consenting Stakeholders, the administrative agent for the Exit ABL Facility on behalf of the lenders under the Exit ABL Facility (the "**Exit ABL Agent**" and the "**Exit ABL Lenders**," respectively), and the administrative agent on behalf of the New Term Lenders (such agent, the "**New Term Agent**"). |

### Treatment of Claims and Interests under Chapter 11 Plan

| Claim | Proposed Treatment |
|---|---|
| Administrative and Priority Claims (except DIP Claims) | Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| DIP Claims | On the Effective Date, each holder of an allowed DIP Claim will receive (a) (i) on account of the outstanding principal amount of such claim, an equal principal amount of New Term Loans and (ii) on account of accrued and unpaid interest and other obligations payable through the Effective Date, which shall not include any fees, premiums, or OID, payment in cash or (b) such other treatment agreed upon between the Company Parties, the Required Consenting Stakeholders, and holders of allowed DIP Claims. |

| | |
|---|---|
| ABL Facility Claims | Obligations outstanding under the *Asset-Based Revolving Credit Agreement* dated October 1, 2021 (the "**ABL Credit Agreement**") between Poseidon Investment Intermediate, Inc., the ABL Agent, and the lenders party thereto, together with accrued but unpaid interest and fees, will be treated in a manner acceptable to the Required Consenting Stakeholders. |
| First Lien Tranche A-1 Term Loan Claims | The First Lien Tranche A-1 Term Loan Claims[5] will be allowed under the Plan in the aggregate principal amount of $1,237,395,831.41 as of the Petition Date plus any accrued and unpaid interest, fees, expenses, and other obligations arising, due or owing in connection with the First Lien Tranche A-1 Term Loans; *provided* that the Consenting Tranche A-1 Lenders shall waive any Make Whole Tranche A Amount (as defined in the First Lien Term Loan Agreement) in the event that all Tranche A Lenders agree to waive such Make Whole Tranche A Amount.

On the Effective Date, each holder of First Lien Tranche A-1 Term Loan Claims will receive its *pro rata* share of (a) (i) New Equity Interests representing, in the aggregate, 72.5% of the New Equity Interests issued on the Effective Date (the "**A-1 Equity Recovery**"), subject to dilution from New Equity Interests issued pursuant to the (A) Participation Premium, (B) Backstop Premium, and (C) post-Effective Date MIP, or (ii) if available and at the election of each Tranche A-1 Lender, the Equity Cash Out, and (b) the Takeback Term Loans.

If the Equity Cash Out is available and the lower of (a) Equity Cash Out Equity subscribed by the Equity Cash Out Investors and (b) Equity Cash Out / ROFR Cap (the lower of (a) and (b), the "**Equity Cash Out Limit**") is exceeded, each holder's share of the Equity Cash Out shall be reduced *pro rata* so that the aggregate Equity Cash Out Equity does not exceed the Equity Cash Out Limit, and each holder shall instead receive New Equity Interests with respect to such unfulfilled Equity Cash Out amount. |
| Second Lien Term Loan Claims[6] | The Second Lien Term Loan Claims will be allowed under the Plan in the aggregate principal amount of $201,404,401.13 as of the Petition Date plus any accrued and unpaid interest, fees, expenses, and other obligations arising, due or owing in connection with the Second Lien Term Loans.

On the Effective Date, each holder of Second Lien Term Loan Claims will receive its *pro rata* share of (i) New Equity Interests representing, in the aggregate, 5.6% of the New Equity Interests issued on the Effective Date, subject to dilution only from New Equity Interests issued pursuant to the post-Effective Date MIP; or (ii) if available and at the election of each Second Lien Term Lender, the Equity Cash Out.

If the Equity Cash Out is available and the Equity Cash Out Limit is exceeded, each holder's share of the Equity Cash Out shall be reduced *pro rata* so that the aggregate Equity Cash Out Equity does not exceed the Equity Cash Out Limit, and each holder shall instead receive New Equity Interests with respect to such unfulfilled Equity Cash Out amount. |
| General Unsecured Claims | Holders of allowed general unsecured claims (the "**General Unsecured Claims**") will receive payment in full in cash on the Effective Date or as promptly as practicable thereafter, *provided* that General Unsecured Claims that arise in the ordinary course of the Company Parties' business shall be paid or disputed in the ordinary course of business in accordance with the terms thereof. |

---

[5]   "**First Lien Tranche A-1 Term Loan Claims**" means claims arising from or related to the First Lien Tranche A-1 Term Loans, including, without limitation, any deficiency claims with respect thereto.

[6]   "**Second Lien Term Loan Claims**" means claims arising from or related to the Second Lien Term Loans, including, without limitation, any deficiency claims with respect thereto.

| | |
|---|---|
| Intercompany Claims | On the Effective Date, all intercompany claims will be adjusted, reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Company Parties with the consent of the Required Consenting Stakeholders. |
| Intercompany Interests | On the Effective Date, all intercompany interests (which will include all interests other than the equity of Pretium) will be adjusted, reinstated, or cancelled, to the extent reasonably determined to be appropriate by the Reorganized Company Parties with the consent of the Required Consenting Stakeholders. |
| Existing Equity Interests | On the Effective Date, all Existing Equity Interests will be cancelled and will be of no further force and effect, regardless of whether surrendered for cancellation, and there shall be no distributions under the Plan for holders of Existing Equity Interests on account of such interests. |
| **Other Terms Relevant to Chapter 11 Plan Implementation** | |
| Unexpired Leases and Executory Contracts | The Plan will provide that all unexpired leases and executory contracts will be assumed as of the Effective Date, other than those unexpired leases and executory contracts scheduled for rejection on a plan supplement as determined by the Company Parties with the prior written consent of the Required Consenting Stakeholders (such consent not to be unreasonably withheld, conditioned, or delayed). |
| Governance Documents | The governance documents in respect of the Reorganized Company Parties will be consistent with the terms attached to the RSA as <u>Exhibit D</u> (the "**Governance Term Sheet**") and otherwise in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders. |
| Right of First Refusal | The Equity Cash Out Investors shall have a right of first refusal (the "**ROFR**") with respect to the sale of New Equity Interests by the holders thereof (to be exercised pro rata amongst holders of New Equity Interests who are selling at the same time) after the Effective Date, *provided* that the ROFR shall expire upon the first to occur of (i) the date that is 6 months following the Effective Date, and (ii) 10.6% of the New Equity Interests (subject to dilution from the post-Effective Date MIP) shall have been acquired on account of the Equity Cash Out and/or the ROFR; *provided, further*, that the ROFR shall not cap or otherwise limit any party's ownership of the Reorganized Company Parties; *provided, further*, that an Equity Cash Out Investor who declines to participate in the Equity Cash Out may participate in the ROFR. The ROFR shall be allocated to each Equity Cash Out Investor on a ratable basis based upon their respective shares of New Equity Interests (including the Equity Cash Out Equity) as of the date that notice has been given to the Equity Cash Out Investors in connection with the ROFR. |
| Released Parties | For purposes of the releases herein and under the Plan, "**Released Parties**" means each of, and solely in its capacity as such, (a) the Company Parties and Reorganized Company Parties, (b) the ABL Agent and ABL Lenders, (c) the First Lien Agent, (d) the Second Lien Agent, (e) the Sponsor, (f) the Consenting Creditors, (g) the DIP ABL Agent and DIP ABL Lenders, (h) the DIP Term Loan Agent and DIP Term Loan Lenders, (i) the Exit ABL Agent and Exit ABL Lenders, (j) the New Term Agent and New Term Lenders, (k) the Backstop Parties, (l) the New Money Investor, (m) the Releasing Parties, and (n) the Related Parties[7] for each of the foregoing; *provided that* |

---

[7]   "**Related Parties**" means, individually or collectively, and each in their capacity as such:  with respect to a given person or entity, (a) all of such person's or entity's present and former affiliates, and (b) all of such person's or entity's, and its present and former affiliates' present and former officers, directors, stockholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries,

| | |
|---|---|
| | Released Parties shall exclude any of the foregoing parties that do not (or are not deemed to) provide the releases under the Plan. |
| Releasing Parties | For purpose of the releases herein and under the Plan, "**Releasing Parties**" means each of, and solely in its capacity as such, (a) the holders of impaired claims who vote to accept the Plan (including each of the Consenting Creditors), (b) the holders of impaired claims who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the ballots, (c) the (i) holders of unimpaired claims or interests or (ii) holders of impaired claims and interests that are deemed to reject, but in either case who do not opt-out of the releases on the notice of non-voting status, (d) the ABL Agent and ABL Lenders, (e) the First Lien Agent, (f) the Second Lien Agent, (g) the Sponsor, (h) the New Money Investor, (i) the Backstop Parties, (j) DIP ABL Agent and the DIP ABL Lenders, (k) the DIP Term Loan Agent and DIP Term Loan Lenders, (l) the Exit ABL Agent and Exit ABL Lenders, (m) the New Term Agent and New Term Lenders, and (n) the Related Parties of each of the foregoing. |
| Debtor Release | As of the Effective Date, notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which shall be confirmed by the Plan, on and after the Effective Date, each Released Party shall be conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Debtors, their estates, and if applicable, the Reorganized Company Parties that were Debtors (the "**Reorganized Debtors**"), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action[8] whatsoever (including any Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer Law and other Law (collectively, "**Avoidance Actions**") and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or thereafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such holders or their estates, |

---

trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of person or entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

[8] "**Causes of Action**" means any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, Liens, guarantees, franchises, Avoidance Actions, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise pursuant to any theory of law. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, the Debtors, the Reorganized Debtors, and their estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, the Reorganized Debtors, or their estates, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases, including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, Avoidance Actions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Definitive Documents, the Plan Supplement, the DIP Term Loans, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit ABL Facility, the New Term Loans, and the Takeback Term Loans, or the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.

Notwithstanding anything to the contrary the Plan, the Debtors shall not, pursuant to the releases set forth above, release (i) any Cause of Action identified in the schedule of retained Causes of Action included in the Plan Supplement, (ii) any obligations of any party or entity under the Plan, the Confirmation Order, any Restructuring Transactions, the documents governing the Exit ABL Facility, the New Term Loans, and the  Takeback Term Loans, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, or (iii) any Claims or Causes of Action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, provided that a party's compliance with, or execution, or implementation of the RSA or the Plan shall not be deemed actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which shall include by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (i) given in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (ii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all holders of Claims and Equity Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, their estates, or the Reorganized Debtors asserting any Claim or action released pursuant to the Debtor Release against any of the Released Parties.

| | |
|---|---|
| Third-Party Release | As of the Effective Date, notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which shall be confirmed by the Plan, on and after the Effective Date, each Released Party shall be conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or thereafter arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such holders or their estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, the Debtors, the Reorganized Debtors, and their estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, the Reorganized Debtors, or their estates, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Cases including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the RSA, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Definitive Documents, the Plan Supplement, the DIP ABL Facility, the DIP Term Loans, the DIP ABL Orders, the DIP Documents, the Exit ABL Facility, the New Term Loans, the Takeback Term Loans, or the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date. <br><br> Notwithstanding anything to the contrary in the Plan, the Releasing Parties shall not, pursuant to the releases set forth above, release (i) any obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transactions, the documents governing the New Term Loans, the Takeback Term Loans, the Exit ABL Facility, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions or (ii) any Claims or Causes of Action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, provided that a party's compliance with, or execution, or implementation of the RSA or the Plan shall not be deemed actual fraud or willful misconduct. <br><br> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to |

| | |
|---|---|
| | Bankruptcy Rule 9019, of the Third-Party Release, which shall include by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of the Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release against any of the Released Parties. |
| Exculpation | To the fullest extent permitted by applicable law, no Exculpated Party[9] shall have or incur, and each Exculpated Party shall be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the RSA, the Definitive Documents, the Plan Supplement, the DIP Term Loans, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit ABL Facility, the New Term Loans, and the Takeback Term Loans, or the filing of the Chapter 11 Cases, the solicitation of votes (before and after the Petition Date) for, or confirmation of, the Plan, the funding of the Plan, the occurrence of the Effective Date, the administration of the Plan or the property to be distributed under the Plan, the issuance of securities under or in connection with the Plan, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, if applicable, in connection with the Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action, in each case arising out of or related to any act or omission of an Exculpated Party that is determined by a final order entered into by the Bankruptcy Court or another court of competent jurisdiction, and not subject to appeal, to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| Management Incentive Plan | The management incentive plan ("**MIP**") shall consist of up to 8% of New Equity Interests, to be implemented on the form, terms, allocation, and vesting mechanism to be determined by the New Board for the Reorganized Company Parties within 120 days of the effective date of the Plan. |
| New Board | The post-emergence board of directors of New Pretium (the "**New Board**") shall be as set forth in the Governance Term Sheet. |

---

[9]   "**Exculpated Parties**" means, collectively and in each case in its capacity as such, (a) the Debtors; (b) the Reorganized Debtors; and (c) each Related Party of the Debtors and the Reorganized Debtors.

| | |
|---|---|
| Indemnification Obligations | The Company Parties' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company or operating agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Parties or their non-Debtor affiliates as of the Petition Date, will remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to each such party than the indemnification provisions in place prior to the Effective Date; *provided* that the Company Parties shall not indemnify any party for any claims or causes of action for which indemnification is barred under applicable law. |
| Tax Structuring | The Restructuring Transaction will be implemented in a tax-efficient manner with respect to the Company Parties as determined by the Required Consenting Stakeholders. |
| Designation Rights | Any person eligible to receive (i) a distribution under the Plan, or (ii) any payment of New Equity Interests in connection with the DIP Documents, may designate an affiliated or related entity to receive such distribution.<br><br>Subject to Section 8 of the RSA, any Consenting Creditor may freely assign to its affiliates any rights and obligations in connection with the DIP Financing, Backstop Commitment, or Liquidity Shortfall. |
| Management Fees | The Sponsor shall waive any right to collect accrued and unpaid management fees. |
| Expenses Related to Poseidon Parent, L.P. | In respect of Poseidon Parent, L.P., the Sponsor shall be responsible for funding any (i) wind-down costs (including in respect of the preparation and submission of tax returns), and (ii) all Claims (including, without limitation, all historical and current liabilities and obligations of such entity, including taxes), to the extent that such amounts in (i) and (ii), in aggregate, exceed $350,000.00.  For the avoidance of doubt, such amount shall not be funded using the New Money Investment.  To the extent that the Sponsor does not satisfy the foregoing funding obligations, the Restructuring Transactions shall exclude Poseidon Parent, L.P. |
| Reporting Obligations in Respect of New Term Loans, Takeback Term Loans, and New Equity Interests | In addition to any informational or reporting rights set forth in the Governance Term Sheet, the Company Parties shall comply with the following reporting requirements:<br><br>Quarterly Financial Reporting: The Reorganized Company Parties shall deliver to the New Term Lenders, Takeback Term Lenders, and holders of New Equity Interests that are not competitors of the Company or any of its subsidiaries (the "Qualifying Equity Holders") quarterly unaudited consolidated financial statements (income statement, balance sheet, and cash flow statement) accompanied by reasonably detailed management discussion and analysis, in each case within 60 days after the end of the first three fiscal quarter of the fiscal year.<br><br>Annual Financial Reporting. The Reorganized Company Parties shall deliver to the New Term Lenders, Takeback Term Lenders, and Qualifying Equity Holders (i) annual unaudited consolidated financial statements (income statement, balance sheet, and cash flow statement) accompanied by a management discussion and analysis prepared in a manner consistent with past practice, in each case within 90 days after the end of each fiscal year and (ii) annual audited consolidated financial statements (income statement, balance sheet, and cash flow statement) accompanied by a management discussion and analysis prepared in a manner consistent with past practice, in each case within 120 days after the end of each fiscal year; *provided*, that the annual audited consolidated financial statements for the 2025 fiscal year shall be delivered within 150 days after the end of that fiscal year.<br><br>Quarterly Earnings Call. Within 7 days following the posting of quarterly financial statements, the Reorganized Company Parties shall host an earnings call, including a detailed presentation (with no less detail than has historically been provided by the Company Parties) and a reasonable opportunity for Q&A with management for the New Term Lenders, Takeback Term Lenders, and |

|  | Qualifying Equity Holders.<br><br>Annual Earnings Call: Within 7 days following the posting of annual unaudited financial statements, the Reorganized Company Parties shall host an earnings call, including a detailed presentation (with no less detail than has historically been provided by the Company Parties) and a reasonable opportunity for Q&A with management for the New Term Lenders, Takeback Term Lenders, and Qualifying Equity Holders.<br><br>Annual Budget and KPIs. Within 120 days following the end of each fiscal year, the Reorganized Company Parties shall post to the New Term Lenders, Takeback Term Lenders, and Qualifying Equity Holders an annual budget for the upcoming fiscal year, including three-statement financials and key operational KPIs/drivers, *provided*, that the budget for the 2026 fiscal year shall be delivered within 150 days after the end of the prior fiscal year. Within 7 days after posting such budget, the Reorganized Company Parties shall host a call with management including a reasonable opportunity for Q&A to discuss such budget and KPIs for the New Term Lenders, Takeback Term Lenders, and Qualifying Equity Holders, which may be the same call as the applicable quarterly earnings call. |
|---|---|

## <u>EXHIBIT C</u>

**Exit Term Sheet**

EXIT TERM LOAN FACILITY TERM SHEET

*Pretium PKG Holdings, Inc. Et Al.*
*Exit Term Loan Facility*

*Capitalized terms used in this Exit Term Loan Facility Term Sheet (the "Exit Term Sheet") and not otherwise defined shall have the meaning given to such terms in either (i) the First Lien Term Loan Credit Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as the borrower, Poseidon Investment Intermediate, Inc., as holdings, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, the subsidiary guarantors, and the lenders party thereto (as amended by the First Amendment, dated as of December 15, 2021, the Second Amendment, dated as of May 25, 2023, the Third Amendment, dated as of October 2, 2023, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "First Lien Credit Agreement") or (ii) the Restructuring Support Agreement to which this Exit Term Sheet is attached (the "Restructuring Support Agreement").*

| | |
|---|---|
| Borrower: | Pretium PKG Holdings, Inc. (in such capacity, the "Borrower")[1]. |
| Exit Term Loan Facility Agent: | A financial institution reasonably acceptable to the Required Consenting First Lien Tranche A-1 Lenders, the New Money Investor and the Borrower (in its capacity as administrative agent and collateral agent, as applicable, under the Exit Term Loan Facility, the "Exit Term Loan Facility Agent"), it being agreed that any of (a) Alter Domus, (b) Wilmington Trust, (c) U.S. Bank Trust Company, (d) SRS Acquiom or (e) Wilmington Savings Fund Society, is reasonably acceptable to the Borrower, the New Money Investor and the Required Consenting First Lien Tranche A-1 Lenders. |
| Exit Term Loan Lenders: | First Out Exit Term Loans (as defined below): Certain funds advised, managed or affiliated with (x) the Backstop Parties, (y) permitted assignees of the Backstop Parties who become Exit Term Loan Lenders in accordance with the Backstop Commitment Letter and (z) Consenting First Lien Tranche A-1 Lenders that elect to participate in the New First Lien Facilities Financing in connection with the Exchange Offer (the "Participating Lenders") (clauses (x)-(z), collectively, the "First Out Exit Term Loan Lenders"). |
| | Second Out Exit Term Loans (as defined below): Certain funds advised, managed or affiliated with the Consenting First Lien Tranche A-1 Lenders (collectively, the "Second Out Exit Term Loan Lenders" and together with the First Out Exit Term Loan Lenders, the "Exit Term Loan Lenders") |
| Exit Term Loan Facility: | The First Out Exit Term Loan Lenders will fund (or the Fronting Lender will fund on their behalf) to the Borrower a senior secured, first lien first out term loan credit facility (the "First Out Exit Term Loan Facility", and the loans thereunder, the "First Out Exit Term Loans") in an aggregate principal amount of $451 million, which First Out Exit Term Loans shall be funded as debtor in possession financing loans ("DIP Loans") and shall be exchanged pursuant to the Plan for the First Out Exit Term Loans on the Effective Date; provided, that such aggregate principal amount will be subject to upward adjustment on a dollar for dollar basis to ensure that the Borrower and its subsidiaries have, after giving effect to the transactions on the Effective Date (including the net cash proceeds from the incurrence of the Exit Term Loans) and to an assumed paydown of any outstanding balances under the Exit ABL Facility, projected cash on hand of no less than $100 million but in no event shall such aggregate principal amount be adjusted to exceed $533.5 million. |

---

[1] Subject to tax analysis.

The Consenting First Lien Tranche A-1 Lenders shall provide to the Borrower (as consideration for the cashless conversion, exchange, or other means of satisfaction determined by the Borrower, the New Money Investor and the Required Consenting First Lien Tranche A-1 Lenders for the Consenting First Lien Tranche A-1 Lenders' First Lien Tranche A-1 Term Loan Claims) a senior secured, first lien second out term loan credit facility (the "Second Out Exit Term Loan Facility" and together with the First Out Exit Term Loan Facility, the "Exit Term Loan Facility"; and the loans under the Second Out Exit Term Loan Facility, the "Second Out Exit Term Loans" and together with the First Out Exit Term Loans, the "Exit Term Loans") in an aggregate principal amount of $526 million; provided that such aggregate principal amount will be subject to a downward adjustment equal to the lesser of: (i) $26,757,642.30 and (ii) an amount necessary such that the Company Parties have $870 million of net debt immediately following the Effective Date and giving effect to the transactions thereon.

Unless otherwise set forth herein, the First Out Exit Term Loans and the Second Out Exit Term Loans shall have the same terms and provisions.

| | |
|---|---|
| Backstop Premium: | The Backstop Premium (as defined in the Restructuring Term Sheet) shall be payable to the Backstop Parties on the terms and conditions set forth in the Restructuring Term Sheet. |
| Participation Premium: | The Participation Premium (as defined in the Restructuring Term Sheet) shall be payable to the Participating Lenders on the terms and conditions set forth in the Restructuring Term Sheet. |
| Effective Date: | The date ("Effective Date"), upon which all conditions precedent in the Restructuring Support Agreement and the Exit Term Loan Facility Documents to the effectiveness of the Exit Term Loan Facility Documents for the Exit Term Loan Facility are satisfied or waived in accordance with the terms thereof. |
| | "Exit Term Loan Facility Documents" shall mean the definitive loan documents related to the Exit Term Loan Facility, including, without limitation, (x) credit agreements, guarantees, security agreements, pledge agreements (or in each case, as determined by the Borrower, the New Money Investor and the Required Consenting First Lien Tranche A-1 Lenders, amendments or amendments and restatements thereof) and (y) opinions of counsel, officer's certificates, certificates of good standings, corporate organizational documents and other related definitive documents in form and substance reasonably satisfactory to the Required Consenting First Lien Tranche A-1 Lenders. |
| Maturity Date: | The First Out Exit Term Loan Facility will mature on the date that is five (5) years after the Effective Date. |
| | The Second Out Exit Term Loan Facility will mature on the date that is six (6) years less one day after the Effective Date. |
| Amortization: | None. |
| OID: | None. |
| Interest Rate: | First Out Exit Term Loans: Term SOFR plus 5.25%; provided, that, prior to the Effective Date, such applicable margin may be increased by (x) at the election of the Required Consenting First Lien Tranche A-1 Lenders, an amount up to 0.25% and (y) at the election of the Required Consenting First Lien Tranche A-1 Lenders, an amount up to 0.75% (in addition to any discretionary flex pursuant |

to clause (x)) that corresponds to the increase since the date hereof to the day prior to the Effective Date in the Single-B U.S. High Yield / Leverage Loan Index as reasonably agreed between the New Money Investor, the Required Consenting First Lien Tranche A-1 Lenders and the Borrower; provided further, that any such increase pursuant to clause (x) and/or (y) will reduce the cash portion of the applicable margin for the Second Out Exit Term Loans by an amount that corresponds to the total cash interest increase as a result of such increase pursuant to clause (x) and/or (y) (with the in-kind portion of such applicable margin unchanged).

Second Out Exit Term Loans: At the election of the Borrower, either (a) Term SOFR plus 6.00% (provided, that 1.20% thereof shall be payable in kind and added to the principal of the Second Out Exit Term Loans with the remainder payable in cash) or (b) Term SOFR plus 5.75% (payable in cash), in each case, subject to adjustment pursuant to the foregoing paragraph. Notwithstanding the foregoing, the interest period beginning after the fifth anniversary of the Effective Date will end on the applicable Maturity Date, and the interest rates set forth in the foregoing will be adjusted accordingly in the definitive documentation to reflect any lengthening of the interest period.

| | |
|---|---|
| Default Rate: | Any principal or interest payable under or in respect of the Exit Term Loan Facility not paid when due shall bear interest at the applicable interest rate plus 2% per annum. Other overdue amounts shall bear interest at the interest rate applicable to Base Rate loans plus 2% per annum. |
| Documentation Principles: | The Exit Term Loan Facility is to be documented by a new first lien senior secured term loan credit agreement based on the First Lien Credit Agreement, with modifications to reflect the terms and provisions set forth in this Exit Term Sheet and other modifications as may be mutually agreed upon between the Required Consenting First Lien Tranche A-1 Lenders and the Company Parties (provided, that (x) the Required Consenting First Lien Tranche A-1 Lenders hereby agree to negotiate all covenants, threshold, baskets and similar terms and provisions desirable or required for the operations and anticipated business plans of the Company Parties in good faith and (y) the Exit Term Loan Facility shall include a liability management "blocker" and other customary liability management protections, in each case, to be mutually agreed upon between the Required Consenting First Lien Tranche A-1 Lenders and the Company Parties) (collectively, the "First Lien Documentation Principles"). |
| Guarantees: | Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles) including the exceptions and exclusions set forth therein (collectively, the "Guarantors" and, together with the Borrower, the "Loan Parties" and, each individually, a "Loan Party") and other subsidiaries as may be reasonably agreed to between the New Money Investor, the Required Consenting First Lien Tranche A-1 Lenders and the Borrower. |
| Security: | First lien on all term loan priority collateral and second lien on all ABL priority collateral, subject to customary exclusions and exceptions consistent with the First Lien Documentation Principles (collectively, the "Collateral"); provided, that 100% of the equity interests of any direct foreign subsidiaries of the Borrower shall be pledged as Collateral. |
| Priority | The relative payment priority of the First Out Exit Term Loans and Second Out Exit Term Loans shall be consistent with the priority set forth in the Restructuring Term Sheet. |

| | |
|---|---|
| <u>Intercreditor Agreement</u> | The relative priorities of the security interests in shared Collateral securing the Exit Term Loan Facility and the Exit ABL Facility shall be subject to a customary intercreditor agreement consistent with the First Lien Documentation Principles. |

<u>Voluntary Prepayments</u>:

Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles), subject to the Prepayment Premium described below.

If, at any time, all or a portion of the outstanding First Out Exit Term Loans are voluntarily prepaid, repaid, or accelerated (or deemed accelerated), including as a result of the Borrower or any Guarantor filing for bankruptcy or becoming subject to any other insolvency proceeding, the repayment of the obligations as a result of such repayment, voluntary prepayment, redemption or acceleration (each, a "<u>Trigger Event</u>") shall be required to be accompanied by the payment of the prepayment premium (expressed as a percentage of the outstanding principal amount of the First Out Exit Term Loans so prepaid) set forth below opposite the relevant period from the Effective Date (the "<u>First Out Prepayment Premium</u>"):

| **Period** | **Percentage** |
|---|---|
| Prior to end of Year 1: | 0.00% |
| At end of Year 1 and prior to end of Year 2: | 2.00% |
| At end of Year 2 and prior to end of Year 3: | 1.00% |
| At end of Year 3 and thereon: | 0.00% |

Notwithstanding the foregoing, no mandatory prepayment of First Out Exit Term Loans shall be subject to any Prepayment Premium.

The Second Out Exit Term Loans shall not be subject to any prepayment premium upon the occurrence of a Trigger Event with respect to the Second Out Exit Term Loans or otherwise.

<u>Mandatory Prepayments</u>:

Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles), subject to adjustments satisfactory to the Required Consenting First Lien Tranche A-1 Lenders, the New Money Investor and the Borrower.

<u>Representations and Warranties</u>:

Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles), subject to adjustments satisfactory to the Required Consenting First Lien Tranche A-1 Lenders, the New Money Investor and the Borrower.

<u>Use of Proceeds</u>:

The proceeds of the First Out Exit Term Loans shall be used to repay in full the First Lien Tranche A Term Loan Claims and the balance shall be used for working capital, payment of fees and expenses related to the Restructuring Transactions and other general corporate purposes.

The Second Out Exit Term Loans will be used to discharge (whether by cashless conversion, exchange, or other means of satisfaction elected by the Borrower and the New Money Investor and agreed by the Required Consenting First Lien Tranche A-1 Lenders) the First Lien Tranche A-1 Term Loan Claims.

| | |
|---|---|
| Conditions Precedent to<br>Effectiveness on the Effective Date: | The closing of Exit Term Loan Facility shall be subject solely to the following exclusive conditions precedent (unless waived by the Required Consenting First Lien Tranche A-1 Lenders): |

(a)     the Restructuring Support Agreement shall be in full force and effect, and the Company Parties shall be in compliance with the Restructuring Support Agreement in all material respects as of the Effective Date;

(b)     the completion, or substantially contemporaneous completion, of the Restructuring Transactions contemplated by the Restructuring Support Agreement;

(c)     (i) the execution and delivery by the Borrower and the other Loan Parties of the Exit Term Loan Facility Documents consistent with this Exit Term Sheet, (ii) the delivery of customary secretary's certificates (with certification of organizational authorization and organizational documents) of the Loan Parties, (iii) customary organizational good standing certificates of the Loan Parties, (iv) customary legal opinions, (v) a customary solvency certificate from the Borrower's chief financial officer or other financial officer of the Borrower and (vi) a certificate of the Borrower certifying that no default or event of default shall have occurred and be continuing as of the Effective Date;

(d)     the transactions contemplated by the Exit Term Sheet and the Backstop Commitment Letter shall have been consummated in accordance with applicable laws, rules and regulations in all material respects;

(e)     all fees and reasonable and documented out-of-pocket costs, fees, expenses and other compensation payable to the Exit Term Loan Facility Agent and the Backstop Parties (including the reasonable and documented out-of-pocket fees and expenses of Milbank LLP, as counsel to the Backstop Parties), in each case solely to the extent such fees and expenses are required to be paid under the Backstop Commitment Letter and subject to the limitations contained therein, shall be paid substantially simultaneously with the Effective Date pursuant to the terms of the Backstop Commitment Letter;

(f)     all customary documents and instruments (subject to customary exceptions to be agreed) required to create and perfect the Exit Term Loan Facility Agent's first lien security interest in the Collateral (free and clear of all liens, subject to customary and limited exceptions to be agreed upon) shall have been executed (if applicable) and delivered and, if applicable, be in proper form for filing and execution of guarantees;

(g)     no defaults or events of default under the Exit Term Facility Loan Documents shall have occurred and be continuing;

(h)     accuracy of representations and warranties in all material respects as of the Effective Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date;

(i)     each Exit Term Loan Lender having received all reasonable documentation and other information reasonably required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations that is reasonably requested in writing by such Exit Term Loan Lender at least three (3) Business Days prior to the Effective Date;

(j)     all reasonably necessary governmental and third party approvals, consents, licenses and permits in connection with the Exit Term

Loan Facility shall have been obtained and remain in full force and effect; and

(k)   all Participation Premium payable to the Participating Lenders shall be paid substantially simultaneously with the Effective Date pursuant to the terms of the Backstop Commitment Letter.

| | |
|---|---|
| <u>Covenants:</u> | Subject to the First Lien Documentation Principles. |
| <u>Ratings Requirements:</u> | Borrower shall use commercially reasonable efforts to obtain within 180 days following the Effective Date (or such longer period as the Required Consenting First Lien Tranche A-1 Lenders agree) and maintain (but not obtain or maintain a specific rating) a private corporate credit rating of the First Out Exit Term Loan Facility and the Second Out Exit Term Loan Facility (or a joint rating for the Exit Term Loan Facility, if applicable). |
| <u>Affirmative Covenants:</u> | Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles) and expanded to include, without limitation, additional reporting obligations (provided that such obligations shall be limited to those set forth in the Restructuring Term Sheet attached to the Restructuring Support Agreement), notice requirements and other affirmative covenants to be mutually agreed between the Borrower and the Required Consenting First Lien Tranche A-1 Lenders |
| <u>Financial Covenants:</u> | None. |
| <u>Events of Default:</u> | Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles), subject to adjustments satisfactory to the Required Consenting First Lien Tranche A-1 Lenders, the New Money Investor and the Borrower. |
| <u>Voting:</u> | Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles), subject to adjustments satisfactory to the New Money Investor, the Required Consenting First Lien Tranche A-1 Lenders and the Borrower; <u>provided</u> that no "net short lender" (to be defined) in respect of the Exit Term Loan Facility or other funded indebtedness of the Company Parties shall have the right to vote on any amendment, modification or waiver. |
| <u>Assignments and Participations:</u> | Consistent with the First Lien Credit Agreement (subject to the First Lien Documentation Principles), subject to adjustments satisfactory to the New Money Investor, the Required Consenting First Lien Tranche A-1 Lenders and the Borrower; <u>provided</u> that, (i) for the avoidance of doubt, the Borrower and New Money Investor may, from time to time prior to and following the Effective Date, deliver a new and update the list of "disqualified lenders" (or any similar term) , (ii) each "net short lender" shall be a "disqualified lender" (or any similar term), (iii) no "disqualified lender" may be a participant, (iv) so long as neither a payment or bankruptcy Event of Default has occurred and is continuing, any assignment and participation to a Person that is not an existing Lender (or an Affiliate or an Approved Fund thereof) shall be subject to the consent of the Borrower (such consent not to be unreasonably withheld, conditioned or delayed); <u>provided</u> that other than with respect to assignments to a "disqualified lender" (or any similar term), the Borrower shall be deemed to have consented to any assignment unless the Borrower objects thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; <u>provided</u>, <u>further,</u> that (A) the list of "disqualified lenders" (or any similar term) initially delivered to the Administrative Agent in effect on the Effective Date shall be reasonably satisfactory in form and substance to the |

Required Consenting First Lien Tranche A-1 Lenders, and (B) any subsequent updates (other than to add competitors of the Loan Parties) to such list of "disqualified lenders" (or any similar term) made after the Effective Date shall require the consent of the Administrative Agent (acting at the direction of the Required Lenders (to be defined in the Exit Term Loan Facility Documents)).

| | |
|---|---|
| Expenses and Indemnification: | Consistent with the First Lien Credit Agreement and expanded to include the payment or reimbursement to the Exit Term Lenders for all reasonable documented out-of-pocket costs and expenses incurred by the Exit Term Lenders, regardless of whether the Effective Date occurs, in connection with (i) the preparation, negotiation and execution of the Exit Term Loan Facility Documents; (ii) the funding of the Exit Term Loans; (iii) the creation, perfection or protection of the liens under the Exit Term Loan Facility Documents (including all search, filing and recording fees); and (iv) the on-going administration or enforcement of the Exit Term Loan Facility Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto). |
| Governing Law and Forum: | New York. |

# EXHIBIT D

## Governance Term Sheet

**GOVERNANCE TERM SHEET**

| | |
|---|---|
| **Board of Managers**: | The organizational documents of the Company[1] will provide that the Board will have five (5) Managers (each, a "***Manager***"). At each annual meeting, the Managers shall be appointed or elected, as applicable, as set forth in this section.

**Composition:** The Board will initially be comprised of the following Managers (as the Board shall thereafter be adjusted in accordance with the terms of this heading "Board of Managers"), in each case, until their successors are appointed or elected, as applicable, or such Managers are otherwise replaced as set forth in this section:

- For so long as Clearlake (together with its affiliates and related funds) owns more than ten percent (10%) but no more than twenty percent (20%) of the outstanding interests, it shall be entitled to designate one (1) Manager, and for so long as it (together with its affiliates and related funds) owns more than twenty percent (20%) of the outstanding interests shall be entitled to designate two (2) Managers (any Manager designated by Clearlake pursuant to this bullet, a "***CCG Manager***").
- For so long as [*Largest AHG Member*] (together with its affiliates and related funds) owns more than ten percent (10%) of the outstanding interests, it shall be entitled to designate one (1) Manager (the "***AHG Manager***").
- The then-serving Chief Executive Officer of the Company shall be a Manager.
- One (1) Manager (the "***Minority Manager***") shall be selected by a simple majority vote of the equityholders (excluding each equityholder (and its affiliates and related funds) that then has the right to designate a CCG Manager or AHG Manager, provided that the equityholders will agree to consult with such designating holders in connection with the selection of the initial Minority Manager).
- The remaining Manager seats, if any, shall be filled by simple majority vote of the equityholders.

Managers may not be employed by or equityholders of any Disqualified Lender or its affiliates.

If, at any time following the appointment of any Manager, the number of Managers any equityholder (or group of equityholders) is entitled to appoint decreases as a result of such equityholder (or group of equityholders), together with its affiliates, holding less than the applicable threshold of outstanding equity interests required to appoint such Manager or the designation right otherwise expiring, such equityholder's (or group of equityholders) applicable designated Manager(s) shall be deemed to have automatically resigned, and the vacancy created thereby shall be filled in accordance with the foregoing.

For purposes of determining an equityholder's Manager designation rights, the percentage of equity interests of the Company held by such equityholder will be calculated without giving any effect to any interests issued pursuant to any management incentive plan or any other similar management equity |

---

[1]    Identity of the issuer of the New Equity Interests to be determined by the Required Consenting First Lien Tranche A-1 Lenders and New Money Investor.

| | |
|---|---|
| | issuances. Only Managers who are not full-time employees of the Company or its subsidiaries (or the equityholder entitled to appoint such Manager) will be entitled to receive compensation for service on the Board (other than customary indemnification and expense reimbursement that will be provided to all Managers). |
| | *Notice and Quorum* |
| | Notice will must be given at least forty-eight (48) hours in advance of a Board meeting unless waived. A quorum will require the presence of a majority of the Managers, including one (1) CCG Manager (while Clearlake has the right to appoint at least one (1) such CCG Manager) and the AHG Manager (while [*Largest AHG Member*] has the right to appoint the AHG Manager), provided that if quorum is not present for one meeting because no CCG Manager is present or the AHG Manager is not present, the meeting may be reconvened and at that meeting a quorum will only require the presence of a majority of the Managers. |
| | *Action by Written Consent* |
| | In lieu of acting at a meeting, the Board may act by unanimous written consent. |
| **Board Observer**: | Each equityholder that owns more than ten percent (10%) of the outstanding interests shall be entitled to appoint one (1) Board observer (who, for the avoidance of doubt, shall not be compensated by the Company). |
| **Board Decisions**: | Decisions of the Board will be made by majority vote. Each Manager will have one vote. |
| **Strategic Review Process**: | At the election of a majority of the equityholders at any time following the third anniversary of the Effective Date, or by the election of more than one-third of the equityholders at any time following the fifth anniversary of the Effective Date when a Minority Liquidity Right has not been initiated, but not more than once, the Company will, at the Company's sole expense, engage an investment bank or similar financial advisor chosen by such majority of equityholders and reasonably acceptable to the Board, to run a non-binding strategic review process in anticipation of a sale. |
| **Equityholder Approval Rights**: | The following matters shall require (x) either (i) unanimous approval of the Board and approval of equityholders holding a majority of the outstanding interests of the Company or (ii) approval of the Board and approval of (A) for the first year following emergence, non-Clearlake equityholders holding a majority of the outstanding interests of the Company not held by Clearlake and (B) thereafter, equityholders holding at least seventy-five percent (75%) of the outstanding interests of the Company, and (y) Clearlake for so long as Clearlake (together with its affiliates and related funds) owns more than thirty percent (30%) of the outstanding interests:<br><br>• Sale of the Company;<br>• Material M&A activity;<br>• Initiate an initial public offering of the Company;<br>• Redeem or repurchase any equity in the Company except in connection with: (i) a validly approved sale of the Company; (ii) a redemption, repurchase, or distribution made to all equityholders where all equityholders are subject to the same terms and receive the same consideration; (iii) the repurchase of any of equity in the Company held |

2

|  | by the Company's (or any of its subsidiaries') officers, managers, directors, employees, or service providers if such officer, manager, director, employee, or service provider is terminated; or (iv) a pro rata distribution in accordance with the terms of the then existing shareholder agreement;<br>• Equity issuances, subject to customary exceptions including for issuances pursuant to the approved incentive plan;<br>• Incurrence of indebtedness, other than incurrences in the ordinary course subject to specified limits;<br>• Any modification, refinancing or restructuring of the Company's existing indebtedness;<br>• Materially change or amend the Company's then existing accounting policies, excepted as required to comply with changes in GAAP, applicable law, or the interpretation of the same;<br>• Hiring of firing of the Chief Executive Officer of the Company; or<br>• Voluntarily dissolve, liquidate, terminate, or wind-up the Company's business or affairs (other than through a validly approved sale of the business) or consent to the Company (or any of its subsidiaries) seeking relief under the United States Bankruptcy Code or similar laws or insolvency regimes. |
|---|---|
| **Affiliate Transactions**: | All transactions with affiliates of the Company (including portfolio companies of equity holders) will require approval of a majority of the disinterested Managers (subject to customary exceptions). |
| **Transfers**: | Subject to customary requirements and compliance with the tag-along below, equityholders may transfer any of their equity interests other than transfers to (i) competitors of the Company or any of its subsidiaries or (ii) partners that are on a disqualified lender list under the Company's then-existing credit facilities or any of their affiliates (each, a "***Disqualified Lender***"). |
| **Tag-Along Rights**: | Holders that were members of the Ad Hoc Group that hold 1% or more of the outstanding interests of the Company and other holders of at least 2% of the outstanding interests of the Company will have customary tag-along rights over any transfer by holders (or a group of holders) of at least 50% of the outstanding units of the Company to non-affiliated third parties. |
| **Drag-Along Rights**: | The equityholders will be subject to customary drag-along rights, triggered with the consent of equityholders holding a majority of the then issued and outstanding interests of the Company of a sale of the business, subject to customary minority protections (e.g., all dragged equityholders shall receive the same consideration (excluding the opportunity to participate in new money transactions with the purchaser/transferee or bona fide transaction fees earned by certain holders) and, excluding equityholders that are employees of the Company or its subsidiaries, execute the same agreement in connection with any such sale of the business). |
| **Minority     Liquidity Right**: | For so long as (x) Clearlake (together with its affiliates and related funds) has acquired and continues to hold greater than sixty-six percent (66%) of the outstanding interests of the Company and (y) at least one (1) former member of the Ad Hoc Group (an "***AHG Triggering Holder***") (together with its affiliates and related funds) holds at least fifty percent (50%) of the interests of the Company that it (together with its affiliates and related funds) held as of the Effective Date, then (x) at any time following the fifth |

|  | anniversary of the Effective Date, but not more than once and (y) at the election of a majority of the equityholders (including at least one AHG Triggering Holder) other than Clearlake and its affiliates (and without giving effect to any interests issued pursuant to any management incentive plan or any similar management equity issuances): the Company will establish a three-member special committee (the "**Special Committee**"), which shall include the Minority Manager, the AHG Manager (if any) and one (1) Clearlake Manager selected by Clearlake, to oversee a sale process for the Company (the "**Minority Liquidity Right**").  The Special Committee shall have the right to cause the Company to engage an investment bank or similar financial advisor reasonably acceptable to Clearlake and shall have the authority to cause the Company to agree to and effectuate a sale of the Company. |
|---|---|
|  | In the event that the Minority Liquidity Right is exercised, prior to commencement of a sale process, the Company will provide written notice to Clearlake of such event and Clearlake will have the right to acquire all of the outstanding equity interests of the Company not then-held by Clearlake or its affiliates at a price per unit established by a third-party valuation of the Company prepared by an independent nationally-recognized valuation firm (without giving effect to any minority discount) (the "**Valuation Price**").  If Clearlake elects not to acquire all of the outstanding equity interests of the Company not then held by Clearlake or its affiliates at the Valuation Price, then the Special Committee will proceed with the sale process for the Company. |
| **Preemptive Rights:** | Equityholders that were members of the Ad Hoc Group that (together with their affiliates and related funds) hold more than 1% of the then outstanding interests of the Company and any other equityholders that (together with their affiliates and related funds) holds at least 2% of the outstanding interests of the Company (excluding any Disqualified Lender) shall have customary pro rata preemptive rights on equity issuances by the Company and its subsidiaries and debt issuances by the Company and its subsidiaries to any of the Company's equityholders, in each case subject to customary exceptions. |
| **Information Rights:** | Consistent with the Reporting Obligations set forth in the Restructuring Term Sheet. |
|  | In addition, the Company shall furnish to the equityholders, upon reasonable request, any information reasonably required by the equityholders in connection with their public reporting or tax reporting obligations, to the extent such information is reasonably available to the Company. In no event will any financial information required to be furnished be required to include any information required by, or to be prepared or approved in accordance with, or otherwise be subject to, any provision of Section 404 of the Sarbanes-Oxley Act of 2002 or any rules, regulations, or accounting guidance adopted pursuant to that section. |
| **Registration Rights:** | Following an initial public offering, one or more equityholders holding (together with their affiliates and related funds) at least 20% of the then outstanding interests will be entitled to customary demand rights and all equityholders holding (together with their affiliates and related funds) at least 5% of the then outstanding equity interests will be entitled to customary piggyback rights after an initial public offering, subject to customary lockups and underwriter cut-backs; *provided* that any |

| | |
|---|---|
| | underwriter cut-backs in a demand registration shall be on a pro rata basis among the equityholders that elect to participate. Customary expenses and indemnification provisions will be included as part of the registration rights. |
| **Corporate Opportunities; Fiduciary Duties**: | To the fullest extent permitted by applicable law, the Company will waive the doctrine of corporate opportunities and any applicable fiduciary duties, in each case, other than such Managers that are employees or officers of the Company. |
| **Amendments**: | Amendments to the organizational documents of the Company (the "***Equity Documents***") must be approved by the Board and by the equityholders holding a majority of the then outstanding interests, including Clearlake for so long as Clearlake (together with its affiliates and related funds) owns more than thirty percent (30%) of the outstanding interests; *provided* that amendments (i) to the provisions related to board rights, transfer restrictions, tag-along rights, drag-along rights, strategic review process, pre-emptive rights, information rights, affiliate transactions or the amendment provision (other than de minimis changes that affect all holders proportionately), or any waiver of any material provision related to any of the foregoing, shall require the affirmative consent of the holders of at least eighty percent (80%) of the then outstanding interests (including, with respect to the provisions related to the Minority Manager, affiliate transactions, free transferability of interests, tag-along rights, pre-emptive rights and information rights, the affirmative consent of each Holder that was a member of the Ad Hoc Group); (ii) that would have a materially disproportionate and adverse effect on a specific equityholder or group of equityholders as compared to other equityholders, shall require the approval of a majority of the interests held by such disproportionately impacted equityholders; (iii) that would alter the rights expressly granted to a equityholder in the Equity Documents, including the right to designate a Manager to the Board, shall require the approval of such equityholder or (iv) that would alter this amendment provision shall require the approval of each equityholder. |

## <u>EXHIBIT E</u>

**Form of Joinder Agreement**

**<u>Joinder Agreement to Restructuring Support Agreement</u>**

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**") dated as of [__], by and among Poseidon Parent, L.P. ("**Pretium**"), and each of its affiliates that executes the Agreement (collectively, the "**Company Parties**") and the Consenting Stakeholders party thereto from time to time.[1]

The undersigned hereby (i) agrees to be bound by the terms and conditions of the Agreement in its capacity as a Consenting Creditor that holds [First Lien Tranche A Term Loan Claims] [First Lien Tranche A-1 Term Loan Claims] [Second Lien Term Loan Claims] (in each case, as defined in the Agreement), (ii) makes the applicable representations and warranties set forth in Section 9 and 10 of the Agreement to each other Party, in each case, effective as of the date hereof, and (iii) makes the election set forth on the signature page with respect to funding the DIP Term Loans and New Term Loans in accordance with Section 4.01(a)(ii) of the Agreement and the Restructuring Term Sheet.

This Joinder agreement shall be governed by the governing law set forth in the Agreement.

Date: _____

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

**[JOINING PARTY]**

_____

Name:

Title:


Address:


E-mail address(es):


| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Tranche A Term Loan Claims | |
| First Lien Tranche A-1 Term Loan Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests | |


| Election Option – DIP Term Loans and New Term Loans | |
|---|---|
| I, the undersigned above, hereby agree to fund my pro rata share of DIP Term Loans and to convert any such DIP Term Loans into New Term Loan in accordance with Section 4.01(a)(ii) of the Agreement, the Restructuring Term Sheet, and the applicable Definitive Documents. | ☐ **Agree** |

## EXHIBIT F

### Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of [__] (the "**Agreement**"),[1] by and among Poseidon Investment Intermediate, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by (a) the election made by the Transferor to fund the DIP Term Loans and New Term Loans in accordance with Section 4.01(a)(ii) of the Agreement and the Restructuring Term Sheet and (b) the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

If the Transferor has not made the election with respect to funding the DIP Term Loans and New Term Loans in accordance with Section 4.01(a)(ii) of the Agreement and the Restructuring Term Sheet and the Transferee is otherwise eligible to make such an election, it may do so by checking the box on the signature page.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Tranche A Term Loan Claims | |
| First Lien Tranche A-1 Term Loan Claims | |
| Second Lien Term Loan Claims | |
| Equity Interests | |

| Election Option – DIP Term Loans and New Term Loans | |
|---|---|
| I, the undersigned above, hereby agree to fund my pro rata share of DIP Term Loans and to convert any such DIP Term Loans into New Term Loan in accordance with Section 4.01(a)(ii) of the Agreement, the Restructuring Term Sheet, and the applicable Definitive Documents. | ☐ **Agree** |

## Schedule 1

### Milestones

The Company Parties shall implement the Restructuring Transactions in accordance with the following Milestones, each of which may be extended or waived with the consent of the Required Consenting Stakeholders:

(a)    By no later than 15 Business Days following the Execution Date, the Company Parties shall have commenced solicitation of the Plan in accordance with section 1126(b) of the Bankruptcy Code pursuant to the Disclosure Statement and other Solicitation Materials (the "**Launch Date**");

(b)    By no later than 5 Business Days after the Launch Date, the Petition Date shall have occurred;

(c)    By no later than 3 Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(d)    By no later than 35 days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(e)    No later than 60 days after the Petition Date, the Confirmation Order and all other related relief required to be obtained from the Bankruptcy Court to implement the Restructuring Transactions shall have been entered and/or granted, as applicable, by the Bankruptcy Court (the "**Confirmation Date**"); and

(f)    No later than 30 days after the Confirmation Date, the Transaction Effective Date shall have occurred, *provided*, *however*, that such date shall be automatically extended for one (1) additional three (3) month period, solely to the extent that the Company Parties and Required Consenting Stakeholders have otherwise complied with the terms of this Agreement and the Definitive Documents and all other events and actions necessary for the occurrence of the Restructuring Transactions have occurred, other than the receipt of regulatory or other approval of a government entity or unit necessary for the occurrence of the Restructuring Transactions (the "**Outside Date**").

**<u>Exhibit C</u>**

**Liquidation Analysis**

<u>**LIQUIDATION ANALYSIS**</u>[1]

## I. INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") intend to file chapter 11 cases in the United States Bankruptcy Court for the District of New Jersey ("<u>Bankruptcy Court</u>") and seek confirmation of a chapter 11 plan (the "<u>Chapter 11 Plan</u>").

Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," requires that a bankruptcy court find, as a condition of confirmation, that the chapter 11 plan provides, with respect to each impaired class, that each holder of an allowed claim in that impaired class either (i) has accepted the chapter 11 plan, or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such non-accepting holders would so receive or retain if the debtors were liquidated under Chapter 7 of the Bankruptcy Code ("<u>Chapter 7</u>").

Accordingly, to demonstrate that the proposed Chapter 11 Plan satisfies the "best interests test", the Debtors, with assistance from FTI Consulting, Inc. ("<u>FTI</u>"), the Debtors' restructuring advisors, prepared the following hypothetical liquidation analysis ("<u>Liquidation Analysis</u>") of the Debtors and non-Debtor affiliates (together, the "<u>Company</u>"), in connection with the Chapter 11 Plan and the Disclosure Statement.  While we understand that the assets of certain non-Debtor affiliates may not be available for distribution to the Debtors' creditors if the Debtors were liquidated under Chapter 7, FTI has included all Affiliates in the Liquidation Analysis to comprehensively estimate any residual equity value the Debtors may have in non-Debtor Affiliates.

The Liquidation Analysis indicates the estimated recoveries that may be obtained by Classes of Claims or Interests assuming a hypothetical liquidation upon disposition of the Company's assets as an alternative to the Plan under Chapter 7 or similar liquidation proceedings under the applicable jurisdictions (each, a "<u>Liquidation Proceeding</u>"). Accordingly, the values discussed in the Liquidation Analysis may be different from amounts referred to in the Plan. The Liquidation Analysis is based on certain assumptions in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

## II. STATEMENT OF LIMITATIONS

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Company's assets in a Liquidation Proceeding is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by FTI and the Debtors based upon their business judgment and input from certain of their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in, and unanticipated events and circumstances could materially affect the ultimate results of, an actual Liquidation Proceeding. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Company's assets were liquidated in a Liquidation Proceeding.  The Liquidation Analysis is not intended and should not be used for any other purpose.  The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Disclosure Statement for the Joint Prepackaged Plan of Reorganization of Pretium Packaging, L.L.C. and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "<u>Disclosure Statement</u>"), to which this Liquidation Analysis is attached as <u>Exhibit C</u>, or the *Joint Prepackaged Plan of Reorganization of Pretium Packaging, L.L.C and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, and including all exhibits and supplements thereto, the "<u>Plan</u>"), attached to the Disclosure Statement as <u>Exhibit A</u>.

NEITHER FTI, THE DEBTORS, NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.  NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. FTI AND THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

### III. OVERVIEW AND GENERAL ASSUMPTIONS

Hypothetical recoveries set forth in this Liquidation Analysis were determined through multiple steps, as set forth below. This Liquidation Analysis has been prepared assuming that the Debtors convert their Chapter 11 Cases to cases under Chapter 7 on or about February 20, 2026 (the "Conversion Date").  Unless otherwise noted, the basis of the Liquidation Analysis is the Company's estimated cash balance as of Conversion Date and non-cash assets as of November 30, 2025, in addition to the estimated net costs of the applicable Liquidation Proceedings.  The Liquidation Analysis assumes that on or about the Conversion Date, the Debtors would commence a Chapter 7 liquidation under the supervision of a single court appointed Chapter 7 trustee.  The selection of a separate Chapter 7 trustee for one or more of the Estates likely would result in substantially higher administrative expenses associated with the Chapter 7 cases from a large duplication of effort by each trustee and his or her professionals.  In addition, the selection of separate Chapter 7 trustees likely would give rise to complicated, expensive, and time-consuming disputes regarding certain inter-Debtor issues.  The Liquidation Analysis reflects the wind down and liquidation of substantially all the Company's remaining assets and the distribution of available proceeds to holders of Allowed Claims during the period after the Conversion Date.  In addition, the Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer, or other litigation or avoidance actions.

<u>Summary Notes to Liquidation Analysis</u>

1. **Dependence on Assumptions**. The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by FTI and management, the assumptions are inherently subject to significant economic, business, regulatory and competitive uncertainties, and contingencies beyond the control of the Debtors or their management.  The Liquidation Analysis is also based on FTI's best judgment of how numerous decisions in the liquidation process would be resolved.  Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Company were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. **Chapter 7 Funding**.  The Chapter 7 cases are assumed to be funded by cash on hand and liquidation of assets.

3. **Chapter 7 liquidation process**. The liquidation of the Company's assets is assumed to be completed over a three-month period inside of a Chapter 7 case managed by the Chapter 7 trustee.  The Chapter 7 trustee would manage the Estates to maximize recovery to creditors as expeditiously as possible and would appoint professionals (attorneys, investment bankers, financial advisors, liquidators, accountants, consultants, appraisers, experts, etc.) to assist in the liquidation and wind down of the Estates.  The Chapter 7 trustee would oversee the liquidation of the Company's inventory, the collection of outstanding accounts receivable, and the monetization of other assets owned by the Company.  Shortly after the Conversion Date, all manufacturing and purchasing operations would cease, and an essential team of Company staff would be retained.  As the sale progresses, personnel would decrease proportionately as the remaining volume of inventory decreases and operating facilities close.  Furniture, fixtures, and equipment would also be sold during this period.  During the remaining period, the Chapter 7 trustee would primarily focus on monetizing other assets such as real estate assets, ground leases, intellectual property, and other remaining personal property and equipment, as well as administrative activities such as claims reconciliation, distributions to Holders of Claims, and other activities necessary to wind down the Estates.  At the end of this period, any remaining operating leases would be rejected and the premises turned over to the landlords.

4. **Claims Estimates**. In preparing this Liquidation Analysis, the Debtors estimated unpaid principal for the various funded debt obligations on the balance sheet as of the Conversion Date.  The Debtors also rely on their books and

records, where applicable, to estimate the amount of Administrative Claims, Priority Tax Claims, Other Priority Claims, and General Unsecured Claims for purposes of this Liquidation Analysis.  No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the estimated amounts of Allowed Claims set forth in this Liquidation Analysis.  The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.  The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

IV.    **CONCLUSION**

**THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS AND <u>ARTICLE III.E</u> OF THE DISCLOSURE STATEMENT, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE OR SIMILAR LIQUIDATION PROCEEDINGS IN THE APPLICABLE JURISDICTIONS.**

| Amounts in $000s | Note | Adj. Book Value | Low Recovery % | High Recovery % | Low Recovery Amount | High Recovery Amount |
|---|---|---|---|---|---|---|
| **Cash and Cash Equivalents** | A | 15,959 | 100% | 100% | 15,959 | 15,959 |
| **Accounts Receivable, Net (excl. InterCo)** | B | 62,972 | 70% | 80% | 44,080 | 50,377 |
| **Inventory** | C | | | | | |
| Raw Materials | | 25,382 | 40% | 60% | 10,153 | 15,229 |
| Finished Goods | | 36,967 | 50% | 70% | 18,483 | 25,877 |
| Total Inventory | | 62,349 | | | 28,636 | 41,106 |
| **Other Current Assets and Prepaids** | D | 12,049 | 5% | 15% | 602 | 1,807 |
| **Property, Plant & Equipment, Net** | E | | | | | |
| Right-of-Use (ROU) Assets | | 82,153 | 0% | 0% | - | - |
| Leasehold Improvements / Construction in Process | | 16,875 | 0% | 0% | - | - |
| Machinery, Equipment and Tooling | | 113,414 | 35% | 55% | 39,695 | 62,378 |
| Furniture & Fixtures (including IT assets) | | 2,696 | 10% | 20% | 270 | 539 |
| Total PP&E, Net | | 215,138 | | | 39,965 | 62,917 |
| **Other Assets** | | | | | | |
| Intellectual Property | F | 65,645 | 15% | 25% | 9,847 | 16,411 |
| Intangible Assets other than IP | F | 553,439 | 5% | 10% | 28,089 | 56,179 |
| Claims Against Non-Debtor Affiliates | G | 240,323 | 17% | 22% | 40,376 | 53,132 |
| Equity in Non-Debtor Affiliates | H | N/A | N/A | N/A | - | - |
| Total Other Assets | | 859,407 | | | 78,312 | 125,722 |
| **Estimated Monetization Proceeds** | | **1,227,874** | | | **207,554** | **297,889** |

| | | | | | Low Recovery Amount | High Recovery Amount |
|---|---|---|---|---|---|---|
| **Estimated Operating / Wind-down Costs** | | | | | | |
| Wind-Down / Operating Expenses | | | | | (10,378) | (20,852) |
| Chapter 7 Trustee Fees | | | | | (6,250) | (8,960) |
| Chapter 7 Legal Fees and Advisors | | | | | (4,151) | (11,916) |
| Total - Estimated Liquidation Costs | I | | | | (20,779) | (41,728) |
| **Net Estimated Proceeds for Secured Claims** | | | | | **186,776** | **256,161** |

| Amounts in $000s | Note | | Low Recovery % | High Recovery % | Low Recovery Claim Amt. | High Recovery Claim Amt. |
|---|---|---|---|---|---|---|
| **Secured Funded Debt Claims** | | | | | | |
| DIP ABL Claims | J | 71,704 | 100% | 100% | 71,704 | 71,704 |
| DIP Term Loan Claims | J | 373,398 | 31% | 49% | 115,071 | 184,457 |
| ABL Claims | K | - | Unimpaired | Unimpaired | - | - |
| First Lien Tranche A Claims | K | - | Unimpaired | Unimpaired | - | - |
| First Lien Tranche A-1 Claims | K | 1,261,024 | 0% | 0% | - | - |
| Second Lien Claims | K | 211,578 | 0% | 0% | - | - |
| Total Secured Debt | | 1,917,705 | | | 186,776 | 256,161 |
| **Net Proceeds Available for Remaining Claims** | | | | | - | - |
| Administrative, Other Priority, and Priority Tax Claims | L | 25,000 | 0% | 0% | - | - |
| General Unsecured Claims | L | 31,000 | 0% | 0% | - | - |
| Existing Interests | L | - | 0% | 0% | - | - |
| Section 510(b) Claims | L | - | 0% | 0% | - | - |

**Specific Notes to the Liquidation Analysis**

<u>**Monetization Proceeds**</u>

A. <u>**Cash and Cash Equivalents**</u>: Cash and Cash Equivalents consists of cash in the Debtors' bank accounts and highly liquid investment securities that have original maturities of three months or less. This Liquidation Analysis assumes that the Company would not generate additional cash from operation after the Conversion Date. The Debtors estimate that they will have approximately $16.0 million of Cash and Cash Equivalents balance as of the Conversion Date, which will have an estimated recovery rate of 100%. This Liquidation Analysis further assumes that all cash on the balance sheet is available for distribution.

B. <u>**Accounts Receivable**</u>: Accounts receivable consists of all third-party trade accounts. This balance does not include any intercompany accounts receivable against other Debtors. The Debtors' accounts receivable against non-Debtor affiliates, and related estimated recoveries, are captured in a separate row (refer to Note G). Third-party accounts receivable balances have an estimated recovery rate of 70-80%.

C. <u>**Inventories**</u>: Inventory primarily consists of raw materials and finished goods with estimated recovery rates of 40-60% and 50-70%, respectively. These recovery rates are generally consistent with the orderly liquidation values utilized to calculate the Debtors' borrowing base under the ABL Credit Agreement, which are supported by inventory appraisals performed by third parties.

D. <u>**Other Current Assets and Prepaids**</u>: Other current assets generally consist of deposits and various prepaid obligations such as insurance, rent, and taxes. These assets have an estimated recovery rate of 5-15% due to potential rights of setoff and other claims the counterparty may have against the Debtors when the Debtors vacate locations and reject leases and executory contracts after the Conversion Date.

E. <u>**Property, Plant & Equipment**</u>: The Debtors' PP&E consist of machinery, equipment and tooling, leasehold improvements, furniture & fixtures, computer hardware/software, and construction in process. It also includes accounting entries in connection with certain leases for manufacturing facilities, warehouses and office space, including right-of-use (ROU) assets and corresponding liabilities associated with future payment obligations. Estimated recovery rates include:

- Right-of-Use Assets: No recovery assumed because all leases would be rejected in the Liquidation Proceedings

- Building & leasehold improvements and construction in process: No recovery due to counterparties' potential rights of setoff and other claims against the Debtors

- Machinery, Equipment and Tooling: 35-55% recovery rate

- Furniture & Fixtures (including IT assets): 10-20% recovery rate

F. <u>**Intangible Assets:**</u>  The Debtors' intangible assets include intellectual property, including trademarks, and other intangible assets such as customer relationships, deferred financing fees, and goodwill recorded for past acquisitions where the purchase price exceeded the acquired company's book values. Estimated recovery rates include:

- Intellectual property (trademarks): 15-25% recovery rate

- Intangible assets other than IP:

  o Customer relationships: 10-20% recovery rate if the Chapter 7 trustee can generate a competitive environment to acquire OEM customer relationships and related trademarks

  o Acquisition goodwill and deferred financing fees:  No recovery

**G.** **Claims Against Non-Debtor Affiliates:** Includes estimated recoveries on intercompany claims against non-Debtor affiliates if, after the Conversion Date, non-Debtor affiliates were liquidated using similar processes and timelines as the Debtors.  The Debtors' unsecured Intercompany Claims against their non-Debtor affiliates are treated as *pari passu* with the Claims of other unsecured third-party creditors.

Intercompany Claims considered in the analysis include an intercompany note receivable with Mexico ($57.5 million) and various net amounts owed from non-Debtor affiliates to Debtor affiliates ($182.9 million) for normal course activity such as the sale or transfer of inventory, cash transfers, administrative services provided and other normal course activity supporting the non-Debtor affiliates.

This analysis excludes intercompany notes and balances among the other Debtors and de minimis shareholder loans with executives.

**H.** **Equity in Non-Debtor Affiliates:** No recovery assumed as the estimated claims pools for non-Debtor affiliates (including third-party Claims and the Intercompany Claims described above) exceed the estimated net monetization proceeds of the assets at each silo of non-Debtor affiliates.

## Liquidation Costs

**I.** **Estimated Liquidation Costs**

Wind-Down / Operating Expenses: The Liquidation Analysis assumes the cessation of the Debtors' ordinary course operations as of the Conversion Date.  The Debtors anticipate the Chapter 7 trustee incurring costs to wind-down the business in an orderly manner, including continuation of certain leases and service arrangements following the Conversion Date in order to secure books and records and allow for access to physical assets during the liquidation period.  This Liquidation Analysis assumes that orderly liquidation of the Debtors' assets to last at least three months.  During that period, the Company is assumed to continue paying certain employees, rent, utilities, and other direct operating expenses at certain sites in order to effect the wind-down.  A blended cost as a percentage of gross liquidation proceeds is assumed to be 5.0% to 7.0%.

Chapter 7 Trustee Fees: Section 326(a) of the Bankruptcy Code provides for fees payable to the trustee of 25% of the first $5,000 distributed, 10% over $5,000 but less than $50,000 distributed, 5% over $50,000 but less than $1 million distributed and 3.0% in excess of $1 million distributed.

Chapter 7 Legal Fees & Financial Advisors: Professional fees include estimates for certain legal and financial advisory professionals engaged by the Chapter 7 trustee during the wind-down period. These professionals are assumed to be paid 2.0% to 4.0% of the gross liquidation proceeds, excluding cash.

## Claims Recovery Analysis

**J.** **DIP Claims**

DIP ABL Claims:  Expected recovery of 100%.

DIP Term Loan Claims: Expected recovery range of 31-49%.

**K.** **Secured Funded Debt Claims**

ABL Claims: unimpaired; prepetition ABL Claims assumed to have been fully rolled into DIP ABL Claims as of the Conversion Date.

First Lien Tranche A Claims: unimpaired; prepetition First Lien Tranche A Claims assumed to be paid in full with proceeds from DIP Term Loans shortly after the entry of the Interim DIP Order.

First Lien Tranche A-1 Claims: Expected to have no recovery.

Second Lien Claims:  Expected to have no recovery.

**L.**    **<u>Other Claims</u>**

All other Claims, including Administrative Claims, Other Priority Claims, Priority Tax Claims, General Unsecured Claims, Existing Interests, or Section 510(b) Claims are expected to have no recovery.    The estimated amount of Administrative Claims, Priority Tax Claims, Other Secured Claims, and General Unsecured Claims includes Claims that would have otherwise been satisfied in the ordinary course during the Chapter 11 Cases and Claims that would arise in a Liquidation Proceeding, such as damages from rejecting executory contracts and unexpired leases.

## Exhibit D

**Financial Projections**

## Financial Projections[1]

The financial projections for the Debtors are based on the Debtors' budget for the remainder of the fiscal year ended September 30, 2026, and for fiscal years 2027–2031 (the "Financial Projections"), as informed by the current and projected conditions in the Debtors' market and business.

The Financial Projections were prepared by the Debtors' management with the assistance of the Debtors' advisors and are based on assumptions developed by management with respect to the future performance of the Debtors' operations. Although management prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurances that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in Article VIII of the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation of the Plan is not likely to be followed by a liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of the Plan and for the purposes of determining whether the Plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission (the "SEC") or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in these Financial Projections and, accordingly, it does not express an opinion or any other form of assurance on such information or its attainability.

The Debtors do not intend to and have no obligations to: (a) furnish updated Financial Projections to Holders of Claims or Interests prior to the Effective Date or to any other party after the Effective Date; (b) include any such updated information in any documents that may be required to be filed with the SEC; or (c) otherwise make such updated information publicly available.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "Plan") or the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "Disclosure Statement"), as applicable.

**Principal Assumptions for the Financial Projections**

Evercore Group L.L.C. ("Evercore"), the Debtors' investment banker, relied on the Debtors' representation and warranty that the Financial Projections provided by the Debtors to Evercore (a) have been prepared in good faith, (b) are based on fully disclosed assumptions that are reasonable in light of the circumstances under which they were made, (c) reflect the Debtors' best currently available estimates, and (d) reflect the good faith judgments of the Debtors. Evercore does not offer an opinion as to the attainability of the Financial Projections.

The future financial performance of the Reorganized Debtors is contingent on various factors, many of which are beyond the control or knowledge of the Debtors, and consequently, are inherently difficult to predict. The Reorganized Debtors' actual future results may differ materially from these Financial Projections. *See* Section Article VIII of the Disclosure Statement entitled "Risk Factors". In addition, the assumptions underlying the Financial Projections do not take into account the uncertainty and disruption of the business that may accompany a restructuring pursuant to the Bankruptcy Code.

In deciding whether to vote to accept or reject the Plan, Holders of Claims entitled to vote must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. *See* Article VIII of the Disclosure Statement entitled "Risk Factors".

The Financial Projections reflect the operational emergence from chapter 11, but not the impact of fresh-start accounting that may be required upon the Effective Date pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations. Fresh-start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Debtors may be required to implement fresh-start accounting upon emergence, they have not yet completed the work required to quantify the effect upon the Financial Projections, which could be material.

**Safe Harbor Under the Private Securities Litigation Reform Act of 1995**

The Financial Projections contain statements that constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act. Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and management with respect to the timing of, completion of, and scope of the current restructuring, the Plan, the Debtors' business plan, market conditions and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

**Select Risk Factors Related to the Financial Projections**

The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' management team's control.  Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements.  A description of the risk factors associated with the Plan, the Disclosure Statement, and the Financial Projections is included in <u>Article VIII</u> of the Disclosure Statement.

**General Assumptions and Methodology**

The Financial Projections are based on the Debtors' business plan.  The Financial Projections were informed by current and projected conditions in the Debtors' markets and prepared on a holistic basis to reflect the combined results of their entire business, inclusive of Debtor and non-Debtor activity.   The Financial Projections consist of the following non-GAAP unaudited pro forma financial statements:  (a) projected income statement, (b) projected balance sheet, and (c) projected cash flow statement.

The Financial Projections have been prepared using accounting policies that are materially consistent with those applied in the Company's historical financial statements.  The Financial Projections (a) are based upon current and projected market conditions in which the Company operates; (b) are forecasted by the Company's primary business segments; (c) assume emergence from the Chapter 11 Cases on the Effective Date under terms substantially similar to those set forth in the Plan; and (d) reflect capital expenditures related to normal course maintenance and other investments necessary to run the business during the Projection Period.  Assumptions have not been made to depreciation and amortization to reflect fresh-start accounting.

The Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters.   Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period may vary from the projected results.

**Select Projected Consolidated Income Statement Assumptions**

- **<u>Revenue</u>**: The Debtors' revenues are derived from the sale of plastic bottles, jars, closures, trays, and other containers to thousands of customers in the food and beverage, nutrition and wellness, household and commercial chemicals, healthcare, and personal care industries.

- **<u>Cost of Goods Sold</u>**:  Cost of Goods Sold ("<u>COGS</u>") primarily includes raw materials (resin) and labor expenses. COGS also include costs associated with freight, M&R, supplies, utilities, other manufacturing overhead, and miscellaneous costs associated with the production of finished goods.

- **<u>SG&A</u>**:  Consist of salaries and commissions, professional fees, office expenses, and other corporate administrative and technology costs not allocated to COGS.

- **<u>Interest</u>**:  Based on the pro forma capital structure contemplated by the Plan on the Effective Date.

3

- **Taxes**: Consist of projected state and local cash taxes for the respective periods using a predetermined tax rate based on historical trends.

- **Adjusted EBITDA**: Adjusted EBITDA (a non-GAAP metric) is utilized by management to evaluate the performance of the business and excludes the impact of what management believes are non-recurring or one-time impacts to the Reorganized Debtors' financial statements.

## Select Projected Balance Sheet Assumptions

The projected consolidated pro forma balance sheet considers the pro forma capital structure based on cancellation of prepetition debt or other liabilities and the incurrence of Exit Facilities in accordance with the Plan. Actual balances may vary from those reflected in the opening balance sheet due to variances in projections and potential changes in cash needed to consummate the Plan. The actual terms of the Exit Facilities will be set forth in the Exit Facility Documents, the substantially final form of which will be included in the Plan Supplement.

The Debtors' post-emergence capital structure is assumed to consist of the following:

1. $100 million Exit ABL Facility assumed to pay cash interest monthly at SOFR + 175.

2. $496 million Exit First-Out Term Loans maturing in December 2030 assumed to pay cash interest quarterly at SOFR + 525.

3. $499 million Exit Second-Out Term Loans maturing in December 2031 assumed to pay cash interest quarterly at SOFR + 480 with an additional 120 in interest, payable in kind.

The balance sheet does not reflect the impact of "fresh start" accounting, which could result in a change to the projected values of assets and liabilities.

## Select Projected Cash Flow Statement Assumptions

Working Capital:  Changes in working capital primarily consist of changes in accounts receivable, inventory, prepaid expenses and other current assets, accounts payable, and accrued expenses.

Capital Expenditures:  Based on the Debtor's capital plan necessary to maintain operations, as well as capital expenditures related to the growth in the business.

Proceeds / (Repayment) on Debt:  Proceeds and repayments are projected based on the terms of the capital structure contemplated by the Plan.

## Income Statement

| | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|
| Revenue | $752 | $794 | $846 | $892 | $928 | $955 |
| (-) Material Costs | (261) | (271) | (283) | (296) | (308) | (317) |
| (-) Other Cost of Goods Sold | (282) | (299) | (320) | (338) | (352) | (364) |
| **Gross Profit** | **$209** | **$224** | **$243** | **$258** | **$267** | **$274** |
| (-) SG&A | (60) | (60) | (61) | (62) | (62) | (63) |
| **Adjusted EBITDA** | **$149** | **$164** | **$182** | **$196** | **$205** | **$211** |
| (+) Addbacks | (6) | (3) | (3) | (3) | (3) | (3) |
| (-) Depreciation | (67) | (60) | (51) | (54) | (56) | (57) |
| (-) Amortization of Intangible Assets | (129) | (129) | (129) | (129) | (129) | (129) |
| (-) Amortization of Financing Fees | (2) | (1) | (1) | (1) | (1) | (1) |
| (-) Interest Expense, Net | (92) | (82) | (81) | (81) | (80) | (78) |
| **Earnings Before Taxes** | **($146)** | **($110)** | **($83)** | **($71)** | **($64)** | **($58)** |
| (-) Taxes | (15) | (18) | (20) | (22) | (25) | (26) |
| **Net Income** | **($160)** | **($128)** | **($103)** | **($93)** | **($88)** | **($84)** |

## Balance Sheet

| | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash & Cash Equivalents | $116 | $147 | $195 | $254 | $322 | $394 |
| Accounts Receivable | 91 | 94 | 95 | 95 | 94 | 91 |
| Inventories | 69 | 71 | 72 | 72 | 71 | 70 |
| Prepaid Expenses & Other | 16 | 17 | 18 | 19 | 19 | 20 |
| **Current Assets** | **$291** | **$328** | **$379** | **$440** | **$506** | **$575** |
| PP&E, Net | 145 | 116 | 100 | 83 | 66 | 49 |
| Goodwill, Intangibles, and Other | 979 | 849 | 719 | 589 | 459 | 329 |
| **Total Assets** | **$1,416** | **$1,292** | **$1,198** | **$1,112** | **$1,031** | **$953** |
| **Liabilities And Equity** | | | | | | |
| Accounts Payable | $53 | $55 | $60 | $65 | $69 | $73 |
| Accrued Expenses | 49 | 52 | 55 | 58 | 61 | 63 |
| **Current Liabilities** | **$102** | **$107** | **$115** | **$123** | **$130** | **$136** |
| Exit ABL Facility | - | - | - | - | - | - |
| Exit First-Out Term Loans | 496 | 496 | 496 | 496 | 496 | 496 |
| Exit Second-Out Term Loans | 499 | 499 | 499 | 499 | 499 | 499 |
| Other Long Term Liabilities | 204 | 204 | 204 | 204 | 204 | 204 |
| **Total Liabilities** | **$1,301** | **$1,306** | **$1,314** | **$1,322** | **$1,329** | **$1,335** |
| Equity | 115 | (13) | (116) | (209) | (297) | (381) |
| **Total Liabilities and Equity** | **$1,416** | **$1,292** | **$1,198** | **$1,112** | **$1,031** | **$953** |

| Cash Flow Statement | FY2026E | FY2027E | FY2028E | FY2029E | FY2030E | FY2031E |
|---|---|---|---|---|---|---|
| **Operating Activities** | | | | | | |
| Net Income | ($113) | ($128) | ($103) | ($93) | ($88) | ($84) |
| (+) Depreciation & Amortization | 148 | 190 | 181 | 184 | 186 | 187 |
| Changes in Assets & Liabilities | | | | | | |
| (+/-) (Increase) / Decrease in Accounts Receivable | (3) | (3) | (1) | (0) | 1 | 2 |
| (+/-) (Increase) / Decrease in Inventories | (2) | (2) | (1) | (0) | 1 | 2 |
| (+/-) (Increase) / Decrease in Prepaid Expenses & Othe | (1) | (1) | (1) | (1) | (1) | (1) |
| (+/-) (Increase) / Decrease in Accounts Payable | 4 | 2 | 5 | 5 | 5 | 4 |
| (+/-) (Increase) / Decrease in Accrued Expenses | 2 | 3 | 3 | 3 | 2 | 2 |
| Net Cash Provided (Used) by Operating Activitie | $35 | $61 | $83 | $97 | $106 | $113 |
| **Investing Activities** | | | | | | |
| Capex | ($19) | ($30) | ($35) | ($37) | ($38) | ($40) |
| Net Cash Provided (Used) by Investing Activitie | ($19) | ($30) | ($35) | ($37) | ($38) | ($40) |
| **Financing Activities** | | | | | | |
| Increase / (Decrease) in ABL | $ - | $ - | $ - | $ - | $ - | $ - |
| Net Cash Provided (Used) by Financing Activitie | $ - | $ - | $ - | $ - | $ - | $ - |
| Beginning Cash Balance | $100 | $116 | $147 | $195 | $254 | $322 |
| Net Cash Flow | 16 | 31 | 48 | 60 | 67 | 73 |
| Ending Cash Balance | $116 | $147 | $195 | $254 | $322 | $394 |

6

**Exhibit E**

**Valuation Analysis**

<u>VALUATION ANALYSIS</u>

**THE ANALYSIS SET FORTH HEREIN (THIS "<u>VALUATION ANALYSIS</u>") REPRESENTS ESTIMATED DISTRIBUTABLE VALUE FOR THE DEBTORS AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE ESTIMATED VALUE OF THE NEW EQUITY SET FORTH HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.**

## I.    INTRODUCTION

In connection with developing the *Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "<u>Plan</u>"),[1] the Debtors directed their investment banker, Evercore Group L.L.C. ("<u>Evercore</u>"), to prepare this Valuation Analysis estimating the going-concern value of the Reorganized Debtors. This Valuation Analysis has been prepared for the Debtors' sole use and is based on information that the Debtors provided to Evercore. The analysis herein reflects the combined assets and operations of all Debtor and non-Debtor subsidiaries of the Company.

Based on the Financial Projections prepared by the Debtors—a copy of which are attached to the Disclosure Statement as <u>Exhibit D</u>—and subject to the disclaimers and the descriptions of Evercore's methodology set forth herein, and solely for purposes of the Plan and the Disclosure Statement, Evercore estimates the total enterprise value of the Reorganized Debtors to be between approximately $1,041 million and $1,430 million, as of an assumed Effective Date of March 12, 2026. After deducting estimated pro forma projected funded net debt of $894 million as of the assumed Effective Date, including restricted and trapped cash at the Debtors and non-Debtor subsidiaries, the range of total equity value is estimated to be between approximately $147 million and $536 million. The implied total enterprise value should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

In preparing the estimated total enterprise value range for the Reorganized Debtors, Evercore, among other things: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors relating to the business, such as earnings, cash flow, assets, liabilities, and other prospects, including the Financial Projections, which were prepared and provided to Evercore by the Debtors; (c) met with certain members of the Debtors' senior management to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (e) considered certain economic and industry information relevant to the Debtors' operating businesses; (f) prepared discounted cash flow analyses based on the Financial Projections for fiscal years 2026 through 2031 (the "<u>Projection Period</u>"), utilizing various discount rates and assumptions in the calculation of terminal values; and (g) conducted such other analyses as Evercore deemed appropriate.

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the Plan or the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "<u>Disclosure Statement</u>"), as applicable.

Although Evercore conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Evercore relied on the accuracy and completeness of all financial and other information provided by the Debtors and other firms retained by the Debtors in addition to certain publicly available information as to which Evercore does not have independent knowledge.

Evercore has relied on the Debtors' representation and warranty that the Financial Projections (a) were prepared in good faith, (b) were based on fully disclosed assumptions that are reasonable in light of the circumstances under which they were made, (c) reflect the Debtors' best currently available estimates, and (d) reflect the good faith judgments of the Debtors.  Evercore does not offer an opinion as to the attainability of the Financial Projections.  The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project.  The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and, as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

Evercore did not conduct an independent verification of the Financial Projections used in this valuation analysis and did not conduct an independent evaluation or appraisal of the Debtors' assets in connection with this valuation.  Evercore also did not conduct an independent investigation into any of the legal, tax, pension, or accounting matters affecting the Debtors, and therefore makes no representations as to their impact on the Debtors' financial statements.

## II.    VALUATION METHODOLOGIES

The following is a brief summary of certain financial analyses performed by Evercore to arrive at a range of estimated total enterprise values for the Reorganized Debtors.  The following summary does not purport to be a complete description of all of the analyses undertaken to support Evercore's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances.  As a result, the process involved in preparing a valuation is not readily summarized.

In performing this analysis, Evercore considered a variety of factors and applied the following valuation methodologies as applicable to the operations of the Debtors: (a) the discounted cash flow methodology and (b) the public company trading multiples methodology.

(a)  ***Discounted Cash Flow Methodology.***  Evercore used the discounted cash flow methodology to analyze costs associated with the Debtors' business required to support a going concern.  Evercore's application of the discounted cash flow methodology involved deriving the unlevered free cash flows that the Debtors' operations would generate assuming their Financial Projections are realized.  To determine the range of the total enterprise value, these cash flows and an estimated total enterprise value at the end of the Projection Period were discounted to derive their present value as of the assumed Effective Date, using the estimated weighted average cost of capital of the Reorganized Debtors.

(b)  ***Public Company Trading Multiples Methodology.***  Evercore's application of the public company trading multiples methodology involved identifying a group of publicly-traded companies whose businesses and operating characteristics are generally similar to the Reorganized Debtors' operations, although no selected company is either identical or directly comparable to the business of the Reorganized Debtors' operations. From a review of this group, Evercore then developed a range of valuation multiples to apply to the

2

Financial Projections to derive a range of implied enterprise values for the Reorganized Debtors' operations.

In conducting this analysis, Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. This analysis includes two valuation methodologies. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to total enterprise value.

## III.    VALUATION CONSIDERATIONS

This Valuation Analysis is based upon information available to, and analyses undertaken by, Evercore as of December 12, 2025, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Evercore has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to this date, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' value. Neither Evercore nor the Debtors has any obligation to update, revise, or reaffirm this Valuation Analysis.

This Valuation Analysis also reflects a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the minimum amount of cash required to operate the Debtors' businesses, market conditions, and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

Further, the valuation of the New Equity is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates and other conditions in the financial markets; (b) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (c) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganized Debtors or their securities. Such trading value may be materially different from the total enterprise value ranges associated with this Valuation Analysis. As further described in the Disclosure Statement, the Reorganized Debtors are anticipated to be a private company that will not be obligated to file public reports or disclosures. There can be no assurance that any trading market will develop for the New Equity. The estimated values for the Reorganized Debtors do not necessarily reflect the values that may be attainable in public or private markets. Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of Holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value

represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' business and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through a sale or liquidation of the Reorganized Debtors, their securities, or their assets, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as the Debtors' and the Reorganized Debtors' business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such business.

The estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Allowed Claims or Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Evercore or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**<u>Exhibit F</u>**

**Organizational Chart**

## <u>Exhibit G</u>

**Exit ABL Commitment Letter**

*EXECUTION VERSION*

January 25, 2026

Pretium PKG Holdings, Inc.
1555 Page Industrial Boulevard
St. Louis, MO 63123
Attn: Fede Baretto

### EXIT ABL CREDIT FACILITY COMMITMENT LETTER
### $100 MILLION SENIOR SECURED CREDIT FACILITY

Ladies and Gentlemen:

You have advised Wells Fargo Bank, National Association ("***Wells Fargo***") that you are seeking an asset-based senior secured revolving credit facility in a principal amount of up to $100 million (the "***Senior ABL Credit Facility***") in connection with the emergence of Pretium PKG Holdings, Inc., a Delaware corporation ("***you***" or the "***Company***") and certain of its affiliates (collectively with the Company, the "***Debtors***") from pending jointly administered bankruptcy cases (the "***Chapter 11 Cases***") under chapter 11 of the U.S. Bankruptcy Code commenced in the U.S. Bankruptcy Court for the District of New Jersey (the "***Bankruptcy Court***").  The Debtors' emergence from bankruptcy will be pursuant to an Acceptable Plan of Reorganization (as defined in that certain Senior Secured, Super-Priority Debtor-in-Possession ABL Credit and Guarantee Agreement, to be dated on or around the Petition Date (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***DIP ABL***")) (the "***Approved Plan***").  The confirmation of the Approved Plan, the entering into, and funding of, the Senior ABL Credit Facility, the entering into, and funding of, the exit term loan facility in an aggregate principal amount of up to $533,500,000 (the "***Exit Term Loan Facility***") by and among the Company, the other loan parties thereto, the lenders thereto (the "***Exit Term Loan Lenders***"), and the agents party thereto (in such capacity, the "***Exit Term Loan Agent***") and all related transactions are referred to hereinafter, collectively, as the "***Exit Transaction***."

In connection with the foregoing and based upon information known to us today concerning the Transactions, Wells Fargo is pleased to advise you of its commitment to provide 100% of the principal amount of the Senior ABL Credit Facility and to act as the sole administrative agent (in such capacity, the "***Administrative Agent***") and sole collateral agent (in such capacity, the "***Collateral Agent***") for the Senior ABL Credit Facility, all upon and subject to the terms and conditions set forth in this commitment letter and the annexes attached hereto (this "***Commitment Letter***") and the term sheet (attached hereto as Annex A) (the "***Term Sheet***").  The parties acknowledge that the Term Sheet and this Commitment Letter summarize the material terms to the Senior ABL Credit Facility (but do not purport to summarize all of the covenants, representations, and events of default) that will be contained in the definitive documentation for the Senior ABL Credit Facility (collectively, the "***Loan Documents***"), and will be subject to the Documentation Principles (as defined in the Term Sheet).

***Confidentiality***

(a)      You agree that this Commitment Letter (including the Term Sheet) and the contents hereof are confidential and, except for disclosure hereof or thereof on a confidential basis to your accountants,

Pretium PKG Holdings, Inc.
January 25, 2026

attorneys and other professional advisors retained by you in connection with the Exit Transaction or as otherwise required by statute, decision, or judicial or administrative order, rule, or regulation, may not be disclosed by you in whole or in part to any person or entity without our prior written consent; _provided_, however, it is understood and agreed that you may disclose this Commitment Letter (including the Term Sheet) (a) on a confidential basis to the Sponsor (as defined in the DIP ABL) and their and the Debtors' respective officers, directors, agents, affiliates, shareholders, representatives, attorneys, accountants, financial advisors, auditors and other advisors in connection with their consideration of the Exit Transactions, (b) on a confidential basis to the agent and the lenders under the DIP Term Loan Agreement (as defined in the DIP ABL) and Exit Term Loan Facility and its and their counsel and advisors, (c) in any filings made with the Bankruptcy Court in connection with the Exit Transactions, (d) to the Office of the United States Trustee and its representatives and advisors and professional advisors to the official Committee of unsecured creditors and (e) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter or the transactions contemplated hereby.

(b)      Wells Fargo agrees that material, non-public information regarding the Loan Parties (as defined in the Term Sheet) and their respective subsidiaries, their operations, assets, and existing and contemplated business plans shall be treated by Wells Fargo in a confidential manner, and shall not be disclosed by Wells Fargo to persons who are not parties to this Commitment Letter, except: (i) to officers, directors, employees, attorneys advisors, accountants, auditors, and consultants to Wells Fargo on a "need to know" basis in connection with the Exit Transactions contemplated hereby and on a confidential basis, (ii) to subsidiaries and affiliates of Wells Fargo, provided that any such subsidiary or affiliate shall have agreed to receive such information hereunder subject to the terms of this clause (b), (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, _provided_ that prior to any disclosure under this clause (iii), the disclosing party agrees to provide the Company with prior notice thereof, to the extent that it is practicable to do so and not prohibited by applicable law, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation, _provided_ that prior to any disclosure under this clause (iv), the disclosing party agrees to provide the Company with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Company pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance by the Company, (vi) as requested or required by any governmental authority pursuant to any subpoena or other legal process, _provided_ that prior to any disclosure under this clause (vi) the disclosing party agrees to provide the Company with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to the Company pursuant to the terms of the subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Wells Fargo), (viii) in connection with any proposed assignment or participation of Wells Fargo's interest in the Senior ABL Credit Facility, provided that any such proposed assignee or participant shall not be a Disqualified Institution (as defined in the DIP ABL) and shall have agreed to receive such information subject to the terms of this clause (b), and (ix) in connection with any litigation or other adverse proceeding involving parties to this Commitment Letter; _provided_ that prior to any disclosure to a party other than the Loan Parties, the lenders under the Senior ABL Credit Facility (individually, each a "**_Lender_**" and collectively, the "**_Lenders_**"), their respective affiliates and their respective counsel under this clause (ix) with respect to litigation involving a party other than the Loan Parties, the Lenders, and their respective affiliates, the disclosing party agrees to provide the Company with prior notice thereof.

(c)      Anything to the contrary in this Commitment Letter notwithstanding, the Company agrees, on behalf of itself and the other Loan Parties, that (i) Wells Fargo shall have the right to provide information concerning the Senior ABL Credit Facility to loan syndication and reporting services, and (ii) that the

Pretium PKG Holdings, Inc.
January 25, 2026

projections, the marketing materials, and all other information provided by or on behalf of the Company and your affiliates to Wells Fargo regarding the Loan Parties and their respective affiliates, the Exit Transactions and the other transactions contemplated hereby in connection with the Senior ABL Credit Facility may be disseminated by or on behalf of Wells Fargo to prospective lenders and other persons (in each case other than Disqualified Institutions), who have agreed to be bound by customary confidentiality undertakings (including, "click-through" agreements), all in accordance with Wells Fargo's standard loan syndication practices (whether transmitted electronically by means of a website, e-mail or otherwise, or made available orally or in writing, including at potential lender or other meetings). You hereby further authorize Wells Fargo to download copies of the Loan Parties' logos from their respective websites and post copies thereof on SyndTrak® or similar workspace and use the logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the syndication of the Senior ABL Credit Facility.

### Costs and Expenses

In consideration of the issuance of this letter by Wells Fargo and recognizing that in connection with the Exit Transactions, Wells Fargo has been and will be incurring costs and expenses (including, without limitation, fees and disbursements of counsel, search and filing fees, costs and expenses of due diligence, transportation, duplication, messenger, appraisal, audit, syndication, and consultant costs and expenses), you hereby agree to pay or reimburse Wells Fargo, promptly upon demand therefor, for all such reasonable and documented costs and expenses, regardless of whether the Transactions are consummated; provided that such costs and expenses shall be limited, in the case of legal fees and expenses, to (x) the reasonable and documented fees and expenses of one firm of counsel to Wells Fargo and (y) to the extent reasonably necessary, to the reasonable and documented fees and expenses of one local counsel to Wells Fargo in each applicable jurisdiction (which may include a single special counsel acting in multiple jurisdictions). You also agree to pay all reasonable and documented costs and expenses of Wells Fargo (including, without limitation, fees and disbursements of counsel, subject to the proviso in the immediately preceding sentence) incurred in connection with the enforcement of any of its rights and remedies hereunder.

### Indemnification

The Company agrees to indemnify, defend, and hold harmless Wells Fargo, each of its affiliates, and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives (each, an "***Indemnified Person***") as set forth on Annex C hereto. The parties agree that the indemnification (and other) provisions shall be as set forth on Annex C and those provisions are incorporated herein by this reference.

### Syndication

The parties agree that the syndication provisions shall be as set forth on Annex B hereto and those provisions are incorporated herein by this reference.

### Conditions

The commitment of Wells Fargo hereunder is subject solely to the satisfaction of the terms and conditions set forth in the Annex D attached hereto.

Pretium PKG Holdings, Inc.
January 25, 2026

## Exclusivity

On or prior to July 24, 2026, the Company agrees to work exclusively with Wells Fargo to consummate the Senior ABL Credit Facility and agrees that it will not (a) engage in any discussions with any other lender or funding source regarding a debt financing alternative to the Senior ABL Credit Facility, (b) provide any deposit to any other lender or funding source in connection with a debt financing alternative to the Senior ABL Credit Facility, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with a debt financing alternative to the Senior ABL Credit Facility, or (d) otherwise permit or encourage another person to solicit a debt financing proposal or conduct due diligence in connection with a debt financing alternative to the Senior ABL Credit Facility; provided that nothing herein shall prevent the Company, following commencement of Chapter 11 Cases, from (i) responding to and subsequently corresponding with alternative asset-based lenders ("**_Alternative ABL Proposals_**"), that, on the advice of counsel, provide lower or otherwise better terms for the Company than the terms contemplated herein or (ii) otherwise complying with the United States Bankruptcy Code or orders or directions of the United States Bankruptcy Court presiding over the Chapter 11 Cases, and any action taken pursuant to this proviso shall not be a breach of the terms of this Commitment Letter; provided, further that (x) upon the receipt of any Alternative ABL Proposals, the Company shall promptly notify Wells Fargo in writing of such Alternative ABL Proposal, and (y) such exclusivity obligations shall not be applicable if you shall have terminated this Commitment Letter (a "**_For Cause Termination_**") after (i) the Lenders commit a material breach of their obligations under this Commitment Letter or (ii) Lenders notify you in writing that they do not intend to fund the Senior ABL Credit Facility on the Closing Date, other than by reason of a condition to funding failing to be satisfied. The failure to comply with the foregoing provisions (including if as a result of an order or direction by the United States Bankruptcy Court pursuant to clause (ii) of the proviso above) shall, at the option of the Wells Fargo (with written notice to the Company), automatically terminate any and all obligations of Wells Fargo with respect to the Senior ABL Credit Facility contemplated hereunder.

## *Information*

In issuing this Commitment Letter, Wells Fargo is relying on the accuracy of the information furnished to it by or on behalf of the Loan Parties and its affiliates, without independent verification thereof. All written information (other than budgets, estimates and any other than forward looking information, projections of future financial performance (collectively, "**_Projections_**") and general economic or industry-specific information information) concerning the Loan Parties and their respective subsidiaries (the "**_Information_**") that has been, or is hereafter, made available by or on behalf of the Loan Parties or their affiliates is, or when delivered shall be, when considered as a whole and together with any supplements thereto, complete and correct in all material respects and does not, or shall not when delivered, when considered as a whole and together with any supplements thereto, contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in any material respect in light of the circumstances under which such statements have been made, and (b) all projections that have been or are hereafter made available by or on behalf of the Loan Parties or their affiliates are, or when delivered shall be, prepared in good faith on the basis of information and assumptions that are believed by the Loan Parties to be reasonable at the time such projections were prepared; it being recognized by Wells Fargo that Projections are not to be viewed as facts or guarantees of performance and are subject to significant uncertainties and contingencies many of which are beyond our control, that no assurance can be given that any particular financial or other projections will be realized, that actual results may vary materially from projected results. You agree that if at any time prior to the closing of the Senior ABL Credit Facility any of the representations and warranties in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were

Pretium PKG Holdings, Inc.
January 25, 2026

being made, at such time, then you will use commercially reasonable efforts to promptly supplement the Information and the Projections so that such representations and warranties will be correct in all material respects under those circumstances. Any supplement to any information (including Information and Projections) furnished to Wells Fargo by or on behalf of the Loan Parties and its affiliates shall cure any breach of the representations in this paragraph.

### *Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities*

You acknowledge that Wells Fargo or one or more of its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein or otherwise. You also acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by us from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you, on the one hand, and Wells Fargo, on the other hand, is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether Wells Fargo or one or more of its affiliates has advised or is advising you on other matters, (b) Wells Fargo, on the one hand, and you, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of Wells Fargo, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that Wells Fargo or one or more of its affiliates is engaged in a broad range of transactions that may involve interests that differ from your interests and that Wells Fargo does not have any obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, and (e) you waive, to the fullest extent permitted by law, any claims you may have against Wells Fargo for breach of fiduciary duty or alleged breach of fiduciary duty and agree that Wells Fargo shall not have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors. For the avoidance of doubt, the provisions of this paragraph apply only to the transactions contemplated by this Commitment Letter and the relationships and duties created in connection with the transactions contemplated by this Commitment Letter.

You further acknowledge that Wells Fargo or one or more of Wells Fargo's affiliates are full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, Wells Fargo or one or more of Wells Fargo's affiliates may provide investment banking and other financial services to, and/or acquire, hold or sell, for their respective own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and other companies with which you may have commercial or other relationships. With respect to any debt or other securities and/or financial instruments so held by Wells Fargo or one or more of its affiliates or any of their respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

### *Governing Law, Etc.*

This Commitment Letter and the Term Sheet, the rights of the parties hereto or thereto with respect to all matters arising hereunder or related hereto, and any and all claims, controversies or disputes arising

Pretium PKG Holdings, Inc.
January 25, 2026

hereunder or related hereto shall be governed by, and construed in accordance with, the law of the State of New York.  Each of the parties hereto agrees that all claims, controversies, or disputes arising hereunder or hereto shall be tried and litigated only in the state courts, and to the extent permitted by applicable law, federal courts located in New York, New York and each of the parties hereto submits to the exclusive jurisdiction and venue of such courts relative to any such claim, controversy or dispute.

### *Waiver of Jury Trial*

To the maximum extent permitted by applicable law, each party hereto irrevocably waives any and all rights to a trial by jury in respect of to any claim, controversy, or dispute (whether based in contract, tort, or otherwise) arising out of or relating to this letter or the Transactions contemplated hereby or the actions of Wells Fargo or any of its affiliates in the negotiation, performance, or enforcement of this Commitment Letter or the Transactions contemplated hereby or the actions of Wells Fargo or any of its affiliates in the negotiation, performance, or enforcement of this Commitment Letter.

### *Patriot Act*

Wells Fargo hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "PATRIOT Act"), Wells Fargo may be required to obtain, verify and record information that identifies the Loan Parties (as defined in the Term Sheet), which information includes the name, address, tax identification number and other information regarding the Loan Parties that will allow Wells Fargo to identify the Loan Parties in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act. You agree to cause Company to provide Wells Fargo, prior to the Closing Date, with all documentation and other information required by bank regulatory authorities under "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act.

If a 1-4 unit family residential dwelling will be securing any part of the Senior ABL Credit Facility and an appraisal or valuation is required, we may order an appraisal to determine the property's value and charge you for this appraisal. We will promptly give you a copy of any appraisal, even if the Senior ABL Credit Facility does not close. You can pay for an additional appraisal for your own use at your own cost.

### *Counterparts; Electronic Execution*

This Commitment Letter (together with the Term Sheet) sets forth the entire agreement between the parties with respect to the matters addressed herein, supersedes all prior communications, written or oral, with respect to the subject matter hereof, and may not be amended or modified except in writing signed by the parties hereto.  This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same letter. Execution of any such counterpart may be by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Wells Fargo reserves the right, in its discretion, to accept, deny, or condition acceptance of any electronic signature on this Commitment Letter.  Any party delivering an executed counterpart of this Commitment Letter by faxed, scanned or photocopied manual signature shall, at Wells Fargo's reasonable request, also deliver an original manually executed counterpart, but the failure to deliver an original manually executed counterpart shall not affect the validity, enforceability and binding effect of this letter.

Pretium PKG Holdings, Inc.
January 25, 2026

This Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other parties hereto (any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Persons.  In the event that this Commitment Letter is terminated or expires, the Costs and Expenses, Indemnification, Confidentiality, Exclusivity, Sharing Information; Absence of Fiduciary Relationship; Affiliate Transactions, Governing Law, Etc., and Waiver of Jury Trial provisions hereof shall survive such termination or expiration.  Anything contained herein to the contrary notwithstanding, the obligations of the Company under this Commitment Letter, other than the obligations of the Company under the paragraph captioned "Syndication", shall terminate at the time of the initial funding of the Senior ABL Credit Facility.

Nothing contained herein shall limit or preclude  Wells Fargo or any of its affiliates from carrying on any business with, providing banking or other financial services to, or from participating in any capacity, including as an equity investor, in any entity or person whatsoever, including, without limitation, any competitor, supplier or customer of any Loan Party or the seller(s) of the stock of any Loan Party, or any of your or their respective affiliates, or any other entity or person that may have interests different than or adverse to such entities or persons.  Neither Wells Fargo nor any of its affiliates has assumed or will assume an advisory, agency, or fiduciary responsibility in your or your affiliates' favor with respect to any of the Exit Transactions or the process leading thereto (irrespective of whether Wells Fargo or any of its affiliates has advised or is currently advising you or your affiliates on other matters).

This Commitment Letter and all commitments of Wells Fargo hereunder will expire at 5:00 p.m. (New York City time) on January 29, 2026 unless you execute this Commitment Letter and return it to Wells Fargo or its advisors prior to that time (which may be by facsimile transmission or electronic mail), whereupon this Commitment Letter (including the Term Sheet) shall become a binding agreement of Wells Fargo; provided, however, that this Commitment Letter and all commitments of Wells Fargo hereunder will automatically expire (i) if that certain Restructuring Support Agreement, dated as of December 30, 2025 (as amended or otherwise modified from time to time in accordance with the terms of the DIP ABL, the "**Restructuring Support Agreement**"), by and among certain of the Loan Parties and their subsidiaries, and the Consenting Stakeholders (as defined therein) shall have been terminated in accordance with its terms, (ii) if the Bankruptcy Court has not entered a confirmation order (the "**Confirmation Order**") approving Wells Fargo's obligations under this Commitment Letter, including, without limitation, the payment of fees set forth herein and in the Term Sheet, in form and substance satisfactory to Wells Fargo on or prior to the date that is sixty (60) days following the Petition Date (or such later date as Wells Fargo may approve in its sole discretion), (iii) if the Bankruptcy Court has not entered the Confirmation Order that, among other things, approves entry into the Senior ABL Credit Facility on or prior to the date that is sixty (60) days following the Petition Date (or such later date as Wells Fargo may approve in its sole discretion), (iv) if an order is entered reversing, modifying, denying, vacating or reconsidering the Confirmation Order in any material way without the consent of Wells Fargo; (v) if an order is entered by a court of competent jurisdiction staying the Confirmation Order and such stay remains in effect for a period in excess of fifteen (15) business days; (vi) if  any of the Chapter 11 Cases (as defined in the Restructuring Support Agreement as in effect on the date hereof) is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (vii) if a trustee or examiner with expanded powers is appointed with respect to any of the Debtors; (viii) if the "Obligations" are accelerated following an "Event of Default" (or similar term) that has occurred and is continuing under the DIP ABL or the DIP Term Loan Agreement; (ix) upon a For Cause Termination, and (x) on July 24, 2026 (collectively, the "Termination Events"). For the avoidance of doubt, the Debtors acknowledge and agree, and shall not dispute that, any termination (or notice thereof) of this Commitment Letter upon the occurrence of a Termination Event shall not be a violation of the automatic stay arising

Pretium PKG Holdings, Inc.
January 25, 2026

under section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

[*Remainder of Page Intentionally Left Blank; Signature Pages Follow.*]

**ANNEX A**

**TERM SHEET**

Please see attached.

CONFIDENTIAL

SUBJECT TO FRE 408 AND ANALOGOUS STATE LAW

This Term Sheet is part of the commitment letter, dated January 25, 2026 (the "**Commitment Letter**"), addressed to Pretium PKG Holdings, Inc., a Delaware corporation ("**Company**") by Wells Fargo Bank, N.A. ("**Wells Fargo**"), and is subject to the terms and conditions of the Commitment Letter.  Capitalized terms used herein shall have the meanings set forth in the Commitment Letter unless otherwise defined herein.

| | | |
|---|---|---|
| **Facilities** | **Borrowers and Guarantors** | To be consistent with the Existing Credit Agreement[1]  and Documentation Principles (as defined below). |
| | **Tranche** | Asset-Based Lending Commitment (including a first-in-last-out ("**FILO**") component). |
| | **Amount** | $100,000,000 with a $20,000,000 Canadian Sub-Facility (to be consistent with the Existing Credit Agreement and Documentation Principles). |
| | **Drawn Pricing** | • Level I: EA > 66.67%: S + 1.50%<br>• Level II: 66.67% ≥ EA ≥ 33.33%: S + 1.75%<br>• Level III: EA < 33.33%: S + 2.00%<br>• FILO pricing 1.00% higher |
| | **Default Rate** | 2.00% |
| | **Tenor** | Lesser of (i) 5 yrs, and (ii) 91 days prior to any material debt including Exit Term Loan Facility |
| | **Financial Covenant (Minimum Fixed Charge Coverage Ratio)** | Springing FCCR to be consistent with the Existing Credit Agreement, except to be tested quarterly only. |
| | **FILO** | Up to $7,500,000, subject to availability, amortizes quarterly starting one full quarter after close over 6 quarters, and otherwise to be consistent with the Existing Credit Agreement |
| **Fees** | | • Unused Line Fee: To be consistent with the Existing Credit Agreement.<br>• Closing Fee: 1.75%.<br>• Letter of Credit Fee: To be consistent with the Existing Credit Agreement.<br>• Collateral Monitoring Fee: $50,000, paid quarterly. |
| **Upsize** | | $50,000,000 uncommitted accordion and to be consistent with the Existing Credit Agreement. |

[1] "**Existing Credit Agreement**" means that certain Amended and Restated ABL Credit and Guarantee Agreement, dated as of October 1, 2021 (as amended by that certain First Amendment to Amended and Restated ABL Credit and Guarantee Agreement, dated as of May 11, 2023, as further amended by that certain Second Amendment to Amended and Restated ABL Credit and Guarantee Agreement, dated as of July 5, 2023, as further amended by that certain Third Amendment to Amended and Restated ABL Credit and Guarantee Agreement, dated as of September 22, 2023, as further amended by that certain Fourth Amendment to Amended and Restated ABL Credit and Guarantee Agreement, dated as of June 27, 2024, as further amended by that certain Fifth Amendment to Amended and Restated ABL Credit and Guarantee Agreement, dated as of October 31, 2025, as further amended by that certain Sixth Amendment and Limited Consent to Amended and Restated ABL Credit and Guarantee Agreement, dated as of November 12, 2025, as further amended by that certain Seventh Amendment and Limited Consent to Amended and Restated ABL Credit and Guarantee Agreement, dated as of November 19, 2025, as further amended by that certain Forbearance Agreement, Eighth Amendment and Limited Consent to Amended and Restated ABL Credit and Guarantee Agreement, dated as of December 30, 2025, and as the same may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Existing Credit Agreement**"), by and among, *inter alios*, the Company, the other loan parties from time to time party thereto, Wells Fargo, as administrative agent and collateral agent, the lenders from time to time party thereto, and the other parties from time to time party thereto

| Cash Dominion | | To be consistent with the Existing Credit Agreement. |
|---|---|---|
| **Borrowing Base Accounts Receivable** | **Advance Rates** | To be consistent with the Existing Credit Agreement. |
| | **Eligibility** | To be consistent with the Existing Credit Agreement, except (i) dated < 120 DOI / 90 DPD, 50% cross age (ii) terms < 90 days, except Ecolab, RB Health and Glanbia all 91-135, capped at $12,500,000. |
| | **Dilution** | To be consistent with the Existing Credit Agreement. |
| | **Concentration Limits** | To be consistent with the Existing Credit Agreement. |
| | **Acquired A/R** | To be consistent with the Existing Credit Agreement. |
| **Borrowing Base Inventory** | **Advance Rates** | To be consistent with the Existing Credit Agreement. |
| | **Eligibility** | To be consistent with the Existing Credit Agreement, except (i) limits for Domestic/Foreign In Transit each to be $10,000,000 and (ii) subject to other exceptions to be reasonably agreed and scheduled prior to closing. |
| | **Acquired Inventory** | To be consistent with the Existing Credit Agreement. |
| **Cash** | **Sublimit** | Qualified Cash to be capped at $30,000,000 during FILO Period; otherwise, uncapped. |
| | **Advance Rate** | 100% |
| | **Eligibility** | To be consistent with the Existing Credit Agreement. |
| **Other Reserves** | **Rent Reserves** | To be consistent with the Existing Credit Agreement. |
| | **Requirement to deliver new Borrowing Base Certificate following a major disposition** | To be consistent with the Existing Credit Agreement. |
| **Use of Proceeds** | | • To be consistent with the Existing Credit Agreement. |
| **Borrowing Base Frequency** | | • Monthly no later than the 20th day of each month.<br>• Weekly on every Wednesday if (i) when Specified Excess Availability is less than the greater of (a) $7,500,000 and (b) 10.0% of the Line Cap for 5 consecutive days; (ii) during the continuance of such Specified Default.<br>• Specified EA: Excess Availability plus suppressed availability not to exceed 5% of Maximum Revolver Amount.<br>• Line Cap: Lesser of Maximum Revolver Amount and Borrowing Base.<br>• All triggers (including but not limited to: borrowing base frequency, financial covenant testing, Cash Dominion, Inventory Appraisal & Field Exam Frequency, Payment Conditions) to exclude additional availability generated by FILO. |
| **Inventory Appraisal & Field Exam Frequency** | | • To be consistent with the Existing Credit Agreement. |

| Financial and General Reporting Frequency | <ul><li>Audited Financials: 120 days after FYE (or 180 days for FYE September 30, 2025).</li><li>Monthly: 30 days after ME subject to triggering conditions consistent with the Existing Credit Agreement.</li><li>Quarterly: 60 days after QE.</li><li>Projections: 120 days from FYE.</li></ul> |
|---|---|
| Payment Conditions | To be consistent with the Existing Credit Agreement. |
| Restricted Payments | To be same as Exit Term Loan Facility, subject to inclusion of payment conditions, review of loan documentation in respect of the Exit Term Loan Facility, and Documentation Principles. |
| PEG Management Fee Limitation | To be same as Exit Term Loan Facility, subject to inclusion of payment conditions, review of loan documentation in respect of the Exit Term Loan Facility, and Documentation Principles. |
| Permitted Acquisitions | To be same as Exit Term Loan Facility, subject to inclusion of payment conditions, review of loan documentation in respect of the Exit Term Loan Facility, and Documentation Principles. |
| Permitted Indebtedness | To be same as Exit Term Loan Facility, subject to inclusion of payment conditions, review of loan documentation in respect of the Exit Term Loan Facility, and Documentation Principles. |
| Permitted Investments | To be same as Exit Term Loan Facility, subject to inclusion of payment conditions, review of loan documentation in respect of the Exit Term Loan Facility, and Documentation Principles. |
| Permitted Restructuring/Tax Transactions | To be same as DIP ABL (to the extent applicable (and subject to review of loan documentation in respect of the Exit Term Loan Facility)). |
| Equity Cure | To be consistent with the Existing Credit Agreement. |
| Ability to Implement Reserves and other BB changes in Permitted Discretion | To be consistent with the Existing Credit Agreement. |
| Other | <ul><li>To include Liability Management Blockers.</li><li>The Senior ABL Credit Facility's affirmative and negative covenants are no worse (from each of the Company's and Wells Fargo's perspectives) than the Exit Term Loan Facility.</li><li>Post-closing schedule to include 90-day period from Closing Date to provide control agreements with respect to deposit and similar accounts (including in connection with the requirement to provide control agreements for purposes of Qualified Cash), subject to Documentation Principles.</li></ul> |
| Assignments | To be consistent with Existing Credit Agreement, except net short lenders to be disqualified lenders. |
| Documentation Principles | The Loan Documents for the Senior ABL Credit Facility will be negotiated in good faith and substantially similar to the loan documentation delivered in connection with the Existing Credit Agreement with modifications (i) reflected in this Term Sheet, (ii) necessary to give due regard to the operational requirements, size, industries, jurisdictions, projections, businesses and business practices of Company and its subsidiaries, including, without limitation, changes to various baskets, thresholds, exceptions, time periods, and similar terms desirable or required for operations and anticipated business plans of the Company and its subsidiaries, (iii) to reflect administrative, agency, legal, regulatory and borrowing mechanics and other operational/form requirements of Administrative Agent, which shall be negotiated in good faith and (iv) otherwise mutually agreed upon in good faith (the foregoing, collectively, the "***Documentation Principles***"). |

**ANNEX B**

**SYNDICATION PROVISIONS**

While Wells Fargo has provided a commitment for the entire amount of the Senior ABL Credit Facility, subject to the terms and conditions of this Commitment Letter and the Term Sheet,  it is understood and agreed that prior to and/or after the execution of the definitive documentation for the Senior ABL Credit Facility, Wells Fargo may syndicate all or a portion of Wells Fargo's commitments with respect to the Senior ABL Credit Facility to other lenders (other than any Disqualified Institution) identified by Wells Fargo in consultation with you; provided, however, that any assignment made prior to the date of the consummation of the Senior ABL Credit Facility (such date, the "***Closing Date***") shall not relieve Wells Fargo of its commitments and obligations hereunder to the extent that an assignee breaches its obligation to fund its ratable share of the drawings under the Senior ABL Credit Facility on the Closing Date (provided that Wells Fargo shall not have any obligation with respect to any breach by an assignee that occurs after the Closing Date).

## ANNEX C

## INDEMNIFICATION PROVISIONS

Capitalized terms used herein shall have the meanings ascribed to them in the commitment letter, dated January 25, 2026 (the "**Commitment Letter**") addressed to Pretium PKG Holdings, Inc., a Delaware corporation (the "**Indemnifying Party**") from Wells Fargo Bank, National Association ("**Wells Fargo**").

To the fullest extent permitted by applicable law, the Indemnifying Party agrees that it will indemnify, defend, and hold harmless each of the Indemnified Persons from and against (i) any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements, (ii) any and all actions, suits, proceedings and investigations in respect thereof, and (iii) any and all reasonable and documented legal or other costs, expenses or disbursements in giving testimony or furnishing documents in response to a subpoena or otherwise (including, without limitation, the costs, expenses and disbursements, as and when incurred, of investigating, preparing or defending any such action, proceeding or investigation (whether or not in connection with litigation in which any of the Indemnified Persons is a party) and including, without limitation, any and all losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements, resulting from any act or omission of any of the Indemnified Persons) (limited, in the case of legal fees and expenses, to (x) the reasonable and documented fees and expenses of one firm of counsel to all Indemnified Persons, taken as a whole and, (y) to the extent reasonably necessary, to the reasonable and documented fees and expenses of one local counsel to all Indemnified Persons, taken as a whole (which may include a single special counsel acting in multiple jurisdictions); provided that in the case of an actual or perceived conflict of interest notified to the Indemnifying Party by any Indemnified Person, such indemnity for fees and expenses shall extend to one additional primary counsel and (to the extent reasonably necessary) one local counsel for such Indemnified Person taken as a whole (which may include a single special counsel acting in multiple jurisdictions), directly or indirectly, caused by, relating to, based upon, arising out of or in connection with (a) the Exit Transaction, (b) the Commitment Letter or the Senior ABL Credit Facility, or (c) any untrue statement or alleged untrue statement of a material fact contained in, or omissions or alleged omissions in, information furnished by Indemnifying Party or any other Loan Party, or any of their subsidiaries or affiliates, or any other person in connection with the Exit Transaction or the Commitment Letter, except in each case to the extent any such loss, claim, damage, obligation, penalty, judgment, award, liability, cost, expense and/or disbursement has been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (x) the gross negligence, bad faith, or the willful misconduct of such Indemnified Person or its related Indemnified Persons, (y) a material breach of the obligations of such Indemnified Person or its related Indemnified Persons under this Commitment Letter or (iii) claims between or among the Indemnified Persons and/or their related Indemnified Persons and not arising out of any act or omission of you, any of your subsidiaries or the Sponsor (as defined in the DIP ABL) (other than any proceeding against Wells Fargo solely in its capacity or in fulfilling its role as Administrative Agent, as Collateral Agent, or similar role under the Senior ABL Credit Facility); provided, however, such indemnity agreement shall not apply to any portion of any such loss, claim, damage, obligation, penalty, judgment, award, liability, cost, expense or disbursement of an Indemnified Person to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the gross negligence or willful misconduct of such Indemnified Person.

These Indemnification Provisions shall be in addition to any liability which the Indemnifying Party may have to the Indemnified Persons.

If any action, suit, proceeding or investigation is commenced, as to which any of the Indemnified Persons proposes to demand indemnification, it shall notify the Indemnifying Party with reasonable promptness;

provided, however, that any failure by any of the Indemnified Persons to so notify the Indemnifying Party shall not relieve the Indemnifying Party from its obligations hereunder. Wells Fargo, on behalf of the Indemnified Persons, shall have the right to retain one counsel (and, to the extent reasonably necessary, one local counsel in each applicable jurisdiction (which may include a single special counsel acting in multiple jurisdictions), provided that in the case of an actual or perceived conflict of interest notified to the Indemnifying Party by such Indemnified Persons such indemnity shall extend to one additional primary counsel and (to the extent reasonably necessary) one local counsel for such Indemnified Persons taken as a whole (which may include a single special counsel acting in multiple jurisdictions) of its choice to represent the Indemnified Persons, and the Indemnifying Party shall pay the reasonable and documented fees, expenses, and disbursement of such counsel, and such counsel shall, to the extent consistent with its professional responsibilities, cooperate with the Indemnifying Party and any counsel designated by the Indemnifying Party. The Indemnifying Party shall be liable for any settlement of any claim against any of the Indemnified Persons made with its written consent, which consent shall not be unreasonably withheld. Without the prior written consent of Wells Fargo (not to be unreasonably withheld, conditioned or delayed), the Indemnifying Party shall not settle or compromise any claim, permit a default or consent to the entry of any judgment in respect thereof unless such settlement or compromise (a) includes an unconditional release of Wells Fargo or the applicable Indemnified Person from all liability or claims that are the subject matter of such proceeding, (b) does not include any statement as to any admission of fault or culpability and (c) includes customary confidentiality and non-disparagement agreements.

In order to provide for just and equitable contribution, if a claim for indemnification pursuant to these Indemnification Provisions is made but is found by a judgment of a court of competent jurisdiction (not subject to further appeal) that such indemnification may not be enforced in such case, even though the express provisions hereof provide for indemnification in such case, then the Indemnifying Party, on the one hand, and the Indemnified Persons, on the other hand, shall contribute to the losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements to which the Indemnified Persons may be subject in accordance with the relative benefits received by the Indemnifying Party, on the one hand, and the Indemnified Persons, on the other hand, and also the relative fault of the Indemnifying Party, on the one hand, and the Indemnified Persons collectively and in the aggregate, on the other hand, in connection with the statements, acts or omissions which resulted in such losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses and disbursements and the relevant equitable considerations shall also be considered. No person found liable for a fraudulent misrepresentation shall be entitled to contribution from any other person who is not also found liable for such fraudulent misrepresentation. Notwithstanding the foregoing, none of the Indemnified Persons shall be obligated to contribute any amount hereunder that exceeds the amount of fees previously received by such Indemnified Person pursuant to the Commitment Letter.

Neither expiration nor termination of Wells Fargo's commitments under the Commitment Letter or funding or repayment of the loans under the Facility shall affect these Indemnification Provisions which shall remain operative and continue in full force and effect; provided that, these Indemnification Provisions shall terminate on the Closing Date and be superseded by the applicable indemnification provisions in the credit agreement governing the Senior ABL Credit Facility.

**ANNEX D**

**CONDITIONS PRECEDENT**

The availability of the Senior ABL Credit Facility is subject solely to the satisfaction (or waiver by the Lenders) of each of the following conditions precedent:

(a)     On the Closing Date, immediately after giving effect to the Restructuring Transactions (as defined in the Restructuring Support Agreement) contemplated on the Closing Date, including the funding of the term loans under the Exit Term Loan Facility, Excess Availability (as defined in the Senior ABL Credit Facility) shall be equal to or greater than $50,000,000.00; provided, however, for purposes of this clause (a), the amount of any Term Loan Qualified Cash (as defined below) included in the calculation of Excess Availability shall not exceed $30,000,000 so long as such Term Loan Qualified Cash satisfies the requirements of the definition of Qualified Cash (as defined in the Senior ABL Credit Facility);

(b)     the Debtors shall have no less than the lesser of (i) $100,000,000.00 of cash and cash equivalents and (ii) the amount required to satisfy the Minimum Liquidity Condition as defined in the Approved Plan as in effect on the date hereof), in each case on their balance sheet (the "***Term Loan Qualified Cash***") after giving effect to the Restructuring Transactions contemplated on the Effective Date (as defined in the Restructuring Support Agreement), without giving effect to any availability under the Senior ABL Credit Facility;

(c)     the Restructuring Support Agreement shall be in full force and effect, and the Debtors shall be in compliance with the Restructuring Support Agreement in all material respects as of the Closing Date;

(d)     the completion, or substantively contemporaneous completion, of the Restructuring Transactions contemplated by the Restructuring Support Agreement;

(e)     (i) the execution and delivery by the Debtors of the Exit Term Loan Facility Documents (as defined in the Restructuring Support Agreement) consistent with the Exit Term Sheet (as defined in the Restructuring Support Agreement), (ii) the execution and delivery by the Debtors of the Loan Documents (including, without limitation, an intercreditor agreement) in form and substance consistent with the Commitment Letter, the Term Sheet, and the Documentation Principles (as defined in the Term Sheet), (iii) the delivery of customary secretary's certificates (with certificate of organizational authorization and organizational documents) of the Debtors, (iv) customary organizational good standing certificates of the Debtors, (v) customary legal opinions, (vi) a customary solvency certificate from the Company's chief financial officer or other financial officer of the Company and (vii) a certificate of the Company certifying that no default or event of default shall have occurred and be continuing as of the Closing Date;

(f)     the transactions contemplated by the Exit Term Sheet (as defined in the Restructuring Support Agreement), the Term Sheet, the Commitment Letter and the Backstop Commitment Letter (as defined in the Restructuring Support Agreement) shall have been consummated in accordance with applicable laws, rules and regulations in all material respects;

(g)     all fees required to be paid on the Closing Date pursuant to any applicable fee letter and all reasonable and documented expenses required to be paid on the Closing Date pursuant to the Commitment Letter, to the extent such expenses are invoiced (in the case of expenses) at least two (2) Business Days prior to the Closing Date (or such later date as the Company may reasonably agree) shall have been paid on the Closing Date;

(h)      all customary documents and instruments (subject to customary exceptions (including post-closing exceptions) to be agreed) required to create and perfect the Collateral Agent's first lien security interest in the collateral (free and clear of all liens, subject to customary and limited exceptions to be agreed upon) shall have been executed (if applicable) and delivered and, if applicable, be in proper form for filing and execution of guarantees, if any;

(i)      no defaults or events of default under the Loan Documents shall have occurred and be continuing;

(j)      the accuracy of representations and warranties in all material respects (except that such materiality qualifier shall not be applied to any representations and warranties that already are qualified by materiality in the text thereof) as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects (except that such materiality qualifier shall not be applied to any representations and warranties that already are qualified by materiality in the text thereof) as of such earlier date;

(k)      the Debtors shall have provided the documentation and other information reasonably requested in writing at least ten (10) Business Days prior to the Closing Date by the Administrative Agent and the Lenders as they reasonably determine is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act, the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada)  and a Beneficial Ownership Certification in relation to each Borrower, in each case at least three (3) Business Days prior to the Closing Date (or such shorter period as the Administrative Agent shall otherwise agree);

(l)      the Bankruptcy Court shall have entered an order approving the disclosure statement with respect to the Approved Plan, and such order shall not have been reversed, stayed, modified, or vacated on appeal;

(m)      the Bankruptcy Court shall have entered the Confirmation Order, and such order shall be a final non-appealable order;

(n)      all actions, documents, and agreements necessary to implement and consummate the Approved Plan shall have been effected and executed;

(o)      the Bankruptcy Court shall have entered the Orders (as defined in the DIP ABL), which shall be final and non-appealable unless waived by the Required Lenders, the Loan Documents (as defined in the DIP ABL) shall be in full force and effect in accordance with their terms, the Termination Date (as defined in the Orders) shall not have occurred, no Event of Default (as defined in the Loan Documents (as defined in the DIP ABL) shall have occurred or be continuing, and obligations outstanding under the DIP Term Loan Credit Agreement or the DIP ABL shall have not been accelerated; and

(p)      all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the Restructuring Transactions contemplated by the Restructuring Support Agreement and the Senior ABL Credit Facility shall have been obtained, not be subject to the unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired or been terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such Restructuring Transactions and the Senior ABL Credit Facility.

## **Exhibit H**

**Backstop Commitment Letter**

*EXECUTION VERSION*

<u>**CONFIDENTIAL**</u>

January 25, 2026

Poseidon Investment Intermediate, Inc.
1555 Page Industrial Blvd.
St. Louis, MO 63132

<u>Backstop Commitment Letter</u>

Ladies and Gentlemen:

You have informed the undersigned (in such capacities, the "***Backstop Parties***") that Poseidon Parent, L.P., a Delaware limited partnership (the "***Parent***"), Poseidon Investment Intermediate, Inc., a Delaware corporation (the "***Company***"), and certain of the Company's subsidiaries and affiliates (collectively with the Parent and the Company, "***you***" or the "***Debtors***") are contemplating filing (the date of such filing, the "***Petition Date***") cases under chapter 11 (the "***Chapter 11 Cases***") of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court presiding over such chapter 11 cases (the "***Bankruptcy Court***") and wish to obtain multi-draw senior secured superpriority debtor-in-possession financing (the "***DIP Term Loan Facility***"; the term loans thereunder, the "***DIP Term Loans***"), from certain of the Consenting First Lien Tranche A-1 Lenders (as defined in the Restructuring Support Agreement, in their capacity as lenders, the "***DIP Term Loan Lenders***") of a principal amount of (i) $451 million, plus (ii) up to $82.5 million (the "***Liquidity Shortfall Funding Cap***") in connection with a Liquidity Shortfall (as defined in the Restructuring Term Sheet) (such aggregate principal amount, the "***DIP Term Loan Amount***") on terms consistent with the credit agreement governing the DIP Term Loan Facility attached hereto as <u>Annex A</u> (the "***DIP Term Loan Credit Agreement***"), which on the effective date of the Plan (the "***Transaction Effective Date***") will be converted (pursuant to the procedures set forth in the DIP Term Loan Credit Agreement and the Plan) into new senior secured first lien term loans (the "***New Term Loans***"; the credit agreement in respect thereof, the "***New Term Loan Credit Agreement***") on terms consistent with the exit term sheet attached to the Restructuring Support Agreement (the "***Exit Term Sheet***") (this agreement, the "***Commitment Letter***").

We refer to that certain (i) First Lien Term Loan Credit Agreement, dated as of October 1, 2021, (the "***First Lien Credit Agreement***") as amended by that certain First Amendment to First Lien Term Loan Credit Agreement, dated as of December 15, 2021, that certain Second Amendment to First Lien Term Loan Credit Agreement, dated as of May 25, 2023, that certain Third Amendment to First Lien Term Loan Credit Agreement and First Amendment to Security Agreements, dated as of October 2, 2023, that certain Fourth Amendment to First Lien Term Loan Credit Agreement, dated as of November 19, 2025, and as further amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, by and among Pretium PKG Holdings, Inc., as the borrower, Pretium, as holdings, Credit Suisse AG, Cayman Islands Branch, as agent, the subsidiary guarantors, the Third Amendment Tranche A Term Lenders (the "***Tranche A Term Lenders***"), and the Third Amendment Tranche A-1 Term Lenders (the "***Tranche A-1 Term Lenders***"); (ii) Second Lien Term Loan Credit Agreement, dated October 1, 2021, (the "***Second Lien Credit Agreement***"), as amended by that certain First Amendment, dated as of May

25, 2023, that certain Second Amendment, dated as of November 19, 2025, and as further amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date, by and among Pretium PKG Holdings, Inc., as borrower, Pretium, as borrower, the Credit Suisse AG, Cayman Islands Branch, as agent, the guarantors party thereto, and the lender parties thereto (the "***Second Lien Term Lenders***"); and (iii) Restructuring Support Agreement, dated as of December 30, 2025 by and among the Debtors and each Consenting Stakeholder (as defined therein) (as amended, restated, modified, or supplemented from time to time, the "***Restructuring Support Agreement***").

Capitalized terms used and not defined in this Commitment Letter will have the meaning given thereto in Annex A or, if not defined therein, in the Restructuring Support Agreement.

1.      **Commitments: Titles and Roles.**

Each of the Backstop Parties is pleased to confirm its commitment to, and hereby commits to, severally but not jointly:

(x) provide and fund to the Debtors, on the Closing Date and each Subsequent Closing Date (each as defined below), as applicable, DIP Term Loans (including in respect of any Liquidity Shortfall up to Liquidity Shortfall Funding Cap) in an amount equal to the DIP Term Loan Amount multiplied by the percentages (which shall be based on the principal amount of First Lien Tranche A-1 Term Loans each Backstop Party holds under the First Lien Credit Agreement relative to the aggregate outstanding principal amount of First Lien Tranche A-1 Term Loans) set forth opposite each such Backstop Commitment Party's name on Schedule I hereto as "A-1 DIP Commitments" (the amount to be funded under this clause (x), the "***A-1 DIP Commitment Amount***");

(y) with respect to the portion of the DIP Term Loan Amount available to be funded by Electing Lenders in accordance with Section 2 below, provide and fund to the Debtors, on the Closing Date and the Subsequent Closing Date, as applicable, the portion of such DIP Term Loan Amount in an amount equal to the DIP Deficiency Amount (as defined below) multiplied by the percentages set forth opposite each such Backstop Party's name on Schedule I hereto as "***Specified DIP Backstop Commitments***" (together with the A-1 DIP Commitments, the "***DIP Backstop Commitments***").  As used herein, "***DIP Deficiency Amount***" equals the DIP Term Loan Amount less both (a) the A-1 DIP Commitment Amount and (b) the amount of the DIP Term Loans actually funded to the Borrower by each Electing Lender in accordance with Section 2 below and the Restructuring Support Agreement; and

(z) exchange or otherwise convert its holdings of DIP Term Loans on a cashless, dollar-for-dollar basis into New Term Loans pursuant to the procedures set forth in the DIP Term Loan Credit Agreement and the Plan (the "***New Money Conversion***").

The aggregate DIP Backstop Commitments under this Commitment Letter are $533.5 million in total.

## 2.      Election Procedures

The parties hereto agree that each Tranche A-1 Lender that is not a Backstop Party (in such capacity, each an "***Electing Lender***") may participate with the other Electing Lenders to provide its *pro rata* portion of the DIP Term Loan Facility (including, for the avoidance of doubt, any Liquidity Shortfall) by executing a joinder (each, an "***Election Joinder***") to the Restructuring Support Agreement no later than the earlier of (i) four (4) Business Days after the commencement of such syndication of the DIP Term Loan Facility and (ii) the day on which the Bankruptcy Court holds a hearing with respect to the Debtors' "first day" motions (as may be further extended by the Backstop holding a majority of the DIP Backstop Commitments (the "***Required Backstop Parties***", and such deadline, the "***Election Deadline***")). Such participation shall be on a *pro rata* basis in accordance with the proportion of (1) the aggregate principal amount of such Consenting First Lien Tranche A-1 Term Lender's First Lien Tranche A-1 Term Loan Claims under the First Lien Credit Agreement to (2) the aggregate principal amount of all First Lien Tranche A-1 Term Loan Claims held by all Tranche A-1 Term Lenders under the First Lien Credit Agreement on the Election Deadline.

On or promptly after the Election Deadline, as applicable, the DIP Term Loan Credit Agreement commitment schedules will be revised to reflect the commitments of the Electing Lenders under the DIP Term Loan Facility (including, without limitation, the commitments to roll such loans into the New Money Exit Loans in accordance with the DIP Term Loan Credit Agreement); provided that, no Backstop Party shall be released in respect of its DIP Backstop Commitments for any amounts not actually funded by the Electing Lenders to the Borrowers on the Closing Date.

## 3.      Premium.

As consideration for the agreements and commitments under this Commitment Letter, the Debtors collectively agree to pay, (i) if the Plan becomes effective in accordance with the Restructuring Support Agreement, to the Backstop Parties a backstop premium in an amount equal to 11.5% of the aggregate amount of DIP Backstop Commitments, which Backstop Premium shall be paid in 26.9% of the New Equity Interests issued to the Backstop Parties (and allocated to the Backstop Parties in accordance with the percentages set forth in Schedule I hereof in the column labeled "Specified DIP Backstop Commitments") on the Transaction Effective Date, which will be subject to dilution as set forth in the Restructuring Term Sheet, or (ii) in the event of a termination of this Backstop Commitment Letter as a result of the termination of the Restructuring Support Agreement pursuant to Sections 12.01(a) (with respect to a breach by the Company Parties), (c) (with respect to amendments, waivers, or modifications consented to by the Company Parties to which the Backstop Parties have not consented) (f), or (g); Section 12.02(a); or Section 12.04(d), a cash premium equal to $16,005,000.00 which shall be paid within five (5) Business Days of such termination (either clause (i) or (ii), the "***Backstop Premium***"). The Backstop Premium shall be fully earned, nonrefundable and non-avoidable upon the date hereof and shall be paid free and clear of any withholding or deduction on account of taxes.  For the avoidance of doubt, the Backstop Premium as set forth in this Section 3 shall constitute the entire "Backstop Premium" as defined in and set forth in the Restructuring Term Sheet.

The Backstop Parties and the Company intend that, for U.S. federal income tax purposes, the Backstop Premium and shall be treated as "put premium" paid to the Backstop Parties on account

of the DIP Backstop Commitments and not on account of services. Each party shall file all tax returns consistent with, and take no position inconsistent with, such treatment (whether in audits, tax returns or otherwise) unless required to do so pursuant to a "determination" within the meaning of Section 1313(a) of the Code.

**4.   Conditions Precedent.**

The Backstop Parties' commitments and agreements hereunder in respect of (x) the DIP Term Loans are subject solely to the satisfaction or waiver of all conditions precedent set forth in Section 4.01 (in respect of the initial funding; the date of such satisfaction or waiver, the "**Closing Date**") and Section 4.02 (in respect of any delayed draw funding; any date of such satisfaction or waiver, the "**Subsequent Closing Date**") of the DIP Term Loan Credit Agreement, as applicable, and (y) the New Money Conversion are subject solely to the satisfaction or waiver of the conditions precedent set forth in the section of the Exit Term Sheet entitled "Conditions Precedent to Effectiveness on the Effective Date".

Each party hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein.

**5.   Indemnification and Related Matters.**

(a)    The Debtors agree to indemnify and hold each of the Backstop Parties (and, in addition to the Backstop Parties, where a Backstop Party is an investment manager or advisor for a beneficial holder, such beneficial holder), and each of their respective affiliates, and each of their and their affiliates' respective officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives, and the successors, heirs, and assigns of such Backstop Party (and, in addition to the Backstop Parties, where a Backstop Party is an investment manager or advisor for a beneficial holder, such beneficial holder) and their affiliates (each such Backstop Party and other person, an "***Indemnified Person***") harmless against any and all losses, claims, damages, liabilities and/or reasonable and documented out-of-pocket expenses (limited, in the case of legal fees and expenses, to (x) the reasonable and documented out-of-pocket fees and expenses of one firm of counsel to all Indemnified Persons, taken as a whole, (y) to the extent reasonably necessary, to the reasonable and documented out-of-pocket fees and expenses of one local counsel to all Indemnified Persons, taken as a whole, and (z) to the extent reasonably necessary, one conflicts counsel to all affected Indemnified Persons, taken as a whole) to any such Indemnified Person in connection with the transactions contemplated by this Commitment Letter or as a result of either this arrangement or any matter referred to in the Commitment Letter (whether or not such losses, claims, damages, or liabilities result from an investigation, litigation, claim, or proceeding that is brought by you, your equity holders, or creditors or an Indemnified Person and whether or not any such Indemnified Person is otherwise a party thereto), except to the extent that such loss, claim, damage, liability or expense has been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (i) the actual fraud or willful misconduct of such Indemnified Person or its related Indemnified Persons, (ii) a material breach of the obligations of such Indemnified Person or its related Indemnified Persons under this Commitment Letter or the Restructuring Support Agreement or (iii) claims between or among the Backstop Parties or their related

4

Indemnified Persons.

(b)     The indemnity obligations of the Debtors under this <u>Section 6</u> will be in addition to any liability which the Debtors may otherwise have to any Indemnified Person, will be binding upon any successors, assigns, heirs, or personal representatives of the Debtors, and will inure to the benefit of any successors, assigns, heirs, or personal representatives of any Indemnified Person.

(c)     The provisions of this <u>Section 5</u> will survive any termination or completion of the arrangement provided by the Commitment Letter and the occurrence of the Transaction Effective Date and any discharge of claims against or interests in the Debtors.

**6.     Assignments.**

This Commitment Letter may not be assigned by any Debtor without the prior written consent of each of the Backstop Parties (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Each of the Backstop Parties may assign its respective commitments and agreements hereunder to (i) the Sponsor, (ii) any affiliate of such Backstop Party (any such assignment, an "***Affiliate Assignment***"), (iii) any other Backstop Party (or, where a Backstop Party is an investment manager or advisor for beneficial holders, to such beneficial holders) or (iv) with the Company's prior written consent (such consent not to be unreasonably withheld), to a Tranche A-1 Term Lender; provided that, (i) in the case of an assignment to a party who is not a Consenting Stakeholder such assignment may only be undertaken after such assignee becomes a party to the Restructuring Support Agreement, (ii) the obligations of the Backstop Parties hereunder may be assigned separately from the right to receive payment of the Backstop Premium and (iii) in the case of any assignment pursuant to clause (i), (iii) or (iv), the assignee Backstop Party shall promptly deliver an updated <u>Schedule I</u> hereto to the Company reflecting such assignment.

Notwithstanding anything herein to the contrary, no Backstop Party shall be released or novated from its obligations hereunder (including its obligation to fund the DIP Term Loan Facility) in connection with an Affiliate Assignment until the earlier of (x) each of the funding of the DIP Backstop Commitments, the New Money Conversion and the Transaction Effective Date and (y) the termination of this Commitment Letter in accordance with its terms.

**7.     Confidentiality.**

Please note that this Commitment Letter and any written communications provided by, or oral discussions with, the Backstop Parties in connection with this arrangement are exclusively for the information of the Debtors and may not be disclosed to any third party or circulated or referred to publicly without the prior written consent of the Backstop Parties; <u>provided</u> that we hereby consent to your disclosure of (i) this Commitment Letter and such communications and discussions to the Sponsor and their and the Debtors' respective officers, directors, agents, affiliates, shareholders, representatives, attorneys, accountants, financial advisors, auditors and other advisors who are directly involved in the consideration of the DIP Term Loan Facility and who have been informed by you of the confidential nature of the Commitment Letter and who have agreed to treat such

information confidentially, (ii) this Commitment Letter after execution and delivery of this Commitment Letter by the Debtors and the Backstop Parties (a) to the office of the U.S. Trustee and its representatives and professional advisors on a confidential and "need to know" basis, (b) in a redacted manner in form and substance reasonably satisfactory to the Backstop Parties, in a filing with the Bankruptcy Court solely in connection with obtaining an order of the Bankruptcy Court approving the Debtors' execution, delivery, and performance of this Commitment Letter, the definitive DIP Documents, the Exit Term Sheet, the Restructuring Support Agreement, and the orders approving the DIP Term Loan Facility on an interim and final basis and (c) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter or the transactions contemplated hereby, (iii) the Exit Term Sheet, including the existence and contents thereof, may be disclosed to any rating agency, (iv) in a manner redacting the commitment schedule, to the ABL Agent, ABL Lenders and their respective counsel, and (v) this Commitment Letter as required by applicable law or compulsory legal process (in which case you agree to inform us promptly thereof) and/or otherwise in connection with the exercise of any remedy under this Commitment Letter; *provided*, such confidentiality restrictions shall not apply to any information that is, was, or becomes available to the public other than as a result of a disclosure in violation of this Commitment Letter.

**8.    Absence of Fiduciary Relationship; Affiliates; Etc.**

(a)    You acknowledge that the Backstop Parties, together with their affiliates and related entities (each a "***Funding Entity***" and collectively, the "***Funding Entities***"), may be engaged, either directly or through affiliates in various activities, including securities trading, investment management, and principal investment activities. In the ordinary course of these activities, each Funding Entity may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for their own account and for the accounts of their investors and may at any time hold long and short positions in such securities and/or instruments. Such investment and other activities may involve securities and instruments of the Debtors, as well as of other entities and persons and their affiliates which may (i) be involved in transactions arising from or relating to the engagement contemplated by this Commitment Letter, (ii) be customers or competitors of the Debtors, or (iii) have other relationships with the Debtors. In addition, each Funding Entity may provide services to such other entities and persons. Each Funding Entity may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of the Debtors or such other entities. The transactions contemplated by this Commitment Letter may have a direct or indirect impact on the investments, securities, or instruments referred to in this paragraph. Although the Funding Entities in the course of such other activities and relationships may acquire information about the transaction contemplated by this Commitment Letter or other entities and persons which may be the subject of the transactions contemplated by this Commitment Letter, the Funding Entities shall have no obligation to disclose such information, or the fact that the Funding Entities are in possession of such information, to the Debtors or to use such information on the Debtors' behalf.

(b)    Furthermore, you acknowledge that neither the Funding Entities nor any of their respective

affiliates have an obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained or that may be obtained by them from any other person.

(c)     The Funding Entities may have economic interests that conflict with those of the Debtors, its equity holders, and/or its affiliates. You agree that each Funding Entity will act under this Commitment Letter as an individual independent contractor and that nothing in this Commitment Letter will be deemed to create an advisory, fiduciary, or agency relationship or fiduciary or other implied duty between any of the Funding Entities and the Debtors, their equity holders, or their affiliates. You acknowledge and agree that the transactions contemplated by this Commitment Letter (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between each of the Funding Entities, on the one hand, and the Debtors, on the other, and in connection therewith and with the process leading thereto, (i) none of the Funding Entities has, by virtue of this Commitment Letter, assumed an advisory or fiduciary responsibility in favor of the Debtors, their equity holders, or their affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any of the Funding Entities has advised, is currently advising or will advise the Debtors, their equity holders or their affiliates on other matters) or any other obligation to the Debtors except the obligations expressly set forth in this Commitment Letter and (ii) each Funding Entity is acting solely as a principal and not as an agent or fiduciary of the Debtors, their management, equity holders, affiliates, creditors, or any other person. The Debtors acknowledge and agree that the Debtors have consulted their own legal and financial advisors to the extent they deemed it appropriate and that they are responsible for making their own independent judgment with respect to such transactions and the process leading thereto. The Debtors agree that they will not claim that, by virtue of this Commitment Letter, any of the Funding Entities have rendered advisory services of any nature or respect, or owe fiduciary or similar duties to the Debtors, in connection with such transactions or the process leading thereto.

(d)     In addition, please note that the Funding Entities do not provide accounting, tax, or legal advice. Notwithstanding anything herein to the contrary, the Debtor (and each employee, representative or other agent of the Debtor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the DIP Term Loan Facility and all materials of any kind (including, without limitation, opinions or other tax analyses) that are provided to the Debtor relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure will remain subject to the confidentiality provisions hereof (and the foregoing sentence will not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates, and their respective affiliates' directors and employees to comply with applicable securities laws. For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Commitment Letter but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

7

9.      **Termination.**

The Backstop Parties' commitments and agreements hereunder (all of which are several, and not joint, in nature) will terminate (the "***Termination Date***") upon the first to occur of: (i) each of funding of the DIP Backstop Commitments, the New Money Conversion and the Transaction Effective Date; (ii) the date that is 120 days after the Confirmation Date (at 11:59 p.m., New York City time); *provided*, *however*, that such date shall be automatically extended for one (1) additional thirty-day (30) period, solely to the extent that the Company and Required Consenting Stakeholders have otherwise complied with the terms of this the Restructuring Support Agreement, this Agreement and the other Definitive Documents and all other events and actions necessary for the occurrence of the Restructuring Transactions have occurred, other than the receipt of regulatory or other approval of a government entity or unit necessary for the occurrence of the Restructuring Transactions; and (iii) the termination of the Restructuring Support Agreement as to the Company Parties or the Consenting First Lien Tranche A-1 Term Lenders.

In the event of any termination pursuant to this paragraph, this Commitment Letter, and the Backstop Parties' agreement to perform hereunder, shall automatically terminate without further action or notice and without further obligation to the Debtors. If, once entered, the Interim DIP Order or Final DIP Order shall at any time cease to be in full force and effect or shall be reversed, stayed or modified in any manner inconsistent with the terms contained in Annex A hereto without the prior written consent of the Backstop Parties, the Backstop Parties may, at their own discretion, terminate this agreement.

The provisions set forth under Sections 5 and 7 (for a period of one year after the Termination Date) hereof, Section 3 hereof, this Section 9, and Section 10 will remain in full force and effect notwithstanding the expiration or termination of this Commitment Letter or the Backstop Parties' commitments and agreements hereunder.

10.      **Miscellaneous**

**The Debtors and their affiliates agree that any suit or proceeding arising in respect to this Commitment Letter or the Backstop Parties' commitments or agreements hereunder will be tried in the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, in any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and the Debtors agree to submit to the exclusive jurisdiction of, and to venue in, such court. Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of either the Backstop Parties' commitments or agreements or any matter referred to in this letter is hereby waived by the parties hereto. The Debtors agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Service of any process, summons, notice, or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses below shall be effective service of process against such party for any suit, action, or proceeding brought in any such court. This Commitment Letter will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.**

The Backstop Parties hereby notify the Debtors that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), the Backstop Parties may be required to obtain, verify, and record information that identifies each Debtor, which information includes the name and address of such Debtor and other information that will allow the Backstop Parties to identify such Debtor in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective for the Backstop Parties.

The DIP Documents and New First Lien Credit Agreement will include "Bail-In" language as required by the Bank Recovery and Resolution Directive of the European Union if requested by the Backstop Parties.

In the event of any conflict between the New Term Loan Credit Agreement and the Exit Term Sheet, the New Term Loan Credit Agreement shall control. In the event of any conflict between the DIP Term Loan Credit Agreement and the Restructuring Support Agreement, the DIP Term Loan Credit Agreement shall control.

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in .pdf format) will be effective as delivery of a manually executed counterpart hereof. This Commitment Letter may not be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto or thereto, as applicable, and any term or provision hereof or thereof may be amended or waived only by a written agreement executed and delivered by all parties hereto and thereto.

*[Remainder of page intentionally left blank.]*