*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PRETIUM PACKAGING, L.L.C., *et al.*,[1] | ) | Case No. 26-10896 (CMG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### JOINT PREPACKAGED CHAPTER 11 PLAN
### OF REORGANIZATION OF PRETIUM PACKAGING, L.L.C. AND ITS DEBTOR AFFILIATES

---

**THIS CHAPTER 11 PLAN IS BEING SOLICITED FOR ACCEPTANCE OR REJECTION IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE. THIS CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE COMMENCEMENT OF THE CHAPTER 11 CASES.**

---

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Jordan E. Elkin (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
steven.serajeddini@kirkland.com
jordan.elkin@kirkland.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C. (*pro hac vice* pending)
Yusuf Salloum (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com
yusuf.salloum@kirkland.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and
Debtors in Possession*

---

[1] The last four digits of Debtor Pretium Packaging, L.L.C.'s tax identification number are 7802. A complete list of each of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Pretium following the commencement of the Chapter 11 Cases. The location of the Debtors' service address in the Chapter 11 Cases is: 2560 White Oak Circle, Suite 120, Aurora, IL 60502.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
GOVERNING LAW ......................................................................................................... 1
    A.    Defined Terms. ............................................................................................................. 1
    B.    Rules of Interpretation. ............................................................................................. 16
    C.    Computation of Time. ............................................................................................... 17
    D.    Governing Law. ......................................................................................................... 17
    E.    Reference to Monetary Figures. ............................................................................... 17
    F.    Reference to the Debtors or the Reorganized Debtors. ............................................ 17
    G.    Controlling Document. .............................................................................................. 17
    H.    Consultation, Information, Notice, and Consent Rights. .......................................... 17

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ................................... 18
    A.    Administrative Claims. ............................................................................................. 18
    B.    DIP Claims. ............................................................................................................... 18
    C.    Priority Tax Claims. .................................................................................................. 19
    D.    Professional Fee Claims. .......................................................................................... 19
    E.    Payment of Statutory Fees. ....................................................................................... 20
    F.    Transaction Expenses. .............................................................................................. 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................... 21
    A.    Classification of Claims and Interests. ..................................................................... 21
    B.    Treatment of Claims and Interests. .......................................................................... 21
    C.    Special Provision Governing Unimpaired Claims. ................................................... 25
    D.    Elimination of Vacant Classes. ................................................................................ 25
    E.    Deemed Acceptance If No Votes Cast. ..................................................................... 25
    F.    Intercompany Interests. ............................................................................................. 25
    G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ........ 25
    H.    Controversy Concerning Impairment. ...................................................................... 26
    I.    Subordinated Claims and Interests. .......................................................................... 26

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ......................................... 26
    A.    General Settlement of Claims and Interests. ............................................................ 26
    B.    Restructuring Transactions. ...................................................................................... 26
    C.    Reorganized Debtors. ............................................................................................... 27
    D.    Sources of Consideration for Plan Distributions. ..................................................... 27
    E.    Corporate Existence. ................................................................................................. 31
    F.    Vesting of Assets in the Reorganized Debtors. ........................................................ 31
    G.    Cancelation of Existing Securities and Agreements. ................................................ 31
    H.    Corporate Action. ..................................................................................................... 32
    I.    New Organizational Documents. .............................................................................. 32
    J.    Indemnification Obligations. .................................................................................... 33
    K.    Directors and Officers of the Reorganized Debtors. ................................................ 33
    L.    Effectuating Documents; Further Transactions. ....................................................... 33
    M.    Certain Securities Law Matters. ............................................................................... 33
    N.    Section 1146 Exemption. .......................................................................................... 34
    O.    Director and Officer Liability Insurance. ................................................................. 34
    P.    Management Incentive Plan. ..................................................................................... 35
    Q.    Preservation of Causes of Action. ............................................................................ 35

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 36
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ............ 36
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. .............. 37
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. .......... 37
    D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases. .......... 38

E.      Insurance Policies. ..................................................................................................38
F.      Reservation of Rights. .............................................................................................38
G.      Nonoccurrence of Effective Date. ...........................................................................38
H.      Employee Compensation and Benefits. ...................................................................38
I.      Contracts and Leases Entered Into After the Petition Date. ....................................39

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .............................................39
A.      Distributions on Account of Claims Allowed as of the Effective Date. ...................39
B.      Disbursing Agent. ....................................................................................................40
C.      Rights and Powers of Disbursing Agent. .................................................................40
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions. .............40
E.      Manner of Payment. .................................................................................................42
F.      Indefeasible Distributions. .......................................................................................42
G.      Compliance with Tax Requirements. .......................................................................42
H.      Allocations. ..............................................................................................................43
I.      No Postpetition Interest on Claims. .........................................................................43
J.      Foreign Currency Exchange Rate. ...........................................................................43
K.      Setoffs and Recoupment. .........................................................................................43
L.      Claims Paid or Payable by Third Parties. ................................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND
         DISPUTED CLAIMS ......................................................................................44
A.      Disputed Claims Process. .........................................................................................44
B.      Allowance of Claims. ...............................................................................................44
C.      Claims Administration Responsibilities. ..................................................................45
D.      Estimation of Claims and Interests ..........................................................................45
E.      Adjustment to Claims or Interests without Objection. .............................................45
F.      Disallowance of Claims or Interests. .......................................................................45
G.      No Distributions Pending Allowance. ......................................................................46
H.      Distributions After Allowance. ................................................................................46
I.      Single Satisfaction of Claims. .................................................................................46

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............46
A.      Discharge of Claims and Termination of Interests. ..................................................46
B.      **Release of Liens.** ...................................................................................................46
C.      **Releases by the Debtors.** ......................................................................................47
D.      **Releases by the Releasing Parties.** ......................................................................48
E.      **Exculpation.** .........................................................................................................49
F.      **Injunction.** ............................................................................................................50
G.      Protections Against Discriminatory Treatment. .......................................................51
H.      Document Retention. ................................................................................................51
I.      Reimbursement or Contribution. ..............................................................................51

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN .................51
A.      Conditions Precedent to the Effective Date. ............................................................51
B.      Waiver of Conditions. ..............................................................................................52
C.      Effect of Failure of Conditions. ...............................................................................53
D.      Substantial Consummation .......................................................................................53

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN ...................53
A.      Modification and Amendments. ................................................................................53
B.      Effect of Confirmation on Modifications. ................................................................53
C.      Revocation or Withdrawal of Plan. ..........................................................................53

ARTICLE XI. RETENTION OF JURISDICTION .............................................................................54

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................55
    A.     Immediate Binding Effect. ...............................................................................55
    B.     Additional Documents. ....................................................................................56
    C.     Statutory Committee and Cessation of Fee and Expense Payment ...................56
    D.     Reservation of Rights. .....................................................................................56
    E.     Successors and Assigns.....................................................................................56
    F.     Notices. ...........................................................................................................56
    G.     Enforcement of Confirmation Order. ...............................................................58
    H.     Term of Injunctions or Stays............................................................................58
    I.     Entire Agreement. ...........................................................................................58
    J.     Plan Supplement. ............................................................................................58
    K.     Nonseverability of Plan Provisions. .................................................................58
    L.     Votes Solicited in Good Faith. .........................................................................59
    M.     Closing of Chapter 11 Cases. ..........................................................................59
    N.     Waiver or Estoppel...........................................................................................59
    O.     Creditor Default. .............................................................................................59
    P.     No Group ........................................................................................................59

**INTRODUCTION**

Pretium Packaging, L.L.C. and the above-captioned debtors and debtors in possession (collectively, the "Debtors") propose this joint prepackaged chapter 11 plan of reorganization (as amended, supplemented, or otherwise modified from time to time, this "Plan") for the resolution of the outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates*. Holders of Claims against or Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of this Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

# ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.     *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*ABL Agent*" means Wells Fargo Bank, National Association, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

2.      "*ABL Claims*" means any Claims arising under, derived from, based on, or related to the ABL Facility, including all ABL Loans and ABL Obligations.

3.      "*ABL Credit Agreement*" means that certain Amended and Restated ABL Credit and Guarantee Agreement, dated as October 1, 2021, by and among Poseidon Investment Intermediate, Inc. as holdings, Pretium PKG Holdings, Inc. as the parent borrower, the several borrowers party thereto, the other guarantors party thereto, the ABL Lenders, and the ABL Agent, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

4.      "*ABL Documents*" means, collectively, the ABL Credit Agreement and any other documents governing the ABL Facility, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

5.      "*ABL Facility*" means the secured asset-based revolving loan facility arising under the ABL Documents.

6.      "*ABL Lenders*" means the lenders party to the ABL Credit Agreement from time to time.

7.      "*ABL Loans*" means the "Revolving Loans" as defined in the ABL Credit Agreement.

8.      "*ABL Obligations*," means the "Obligations" as defined in the ABL Credit Agreement and any outstanding adequate protection payments for Prepetition ABL Obligations (as such term is defined in the DIP Orders).

9.        "*ABL/Term Loan Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of October 1, 2021, by and among the ABL Agent, the First Lien Agent, the Second Lien Agent, each in its capacity as such, and other persons from time to time party thereto from time to time, as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

10.        "*Ad Hoc Group*" means that certain ad hoc group of Holders of First Lien Term Loans and Second Lien Term Loans represented by the Ad Hoc Group Advisors.

11.        "*Ad Hoc Group Advisors*" means, collectively, Milbank LLP, Moelis & Company LLC, SAI Derecho & Economía, S.C., Gowling WLG, and one other local counsel, and, with the prior consent of the Debtors (such consent not to be unreasonably withheld, conditioned, or delayed), any other professionals and/or consultants for the Ad Hoc Group, if any.

12.        "*Administrative Claim*" means a Claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) the Allowed Professional Fee Claims; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code; and (d) the Transaction Expenses.

13.        "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

14.        "*Agents*" means, collectively, the ABL Agent, the First Lien Agent, the Second Lien Agent, the DIP Agents, the Exit Facility Agents, and any other administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement, the First Lien Credit Agreement, the Second Lien Credit Agreement, the DIP Documents, and the Exit Facility Documents, including any successors thereto.

15.        "*Allowed*" means, with respect to a Claim or Interest, any Claim or Interest (or portion thereof) against any Debtor that:  (a) is deemed allowed under the Bankruptcy Code; (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of this Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (c) has been allowed by a Final Order of the Bankruptcy Court.  For the avoidance of doubt, any Claim or Interest (or portion thereof), that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim.  Except as otherwise specified in this Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.

16.        "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties-in-interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer Law and other Law.

17.        "*Backstop Commitment Letter*" means that certain Backstop Commitment Letter between the Debtors and the Backstop Parties, as may be amended, modified, or supplemented from time to time, pursuant to which the Backstop Parties shall have agreed to provide the Backstop Commitments in exchange for receiving the Backstop Premium.

18.        "*Backstop Commitments*" means the commitments to backstop 100 percent of the DIP Term Loans, including the Liquidity Shortfall Funding Amount, up to the Liquidity Shortfall Funding Cap.

19.        "*Backstop Parties*" means the DIP Term Loan Lenders party to the Backstop Commitment Letter.

20.        "*Backstop Premium*" means the New Equity, subject to dilution by the MIP Equity, to be issued to the Backstop Parties in accordance with, or as otherwise payable as set forth in, the Backstop Commitment Letter.

21.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

22.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of New Jersey.

23.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

24.     "*Blue-Sky Laws*" means any local or state securities law of any securities regulatory authority of any locality or any state.

25.     "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or other day on which commercial banks are authorized to close under the Laws of, or in fact are closed in, the State of New York.

26.     "*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

27.     "*Cash Out Option Investors*" means the New Money Investor and the Lender Cash Out Investors, each in its capacity as an investor with respect to the Cash Out Option Investment.

28.     "*Cash Out Option Equity*" means, collectively, the First Lien New Equity and Second Lien New Equity acquired by the Cash Out Option Investors on account of the Cash Out Option Investment, which shall be distributed to each Cash Out Option Investor proportional to the share of the Cash Out Option Investment it funds.

29.     "*Cash Out Option Investment*" means that certain new money investment, if any, funded by the Cash Out Option Investors in an aggregate amount necessary for the Debtors to fund the First Lien Cash Out Option and the Second Lien Cash Out Option, up to the Cash Out Option Investment Cap, and which shall be allocated to the New Money Investor, on the one hand, and the Lender Cash Out Investors, on the other hand, on a ratable basis based upon their respective *pro forma* holdings of New Equity as of December 30, 2025, which allocation to any Cash Out Option Investor may be increased or decreased by up to five percentage points based upon their respective pro forma holdings of New Equity as of the Cash Out Option Offer Date.

30.     "*Cash Out Option Investment Cap*" means the amount of the Cash Out Option Investment equal to the lower of (a) the Cash Out Option Investment made available by the Cash Out Option Investors and (b) the aggregate Cash Out Option Investment such that the Cash Out Option Investors, after funding their respective shares of such amount, will acquire Cash Out Option Equity in an amount that, following dilution by the Participation Premium and Backstop Premium, but subject to dilution from the MIP Equity, equals no greater than 10.6 percent of New Equity.

31.     "*Cash Out Option Offer Date*" means the date that is 21 days prior to the anticipated Effective Date.

32.     "*Cash Out Value*" means a value to be determined by the Required Consenting Stakeholders prior to the Cash Out Option Offer Date.

33.     "*Causes of Action*" means any and all claims, interests, controversies, actions, proceedings, reimbursement claims, contribution claims, recoupment rights, debts, third-party claims, indemnity claims, damages, remedies, causes of action, demands, rights, suits, obligations, liabilities, accounts, judgments, defenses, offsets, powers, privileges, licenses, Liens, guarantees, franchises, Avoidance Actions, counterclaims, and cross-claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, asserted or unasserted, direct or indirect, assertable directly or derivatively, choate or inchoate, reduced to judgment or otherwise, secured or unsecured, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise pursuant to any theory of law.  Causes of Action also include:  (a) all rights of setoff,

counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

34.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

35.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code.

36.    "*Claims Register*" means the official register of Claims maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

37.    "*Class*" means a class of Claims or Interests as set forth in <u>Article III</u> of this Plan pursuant to section 1122(a) of the Bankruptcy Code.

38.    "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

39.    "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all employment, wages, compensation, and benefit plans and policies, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, supplemental executive retirement plans, healthcare plans, disability plans, severance benefit plans, incentive and retention plans, programs, and payments, life and accidental death and dismemberment insurance plans and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees, and non-employee directors and managers, in each case existing with the Debtors as of immediately prior to the Effective Date.

40.    "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

41.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

42.    "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code to consider Confirmation of this Plan and approval of the Disclosure Statement and Solicitation Materials, as such hearing(s) may be adjourned or continued from time to time.

43.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and, if applicable, approving the Disclosure Statement and the Solicitation Materials.

44.    "*Consenting Equity Holders*" means, collectively, the Holders of Existing Interests party to the Restructuring Support Agreement.

45.    "*Consenting Lenders*" means, the "Consenting Creditors," as defined in the Restructuring Support Agreement.

46.    "*Consenting Stakeholders*" means, collectively, the Consenting Lenders, the Consenting Equity Holders, the New Money Investor, and the Backstop Parties.

47.    "*Consummation*" means the occurrence of the Effective Date.

48.    "*Cure*" means all amounts, including an amount of $0, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an

Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

49.      "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") covering any of the Debtors' current or former directors', managers', officers' and/or employees' liability and all agreements, documents, or instruments relating thereto.

50.      "*Debtor Release*" means the releases given on behalf of the Debtors and their Estates as set forth in Article VIII.C of this Plan.

51.      "*Debtors*" has the meaning set forth in the preamble.

52.      "*Definitive Documents*" means, collectively and as applicable, all agreements, instruments, pleadings, orders, forms, and other documents (including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto) governing the Restructuring Transactions, including the following:  (a) this Plan; (b) the Disclosure Statement; (c) the Solicitation Materials; (d) the Plan Supplement; (e) the DIP Documents; (f) the Confirmation Order; (g) the Disclosure Statement Order and the motion seeking approval thereof; (h) all material pleadings Filed by the Debtors in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings and all orders sought pursuant thereto, except the pleadings (including retention applications and fee applications) related to the retention and compensation of Professionals; (i) the New Equity Documents; (j) the Exit Facility Documents; and (k) with respect to each of the foregoing clauses (a) through (j), subject to the consent, approval, and consultation rights set forth therein and in the Restructuring Support Agreement.

53.      "*DIP ABL Agent*" means Wells Fargo Bank, National Association, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the DIP ABL Credit Agreement, if any.

54.      "*DIP ABL Claims*" means any Claims arising under, derived from, based on, or related to the DIP ABL Facility or the DIP ABL Obligations (as defined in the DIP Orders).

55.      "*DIP ABL Credit Agreement*" means the debtor-in-possession financing credit agreement by and among certain of the Debtors, the DIP ABL Agent, and the DIP ABL Lenders setting forth the terms and conditions of the DIP ABL Facility, as may be amended, supplemented, or otherwise modified from time to time.

56.      "*DIP ABL Documents*" means, collectively, the DIP ABL Credit Agreement, the DIP Orders, and any other documents governing the DIP ABL Facility, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

57.      "*DIP ABL Facility*" means the debtor-in-possession asset-based revolving loan facility, if any, incurred in accordance with the DIP ABL Documents.

58.      "*DIP ABL Lenders*" means the lenders party to the DIP ABL Credit Agreement from time to time.

59.      "*DIP Agents*" means, collectively, the DIP ABL Agent and the DIP Term Loan Agent.

60.      "*DIP Claims*" means, collectively, the DIP ABL Claims and DIP Term Loan Claims.

61.      "*DIP Documents*" means, collectively, the DIP ABL Documents and the DIP Term Loan Documents.

62.      "*DIP Lenders*" means, collectively, the DIP ABL Lenders and the DIP Term Loan Lenders.

63.      "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

64.     "*DIP Term Loan Agent*" means Wilmington Savings Fund Society, FSB, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the DIP Term Loan Credit Agreement.

65.     "*DIP Term Loan Amount*" means $451,000,000.00 *plus* any Liquidity Shortfall Funding Amount.

66.     "*DIP Term Loan Claims*" means any Claims arising under, derived from, based on, or related to the DIP Term Loan Facility or the DIP Term Loan Obligations (as defined in the DIP Orders).

67.     "*DIP Term Loan Credit Agreement*" means that certain senior secured superpriority debtor-in-possession term loan credit agreement by and among the Debtors, the DIP Term Loan Agent, and the DIP Term Loan Lenders setting forth the terms and conditions of the DIP Term Loan Facility.

68.     "*DIP Term Loan Documents*" means, collectively, the DIP Term Loan Credit Agreement, the DIP Orders, the Backstop Commitment Letter, and any other documents governing the DIP Term Loan Facility, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

69.     "*DIP Term Loan Facility*" means the superpriority senior secured multi-draw debtor-in-possession term loan credit facility incurred in accordance with the DIP Term Loan Documents.

70.     "*DIP Term Loan Lenders*" means the lenders party to the DIP Term Loan Credit Agreement from time to time.

71.     "*DIP Term Loans*" means the term loans in an aggregate principal amount equal to the DIP Term Loan Amount issued under the DIP Term Loan Facility.

72.     "*Disbursing Agent*" means, as applicable, the Reorganized Debtors or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions pursuant to this Plan.

73.     "*Disclosure Statement*" means the disclosure statement for this Plan, including all exhibits and schedules thereto, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, rule 3018 of the Bankruptcy Rules, and any other applicable Law, as may be amended, supplemented, or otherwise modified from time to time, to be approved by the Disclosure Statement Order.

74.     "*Disclosure Statement Order*" means the order of the Bankruptcy Court (which may be the Confirmation Order) approving the Disclosure Statement and the other Solicitation Materials.

75.     "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest (or portion thereof):  (a) that is not Allowed; (b) that is not disallowed by this Plan, the Bankruptcy Code, or a Final Order, as applicable; and (c) with respect to which a party-in-interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

76.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Disbursing Agent shall make distributions to Entities entitled to receive distributions under this Plan.

77.     "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under this Plan, which date shall be the first day of the Confirmation Hearing, or such other date to be determined by the Debtors.

78.     "*DTC*" means the Depository Trust Company.

79.     "*Effective Date*" means the date on which (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of this Plan have been satisfied or waived in accordance with Article IX.B of this Plan and (b) this Plan is declared effective by the Debtors.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

80.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

81.     "*Estate*" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

82.     "*Exculpated Parties*" means, collectively and in each case in its capacity as such, (a) the Debtors; (b) the Reorganized Debtors; and (c) each Related Party of the Debtors and the Reorganized Debtors.

83.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

84.     "*Existing Interests*" means any Interest in Pretium Parent existing immediately prior to the occurrence of the Effective Date.

85.     "*Exit ABL Agent*" means, if any, the administrative agent and collateral agent under the Exit ABL Documents or any assign or successor thereto.

86.     "*Exit ABL Credit Agreement*" means the asset-backed revolving loan credit agreement, to be dated on or about the Effective Date, by and among certain of the Reorganized Debtors, the Exit ABL Agent, and the Exit ABL Lenders setting forth the terms and conditions of the Exit ABL Facility (which may, at the election of the Debtors or the Reorganized Debtors, as applicable, and with the reasonable consent of the DIP ABL Agent and/or the ABL Agent, take the form of an amendment or amendment & restatement to the ABL Credit Agreement so long as such amendment or amendment & restatement is in accordance with the Exit ABL Commitment Letter).

87.     "*Exit ABL Commitment Letter*" means that certain Exit ABL Commitment Letter, dated January 25, 2026, by and between Wells Fargo Bank, National Association and the Debtors.

88.     "*Exit ABL Documents*" means, collectively, the documents governing the Exit ABL Facility, including the Exit ABL Credit Agreement and any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

89.     "*Exit ABL Facility*" means the asset-backed revolving facility, if any, entered into by the Reorganized Debtors on the Effective Date in accordance with the Exit ABL Documents.

90.     "*Exit ABL Lenders*" means, the lenders party to the Exit ABL Credit Agreement from time to time.

91.     "*Exit ABL/Term Loan Intercreditor Agreement*" means an intercreditor agreement, to be dated on or about the Effective Date, by and among the applicable Debtors or Reorganized Debtors, the Exit ABL Agent, and the Exit Term Loan Agent.

92.     "*Exit Facilities*" means, collectively, the Exit ABL Facility, and the Exit Term Loan Facility.

93.     "*Exit Facility Agents*" means, collectively, the Exit ABL Agent, and the Exit Term Loan Agent.

94.     "*Exit Facility Documents*" means, collectively, the Exit ABL Documents the Exit Term Loan Documents, and the Exit ABL/Term Loan Intercreditor Agreement.

95.     "*Exit Facility Lenders*" means, collectively, the Exit ABL Lenders and the Exit Term Loan Lenders.

96.     "*Exit First-Out Term Loans*" means the senior secured first-lien first-out term loans in an aggregate principal amount equal to the DIP Term Loan Amount incurred by the Reorganized Debtors under the Exit Term Loan Facility.

97.     "*Exit Second-Out Adjustment*" means the lesser of (i) $26,757,642.30, and (ii) the amount necessary such that the Reorganized Debtors' pro forma net debt immediately following the Effective Date is $870,000,000.00.

98.     "*Exit Second-Out Term Loans*" means the senior secured first-lien second-out term loans in an aggregate principal amount equal to $526,000,000.00 *less* the Exit Second-Out Adjustment, if any, incurred by the Reorganized Debtors under the Exit Term Loan Facility.

99.     "*Exit Term Loan Agent*" means the administrative agent and collateral agent under the Exit Term Loan Documents.

100.     "*Exit Term Loan Credit Agreement*" means the term loan credit agreement, to be dated on or about the Effective Date, by and among certain of the Debtors or Reorganized Debtors, the Exit Term Loan Agent, and the Exit Term Loan Lenders setting forth the terms and conditions of the Exit Term Loan Facility.

101.     "*Exit Term Loan Documents*" means the documents governing the Exit Term Loan Facility, including the Exit Term Sheet, the Exit Term Loan Credit Agreement, the Backstop Commitment Letter, and any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, which shall be consistent with the Restructuring Support Agreement.

102.     "*Exit Term Loan Facility*" means the senior secured first-lien term loan facility incurred by the Reorganized Debtors in accordance with the Exit Term Loan Documents.

103.     "*Exit Term Loan Lenders*" means the lenders party to the Exit Term Loan Credit Agreement from time to time.

104.     "*Exit Term Sheet*" means that certain Exit Term Loan Facility Term Sheet attached as <u>Exhibit C</u> to the Restructuring Support Agreement.

105.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

106.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

107.     "*Final DIP Order*" means the order of the Bankruptcy Court approving the DIP Documents, the DIP ABL Facility, and the DIP Term Loan Facility, and authorizing the use of cash collateral on a final basis.

108.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, vacated, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken; or as to which, any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought, or the new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

109.     "*First Day Pleadings*" means the pleadings and related documentation requesting certain emergency relief, or supporting the request for such relief, Filed by the Debtors on or around the Petition Date and heard at the "first day" hearing.

110.     "*First Lien Agent*" means UBS AG, Stamford Branch, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement.

111.     "*First Lien Cash Out Option*" means the potential right of each Holder of an Allowed First Lien Tranche A-1 Claim to receive, subject to the Cash Out Option Investment Cap, Cash in an amount equal to the Cash value of its Pro Rata share of First Lien New Equity based on the Cash Out Value, in lieu of its Pro Rata share of First Lien New Equity.

112.     "*First Lien Credit Agreement*" means that certain First Lien Term Loan Credit Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as the borrower, Poseidon Investment Intermediate, Inc., as holdings, the First Lien Agent, the subsidiary guarantors, and the First Lien Lenders, as may be amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

113.     "*First Lien Documents*" means, collectively, the First Lien Credit Agreement and any other documents governing the First Lien Term Loans, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

114.     "*First Lien Lenders*" means the lenders party to the First Lien Credit Agreement from time to time.

115.     "*First Lien New Equity*" means 72.5 percent of the New Equity, subject to dilution by the Participation Premium, the Backstop Premium, and the MIP Equity, to be provided to Holders of First Lien Tranche A-1 Claims as set forth in Article III.B hereof.

116.     "*First Lien Term Loans*" means, collectively, the First Lien Tranche A Term Loans and the First Lien Tranche A-1 Term Loans.

117.     "*First Lien Tranche A Claims*" means any Claims against the Debtors arising under, derived from, based on, or related to the First Lien Tranche A Term Loans.

118.     "*First Lien Tranche A Term Loans*" means the senior secured first-lien first-out term loans defined as the "Third Amendment Tranche A Term Loans" in the First Lien Documents.

119.     "*First Lien Tranche A-1 Claims*" means any Claims against the Debtors arising under, derived from, based on, or related to the First Lien Tranche A-1 Term Loans.

120.     "*First Lien Tranche A-1 Term Loans*" means the senior secured first-lien second-out term loans defined as the "Third Amendment Tranche A-1 Term Loans" in the First Lien Documents.

121.     "*First Lien/Second Lien Intercreditor Agreement*" means that certain First Lien/Second Lien Intercreditor Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as borrower, Poseidon Investment Intermediate, Inc., as holdings, the other grantors from time to time party thereto, the First Lien Agent, as senior priority representative for the First Lien Credit Agreement secured parties, the Second Lien Agent, as senior priority representative for the initial second priority debt secured parties, and each additional representative from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

122.     "*First Out/Second Out Intercreditor Agreement*" means that certain Agreement Among Lenders, attached as Annex A to the First Lien Credit Agreement, governing the rights, relationship, and relative payment priorities between the holders of First Lien Tranche A Term Loans and the holders of First Lien Tranche A-1 Term Loans.

123.    "*General Unsecured Claim*" means any Unsecured Claim against any of the Debtors, other than: (a) an Administrative Claim; (b) a First Lien Tranche A-1 Claim; (c) a Second Lien Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; or (f) an Intercompany Claim.

124.    "*Glenn Agre Group*" means that certain ad hoc group of Holders of First Lien Term Loans and Second Lien Term Loans represented by Glenn Agre.

125.    "*Glenn Agre*" means Glenn Agre Bergman & Fuentes LLP, in its capacity as counsel to the Glenn Agre Group.

126.    "*Governance Term Sheet*" means that certain Governance Term Sheet attached as <u>Exhibit D</u> the Restructuring Support Agreement.

127.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

128.    "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor, as applicable.

129.    "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

130.    "*Intercompany Claim*" means any Claim against any Debtor held by a Debtor or an Affiliate of a Debtor.

131.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

132.    "*Intercreditor Agreements*" means, collectively, the ABL/Term Loan Intercreditor Agreement, the First Lien/Second Lien Intercreditor Agreement, and the First Out/Second Out Intercreditor Agreement.

133.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interest, unit or share in any Debtor and any other rights, options, warrants, rights, restricted stock awards, performance share awards, performance share units, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, stock-settled restricted stock units, cash-settled restricted stock units, other securities, agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor or any other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor (whether or not arising under or in connection with any employment agreement, separation agreement, or employee incentive plan or program of a Debtor as of the Petition Date and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or similar security).

134.    "*Interim DIP Order*" means the order of the Bankruptcy Court approving the DIP Documents, the DIP ABL Facility, and the DIP Term Loan Facility, and authorizing the Debtors' use of cash collateral on an interim basis.

135.    "*IRC*" means the Internal Revenue Code of 1986, as amended.

136.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

137.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

138.    "*Lender Cash Out Investors*" means the members of the Ad Hoc Group providing the Cash Out Option Investment.

139.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

140.    "*Liquidity Shortfall Funding Amount*" means the aggregate principal amount of DIP Term Loans funded by the DIP Term Loan Lenders and the Backstop Parties, as applicable, immediately before the occurrence of the Effective Date in accordance with the DIP Term Loan Documents, up to the Liquidity Shortfall Funding Cap, and solely to the extent necessary to satisfy the Minimum Liquidity Condition.

141.    "*Liquidity Shortfall Funding Cap*" means $82,500,000.00, which shall be the maximum Liquidity Shortfall Funding Amount.

142.    "*Management Incentive Plan*" means a post-Effective Date incentive plan of the Reorganized Debtors to be established and implemented in accordance with Article IV.P of this Plan.

143.    "*Minimum Liquidity Condition*" means the Reorganized Debtors having no less than $100,000,000.00 of Cash on their consolidated balance sheet after giving effect to the Restructuring Transactions contemplated on the Effective Date, without giving effect to any availability under the Exit ABL Facility, if any, which shall be a condition to the occurrence of the Effective Date, as set forth in Article IX.A.1 herein and subject to the modifications set forth herein.

144.    "*MIP Equity*" means up to 8 percent of the fully-diluted New Equity reserved for issuance pursuant to the Management Incentive Plan.

145.    "*New Board*" means the board of directors or the board of managers, as applicable, of New Pretium.

146.    "*New Equity*" means the common equity interests of New Pretium, issued in accordance with this Plan and the New Equity Documents.

147.    "*New Equity Documents*" means, collectively, the New Organizational Documents and the New Equity Subscription Agreement, which shall be consistent with the Restructuring Support Agreement.

148.    "*New Equity Subscription Agreement*" means that certain subscription agreement by and between New Pretium and the New Money Investor, pursuant to which the New Money Investor will subscribe for the New Money Equity in connection with the New Money Investment.

149.    "*New Investor Agreement*" means the definitive shareholders agreement, limited liability company agreement, or other applicable agreement (including all annexes, exhibits, and schedules thereto) governing the New Equity and associated governance rights.

150.    "*New Money Equity*" means 21.9 percent of the New Equity, subject to dilution by the MIP Equity.

151.    "*New Money Investment*" means that certain new money investment in the amount of $50,000,000.00 in New Pretium to be made by the New Money Investor on the Effective Date in exchange for the New Money Equity, on the terms set forth in the Restructuring Support Agreement, New Equity Subscription Agreement, and subject to the execution and delivery of the New Equity Documents.

152.    "*New Money Investor*" means the party providing the New Money Investment pursuant to the New Equity Subscription Agreement.

153.    "*New Money Investor Wind-Down Investment*" has the meaning set forth in Article IV.D.3 herein.

154.    "*New Money Investor Advisors*" means (i) one lead counsel and one additional local counsel employed by the New Money Investor in connection with the Restructuring Transactions, and (ii) with the prior consent of the Required Consenting First Lien Tranche A-1 Lenders (as defined in the Restructuring Support Agreement), such consent not to be unreasonably withheld, conditioned, or delayed, any other legal counsel employed by the New Money Investor in connection with the Restructuring Transactions.

155.    "*New Organizational Documents*" means, collectively, and as applicable, the documents providing for the formation, organization, and corporate governance of each of the Reorganized Debtors, including, without limitation, any charters, bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, the New Investor Agreement, or other organizational documents or shareholders' agreements, which shall be consistent with the Restructuring Support Agreement.

156.    "*New Pretium*" means either (i) Poseidon Investment Intermediate, Inc., as reorganized pursuant to this Plan, or any successor or assign thereto, by merger, consolidation, or otherwise after the Effective Date, or (ii) a new Entity, which in either case shall be the ultimate parent of the other Reorganized Debtors (other than Pretium Parent) on and after the Effective Date.

157.    "*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

158.    "*Other Secured Claim*" means any Secured Claim other than (a) a First Lien Tranche A-1 Claim that is a Secured Claim, (b) a Second Lien Claim that is a Secured Claim, (c) a DIP Claim, or (d) an ABL Claim.

159.    "*Participation Premium*" means 23.4 percent of New Equity, subject to dilution by the MIP Equity, which shall be issued to the DIP Lenders in accordance with the DIP Term Loan Documents.

160.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

161.    "*Petition Date*" means the first date on which any of the Debtors commence a Chapter 11 Case.

162.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims or other eligible Entities in accordance with this Plan.

163.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and subject to (x) the reasonable consent of the Exit ABL Agent, DIP ABL Agent or ABL Agent, as applicable: (x) to the extent any is a party to any Plan Supplement document, or (y) solely with respect to any Plan Supplement document (or portion thereof) that materially affects the rights, remedies, or obligations of such party, and (ii) the Bankruptcy Code and Bankruptcy Rules), and any additional documents Filed as amendments to the Plan Supplement, to be Filed by the Debtors prior to the Confirmation Hearing to the extent reasonably practicable, including the following, as applicable: (a) the New Equity Documents; (b) the Exit Facility Documents; (c) to the extent known, the identities of the members of the New Board; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Proposed Cure Amounts; (f) the Schedule of Retained Causes of Action; and (g) the Restructuring Steps Memorandum.  To the extent any document to be set forth in the Plan Supplement is an exhibit to the Disclosure Statement, the Plan Supplement may cross-refer to such exhibit.  The Debtors shall have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement in accordance with this Plan, the Restructuring Support Agreement, or such documents included therein on or before the Effective Date.  The Plan Supplement shall be deemed incorporated into and part of this Plan as if set forth herein in full; *provided* that in the event of a conflict between this Plan and the Plan Supplement, the Plan Supplement shall control in accordance with <u>Article I.G</u>.

164.    "Pretium Parent Wind-Down Costs and Distributions" has the meaning set forth in <u>Article IV.D.3</u> herein.

165.    "*Pretium Parent*" means Poseidon Parent, L.P.

166.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

167.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

168.    "*Professional*" means an Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or as of the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

169.    "*Professional Escrow Account*" means an account funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

170.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

171.    "*Professional Fee Claim*" means any Claim by a Professional for compensation for services rendered or reimbursement of expenses incurred by such Professional through and including the Confirmation Date under sections 328, 330, 331, 503(b)(2), 503(b)(4), or 503(b)(5) of the Bankruptcy Code to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.  For the avoidance of doubt, the Transaction Expenses shall not be considered Professional Fee Claims, and any such amounts shall be paid in accordance with the Restructuring Support Agreement, the DIP Orders, and this Plan, as applicable.

172.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

173.    "*Quarterly Fees*" means fees payable pursuant to section 1930(a) of the Judicial Code, including fees payable to the U.S. Trustee and any interest thereon pursuant to 31 U.S.C. § 3717.

174.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to a Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

175.    "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule (including any amendments, supplements, or modifications thereto) of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan, if any, which schedule shall be included in the Plan Supplement.

176.    "*Related Parties*" means, with respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any Disbursing Agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, servants and nominees of the foregoing.

177.    "*Released Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Agents; (e) the ABL Lenders and each Holder of an ABL Claim; (f) the DIP Lenders and each Holder of a DIP Claim; (g) the New Money Investor; (h) the Backstop Parties; (i) the Exit Facility Lenders; (j) all Releasing Parties; and (k) each Related Party of each Entity in clause (a) through (i); *provided* that any Holder of a Claim or Interest that opts out of the releases contained in this Plan shall not be a "Released Party."

178.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Agents; (e) the ABL Lenders and each Holder of an ABL Claim; (f) the DIP Lenders and each Holder of a DIP Claim; (g) the New Money Investor; (h) the Backstop Parties; (i) the Exit Facility Lenders; (j) all Holders of Claims that vote to accept this Plan; (k) all Holders of Claims or Interests that are deemed to accept this Plan and who do not affirmatively opt out of the releases provided by this Plan; (*l*) all Holders of Claims or Interests that are deemed to reject this Plan and who do not affirmatively opt out of the releases provided by this Plan; (m) all Holders of Claims who abstain from voting on this Plan and who do not affirmatively opt out of the releases provided by this Plan; (n) all Holders of Claims who vote to reject this Plan and who do not affirmatively opt out of the releases provided by this Plan; and (o) each Related Party of each Entity in clause (a) through (n); *provided* that, for the avoidance of doubt, each Holder of Claims and/or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the releases; *provided*, *further*, that notwithstanding anything contrary herein, with respect to funds and accounts managed by HPS Investment Partners, LLC or its Affiliates that are Consenting Lenders (the "HPS Consenting Creditors"), the defined terms "Releasing Parties" shall be limited to (i) the HPS Consenting Creditors, (ii) any trading desk(s), fund(s), account, branch, unit, and/or business group(s) of the HPS Consenting Creditors that have a beneficial interest in the Claims held by HPS Consenting Creditors, or are otherwise acting for the benefit of or at the direction of the HPS Consenting Creditors, against the Debtors, and (iii) any Affiliates and Related Parties of HPS Consenting Creditors for which the HPS Consenting Creditors are legally entitled to bind under applicable law.

179.    "*Reorganized Debtors*" means, collectively, the Debtors, as reorganized pursuant to and under this Plan, on and after the Effective Date, or any successor or assign thereto, by merger, consolidation, or otherwise, including any new Entity established in connection with the implementation of the Restructuring Transactions.

180.    "*Required Consenting Stakeholders*" means the "Required Consenting Stakeholders," as such term is defined in the Restructuring Support Agreement.

181.    "*Restructuring Steps Memorandum*" means the summary of transaction steps to consummate the Restructuring Transactions, which shall be included in the Plan Supplement, and which shall be acceptable to the Required Consenting Stakeholders.  The Restructuring Transactions Memorandum shall, among other things, designate New Pretium and the borrower of the Exit Facilities.

182.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, entered into and dated as of December 30, 2025, by and among the Debtors and the Consenting Stakeholders, including all exhibits, schedules, and other attachments thereto, as such agreement may be further amended, modified, or supplemented from time to time, solely in accordance with its terms, which is attached as Exhibit B to the Disclosure Statement.

183.    "*Restructuring Transactions*" means any transaction and any actions as may be necessary or appropriate to effect a corporate restructuring of the Debtors' and the Reorganized Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in this Plan and the Restructuring Support Agreement, including the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to this Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Article IV.B of this Plan and consistent with the Restructuring Steps Memorandum.

184.    "*Schedule of Proposed Cure Amounts*" means any schedule (including any amendments, supplements, or modifications thereto) of the Debtors' proposed Cure amounts (if any) with respect to each of the Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to this Plan.

185.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

186.    "*Second Lien Agent*" means UBS AG, Stamford Branch, or any assign or successor thereto, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement.

187.    "*Second Lien Cash Out Option*" means the potential right of each Holder of an Allowed Second Lien Claim to receive, subject to the Cash Out Option Investment Cap, Cash in an amount equal to the Cash value of its Pro Rata share of Second Lien New Equity based on the Cash Out Value, in lieu of its Pro Rata share of Second Lien New Equity.

188.    "*Second Lien Cash Recovery*" means $5,784,220.72, to be distributed Pro Rata to Holders of Allowed Second Lien Claims as set forth in Article III.B hereof.

189.    "*Second Lien Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Second Lien Term Loans and any fees, costs, and expenses that are reimbursable by any Debtor pursuant to the Second Lien Documents.

190.    "*Second Lien Credit Agreement*" means that certain Second Lien Term Loan Credit Agreement, dated as of October 1, 2021, by and among Pretium PKG Holdings, Inc., as borrower, Poseidon Investment Intermediate, Inc., as borrower, the Second Lien Agent, the guarantors party thereto, and the Second Lien Lenders, as may be amended, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

191.    "*Second Lien Documents*" means, collectively, the Second Lien Credit Agreement and any other documents governing the Second Lien Term Loans, including any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

192.    "*Second Lien Lenders*" means the lenders party to the Second Lien Credit Agreement from time to time.

193.    "*Second Lien New Equity* " means 5.6 percent of the New Equity, subject to dilution by the MIP Equity, to be provided to Holders of Second Lien Claims as set forth in Article III.B hereof.

194.    "*Second Lien Term Loans*" means those certain senior secured second-lien term loans defined as the "Initial Term Loans" under the Second Lien Credit Agreement.

195.    "*Section 510(b) Claims*" means any Claim subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

196.    "*Secured Claim*" means a Claim that is:  (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to this Plan, or separate order of the Bankruptcy Court, as a secured claim.

197.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

198.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

199.    "*Solicitation Agent*" means Stretto, Inc., the notice, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

200.    "*Solicitation Materials*" means, collectively, the solicitation materials with respect to this Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

201.    "*Third-Party Release*" means the releases set forth in Article VIII.D of this Plan.

202.    "*Transaction Expenses*" means, collectively, all prepetition and postpetition reasonable and documented fees, expenses, and disbursements (including success fees, transaction fees, or similar fees) of the advisors to the Ad Hoc Group, the New Money Investor, and the Glenn Agre Group with respect to the efforts to implement the Restructuring Transactions and not previously paid by, or on behalf of, the Debtors or Reorganized Debtors, as applicable, including:  (a) the Ad Hoc Group Advisors, (b) the New Money Investor Advisors, and (c) Glenn Agre in an amount not to exceed $150,000.00 and payable solely to the extent each member of the Glenn Agre Group becomes a Consenting Lender and does not breach the Restructuring Support Agreement, in each case subject to (x) the terms of any applicable engagement letter or reimbursement letter with any of the Debtors and (y) the terms and conditions in the Restructuring Support Agreement.

203.    "*U.S. Trustee*" means the United States Trustee for the District of New Jersey.

204.    "*Unclaimed Distribution*" means any distribution under this Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check within 180 calendar days of receipt; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution within 180 calendar days of receipt; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution prior to the deadline included in such request for information; or (d) timely taken any other action necessary to facilitate such distribution.

205.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

206.    "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

207.    "*Unsecured Claim*" means any Claim that is not a Secured Claim.

*B.*    *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any party's consent rights over any of the Definitive Documents or any amendments thereto as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with this Plan; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (7) subject to the provisions of any contract, charter, bylaws, limited liability company agreements, operating agreements, certificates of incorporation, or other organizational documents or shareholders' agreements, as applicable, instrument, release, or other agreement or document created or entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with the applicable Law, including the Bankruptcy Code and the Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) the words "include" and "including," and variations thereof, shall not be deemed to be terms of

limitation, and shall be deemed to be followed by the words "without limitation"; (14) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (15) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of this Plan without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (16) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of New York, without giving effect to the principles of conflict of Laws (other than section 5-1401 and section 5-1402 of the New York General Obligations Law), shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

E.      *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document.*

In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects. In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and this Plan, the Confirmation Order shall control.

H.      *Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to this Plan, and the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other

modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Restructuring Support Agreement shall not impair such rights and obligations.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.     *Administrative Claims.*

Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, on the date of such Allowance or as soon as reasonably practicable thereafter, but in any event no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

B.     *DIP Claims.*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP ABL Facility (including the amount of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) in accordance with the terms and in the amounts specified under the DIP ABL Documents) and the DIP Term Loan Facility, as applicable, on such date, (ii) all interest and other obligations accrued and unpaid thereon to the date of payment (which shall not include any fees, premiums, or original issue discount), (iii) all premiums earned and payable thereon, including the Backstop Premium and the Participation Premium, and (iv) all accrued fees, expenses, and non-contingent indemnification obligations payable under the DIP Documents and the DIP Orders.

Except to the extent that a Holder of an Allowed DIP ABL Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP ABL Claim: (i)(a) all Holders of Allowed DIP ABL Claims (other than with respect to Letters of Credit and all Bank Product Obligations issued and outstanding under the DIP ABL Documents) shall be paid in full in Cash, (b) the issued and undrawn Letters of Credit and all Bank Product Obligations shall be canceled, replaced, or cash collateralized in accordance with the terms and in the amounts specified under the DIP ABL Documents, and (c) following the occurrence of subsections (a) and (b), all Liens on the collateral that secures the DIP ABL Claims under the DIP ABL Documents shall be released or canceled and no longer in effect, in each case in accordance with the terms and in the amounts specified under the DIP ABL Documents; or, to the extent the Exit ABL Facility is provided by the DIP ABL Agent and the DIP ABL Lenders (or their affiliate(s)) and consistent with the terms set forth in the Exit ABL Commitment Letter and at the election of the Debtors or the Reorganized Debtors, (ii)(a) all Holders

of Allowed DIP ABL Claims shall be refinanced by conversion on a cashless, dollar-for-dollar basis, into Obligations (as defined in the Exit ABL Documents) under the Exit ABL Facility; (b) the Letters of Credit and all Bank Product Obligations issued and outstanding under the DIP ABL Documents shall be converted to Letters of Credit and Bank Product Obligations, as applicable, deemed to be issued and outstanding under the Exit ABL Documents; and (c) all Liens on the collateral that secures the DIP ABL Claims under the DIP ABL Documents shall be reaffirmed, ratified, and shall automatically secure all Obligations (as defined in the Exit ABL Documents) under the Exit ABL Facility, subject to the priorities and extent of Liens set forth in the Exit Facility Documents.

Except to the extent that a Holder of an Allowed DIP Term Loan Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed DIP Term Loan Claim, (i) the principal amount of the DIP Term Loans giving rise to such Claim shall be refinanced by conversion on a cashless, dollar-for-dollar basis into the Exit First-Out Term Loans in accordance with the DIP Term Loan Documents and the Exit Term Loan Documents; (ii) accrued and unpaid interest and other obligations giving rise to such Allowed DIP Term Loan Claim, excluding fees, premiums, and original issue discount, if any, shall be paid in full in Cash; and (iii) the Participation Premium will be distributed on a Pro Rata basis to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents; and (iv) the Backstop Premium will be distributed to the Backstop Parties in accordance with the DIP Term Loan Documents.

Following the satisfaction of the Allowed DIP Claims, the DIP ABL Facility, the DIP Term Loan Facility in accordance with this Article II.B, the DIP Documents, and all related loan documents shall be deemed canceled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP ABL Facility or DIP Term Loan Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case, without further action by the DIP Agents or the DIP Lenders and without further order of the Bankruptcy Court, and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agents or the DIP Lenders. The DIP Agents and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

C.    *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.    *Professional Fee Claims.*

1.    Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Escrow Account, and which Allowed amount shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

2.    Professional Escrow Account.

No later than the Effective Date, the Debtors shall establish and fund the Professional Escrow Account with Cash equal to the Professional Fee Amount. The Professional Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Escrow Account as soon as reasonably practicable

after such Professional Fee Claims are Allowed; *provided* that the Debtors' and the Reorganized Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Escrow Account, and to the extent that funds held in the Professional Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with <u>Article II.A</u> of this Plan. When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

3.   <u>Professional Fee Amount</u>.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date, and shall deliver such estimate to the Debtors no later than one (1) day before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.   <u>Post-Confirmation Date Fees and Expenses</u>.

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan and Consummation incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ and pay any Professional in the ordinary course of business for the period after the Confirmation Date without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Payment of Statutory Fees.*

All Quarterly Fees, to the extent applicable, due prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, all Quarterly Fees shall be paid to the U.S. Trustee when due and payable, until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first. Nothing in this Plan shall discharge or release any Quarterly Fees. The U.S. Trustee shall not be required to file a Proof of Claim or request for payment for Quarterly Fees. The Reorganized Debtors shall timely file all required monthly operating reports and post-confirmation quarterly reports in a form prescribed by the U.S. Trustee until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

F.    *Transaction Expenses.*

To the extent not previously paid prior to or during the course of the Chapter 11 Cases in accordance with, and subject to, the terms of the Restructuring Support Agreement, the DIP Orders, or any other Final Order of the Bankruptcy Court, and subject to the Debtors' receipt of an invoice with reasonable detail from the applicable Entity entitled to such Transaction Expenses in accordance with, if applicable, such Entity's respective engagement letter or fee letter, the Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date without any requirement (1) to file a fee application with the Bankruptcy Court or (2) for review or approval by the Bankruptcy Court or any other party. All Transaction Expenses to be paid on the Effective Date shall be estimated as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Transaction Expenses; *provided*, *further*, that any difference in (a) estimated Transaction Expenses on and including the Effective Date as compared to (b) Transaction Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity following the Effective Date. In addition, the Debtors and Reorganized Debtors (as applicable) shall continue to pay, on the day that is the later of (i) ten (10) Business Days after the day such Transaction Expenses are invoiced under the applicable engagement letter or fee letter and (ii) the day such Transaction Expenses are due

under the applicable engagement letter or fee letter, Transaction Expenses related to implementation, Consummation, and defense of this Plan after the Effective Date in accordance with, if applicable, the respective engagement letter or fee letter and solely upon receipt of an invoice from any Entity requesting such Transaction Expenses with reasonable detail (but without the need for time detail).

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under this Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan constitutes a separate Plan proposed by each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors (except for Class 10 Existing Interests, which shall only apply to Pretium Parent).  All of the potential Classes for the Debtors are set forth herein.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets, and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | ABL Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 4 | First Lien Tranche A-1 Claims | Impaired | Entitled to Vote |
| Class 5 | Second Lien Claims | Impaired | Entitled to Vote |
| Class 6 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Not Entitled to Vote (Deemed to Reject) |
| Class 9 | Existing Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 10 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, with the consent of the Required Consenting Stakeholders, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due,

in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

1.  Class 1 – Other Secured Claims

    (a)  *Classification*: Class 1 consists of all Other Secured Claims.

    (b)  *Treatment*: Each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor or Reorganized Debtor, either:

        (i)   payment in full in Cash of its Allowed Other Secured Claim;

        (ii)  the collateral securing its Allowed Other Secured Claim;

        (iii) Reinstatement of its Allowed Other Secured Claim; or

        (iv)  such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)  *Voting*: Class 1 is Unimpaired under this Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

2.  Class 2 – Other Priority Claims

    (a)  *Classification*: Class 2 consists of all Other Priority Claims.

    (b)  *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Allowed Other Priority Claim, treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, which renders such Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

    (c)  *Voting*: Class 2 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

3.  Class 3 – ABL Claims

    (a)  *Classification*: Class 3 consists of all ABL Claims.

    (b)  *Allowed Amount*:  As of the Effective Date, the ABL Claims shall be Allowed and deemed to be Allowed Claims in the aggregate principal amount outstanding under the ABL Credit Agreement, *plus* through the Petition Date, accrued and unpaid interest, fees, and costs owed under the ABL Credit Agreement, *less* the amount satisfied in accordance with the DIP Documents.

    (c)  *Treatment*: Each Holder of an Allowed ABL Claim (to the extent such Allowed ABL Claim is not a DIP ABL Claim) shall receive, in full and final satisfaction of such Allowed ABL Claim on the Effective Date, (i)(a) payment in full in Cash (other than with respect to Letters of Credit and all Bank Product Obligations issued and outstanding under the ABL Documents) and (b) the cancelation, replacement, or cash collateralization of all issued and undrawn Letters of Credit and all Bank Product Obligations (each as defined in

22

the ABL Documents) in accordance with the terms and in the amounts specified under the ABL Documents; or, to the extent the Exit ABL Facility is provided by the ABL Agent and the ABL Lenders (or their Affiliate(s)) and consistent with the terms set forth in the Exit ABL Commitment Letter and at the election of the Debtors or the Reorganized Debtors, (ii)(a) all Holders of Allowed ABL Claims shall be refinanced by conversion on a cashless, dollar-for-dollar basis, into Obligations (as defined in the Exit ABL Documents) under the Exit ABL Facility; (b) the Letters of Credit and all Bank Product Obligations issued and outstanding under the ABL Documents shall be converted to Letters of Credit and Bank Product Obligations, as applicable, deemed to be issued and outstanding under the Exit ABL Documents.

(d)      *Voting*:  Class 3 is Unimpaired under this Plan.  Holders of Allowed ABL Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject this Plan.

4.   Class 4 – First Lien Tranche A-1 Claims

(a)      *Classification*:  Class 4 consists of all First Lien Tranche A-1 Claims.

(b)      *Allowed Amount*:  As of the Effective Date, the First Lien Tranche A-1 Claims shall be Allowed and deemed to be Allowed Claims in the principal amount of $1,237,395,831.42, *plus*, through the Petition Date, accrued and unpaid interest, fees, and costs owed under the First Lien Credit Agreement in connection with the First Lien Tranche A-1 Term Loans.

(c)      *Treatment*:  Each Holder of an Allowed First Lien Tranche A-1 Claim shall receive, in full and final satisfaction of such Allowed First Lien Tranche A-1 Claim:  (i) its Pro Rata share of the Exit Second-Out Term Loans; and (ii)(A) its Pro Rata Share of the First Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment is available, (B) the First Lien Cash Out Option.

(d)      *Voting*:  Class 4 is Impaired under this Plan.  Holders of Allowed First Lien Tranche A-1 Claims are entitled to vote to accept or reject this Plan.

5.   Class 5 – Second Lien Claims

(a)      *Classification*:  Class 5 consists of all Second Lien Claims.

(b)      *Allowed Amount*:  As of the Effective Date, the Second Lien Claims shall be Allowed and deemed to be Allowed Claims in the principal amount of $201,404,401.13, *plus*, through the Petition Date, accrued and unpaid interest, fees, and costs owed under the Second Lien Credit Agreement in connection with the Second Lien Term Loans.

(c)      *Treatment*:  Each Holder of an Allowed Second Lien Claim shall receive, in full and final satisfaction of such Allowed Second Lien Claim:  (i) its Pro Rata share of the Second Lien New Equity or, at its election and solely to the extent the Cash Out Option Investment is available, the Second Lien Cash Out Option; and (ii) its Pro Rata share of the Second Lien Cash Recovery.

(d)      *Voting:* Class 5 is Impaired under this Plan.  Holders of Allowed Second Lien Claims are entitled to vote to accept or reject this Plan.

6.   Class 6 – General Unsecured Claims

(a)      *Classification*:  Class 6 consists of all General Unsecured Claims.

    (b)    *Treatment*: Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such General Unsecured Claim, at the option of the applicable Debtor or Reorganized Debtor, either (i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code or (ii) payment in full in Cash on the Effective Date.

    (c)    *Voting*: Class 6 is Unimpaired under this Plan. Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

7. <u>Class 7 – Intercompany Claims</u>

    (a)    *Classification*: Class 7 consists of all Intercompany Claims.

    (b)    *Treatment*: Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor or Reorganized Debtor with the consent of the Required Consenting Stakeholders, either Reinstated, converted to equity, otherwise set off, settled, distributed, contributed, canceled, or released, in each case, in accordance with the Restructuring Steps Memorandum.

    (c)    *Voting*: Class 7 is Unimpaired under this Plan if Intercompany Claims are Reinstated or Impaired under this Plan if Intercompany Claims are canceled. Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

8. <u>Class 8 – Intercompany Interests</u>

    (a)    *Classification*: Class 8 consists of all Intercompany Interests.

    (b)    *Treatment:* On the Effective Date, Intercompany Interests shall be (i) Reinstated, (ii) set off, settled, discharged, contributed, canceled, released, and extinguished, or (c) otherwise addressed, in each case, at the option of the applicable Debtor or Reorganized Debtor with the consent of the Required Consenting Stakeholders.

    (c)    *Voting*: Class 8 is Unimpaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject this Plan.

9. <u>Class 9 – Existing Interests</u>

    (a)    *Classification*: Class 9 consists of all Existing Interests.

    (b)    *Treatment*: All Existing Interests shall be canceled, released, and extinguished and will be of no further force or effect. Holders of Existing Interests shall receive no recovery or distribution on account thereof and each Holder of an Existing Interest shall not receive or retain any distribution, property, or other value on account of such Existing Interest.

(c)    *Voting*:  Class 9 is Impaired under this Plan.  Holders of Existing Interests are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Interests are not entitled to vote to accept or reject this Plan.

10.    <u>Class 10 – Section 510(b) Claims</u>

(a)    *Classification*:  Class 10 consists of all Section 510(b) Claims.

(b)    *Allowed Amount*:  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court.

(c)    *Treatment*:  On the Effective Date, all Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims.

(d)    *Voting*:  Class 10 is Impaired under this Plan.  Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders (if any) are not entitled to vote to accept or reject this Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Deemed Acceptance If No Votes Cast.*

If no Holders of Claims eligible to vote in a particular Class vote to accept or reject the Plan, this Plan shall be deemed accepted by the Holders of such Claims in such Class.

F.    *Intercompany Interests.*

To the extent Reinstated under this Plan, distributions (if any) on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under this Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, unless otherwise set forth in the Restructuring Steps Memorandum, to the extent Reinstated pursuant to this Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

G.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by one or more of the Classes entitled to vote pursuant to <u>Article III.B</u> of this Plan.  The Debtors shall

seek Confirmation of this Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify this Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests or reclassifying Claims to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H.      *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including the First Lien Credit Agreement and the Intercreditor Agreements. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, with the consent of the Required Consenting Stakeholders, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THIS PLAN

A.      *General Settlement of Claims and Interests.*

To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan. To the greatest extent permissible under the Bankruptcy Code, this Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Restructuring Transactions.*

On or before the Effective Date, with the consent of the Required Consenting Stakeholders (to the extent set forth in the Restructuring Support Agreement or the applicable Definitive Documents), the applicable Debtors or the Reorganized Debtors shall enter into and shall take any actions, including the actions set forth in the Restructuring Steps Memorandum, as may be necessary or appropriate to effect the Restructuring Transactions, which may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of this Plan, the Plan Supplement, the Restructuring Support Agreement, and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan, the Plan Supplement, and the Restructuring Support Agreement, and having other terms for which the applicable Entities may agree; (3) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement,

continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Equity Documents and any certificates or articles of incorporation, bylaws, or such other applicable formation, organizational, governance, or constitutive documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable), and the issuance, distribution, reservation, or dilution of the New Equity, as applicable and as set forth herein, including pursuant to the New Equity Subscription Agreement; (5) the execution and delivery of the Exit Facility Documents (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (6) the reservation of equity under the Management Incentive Plan to the participants in the Management Incentive Plan; and (7) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with this Plan.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate this Plan, including the Restructuring Transactions.

Notwithstanding anything to the contrary set forth herein, the treatment of Claims, distributions, and other transactions contemplated hereby including, without limitation, the funding of the Exit Facilities, if any, may, at the election of the applicable participating parties, be effectuated by netting or other form of cashless implementation.

C.      *Reorganized Debtors.*

On the Effective Date, the New Board shall be established in accordance with the Governance Term Sheet, and the Reorganized Debtors shall adopt their New Organizational Documents.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under this Plan as necessary to consummate this Plan, in each case consistent with the Restructuring Steps Memorandum.  Cash payments to be made pursuant to this Plan will be made by the Debtors or Reorganized Debtors. The Debtors and Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under this Plan.  Except as set forth herein or the Restructuring Steps Memorandum, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of this Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date agreement, including the Exit Facility Documents, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing, subject to the New Organizational Documents, as the boards of directors or boards of managers of the applicable Reorganized Debtors deem appropriate.

D.      *Sources of Consideration for Plan Distributions.*

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under this Plan with:  (1) the Debtors' Cash on hand as of the Effective Date, (2) the proceeds of the Exit Facilities, the New Money Investment, and the Cash Out Option Investment, and (3) the New Money Investor Wind Down Investment, if any.

1.      Exit Facilities.

On and as of the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, pursuant to the Exit Facility Documents and the Restructuring Steps Memorandum.

Solely to the extent the Debtors reasonably determine, ten (10) Business Days prior to the anticipated Effective Date, they will not satisfy the Minimum Liquidity Condition on the Effective Date, after accounting for satisfaction in full in cash of all (a) closing costs in connection with the occurrence of the Effective Date and (b) DIP ABL Claims or ABL Claims, as applicable (in each case, excluding Letters of Credit and all Bank Product Obligations) (collectively, the "Exit Funding Need"), (i) immediately before the occurrence of the Effective Date, the Debtors shall draw, and the DIP Term Loan Lenders shall fund, additional DIP Term Loans in a principal amount equal to such

shortfall subject to the Liquidity Shortfall Funding Cap, which, together with the then-outstanding principal amount of the DIP Term Loans, shall be used to satisfy the Exit Funding Need and be converted to Exit First-Out Term Loans on the Effective Date in accordance with Article II.B hereof; and (ii) the principal amount of the Exit Second-Out Term Loans shall be reduced by the Exit Second-Out Adjustment, if any; *provided* that if the Liquidity Shortfall Funding Cap is met prior to satisfaction of the Exit Funding Need, the Debtors shall pay down the ABL Claims in accordance with Article III.B.3 hereof or DIP ABL Claims in accordance with Article II.B hereto to the extent required to meet any "minimum excess availability" requirement under the Exit ABL Facility in accordance with the Exit ABL Commitment Letter, accounting for "qualified cash" allowance under such facility, and the Minimum Liquidity Condition shall be reduced on a dollar for dollar basis to the Debtors' pro forma Cash on hand.  The DIP Term Loan Lenders shall not be obligated to fund the Debtors in excess of the lower of (x) the maximum principal amount of the DIP Term Loan Facility, including the Liquidity Shortfall Funding Cap and (y) the amount necessary to satisfy the Minimum Liquidity Condition, after giving effect to satisfaction of the Exit Funding Need; *provided, further*, that notwithstanding the foregoing, (i) in no event shall the treatment set forth in Article II.B of the DIP ABL Claims or Article III.B.3 of the ABL Claims be modified without the consent of the applicable DIP ABL Agent, DIP ABL Lenders, ABL Agent, or ABL Lenders, and (ii) this paragraph shall not be modified without the consent of the DIP ABL Agent or the ABL Agent (as applicable).

To the extent that the Exit ABL Facility is not available on the Effective Date in accordance with the Exit ABL Commitment Letter, the Debtors shall satisfy the treatment of DIP ABL Claims set forth in Article II.B and/or Allowed ABL Claims set forth in Article III.B.3 (as applicable) with sources of considerations acceptable to the Required Consenting Stakeholders; *provided* that notwithstanding the foregoing or anything else to the contrary in this Plan, in no event shall the treatment set forth in Article II.B of the DIP ABL Claims or Article III.B.3 of the ABL Claims be modified without the consent of the applicable DIP ABL Agent, DIP ABL Lenders, ABL Agent, or ABL Lenders.

To the extent applicable, Confirmation of this Plan shall be deemed (a) approval of the Exit Facilities (including the transactions and related agreements contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), including the Liquidity Shortfall Funding Amount, the Exit Second-Out Adjustment, if any, to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the Exit Facilities, including the Exit Facility Documents, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

As of the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents:  (a) shall be deemed to be granted; (b) shall be legal, valid, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral specified in the Exit Facility Documents; (c) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever; and (d) shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  As of the Effective Date, the Exit Facility Agents for the benefit of the applicable lenders under the Exit Facility Documents shall have a valid, binding, perfected, non-avoidable, and enforceable lien on and security interest in the collateral and with priority specified in the Exit Facility Documents, and valid, binding, non-avoidable, and enforceable guarantee from each guarantor specified in the Exit Facility Documents.  To the extent provided in the Exit Facility Documents, the Exit Facility Agents or holder(s) of Liens under the Exit Facility Documents are authorized to file with the appropriate authorities mortgages, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests.  The guarantees, mortgages, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in good faith, for legitimate business purposes, and for reasonably equivalent value as an inducement to the lenders thereunder to extend credit thereunder and shall be deemed to not constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable nonbankruptcy Law, and the priorities of such Liens and security interests shall be as set forth in the Exit Facility Documents.  The Reorganized

Debtors and the Persons and Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

    2.   New Equity.

On the Effective Date, New Pretium shall issue the New Equity in accordance with the Restructuring Steps Memorandum. The issuance of the New Equity, including the MIP Equity, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Holders of Claims or Interests. The Reorganized Debtors shall be authorized to issue a certain number of shares, units, or equity interests (as the case may be based on how the New Equity is denominated and the identity of New Pretium issuing such shares, units, or equity interests) of New Equity required to be issued under this Plan and pursuant to their New Organizational Documents and otherwise consistent with the Restructuring Support Agreement (and the exhibits thereto).

All of the shares, units, or equity interests (as the case may be based on how the New Equity is denominated) of New Equity issued pursuant to this Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth in this Plan and the New Organizational Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. Any Entity's acceptance of New Equity shall be deemed as its agreement to the applicable New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. As a condition to receiving the New Equity, all recipients of the First Lien New Equity and the Second Lien New Equity shall be required to execute and deliver the New Investor Agreement; *provided*, *however*, that acceptance of such New Equity constitutes deemed acceptance and consent to the terms of the New Investor Agreement, without the need for execution by any party thereto. For the avoidance of doubt, the Reorganized Debtors may waive the requirement to receive an executed signature page to the New Investor Agreement. The New Investor Agreement will be effective as of the Effective Date, and, as of such date, will be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Equity will be bound thereby in all respects.

The New Equity will be distributed as follows: (i) the New Money Equity, representing 21.9 percent of New Equity, subject to dilution by the MIP Equity only, will be distributed to the New Money Investor on account of the New Money Investment in accordance with the New Equity Subscription Agreement; (ii) the First Lien New Equity, representing 72.5 percent of New Equity, subject to dilution by the Participation Premium, the Backstop Premium, and the MIP Equity, will be distributed to the Holders of Allowed First Lien Tranche A-1 Claims in accordance with Article III.B hereof; (iii) the Second Lien New Equity, representing 5.6 percent of New Equity, subject to dilution by the MIP Equity only, will be distributed to the Holders of the Allowed Second Lien Claims in accordance with Article III.B hereof; (iv) the Participation Premium, representing 23.4 percent of New Equity will be distributed to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents and this Plan; and (v) the Backstop Premium will be distributed to the Holders of Backstop Parties in accordance with the DIP Term Loan Documents. Together, the Participation Premium and Backstop Premium shall dilute the First Lien New Equity, but they shall not dilute the New Money Equity or the Second Lien New Equity, and they shall be subject to dilution by the MIP Equity.

In respect of the Cash Out Option Investment, the Cash Out Option Investors may make a proposal in respect of the First Lien Cash Out Option and/or the Second Lien Cash Out Option to the Holders of Allowed First Lien Tranche A-1 Claims and Allowed Second Lien Claims on the Cash Out Option Offer Date. If such a proposal is made, within 10 days thereafter, each Holder of an Allowed First Lien Tranche A-1 Claim or an Allowed Second Lien Claim may elect the First Lien Cash Out Option or the Second Lien Cash Out Option, in lieu of receiving its Pro Rata share of the First Lien New Equity or the Second Lien New Equity, respectively. If a Holder of an Allowed First Lien Tranche A-1 Claim or an Allowed Second Lien Claim makes such an election, then, subject to the Cash Out Option Investment Cap, in lieu of its Pro Rata share of First Lien New Equity or Second Lien New Equity, it will receive

Cash in an amount equal to the value of such First Lien New Equity or Second Lien New Equity based on the Cash Out Value.

In the event that the aggregate effect of all First Lien Cash Out Options and Second Lien Cash Out Options would cause the Cash Out Option Investment to exceed the Cash Out Option Investment Cap, the Cash distributed to each Holder of a First Lien Tranche A-1 Claim and/or Second Lien Claim who has elected the First Lien Cash Out Option and/or the Second Lien Cash Out Option, as applicable, shall be reduced on a Pro Rata basis such that the aggregate Cash Out Option Investment is reduced to the Cash Out Option Investment Cap.  On account and in lieu of such reduced Cash distribution, each such Holder shall retain First Lien New Equity or Second Lien New Equity that is equal in value to such reduced Cash distribution based on the Cash Out Value.

To the extent applicable, Confirmation of this Plan shall be deemed (a) approval of (i) the issuance of New Money Equity to the New Money Investor pursuant to the New Equity Subscription Agreement (including the transactions and related agreements contemplated thereby and all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors or the Reorganized Debtors, as applicable, in connection therewith), (ii) the Cash Out Option Investors' purchase of Cash Out Option Equity through the Cash Out Option Investment, (iii) the issuance of the Backstop Premium to the Backstop Parties in accordance with the Backstop Commitment Letter, and (iv) the issuance of the Participation Premium to the DIP Term Loan Lenders in accordance with the DIP Term Loan Documents, each to the extent not approved by the Bankruptcy Court previously, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the New Money Investment and, if applicable, the Cash Out Option Investment, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable Law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the New Money Investment and, if applicable, the Cash Out Option Investment, and effectuate the Backstop Commitment Letter.

3.   New Money Investor Wind-Down Investment.

In addition to the New Money Investment, the New Money Investor shall be responsible for funding, whether arising prior to or after the Effective Date, the following costs and amounts with respect to Pretium Parent (the "Pretium Parent Wind-Down Costs and Distributions"): (1) any distributions required to be made under this Plan on account of any Allowed Claims in respect of Pretium Parent; and (2) all wind-down costs of Pretium Parent, including, without limitation, (a) the costs and expenses of preparing and filing tax returns and other required filings, (b) U.S. Trustee Quarterly Fees, (c) any reasonable and documented fees and expenses of Professionals and other advisors incurred in connection with the wind-down of Pretium Parent, and (d) any other expenses associated with the dissolution, liquidation, or case closing of Pretium Parent (including, for the avoidance of doubt, any Transaction Expenses of the New Money Investor incurred in connection with such matters); provided that any costs or expenses incurred in connection with an action taken on behalf of all or nearly all Debtors collectively, rather than Pretium Parent individually, including the closing of the Chapter 11 Cases in accordance with Article XII.M, shall not constitute Pretium Parent Wind-Down Costs and Distributions; provided further that, in the aggregate, the Debtors and Reorganized Debtors shall fund up to the first $350,000 of the Pretium Parent Wind-Down Costs and Distributions, and the New Money Investor shall fund the amount by which the Pretium Parent Wind-Down Costs and Distributions exceed $350,000 (the "New Money Investor Wind-Down Investment"), if any.

The Debtors or Reorganized Debtors, as applicable, shall make all distributions and payments contemplated by this Plan in respect of Pretium Parent in accordance with Article VI through the Disbursing Agent.  On the Effective Date and on a quarterly basis thereafter until all Pretium Parent Wind-Down Costs and Distributions have been paid in full, the New Money Investor shall pay to the Reorganized Debtors the New Money Investor Wind-Down Investment, if any.

Upon request by the Ad Hoc Group, the Debtors or Reorganized Debtors shall provide the Ad Hoc Group Advisors with an accounting of Pretium Parent Wind-Down Costs and Distributions and any New Money Investor Wind-Down Investment.

E.    *Corporate Existence.*

Except as otherwise provided in this Plan, the Confirmation Order, the Plan Supplement, or any agreement, instrument, or other document incorporated therein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation or organization documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation or organization documents) are amended under this Plan or otherwise, in each case, consistent with the Restructuring Support Agreement (which are incorporated herein pursuant to Article I.H), and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation or organization documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

On or after the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.    *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Confirmation Order, this Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated therein, or entered into in connection therewith or pursuant thereto, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound-down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to this Plan.

G.    *Cancelation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in this Plan or the Confirmation Order (including to the extent any DIP ABL Claim or ABL Claim is refinanced and/or converted into the Exit ABL Facility in accordance with the provisions herein), all notes, instruments, certificates, and other documents evidencing Claims or Interests (including Existing Interests) shall be canceled, and all present and future obligations and liabilities, actions, suits, accounts or demands, covenants, and indemnities (both actual and contingent) of the Debtors and any non-Debtor Affiliates thereunder or in any way related thereto, shall be deemed satisfied in full, released, canceled, discharged, and of no force or effect, without any need for further action or approval by the Bankruptcy Court or for a Holder to take further action, and the Agents shall be released from all duties thereunder.

Holders of or parties to such canceled instruments, Existing Interests, and other documentation will have no rights arising from or relating to such instruments, Interests, and other documentation, or the cancelation thereof, except the rights provided for or reserved pursuant to this Plan.  Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI hereof, the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents shall continue in effect after the Effective Date to the extent necessary to, and solely for the purposes of, (a) allowing Holders of Allowed Claims arising under the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents to receive distributions under this Plan on account of such Claims, if any, (b) allowing and preserving the rights of the Agents to receive and make distributions on account of the Allowed Claims arising under the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents pursuant to this Plan, (c) permitting the Agents to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including to enforce any obligation (if any) owed to such Agents or their

respective Holders of Allowed Claims under this Plan in accordance with the ABL Documents, First Lien Documents, Second Lien Documents, and DIP Documents, as applicable, and (d) permitting the Agents to perform any functions that are necessary to effectuate the foregoing; *provided*, *however*, that (1) the preceding proviso shall not affect the discharge of Claims or Interests and the releases pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in this Plan, and (2) except as otherwise provided in this Plan, the terms and provisions of this Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under this Plan. The Agents shall be discharged and shall have no further obligation or liability except as provided in this Plan and Confirmation Order, and after the performance by the Agents and their representatives and professionals of any obligations and duties required under or related to this Plan or Confirmation Order, the Agents shall be relieved of and released from any obligations and duties arising thereunder. For the avoidance of doubt, nothing in this <u>Article V.G</u> modifies section 524(e) of the Bankruptcy Code.

H.    *Corporate Action.*

On or before the Effective Date, as applicable, all actions contemplated under this Plan (including the Restructuring Steps Memorandum and the other documents contained in the Plan Supplement) shall be deemed authorized and approved in all respects, including: (1) adoption or assumption, as applicable, of the Compensation and Benefits Programs; (2) selection of the directors and officers for the Reorganized Debtors; (3) the issuance and distribution of the New Equity; (4) implementation of the Restructuring Transactions; (5) entry into the Exit Facility Documents, as applicable; (6) entry into the New Equity Documents; (7) adoption of the New Organizational Documents; (8) the reservation of the MIP Equity; (9) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (10) all other acts or actions contemplated by this Plan or reasonably necessary or appropriate to consummate this Plan or the Restructuring Transactions (whether to occur before, on, or after the Effective Date). On the Effective Date, all matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under this Plan (or necessary or desirable to effect the transactions contemplated under this Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity, the New Equity Documents, the Exit Facility Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this <u>Article IV.H</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

I.    *New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors and shall supersede any existing organizational documents. To the extent required under this Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization. The New Organizational Documents will (a) authorize the issuance of the New Equity, and (b) prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On the Effective Date, New Pretium shall enter into and deliver the New Investor Agreement to each Holder of New Equity, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act or action under applicable Law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Holders of New Equity shall be deemed to have executed the New Investor Agreement and be parties thereto, without the need to deliver signature pages thereto.

J.      *Indemnification Obligations.*

All indemnification provisions currently in place consistent with applicable law (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) as of the Petition Date for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall, to the fullest extent permitted by applicable law, be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

K.      *Directors and Officers of the Reorganized Debtors.*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents.  To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code.  In subsequent terms, the directors shall be selected in accordance with the New Organizational Documents.  Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.

L.      *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan, the Exit Facility Documents entered into, and the Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

M.      *Certain Securities Law Matters.*

The offering, issuance and distribution of any New Equity before the Petition Date and any New Equity issuable in the form of MIP Equity shall be exempt from the registration requirements of the Securities Act in reliance upon section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or in reliance on Regulation S under the Securities Act.

The offering, issuance and distribution of New Equity (other than MIP Equity) after the Petition Date shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S., state, or local law requiring registration prior to the offering, issuance, distribution, or sale of securities in accordance with, and pursuant to, section 1145 of the Bankruptcy Code, and to the extent such exemption is not available, then such New Equity will be offered, issued and distributed under the Plan pursuant to section 4(a)(2) of the Securities Act, Regulation D or Rule 701 promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration.

The shares of New Equity to be issued under this Plan on account of Allowed Claims in accordance with, and pursuant to, section 1145 of the Bankruptcy Code will be freely transferable under the Securities Act by the recipients thereof that are not, and have not been within 90 days of such transfer, an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 1145(b) of the Bankruptcy Code, and compliance with applicable securities laws and any rules and regulations of the United States Securities and Exchange Commission or state or local securities laws, if any, applicable at the time of any future transfer of such Securities or instruments; and (b) any restrictions on the transferability of such New Equity in the New Organizational Documents.

The shares of New Equity (including the New Money Equity and MIP Equity) that may be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, Regulation S under the Securities Act, and/or other available exemptions from registration will be considered "restricted securities," will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act and subject to any restrictions on the transferability of such New Equity in the New Organizational Documents.

Recipients of the New Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable Blue-Sky Laws for resales of New Equity.

The Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order to any Entity (including DTC or any transfer agent for the New Equity) with respect to the treatment of the New Equity to be issued under this Plan under applicable securities laws.  DTC and any transfer agent for the New Equity shall be required to accept and conclusively rely upon this Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).  Notwithstanding anything to the contrary in this Plan, no Entity (including DTC and any transfer agent for the New Equity) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New Equity to be issued under this Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Equity shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the United States Securities and Exchange Commission, and (iii) shall not be required to list the New Equity on a recognized U.S. stock exchange, except in each case (if at all), as otherwise may be required pursuant to the New Organizational Documents.

*N.*      *Section 1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under this Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Equity; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*O.*      *Director and Officer Liability Insurance.*

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval

of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in this Plan, Confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

P.      *Management Incentive Plan.*

On the Effective Date, the MIP Equity shall be reserved.  The terms and conditions of the Management Incentive Plan, including with respect to the form, terms, allocation, and vesting of the MIP Equity or other equity-based awards, shall be determined at the discretion of the New Board within 120 days of the Effective Date.

Q.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to <u>Article VIII</u> hereof, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in this Plan, including in <u>Article VIII</u> hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity (other than the Released Parties) may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan, including <u>Article VIII</u> hereof.**  The Reorganized Debtors may settle any such Causes of Action without any further notice to or action, order, or approval of the Bankruptcy Court.  If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objecting party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court.  Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to this Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in this Plan, including <u>Article VIII</u> hereof.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the

foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in <u>Article V.H.1</u> and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are:  (1) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date, in the case of (1) and (3) through (5), with the consent of the Required Consenting Stakeholders.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, and related Cure amounts with respect thereto, or rejections of the Executory Contracts or Unexpired Leases as set forth in this Plan or the Rejected Executory Contracts and Unexpired Leases Schedule or Schedule of Proposed Cure Amounts, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to this Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in this Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule or Schedule of Proposed Cure Amounts, at any time up to forty-five (45) days after the Effective Date, subject to the applicable counterparty's right to object and the consent of the Required Consenting Stakeholders.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules requires the Debtors to assume or reject an Executory Contract or Unexpired Lease, such requirement shall be satisfied if the Debtors make an election to assume or reject such Executory Contract or Unexpired Lease prior to the deadline set forth by the Bankruptcy Code or the Bankruptcy Rules, as applicable, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

If certain, but not all, of a contract counterparty's Executory Contracts or Unexpired Leases are assumed pursuant to this Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts or Unexpired Leases that are being rejected pursuant to this Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being assumed pursuant to this Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to this Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, including pursuant to this Plan or the Confirmation Order, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be treated in accordance with <u>Article III.B</u> of this Plan and shall be subject to the Debtors' objection and dispute in accordance with the provisions of <u>Article VII</u> of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts pay all Cure costs (if any) relating to Executory Contracts and Unexpired Leases that are being assumed under this Plan in the ordinary course of business. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure costs that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed on or before fourteen (14) days after the Filing of the Schedule of Proposed Cure Amounts. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to file such request for payment of such Cure costs. The Reorganized Debtors also may settle any Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under this Plan must be Filed with the Bankruptcy Court on or before the Confirmation Hearing. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or as otherwise scheduled for hearing by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of any Cure costs shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors and Reorganized Debtors, as applicable, reserve the right at any time to move to reject any Executory Contract or Unexpired Lease based upon the existence of any such unresolved dispute. If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory

Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts, the Debtors shall have the right to add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as of the Effective Date subject to the applicable counterparty's right to object to such rejection.

Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption, or (3) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

D.    *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

E.    *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under this Plan. Unless otherwise provided in this Plan, on the Effective Date, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (2) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

F.    *Reservation of Rights.*

Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.    *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Employee Compensation and Benefits.*

1.    Compensation and Benefits Programs.

Except as otherwise set forth herein or on the Rejected Executory Contracts and Unexpired Leases Schedule, on the Effective Date and subject to the provisions of this Plan, the Debtors shall (a) assume employment agreements or letters, severance agreements, or other agreements entered into with current and former officers and other employees or (b) to the extent agreed, enter into new agreements with such officers and other employees on terms and

conditions acceptable to (i) the Debtors, (ii) such officers and other employees, and (iii) with respect to such new agreements with the Debtors' executive officers or other insiders (as defined in section 101(31) of the Bankruptcy Code), the Required Consenting Stakeholders, as applicable. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Subject to the provisions of this Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under this Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)     all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Programs that provide for rights to acquire Existing Interests in any of the Debtors;

(b)     Compensation and Benefits Programs that have been rejected pursuant to an order of a Bankruptcy Court; and

(c)     Compensation and Benefits Programs that, as of the entry of the Confirmation Order, have been specifically waived by the beneficiaries of any employee benefit plan or contract.

None of Confirmation of the Plan, Consummation of any of the Restructuring Transactions, or any assumption or assumption and assignment of compensation and benefits agreements, plans, programs, or arrangements pursuant to the terms herein shall be deemed to trigger any applicable change of control, sale of business, assignment, vesting, termination, constructive termination, acceleration, or similar provisions in any compensation and benefits agreements, plans, programs, or arrangements. No counterparty shall have rights under any compensation or benefits agreement, plan, program, or arrangement assumed or assumed and assigned pursuant to the Plan other than those applicable immediately prior to such assumption or assumption and assignment.

2.      Workers' Compensation Programs.

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (b) the Debtors' written contracts, agreements, agreements of indemnity, self-insured workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the first Distribution

Date, the Reorganized Debtors shall make initial distributions under this Plan on account of Claims Allowed on or as soon as reasonably practicable after the Effective Date, subject to the Reorganized Debtors' right to object to Claims. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. Except as otherwise provided in this Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the preceding paragraph, (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C of this Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Article III.B.6 of this Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

B.      Disbursing Agent.

All distributions under this Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

All Plan Distributions to any Disbursing Agent on behalf of the Holders of Claims listed on the Claims Register shall be deemed completed by the Debtors when received by such Disbursing Agent. This Plan Distributions shall be made to any such Holders at the direction of the applicable Disbursing Agent.

C.      Rights and Powers of Disbursing Agent.

1.      Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the

extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    Delivery of Distributions in General.

Except as otherwise provided herein, distributions payable to Holders of Allowed Claims shall be made by the Disbursing Agent to each such Holder as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

3.    Designation of Alternative Distribution Recipient.

A Holder of an Allowed Claim entitled to receive any distribution under this Plan may, at its sole election, irrevocably designate in writing one or more other Persons to receive, on such Holder's behalf, any distribution otherwise payable to such Holder under this Plan (such Holder, the "Designating Holder", and such recipient, a "Designated Recipient").

A Designating Holder must deliver to the Debtors and the Disbursing Agent a duly executed direction letter (a "Direction Letter") in form and substance reasonably acceptable to the Debtors and the Disbursing Agent, which shall (i) identify with particularity the Designating Holder, the Allowed Claim(s), and the Designated Recipient(s), (ii) provide complete payment instructions and delivery details, including any wire, check, or book-entry account information, and (iii) be received no later than six (6) Business Days prior to the Effective Date unless such deadline is extended by the Debtors or the Reorganized Debtors.  The Disbursing Agent may rely conclusively upon any Direction Letter that it reasonably believes to be genuine and duly authorized without further duty of inquiry.

With respect to any distribution of New Equity or other Securities under this Plan, any Designated Recipient must be eligible to receive such Securities under the Plan and applicable securities laws and must execute, deliver, or be deemed to have accepted any agreements, instruments, or organizational documents required as a condition to receipt thereof, including, without limitation, the New Investor Agreement and any applicable New Organizational Documents and provide customary securities laws representations.  No distribution of Securities shall be made to any Designated Recipient unless and until all such conditions are satisfied to the reasonable satisfaction of the Reorganized Debtors

A Direction Letter shall become effective only upon written acknowledgment by the Disbursing Agent, may be rejected if incomplete or untimely, and, once accepted, shall be irrevocable except with the consent of the Reorganized Debtors and the Disbursing Agent. The Reorganized Debtors and the Disbursing Agent shall have no obligation to accommodate partial, conditional, or inconsistent directions.

Recognition of a Designated Recipient is an administrative accommodation only and shall not expand, diminish, or otherwise modify any rights, defenses, or obligations under this Plan, including setoff, recoupment, compliance with tax requirements, the Claims reconciliation and objection process, or the treatment and satisfaction of Claims.

Any distribution made to a Designated Recipient on behalf of a Designating Holder pursuant to a Direction Letter shall be deemed to have been made to the Designating Holder in full and final satisfaction of such Designating Holder's applicable Allowed Claim.

4.    Minimum Distributions.

No fractional shares of New Equity shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity that is not a whole number, the actual distribution of shares of New Equity shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no

further payment therefor.  The total number of authorized shares of New Equity to be distributed to Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

     5.   Undeliverable Distributions and Unclaimed Property.

     In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of New Equity, such New Equity shall be canceled.  Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.  The Disbursing Agent shall adjust the number of shares of New Equity outstanding as of the date of such cancelation to ensure that the distributions of New Equity contemplated under this Plan are given full force and effect.

     6.   Surrender of Canceled Instruments or Securities.

     On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been canceled in accordance with Article IV.G hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under this Plan, charging liens, priority of payment, and indemnification rights.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

*E.*     *Manner of Payment.*

     1.   Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated by this Plan or the Plan Supplement, all distributions of the New Equity to the Holders of the applicable Allowed Claims under this Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

     2.   All distributions of Cash to the Holders of the applicable Allowed Claims under this Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

     3.   At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*F.*     *Indefeasible Distributions.*

     Any and all distributions made under this Plan shall be indefeasible and not subject to clawback or turnover provisions.

*G.*     *Compliance with Tax Requirements.*

     In connection with this Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, such parties shall be authorized

to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the DIP Orders, this Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition)*, on the Petition Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.F hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L.      *Claims Paid or Payable by Third Parties.*

1.      Claims Paid by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt

thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Disputed Claims Process.*

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of this Plan, except as provided in Article V.B of this Plan.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary course of business of the Reorganized Debtors.  The Debtors and the Reorganized Debtors, as applicable, shall have the exclusive authority to (i) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (ii) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan.  If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors or Reorganized Debtors may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by this Plan) and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; *provided further* that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court.  If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

B.    *Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be Allowed under applicable non-bankruptcy law.

C.        *Claims Administration Responsibilities.*

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court; *provided* that the U.S. Trustee shall also have the authority to object to Claims or Interests after the Effective Date.   For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to <u>Article IV.Q</u> of this Plan.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law.  If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute may be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced, provided that, for the avoidance of doubt, the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code to the extent applicable.

D.        *Estimation of Claims and Interests*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.   Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.   In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under this Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

E.        *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.        *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of this Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of this Plan. On or as soon as reasonably practicable after the next Distribution Date after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

I.      *Single Satisfaction of Claims.*

Holders of Allowed Claims may assert such Claims against the Debtor(s) obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against the applicable Debtor(s) based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, this Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan.

B.      **Release of Liens.**

**Except as otherwise provided in the Exit Facility Documents, this Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created or entered into pursuant to this**

Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates or any non-Debtor Affiliate shall be fully released and discharged, and all of the right, title, and interest of any Holder (and the applicable Agents of such Holder) of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert and, as applicable, be reassigned, surrendered, reconveyed, or retransferred to the Reorganized Debtors and their successors and assigns to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable Agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (or the applicable Agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the applicable Agents for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the Exit Facility Agents that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

C.      *Releases by the Debtors.*

Except as expressly set forth herein, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Debtors, their Estates, and if applicable, the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Reorganized Debtors), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein-after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11 Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, their Estates, or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the

47

Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, Avoidance Actions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.

Notwithstanding anything to the contrary herein, the Debtors do not, pursuant to the releases set forth above, release (i) any Causes of Action identified in the Schedule of Retained Causes of Action, (ii) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transactions, the Exit Facility Documents, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, or (iii) any Claims or Causes of action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, *provided* that a party's compliance with, or execution, or implementation of the Restructuring Support Agreement or this Plan shall not be deemed actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) given in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (ii) a good faith settlement and compromise of the Claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (iv) fair, equitable, and reasonable; (v) given and made after reasonable investigation by the Debtors and after due notice and opportunity for a hearing; and (vi) a bar to any of the Debtors, their Estates, or the Reorganized Debtors asserting any Claim or Cause of Action released pursuant to the Debtor Release against any of the Released Parties.

D.    *Releases by the Releasing Parties.*

Except as expressly set forth herein, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged by and on behalf of each and all of the Releasing Parties, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, accrued or unaccrued, existing or herein after arising, whether in Law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such Holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or their Estates (including the capital structure, management, ownership, or operation thereof), the solicitation and provision of Solicitation Materials to Holders of Claims prior to the Chapter 11

Cases, the Chapter 11 Cases, the Restructuring Transactions, the Reorganized Debtors (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any Security of the Debtors, their Estates, or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases including all prior recapitalizations, restructurings, or refinancing efforts and transactions, any Securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, any related adversary proceedings, the formulation, documentation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of Securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before, in respect of the foregoing clause the Effective Date.

Notwithstanding anything to the contrary herein, the Releasing Parties do not, pursuant to the releases set forth above, release (i) any post-Effective Date obligations of any party or Entity under this Plan, the Confirmation Order, any Restructuring Transactions, the Exit Facility Documents, the Plan Supplement, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or the Restructuring Transactions, (ii) the rights of any Holder of Allowed Claims to receive distributions under this Plan, or (iii) any Claims or Causes of action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction, *provided* that a party's compliance with, or execution, or implementation of the Restructuring Support Agreement or this Plan shall not be deemed actual fraud or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual; (ii) essential to the Confirmation of this Plan; (iii) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing this Plan; (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (v) in the best interests of the Debtors and their Estates; (vi) fair, equitable, and reasonable; (vii) given and made after due notice and opportunity for a hearing; and (viii) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release against any of the Released Parties.

E.    *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action arising prior to the Effective Date in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation and pursuit of the Restructuring Support Agreement, the Definitive Documents, the Plan Supplement, the DIP Term Loan Facility, the DIP ABL Facility, the DIP Orders, the DIP Documents, the Exit Facilities, or the filing of the Chapter 11 Cases, the solicitation of votes (before and after the Petition Date) for, or Confirmation of, this Plan, the funding of this Plan, the occurrence of the Effective Date, the administration of this Plan or the property to be distributed under this Plan, the issuance of Securities under or in connection with this Plan, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, if applicable, in connection with this Plan and the Restructuring Transactions, or the transactions in furtherance of any of the foregoing, other than Claims or Causes of Action in each case arising out of or related to any act or omission of an Exculpated Party that is determined by a Final Order to have constituted actual

fraud, willful misconduct, or gross negligence, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable Law or rules protecting such Exculpated Parties from liability.

The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

F.      *Injunction.*

Except as otherwise expressly provided in this Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to this Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, Causes of Action, or liabilities that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities or the Estates on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, Causes of Action, or liabilities released or settled pursuant to this Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Effective Date obligations of any Person or Entity under this Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions (including under the Exit Facilities), or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of this Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to this Plan, shall be deemed to have consented to the injunction provisions set forth in this **Article VIII.F.**

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to **Article VIII.C**, **Article VIII.D**, and **Article VIII.E** without first (a) requesting a determination from the

**Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, or Released Party and is not a Claim that the Debtors released under this Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.**

G.      *Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

I.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

# ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of <u>Article IX.B</u> hereof:

1.   the Minimum Liquidity Condition, subject to the adjustment set forth in <u>Article IV.D.1</u> herein, shall have been satisfied;

2.   the Restructuring Support Agreement shall not have been terminated as to all parties thereto and shall be in full force and effect;

3.   the Bankruptcy Court shall have entered the Disclosure Statement Order, which shall not have been reversed, stayed, modified, or vacated on appeal;

4.  the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order;

5.  the Definitive Documents shall be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto, consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement;

6.  all actions, documents, and agreements necessary to implement and consummate this Plan shall have been effected and executed;

7.  the Bankruptcy Court shall have entered the DIP Orders, and the Final DIP Order shall be a Final Order, the DIP Documents shall be in full force and effect in accordance with their terms, the DIP Termination Date (as defined in the DIP Orders) shall not have occurred, no Event of Default (as defined in the DIP Documents) shall have occurred or be continuing, and the obligations outstanding under the DIP Documents shall not have been accelerated;

8.  all fees, expenses, and premiums payable pursuant to the DIP Orders shall have been paid by the Debtors or the Reorganized Debtors, as applicable;

9.  all Exit Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto, other than the occurrence of the Effective Date, shall have been satisfied or waived;

10. all conditions precedent to the issuance of the New Equity, other than the occurrence of the Effective Date, shall have occurred;

11. all organizational documents and bylaws for New Pretium shall have been adopted on terms consistent with the Restructuring Support Agreement;

12. all fees and expenses of retained Professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Escrow Account pending the Bankruptcy Court's approval of such fees and expenses;

13. all Transaction Expenses shall have been paid as set forth in Article II.F herein;

14. all governmental and third-party authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate this Plan and the Restructuring Transactions, and are contemplated by the Restructuring Support Agreement, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on this Plan and the Restructuring Transactions; and

15. the Restructuring Transactions shall have been consummated or are anticipated to be consummated concurrently with the occurrence of the Effective Date in a manner consistent with the Restructuring Support Agreement (including the consent rights therein) and this Plan.

B.     *Waiver of Conditions.*

The conditions to Confirmation and Consummation set forth in this Article IX.A may be waived by the Debtors with the consent of (i) the Required Consenting Stakeholders and (ii) solely with respect to the conditions set forth in clauses (4), (7), (8), and (9) of this Article IX.A, the ABL Agent, the DIP ABL Agent, and the Exit ABL Agent (with respect to the conditions set forth in clauses (9), solely to the extent the ABL Agent or DIP ABL Agent is the Exit ABL Agent), in each case, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate this Plan.

C.      *Effect of Failure of Conditions.*

If Consummation does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, or any Holders of Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims against or Interests in the Debtors, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

D.      *Substantial Consummation*

"Substantial Consummation" of this Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THIS PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent rights set forth in the Restructuring Support Agreement (which are incorporated herein pursuant to <u>Article I.H</u>), the Debtors reserve the right to modify this Plan (other than with respect to the DIP ABL Facility and the DIP ABL Claims without the consent of the DIP ABL Agent, the ABL Facility and the ABL Claims without the consent of the ABL Agent, or the Exit ABL Facility without the consent of the Exit ABL Agent), whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in this Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify this Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify this Plan, or remedy any defect or omission, or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of this Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to this Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement and subject to the consent rights therein (which are incorporated herein pursuant to <u>Article I.H</u>), the Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if Confirmation or Consummation does not occur, then:  (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain, and including the Allowance or disallowance, of all or any portion of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or this Plan;

3. resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of this Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with this Plan or the Disclosure Statement, including the Restructuring Support Agreement;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan (including in connection with the New Money Investor Wind-Down Investment, if any);

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of this Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

54

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.L hereof;

13. enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14. determine any other matters that may arise in connection with or relate to this Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement, including the Restructuring Support Agreement;

15. enter an order concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under this Plan;

17. consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

20. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in this Plan, including under Article VIII hereof, regardless of whether such termination occurred prior to or after the Effective Date;

22. enforce all orders previously entered by the Bankruptcy Court; and

23. hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents, the Exit Facility Documents, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## ARTICLE XII.
### MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims against or Interests in the Debtors (irrespective of whether such Holders have, or are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim or Interest has voted on this Plan.

B.    *Additional Documents.*

Subject to and in accordance with the Restructuring Support Agreement, on or before the Effective Date, (x) the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of this Plan and the Restructuring Support Agreement and (y) the Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims against the Debtors receiving distributions pursuant to this Plan and all other parties-in-interest, shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

C.    *Statutory Committee and Cessation of Fee and Expense Payment*

On the Confirmation Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members or advisors to any statutory committee after the Confirmation Date.

D.    *Reservation of Rights.*

Except as expressly set forth in this Plan, this Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity; *provided* that nothing in this Article XIII.E modifies section 524(e) of the Bankruptcy Code.

F.    *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Pretium Packaging, L.L.C.<br>1555 Page Industrial Blvd.<br>St. Louis, MO 63132<br>Attention:  J. Federico Barreto<br>          Chief Financial Officer | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attention:  Steven N. Serajeddini, P.C.<br>          Jordan E. Elkin<br>          (steven.serajeddini@kirkland.com)<br>          (jordan.elkin@kirkland.com)<br><br>and<br><br>Kirkland & Ellis LLP<br>333 West Wolf Point Plaza<br>Chicago, Illinois 60654 |

|  | Attention:  Anup Sathy, P.C.<br>Yusuf Salloum<br>(anup.sathy@kirkland.com)<br>(yusuf.salloum@kirkland.com)<br><br>and<br><br>COLE SCHOTZ P.C.<br>Court Plaza North, 25 Main Street<br>Hackensack, New Jersey 07601<br>Attention: Michael D. Sirota, Esq.<br>Warren A. Usatine, Esq.<br>Felice R. Yudkin, Esq.<br>msirota@coleschotz.com<br>wusatine@coleschotz.com<br>fyudkin@coleschotz.com |
|---|---|
| **Counsel to the Ad Hoc Group** | **Sponsor / New Money Investor** |
| Milbank LLP<br>55 Hudson Yards<br>New York, New York 10001<br>Attention:  Evan Fleck<br>Matthew Brod<br>(efleck@milbank.com)<br>(mbrod@milbank.com)<br><br>and<br><br>Chiesa Shahinian & Giantomasi PC<br>105 Eisenhower Parkway<br>Roseland, New Jersey 07068<br>Attention:  Thomas M. Walsh<br>Sam Della Fera, Jr<br>twalsh@csglaw.com<br>sdellafera@csglaw.com | Clearlake Capital Group, L.P.<br>233 Wilshire Boulevard, Suite 800<br>Santa Monica, CA 90401<br>Attention: John Cannon<br>jcannon@clearlake.com |
| **Counsel to the ABL Agent, DIP ABL Agent, and Exit ABL Agent** | **United States Trustee** |
| Morgan, Lewis & Bockius LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attention:  Jennifer Feldsher<br>Elizabeth R. Khoury Ali<br>Ryan C. Hibbard<br>(jennifer.feldsher@morganlewis.com)<br>(elizabeth.ali@morganlewis.com)<br>(ryan.hibbard@morganlewis.com)<br>and<br><br>Morgan, Lewis & Bockius LLP<br>One Federal Street<br>Boston, Massachusetts 02110<br>Attention:  Christopher L. Carter<br>(christopher.carter@morganlewis.com) | Office of The United States Trustee<br>One Newark Center<br>1085 Raymond Boulevard, Suite 21000<br>Newark, New Jersey 07102<br>Attention:  Jeffery M. Sponsor<br>Benjamin A. Hackman<br>Jeffrey.M.Sponder@usdoj.gov<br>Benjamin.A.Hackman@usdoj.gov |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.  Notwithstanding anything herein to the contrary, the Reorganized Debtors shall provide notice of any documents to all Entities whose rights are affected by any such document Filed by the Reorganized Debtors.

G.    *Enforcement of Confirmation Order.*

On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to enforce the terms of the Confirmation Order and this Plan (which shall include, for the avoidance of doubt, the Plan Supplement).

H.    *Term of Injunctions or Stays.*

**Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I.    *Entire Agreement.*

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, this Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

J.    *Plan Supplement.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/Pretium or the Bankruptcy Court's website at https://ecf.njb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

K.    *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided, however*, any such alteration or interpretation shall be acceptable to the Debtors and the Required Consenting Stakeholders.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors and the Consenting Stakeholders (as applicable) will be deemed to have solicited votes on this Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Stakeholders, and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under this Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on this Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under this Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

On and after the Effective Date, the Debtors, or the Reorganized Debtors shall be permitted to classify all of the Chapter 11 Cases of the Debtors as closed, except for the Chapter 11 Case(s) of any Debtor(s) identified in the Restructuring Steps Memorandum as having its Chapter 11 Case(s) remaining open following the Effective Date, and all contested matters relating to any of the Debtors, including objections to Claims and any adversary proceedings, shall be administered and heard in the Chapter 11 Case of a Debtor identified in the Restructuring Steps Memorandum as having its Chapter 11 Case remaining open following the Effective Date, irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in this Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Creditor Default.*

An act or omission by a Holder of a Claim or Interest in contravention of the provisions of this Plan shall be deemed an event of default under this Plan.  Upon an event of default, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Reorganized Debtors in remedying such default.  Upon the finding of such a default by a Holder of a Claim or Interest, the Bankruptcy Court may: (a) designate a party to appear, sign, and/or accept the documents required under this Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (b) enforce this Plan by order of specific performance; (c) award a judgment against such defaulting Holder of a Claim or Interest in favor of the Reorganized Debtors in an amount, including interest, if applicable, to compensate the Reorganized Debtors for the damages caused by such default; and (d) make such other order as may be equitable that does not materially alter the terms of this Plan.

P.      *No Group*

The Ad Hoc Group shall not include any Holders who are not represented by the Ad Hoc Group Advisors. Such Holders did not jointly negotiate the Restructuring Support Agreement or this Plan with the Ad Hoc Group and shall not constitute part of a "group" with the Ad Hoc Group for any purpose, including under foreign law.

Dated: January 25, 2026

Pretium Packaging, L.L.C.
on behalf of itself and all other Debtors

*/s/ J. Federico Barreto*
Name:  J. Federico Barreto
Title:    Chief Financial Officer