UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ANDREW R. VARA
UNITED STATES TRUSTEE, REGIONS 3 & 9
Jeffrey M. Sponder, Esq.
Benjamin A. Hackman, Esq.
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Email: jeffrey.m.sponder@usdoj.gov
        benjamin.a.hackman@usdoj.gov

<div align="center">

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

</div>

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 26-10896 (CMG) |
| Pretium Packaging, L.L.C., et al.,[1] | : | |
| | : | The Honorable Christine M. Gravelle |
| Debtors. | : | |
| | : | Hearing Date: February 23, 2026, at 11:00 a.m. |
| | : | |

<div align="center">

**OBJECTION OF THE UNITED STATES TRUSTEE TO CONFIRMATION
OF THE JOINT PREPACKAGED PLAN OF REORGANIZATION
OF PRETIUM PACKAGING, L.L.C. AND ITS DEBTOR AFFILIATES**

</div>

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, objects to confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* [Dkt. 6] (the "Plan"),[2] and respectfully states as follows:

---

[1] The last four digits of Debtor Pretium Packaging, L.L.C.'s tax identification number are 7802. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Pretium. The location of the Debtors' service address in these chapter 11 cases is: 2560 White Oak Circle, Suite 120, Aurora, Illinois 60502.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (including exhibits), as applicable.

**PRELIMINARY STATEMENT**

1.      The Court should deny confirmation for four reasons.  First, the Plan has non-consensual third-party releases.  The Plan would deem certain creditors to consent to the releases based on inaction, namely, their failure to opt out.  The Court should reject that mechanism, especially where (as here) the Debtors have many foreign customers and vendors who are unfamiliar with the chapter 11 process, and where the deadline to opt out was shortened to 14 days after the notice of commencement.  In contrast, holders of funded debt who signed the Restructuring Support Agreement gave third-party releases through a negotiated term in a written agreement.  Second, the Plan would deem itself to be a global settlement.  Third, the Plan would discharge all of the Debtors—even though the parent Debtor is being wound down and dissolved and does not appear to be eligible for a discharge under 11 U.S.C. § 1141(d)(3).  Fourth, the Plan has a gatekeeping injunction that would improperly restrict post-confirmation litigation.  Unless the above matters are satisfactorily addressed in the confirmation order, the Court should deny confirmation.

**JURISDICTION AND STANDING**

2.      This Court has jurisdiction to hear and determine confirmation of the Plan and this objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable orders of the United States District Court of the District of New Jersey issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

3.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and

Case 26-10896-CMG    Doc 136    Filed 02/13/26    Entered 02/13/26 21:28:43    Desc Main
Document      Page 3 of 30

interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").  Under 28 U.S.C. § 586(a)(3)(B) the U.S. Trustee has the duty to monitor and comment on plans and disclosure statements filed in chapter 11 cases.

4.      The U.S. Trustee has standing to be heard concerning confirmation of the Plan and this objection pursuant to 11 U.S.C. § 307.  *See U.S. Tr. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under section 307, which goes beyond mere pecuniary interest).

## BACKGROUND

5.      On January 28, 2026, the above-captioned debtors (the "Debtors") filed chapter 11 petitions in this Court.  *See* for example Case No. 26-10896 Dkt. 1.  The Debtors design and manufacture plastic containers for consumer goods.

6.      The Debtors have a significant international presence.  They operate manufacturing facilities across the United States, Canada, Mexico, Ireland, and the Netherlands.  *See Declaration of J. Federico Barreto, Chief Financial Officer of Pretium Packaging, L.L.C., In Support of Chapter 11 Petitions and First Day Motions* [Dkt. 18] (the "FDD") ¶ 2.  More than 1,200 of the Debtors' 3,100 employees are located abroad.  *See id.* ¶ 2 & *id.* Ex. C ¶ 13.  The Debtors describe their enterprise as "global" and admit that "many" of their customers and vendors "are unfamiliar with the chapter 11 process[.]"  FDD ¶ 54.

7.      Prepetition, on January 25, 2026, the Debtors solicited votes on the Plan.  The *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "Disclosure Statement") states on p. 3 of 281:

> **EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS WHOSE VOTES ON THE PLAN ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT**

**THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE
<u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO
LATER THAN <u>MARCH 2, 2026, AT 5:00 P.M. (PREVAILING
EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET
FORTH HEREIN AND IN THE BALLOTS.**

8.    On the petition date, the Debtors filed the Plan and Disclosure Statement.  *See* Dkts.

5 & 6.

9.    The Plan provides that it "constitutes a separate Plan for each Debtor[.]"  Plan at 1.

Debtor Poseidon Parent, L.P. is the parent company in the organizational chart.  *See* FDD ¶ 31 &

Ex. A.  There are 17 subsidiaries below Poseidon Parent, L.P.  Nearly half of those subsidiaries

(8) are non-debtors.

10.    On January 30, 2026, the Court entered an order approving the solicitation

procedures and setting the confirmation hearing for February 23, 2026.  *See* Dkt. 57.  That order

requires opt-outs to the Plan's third-party releases to be submitted by February 16, 2026, at 5:00

p.m. (ET).  *See id.* ¶ 2.

11.    On February 8, 2026, the U.S. Trustee's counsel e-mailed Debtors' proposed

counsel informal questions and comments about the Plan.

12.    On February 9, 2026, the Debtors filed the plan supplement.  *See* Dkt. 127.  The

final page of the plan supplement provides that the parent Debtor, Poseidon Parent, L.P., "will be

dissolved."  *Id.* Ex. G.

13.    On February 10, 2026 and February 13, 2026, Debtors' proposed counsel

responded to, and resolved some of, the U.S. Trustee's questions and comments.[3]

14.    The U.S. Trustee has not appointed an official committee of unsecured creditors in

these cases.

---

[3]    The U.S. Trustee reserves his right to review the redlined documents and to object to any issues that are not
satisfactorily captured in the redlines at the confirmation hearing.

## OBJECTION

### I.    Confirmation Standard

15.    A chapter 11 plan cannot be confirmed unless this Court finds the plan complies

with the provisions of section 1129(a) of title 11 of the United States Code (the "Bankruptcy

Code"). *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 220-21 (Bankr. D.N.J. 2000).

A plan proponent bears the burden of proof with respect to each element of section 1129(a). *See*

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Bankr. D. Del. 2001).

16.    For the following reasons, the Plan cannot be confirmed in its present form.

### II.    The Plan is Not Confirmable Because It Proposes Nonconsensual Third-Party Releases That Are Not Authorized Under the Bankruptcy Code.

17.    The Court should deny confirmation because the Plan contains nonconsensual

third-party releases.

18.    Plan § I.A.178 defines "Releasing Parties" to include: "(k) all Holders of Claims or

Interests that are deemed to accept this Plan and who do not affirmatively opt out of the releases

provided by this Plan; (*l*) all Holders of Claims or Interests that are deemed to reject this Plan and

who do not affirmatively opt out of the releases provided by this Plan; . . . (n) all Holders of Claims

who vote to reject this Plan and who do not affirmatively opt out of the releases provided by this

Plan; and (o) each Related Party of each Entity in clause (a) through (n)[.]"[4]

19.    Generally, Plan § VIII.D would cause Releasing Parties to release claims and

causes of action they have against the Released Parties. Plan § VIII.D states: "Entry of the

Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule

---

[4] The definition of "Releasing Parties" also includes "(j) all Holders of Claims that vote to accept this Plan;" and "(m) all Holders of Claims who abstain from voting on this Plan and who do not affirmatively opt out of the releases provided by this Plan[.]"  Undersigned counsel understands that substantially all debtholders in the voting classes have signed the Restructuring Support Agreement, pursuant to which they agreed to the Plan's third-party releases. *See* Dkt. 5 Ex. B § 4.02(a)(ii).  The U.S. Trustee does not take a position regarding parts (j) and (m) of the definition of "Releasing Parties" given the facts and circumstances of this case.

5

9019, of the Third-Party Release, which . . . shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (i) consensual . . . [and] (iv) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release[.]"

20.    The Court should decline to approve the above third-party releases because they are nonconsensual.

21.    The United States Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them.  603 U.S. 204, 209, 227 (2024).  The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release."  *Id*. at 226.

22.    A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law.  As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement.  *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up).  A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

23.    Here, the only existing release agreement is the Restructuring Support Agreement.  *See* Dkt. 5 Ex. B § 4.02(a)(ii).  Beyond the parties to the Restructuring Support Agreement, the Debtors seek to impose third-party releases on creditors in unimpaired classes (including general unsecured creditors), creditors who vote to reject, and minority shareholders, in each case who do

not opt out.  A confirmation order effectuating such releases would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

24.     State law governs whether non-debtors have agreed to release each other.  *See infra* Part A.  Nothing in the Bankruptcy Code allows parties to disregard state law when debtors seek to impose third-party releases in their plans.  Under New York law (*see* Plan § I.D), as in other states, silence is not acceptance of an offer other than in limited circumstances inapplicable here. The Debtors thus cannot deem people who are unimpaired, or who are deemed to reject the Plan, to have released their claims based on their failure to opt out.  Those claimants have not agreed to the third-party release under state law.

**A.  State Contract Law Applies.**

25.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims."  *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979).  Thus, courts apply state law when the question is whether a debtor has entered into a valid settlement agreement.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

26.     The rule is no different for third-party releases.  They are separate agreements between non-debtors governed by state law.  Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do*

7

*so.*"  *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in

original).  *See also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental*

*Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions

"unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source

of the bankruptcy court's authority").  Thus, "the Bankruptcy Code has not altered the contractual

obligations of third parties, the parties themselves have so agreed."  *Arrowmill*, 211 B.R. at 507.

        27.    Because the Bankruptcy Code does not authorize the imposition of an involuntary

release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law.

There is no Bankruptcy Code provision that preempts otherwise applicable state contract law

governing releases between non-debtors.  *See, e.g.*, *Shady Grove Orthopedic Assocs. v. Allstate*

*Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a

statute provides the rule of decision or authorizes a federal court to supply one, 'state law must

govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72

(1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the

Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the

state.").  Section 105(a), for example, "serves only to carry out authorities expressly conferred

elsewhere in the code."  *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted).  But the

Bankruptcy Code does not confer any authority to impose a release of claims between non-debtors

that would not be valid under state law.  The Bankruptcy Code does not define a "consensual

release."  *See* 11 U.S.C. § 101.  "There is no rule that specifies an 'opt out' mechanism or a

'deemed consent' mechanism" for third-party releases in chapter 11 plans.  *In re Chassix Holdings,*

*Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  And no Bankruptcy Code provision authorizes

bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

28.    Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual.  But because there is no applicable Bankruptcy Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law."  *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *18, *22 (Bankr. S.D.N.Y Mar. 7, 2025); *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district rather than any provision of the Bankruptcy Code).  Absent express authority in the Bankruptcy Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims.  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."  *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct."  *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020) (holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return).  Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

29.    Accordingly, state-law contract principles govern whether a third-party release is consensual.  *See*, *e.g.*, *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the

Document      Page 10 of 30

principles of contract law rather than the bankruptcy court's confirmation authority to conclude

that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704,

720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that

would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453,

458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a

creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a

third-party release "is no different from any other settlement or contract" and thus "the validity of

the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than

upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations

in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . .

any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance

and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting

*Purdue*, 603 U.S. at 223). And "any such consensual agreement would be governed by state law."

*Id.*

30.     Even if federal law applied, however, it would not lead to a different result. That

is because "federal contract law is largely indistinguishable from general contract principles under

state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344,

354 (5th Cir 2015) (cleaned up). *See also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th

Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the

common law of contracts that are in force in most states.' . . . These core principles can be derived

from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003));

*In re Gol Linhas Aereas Inteligentes S.A.*, --- B.R. ----, 2025 WL 3456675 at *5 (S.D.N.Y. Dec. 1,

2025) ("[I]t is not necessary to decide whether federal or state law controls. . . . Here, the same

general principles of contract law apply under both federal and state law, so there is no conflict.

Those principles indicate that the third-party releases at issue here are nonconsensual and, thus,

barred by the Supreme Court in Purdue.") (appeal pending sub nom. *In re Gol Linhas Aereas*

*Inteligentes S.A.*, 26-49 (2d Cir.)).

**B. Under State Law, Silence Is Not Acceptance.**

31.    The Debtors bear the burden to prove that the Plan is confirmable.  *In re American*

*Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012).  The Debtors have not met that burden

because they have failed to establish that the third-party release is consensual under applicable

state law.

32.    Under New Jersey law, like in other states, an agreement to release claims—like

any other contract—requires a manifestation of assent to that agreement.[5]  *See, e.g.*, RESTATEMENT

(SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there

is manifestation of mutual assent to the exchange and a consideration."); *In re Hertz Corp.*, 120

F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not

make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under

Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned

up).

---

[5] Plan § I.D has a New York choice-of-law provision.  This provision does not control relations between non-debtors.
But regardless of whether New York or New Jersey law applies, the result would be the same.  *See In re GOL Linhas
Aereas Inteligentes S.A.*, --- B.R. ----, 2025 WL 3456675 at *5 (S.D.N.Y. Dec. 1, 2025) ("the New York Court of
Appeals has 'repeatedly' held that 'a binding contract requires an objective manifestation of mutual assent, through
either words or conduct, to the essential terms comprising the agreement.'")(citing *Wu v. Uber Tech.*, 260 N.E.3d
1060, 1070 (2024)); *Weichert Co. Realtors*, 608 A.2d 280, 284 (N.J. 1992) ("[i]t is requisite that there be an
unqualified acceptance to conclude the manifestation of assent."); *James v. Global Tel*Link Corp.*, 852 F.3d 262, 266
(3d. Cir. 2017) (discussing New Jersey law).

33.    Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance."[6] RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3 (E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D. Cal. Feb. 11, 2021); *In re Gol Linhas*, --- B.R. ----, 2025 WL 3456675 at *5 ("the general principles of contract law, as embodied in the Restatement of Contracts, establish that, outside of rare exceptions, consent cannot be implied from silence."); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th ed.).

34.    There are only very limited exceptions to the "general rule of contracts . . . that silence cannot manifest consent."  *Patterson*, 636 B.R. at 686; *see also*, *e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

---

[6] New Jersey, like many states, follows the Restatement (Second) of Contracts § 69.  *See*, *e.g.*, *Weichert Co. Realtors*, 608 A.2d at 284; *James v. Global Tel*Link Corp.*, 852 F.3d at 266.

35.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F. Supp. 2d at 433 n.3.

### C.  Not Voting and Not Opting Out Do Not Constitute Consent.

36.     Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold*, 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).  Here, the Plan would impose third-party releases on (i) creditors who are unimpaired under the Plan and do not opt-out; (ii) interest holders, who are deemed to reject, who do not opt out; and (iii) dozens of categories of related parties.  There is no basis to infer consent by those parties based on their inaction regarding the Plan.

37.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61.  Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation.  *See*, *e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence).  Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND)

OF CONTRACTS § 69 cmt. c (1981).  Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

38.    Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016).  Consent thus cannot be inferred here because parties whose votes are not solicited at all, but who are instead sent a notice informing them they cannot vote plus an opt-out form that they must return to avoid being bound by the third-party release.

39.    "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 81.  "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor.  But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*).  "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent.  *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original).  "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

40.    Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to

vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.  This is especially true in these cases, where, despite many of the Debtors' global customers and vendors being unfamiliar with the chapter 11 process, and the solicitation voting deadline being shortened to 14 days after the notice of commencement, general unsecured creditors in Class 6 who take no action would be deemed to release their claims against dozens of categories of third parties.

### D. Voting To Reject and Not Opting Out Does Not Manifest Consent to a Third-Party Release.

41.     People who vote to reject the Plan are not consenting to third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to the Plan, much less the third-party release, but also the creditor has expressly stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*"  533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

### E. This Case Does Not Fit the Exception to the Rule that Silence Is Not Consent Based on Taking Offered Benefits.

42.     This case does not fit within the exception to the rule that silence is not consent based on the taking of offered benefits.  Creditors or interest holders who are deemed to accept or deemed to reject the Plan are not "silently tak[ing] offered benefits" from the released non-debtors such that consent to release them may be inferred.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Interest holders and unimpaired classes of creditors are receiving nothing from the released non-debtors.  Any Plan distributions are paid from the bankruptcy estate, not by the

released non-debtors.  And "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors . . . . [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).  "Essentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.*, 662 B.R. at 222.

43.    Nor can receiving distributions under a chapter 11 plan be treated as taking offered benefits in way that manifests consent to a third-party release.[7]  Because creditors are legally entitled to receive distributions allocated to them under a chapter 11 plan, receiving those benefits while remaining silent about a third-party release is not a manifestation of consent to release non-debtors.  Critically, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. c (1981).  Rather, for the taking-benefits exception to apply, three things must be true, none of which are true here.

44.    First, consent cannot be inferred from taking benefits unless the offeree could reject the offered benefits and thereby avoid accepting the offer.  *See, e.g., id.* § 69(1)(a) (requiring a "reasonable opportunity to reject" benefit); *accord* 2 Richard A. Lord, Williston on Contracts § 6:9 (4th ed. 1991); *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230 (9th Cir. 2022); *Register.com, Inc. v. Verio, Inc.*, 365 F.3d 393, 403 (2d Cir. 2004).  But claim and interest holders do not have an opportunity to reject Plan distributions (if any) and thereby avoid being bound by the third-

---

[7] The bankruptcy court in *Spirit* reasoned that there was consent because the released third parties were providing value to the bankruptcy estate with the "understanding that the Third Party Releases are being requested in the form of an opt-out," and that value was then passed on to creditors through the chapter 11 plan.  *In re Spirit Airlines, Inc.*, No. 24-11988, 2025 WL 737068, at *19-*20 (Bankr. S.D.N.Y. Mar. 7, 2025).  But the mere receipt of this second-hand benefit via a chapter 11 plan cannot reasonably be interpreted as manifesting consent to an offer to release non-debtors for the reasons stated below.

party release.[8]  Even if a claim holder could decline their Plan distribution, that person would still be deemed bound by the third-party release despite their silence.

45.    Second, an offeree is not "retaining" benefits from the offeror when the offeree is entitled to those benefits regardless of whether the offeree rejects the offer.  *See Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017).  That is the case here, where  a given creditor's plan distributions are not contingent on how they voted on the plan.  To put it another way, accepting "benefits" to which an offeree is otherwise entitled cannot provide a basis for inferring consent because an offeree cannot be required to give up rights in order to reject the offer. *See Reichert*, 56 F.4th at 1230-31 (using card to access one's own cash did not support inference of consent).  Thus, creditors and interest holders cannot be required to give up their rights to distributions under a chapter 11 plan (to the extent they are entitled to any) in order to reject the third-party release.

46.    The *Reichert* case is illustrative.  There, the plaintiff had cash confiscated when he was jailed.  *Id*. at 1224.  Upon release, he was issued a debit card to access the confiscated cash. *Id*.  He was given no alternative way to access his money.  *Id*.  The Ninth Circuit held that use of the debit card did not constitute an agreement to the card's Account Agreement, despite a clear statement on the card that "by using this card, you agree to the Account Agreement."  *Id*.  The court explained that the plaintiff's "decision to withdraw his own money cannot reasonably be understood to manifest assent to the contract." *Id*. at 1228.

47.    Similarly, claim and interest holders are effectively accessing their own money when they accept distributions under a chapter 11 plan.  Claim and interest holders had prepetition

---

[8] Nor could the plan make distributions contingent on acceptance of a third-party release because section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).

rights against the Debtors.   The Bankruptcy Code permits debtors to impair those rights if Bankruptcy Code requirements are met, including through a confirmed chapter 11 plan.  Once a chapter 11 plan is confirmed, claim and interest holders are entitled to recover whatever distributions the plan allocates to them.  But the distributions they receive are no more than what they were entitled to prepetition, and often much less.  Merely receiving these distributions—to which claim and interest holders have a statutory right—cannot reasonably be understood as manifesting consent to release third-party non-debtors.

48.     Third, to infer consent from a receipt of benefits, the offeror must have a right to preclude the offeree from receiving the benefits.  *Reichert*, 56 F.4th at 1228 (holding accessing one's own funds does not constitute accepting benefits for purposes of this exception); *Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co*., 428 F.3d 214, 223 (5th Cir. 2005) (holding "no reasonable jury could conclude" there was consent to a contract despite the offeror's statement it would view the offeree's failure to remove a pipeline from certain land as consent when there was no evidence the offeror had "the right to exclude" the offeree from the property or that the offeree "accepted any service or thing of value from" the offeror).  But the non-debtor releasees have no right to preclude Debtors' claim and interest holders from receiving distributions under the Plan.

49.     For the above reasons, the Court should deny confirmation unless Plan § I.A.178 is revised to provide:

> "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Stakeholders; (d) the Agents; (e) the ABL Lenders and each Holder of an ABL Claim; (f) the DIP Lenders and each Holder of a DIP Claim; (g) the New Money Investor; (h) the Backstop Parties; (i) the Exit Facility Lenders; (j) all Holders of Claims that vote to accept this Plan; (k) ~~all Holders of Claims or Interests that are deemed to accept this Plan and who do not affirmatively opt out of the releases provided by this Plan; (*l*) all Holders of Claims or Interests that are deemed to reject this Plan and~~

~~who do not affirmatively opt out of the releases provided by this Plan; (m)~~ all Holders of Claims who abstain from voting on this Plan and who do not affirmatively opt out of the releases provided by this Plan; ~~(n) all Holders of Claims who vote to reject this Plan and who do not affirmatively opt out of the releases provided by this Plan;~~ and ~~(o)~~ *(l)* each Related Party of each Entity in clause (a) through ~~(n)~~ (k), but solely to the extent the Entity in clause (a) through (k) is legally entitled to bind the Related Party under applicable non-bankruptcy law; *provided* that, for the avoidance of doubt, each Holder of Claims and/or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the releases; *provided*, *further*, that notwithstanding anything contrary herein, with respect to funds and accounts managed by HPS Investment Partners, LLC or its Affiliates that are Consenting Lenders (the "HPS Consenting Creditors"), the defined terms "Releasing Parties" shall be limited to (i) the HPS Consenting Creditors, (ii) any trading desk(s), fund(s), account, branch, unit, and/or business group(s) of the HPS Consenting Creditors that have a beneficial interest in the Claims held by HPS Consenting Creditors, or are otherwise acting for the benefit of or at the direction of the HPS Consenting Creditors, against the Debtors, and (iii) any Affiliates and Related Parties of HPS Consenting Creditors for which the HPS Consenting Creditors are legally entitled to bind under applicable law.

## III.    Plan Is Not a Global Settlement.

50.    The Court should deny confirmation because Plan § IV.A improperly deems the entire Plan to be a Rule 9019 settlement:

> To the greatest extent permissible under the Bankruptcy Code, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to this Plan. To the greatest extent permissible under the Bankruptcy Code, this Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the

> best interests of the Debtors, their Estates, and Holders of Claims against and Interests in the Debtors. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

51.     Section 1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*[.]" 11 U.S.C. § 1123(b)(3)(A) (emphasis added).

52.     Section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims that creditors and interest holders may have against it, which is what Plan § IV.A seeks to do.  *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest *belonging* to the debtor or to the estate.' . . .  It is significant that there is no parallel authorization regarding claims *against* the estate.") (emphasis in original) (quoting section 1123(b)(3)(A)) (internal citation omitted).

53.     The resolution of claims against the Debtors is governed by sections 1129 and 1141 of the Bankruptcy Code.

54.     A plan may incorporate one or more negotiated settlements, but a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not equivalent to parties negotiating a settlement among themselves.  A "settlement" is "an agreement ending a dispute or lawsuit." BLACK'S LAW DICTIONARY (10th ed. 2014).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  *Id.*

55.     Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n the trustee's [or chapter 11 debtor in possession's] motion and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

56.     The decision whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"  *Washington Mut.*, 442 B.R. at 338 (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).[9]  In contrast, chapter 11 plans are subject to the requirements of Bankruptcy Code sections 1123 and 1129.  *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 511 (3d Cir. 2005) ("Confirmation of a proposed Chapter 11 reorganization plan is governed by 11 U.S.C. § 1129.").  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

57.     Here, Plan § IV.A purports to treat the Plan itself as if it were a Rule 9019 "settlement."  Further, it appears Plan § IV.A is not limited to settling claims belonging to the Debtors or the estates.  Thus, Plan § IV.A exceeds the scope of what can be settled under section 1123(b)(3)(A).

---

[9] The standard for approval of a settlement under Rule 9019 is guided by the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted).

58.     Plan § IV.A cannot be used to impose nonconsensual third-party releases.  Nothing in Bankruptcy Rule 9019 permits bankruptcy courts to force non-debtors who have not consented to release their rights to sue other non-debtors under applicable state law.  The Rule is limited to approvals of a debtor's "compromise or settlement."  Fed. R. Bankr. P. 9019(a).  But a debtor lacks standing to pursue its creditors' direct claims against third parties.  *See Caplin v. Marine Midland Grace Trust Co. of New York*, 406 U.S. 416, 426-29 (1972).   Moreover, a compromise or settlement is, by definition, consensual.  *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added) (defining a "settlement" as "an *agreement ending a dispute* or lawsuit," and defining an "agreement" as "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons") (emphasis added).  By its plain terms, Bankruptcy Rule 9019 does not authorize the imposition of non-consensual releases between non-debtors.

59.     Nor could Bankruptcy Rule 9019 authorize the imposition of nonconsensual releases, even if, counterfactually, it purported to do so.  Because 28 U.S.C. § 2075 commands that bankruptcy rules shall not abridge substantive rights, Bankruptcy Rule 9019 cannot authorize bankruptcy courts to approve something the Supreme Court held in *Purdue* no Bankruptcy Code provision permits.  *Purdue*, 603 U.S. at 227 ("[T]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

60.     Nor can such a "settlement" be included in a chapter 11 plan.  A plan and a settlement are not one and the same thing.  What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" is different than what may be permissible under a plan, which is subject to the requirements of sections 1123

and 1129 of the Bankruptcy Code. *See, e.g., In re Tribune Co.*, 464 B.R. 126, 176 (Bankr. D. Del.

2011) (concluding at confirmation stage that a negotiated settlement could be approved because it

was fair, reasonable and in the best interest of the debtors' estates and making an express finding

that the settlement was properly part of the plan pursuant to section 1123(b)(3)(A)).  Section

1123(b)(3)(A) of the Bankruptcy Code allows a plan proponent to propose "the settlement or

adjustment of any claim or interest *belonging to the debtor or to the estate*[.]" 11 U.S.C.

§ 1123(b)(3)(A) (emphasis added).  Thus, under section 1123(b)(3)(A), a chapter 11 may only

provide for the settlement of claims or interests belonging to the debtor or the estate—not the

settlement of claims held by third parties.  *Purdue*, 603 U.S. at 219-20 ("[P]recisely nothing in

§ 1123(b) suggests those claims can be bargained away without the consent of those affected, as

if the claims were somehow Purdue's own property.").

61.     For the above reasons, the Court should deny confirmation unless Plan § IV.A is

narrowed so that (i) it pertains only to claims the Debtors are settling against others and (ii) it does

not provide that the Plan itself is a settlement.  Without that change, Plan does not comply with

section 1123(b)(3)(A) and does not satisfy section 1129(a)(1).

**IV.     Parent Debtor Does Not Appear Eligible For a Discharge.**

62.     The Court should deny confirmation because the Plan would give the parent Debtor,

Poseidon Parent, L.P., a discharge in apparent violation of section 1141(d)(3) of the Bankruptcy

Code.

63.     Section 1129(a)(1) of the Bankruptcy Code provides that the Court shall confirm a

plan only if the plan "complies with the applicable provisions of this title."

64.     Section 1141(d)(3) of the Bankruptcy Code provides:

The confirmation of a plan does not discharge a debtor if—

23

> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

65. Plan § VIII.A would give Poseidon Parent, L.P. (along with the other Debtors) a discharge:

> Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, this Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date, except as otherwise specifically provided in this Plan or in any contract, instrument, or other agreement or document created or entered into pursuant to this Plan.

66.     However, Poseidon Parent, L.P. does not appear to be eligible for a discharge under Bankruptcy Code section 1141(d)(3).

67.     First, the Plan provides for the liquidation of all or substantially all of Poseidon Parent, L.P.'s property.  Specifically, Poseidon Parent, L.P.'s interests in its subsidiary, Poseidon Investment Intermediate, Inc., are being canceled.  *See* Dkt. 127 Ex. G ("Pretium Parent's existing Interests in Pretium Intermediate will be canceled pursuant to the Plan.") *and* Plan § IV.D.3.

68.     Second, it appears that Poseidon Parent, L.P. will not engage in business after the effective date.  "Business" means a "commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain."  BLACK'S LAW DICTIONARY (8th ed. 2004) at 211.  An entity does not engage in business when its assets are liquidated and the entity is dissolved.  *See Um v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018).  Here, Poseidon Parent, L.P. is being wound down and dissolved.  *See* Plan § IV.D.3 (providing for wind down of Poseidon Parent, L.P. and describing who will bear cost of that wind down) *and* Dkt. 127 Ex. G ("Pretium Parent will be dissolved.").  Its interests in its subsidiary, Poseidon Investment Intermediate, Inc., are being canceled.  Poseidon Parent, L.P. will not engage in business.

69.     Third, Poseidon Parent, L.P., as a legal entity, would not be eligible for a discharge if it were a chapter 7 debtor pursuant to section 727(a)(1) of the Bankruptcy Code, which provides that the Court shall grant a debtor a discharge unless the debtor is not an individual.  *See, e.g.*, *In re Flintkote Co.*, 486 B.R. 99, 129 n.80 (Bankr. D. Del. 2012) ("Section 1141(d)(3)(C) is always satisfied for corporate debtors, as they cannot receive discharges in chapter 7.").

70.    For the above reasons, Poseidon Parent, L.P. does not appear eligible for a discharge under Section 1141(d)(3).  The Court should deny confirmation unless the confirmation order provides that Poseidon Parent, L.P. shall not receive a discharge.

**V.    Plan Has Improper Gatekeeping Injunction.**

71.    The Court should deny confirmation because Plan § VIII.F has an improper gatekeeping injunction.

72.    Plan § VIII.F provides in relevant part:

> **No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, or Released Party and is not a Claim that the Debtors released under this Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.**

73.    Further, Plan §§ XI.11 and XI.21 would give this Court exclusive jurisdiction to resolve any cases, controversies, issues, disputes, or causes of action relating to Plan § VIII, including its injunction(s).

74.    The above provisions would force a non-debtor who wishes to pursue a claim or cause of action against another non-debtor to come to this Court—and only this Court—for a determination of whether such claim or cause of action can proceed.  By specifying that this Court shall determine whether a claimant can proceed, the Plan's gatekeeping injunction effectively grants this Court exclusive jurisdiction to adjudicate the claim or cause of action between non-debtors.  The gatekeeping injunction would apply even after the Debtors' bankruptcy cases have been closed, which would require a non-debtor seeking to pursue a claim against another non-debtor to first move to reopen the bankruptcy cases.

75.    The Plan's gatekeeping injunction is improper because the bankruptcy court lacks jurisdiction and statutory authority to enter such an injunction, and there has been no showing that injunctive relief is warranted.  *See In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353, 359-362 (5th Cir. 2025) (bankruptcy courts "do not have unrestricted power to protect non-debtors from liability via a pre-filing injunction" and holding that injunction be limited to and coextensive with definition of exculpated parties) (*cert. petition filed* Jul. 28, 2025, Case No. 25-119 (S. Ct.)); *In re AIO US, Inc.*, --- B.R. ----, 2025 WL 2426380 at *38 (Bankr. D. Del. Aug. 21, 2025) ("this Court does not believe there is a basis for imposing a 'gatekeeping' role.").

76.    In addition, because there is no "related to" jurisdiction over these non-debtor claims, not only does the bankruptcy court lack jurisdiction to enter the injunction, but it also lacks jurisdiction to perform the gatekeeping function the Plan would exclusively assign to it.

77.    Even if there were "related to" jurisdiction, reserving exclusive jurisdiction in the bankruptcy court to determine whether those non-debtor claims can proceed is contrary to Congress's grant of concurrent jurisdiction over such claims.  28 U.S.C. § 1334(b) (providing "original but not exclusive jurisdiction"); *In re Brady, Texas, Mun. Gas Corp.*, 936 F.2d 212, 218 (5th Cir. 1991).  The defense of "release" is an affirmative defense that cannot be adjudicated prior to the filing of the action to which it relates.  *See*, *e.g.*, Fed. R. Civ. P. 8(c)(1), incorporated in Fed. R. Bankr. P. 7008.  There is no reason why the court in which the relevant action has been filed cannot determine whether the non-debtor claim was released under the Plan.

78.    Further, the gatekeeping injunction contravenes the basic premise that once a company confirms a reorganization plan it "is without the protection of the bankruptcy court.  It may not come running to the bankruptcy judge every time something unpleasant happens."  *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (cleaned up).  This is even more true for the non-debtors protected by the gatekeeping injunction.  Gatekeeping would create inefficient piecemeal litigation contrary to the purpose of "related to" jurisdiction.  *See Matter of Zale Corp.*, 62 F.3d 746, 752 (5th Cir. 1995) ("[W]hen we define 'related to' jurisdiction, we should avoid the inefficiencies of piecemeal adjudication and promote judicial economy by aiding in the efficient and expeditious resolution of all matters connected to the debtor's estate.") (cleaned up).  Parties would have to go to the bankruptcy court for permission to sue, then to the court where they want to sue to file the complaint, and then back to the bankruptcy court again if they want to amend the complaint, then back to the court presiding over the suit if the bankruptcy court allows the amendment.  That makes no sense.  It increases the burden on the courts, imposes unnecessary costs and delay on the parties, and unnecessarily interferes with other courts' jurisdiction and ability to manage the cases before them.  *See Zale*, 62 F.3d at 755 ("[C]ourts must be particularly

28

careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes.") (cleaned up).  There is no reason to deviate from the ordinary course in which the court presiding over a lawsuit determines whether the claims are "colorable," adjudicates any defenses, including the defense of release, and determines whether any amendments to the complaint should be permitted.

79.     A similar provision was rejected in *In re Gulf Coast Health Care, LLC*, where the court noted "the plan says what it says, and other courts should be entitled to exercise their authority to interpret it," and "[i]mposing such a requirement could also impose an unnecessary administrative hurdle and cost the parties when these cases are closed."  *Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del.), Dkt. 1236, Transcript of May 4, 2022, Confirmation Hearing at 30:18-23.

80.     The Court should deny confirmation unless the gatekeeping injunction is removed from Plan § VIII.F, and the word "exclusive" is removed from Plan § XI.

## **CONCLUSION**

81.    WHEREFORE, the U.S. Trustee respectfully asks that this Court deny

confirmation and grant such other relief as the Court deems fair and just.


Dated: February 13, 2026                    Respectfully submitted,
        Newark, New Jersey

                                            **ANDREW R. VARA**
                                            **UNITED STATES TRUSTEE,**
                                            **REGIONS 3 & 9**

                                            By:  _/s/ Jeffrey M. Sponder_
                                            Jeffrey M. Sponder
                                            Trial Attorney
                                            One Newark Center
                                            1085 Raymond Boulevard
                                            Suite 2100
                                            Newark, NJ 07102
                                            (973) 645-3014 (Phone)
                                            jeffrey.m.sponder@usdoj.gov

                                            -and-

                                            Benjamin A. Hackman
                                            Trial Attorney
                                            Department of Justice
                                            Office of the United States Trustee
                                            J. Caleb Boggs Federal Building
                                            844 King Street, Suite 2207, Lockbox 35
                                            Wilmington, DE 19801
                                            (302) 573-6491 (Phone)
                                            benjamin.a.hackman@usdoj.gov