**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Jordan E. Elkin (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
steven.serajeddini@kirkland.com
jordan.elkin@kirkland.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C.
Yusuf Salloum (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
anup.sathy@kirkland.com
yusuf.salloum@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
msirota@coleschotz.com
wusatine@coleschotz.com
fyudkin@coleschotz.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| PRETIUM PACKAGING, L.L.C., *et al.*, | Case No. 26-10896 (CMG) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' MEMORANDUM**
**OF LAW IN SUPPORT OF AN ORDER**
**APPROVING THE DISCLOSURE STATEMENT**
**FOR, AND CONFIRMING, THE AMENDED JOINT**
**PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**OF PRETIUM PACKAGING, L.L.C. AND ITS DEBTOR AFFILIATES**

---

[1] The last four digits of Debtor Pretium Packaging, L.L.C.'s tax identification number are 7802. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Pretium. The location of the Debtors' service address in these chapter 11 cases is: 2560 White Oak Circle, Suite 120, Aurora, Illinois 60502.

**TABLE OF CONTENTS**

**Page(s)**

RELIEF REQUESTED................................................................................................1

PRELIMINARY STATEMENT ................................................................................2

BACKGROUND .......................................................................................................4

I.      Company Background and Restructuring Transactions. ...............................4

II.     The Solicitation Process and Voting Results. ...............................................5

ARGUMENT.............................................................................................................8

I.      The Disclosure Statement should be Approved.............................................9

        A.      The Disclosure Statement Satisfies the Requirements of the Bankruptcy
                Code and the Bankruptcy Rules...........................................................9

                1.      The Debtors' Prepetition Solicitation Was Exempt from
                        Registration and Disclosure Requirements Otherwise Applicable
                        under Nonbankruptcy Law. ......................................................10

                2.      The Disclosure Statement Contains Adequate Information.......11

        B.      The Debtors Complied with the Bankruptcy Code, the Bankruptcy Rules,
                and the Scheduling Order...................................................................14

                1.      The Debtors Complied with the Notice Requirements Set Forth in
                        the Scheduling Order and the Bankruptcy Rules.....................15

                2.      The Ballots Used to Solicit Holders of Claims Entitled to Vote on
                        the Plan Complied with the Scheduling Order. .......................16

                3.      The Debtors' Solicitation Period Complied with the Scheduling
                        Order and Bankruptcy Rule 3018(b).......................................17

                4.      The Debtors' Vote Tabulation Procedures Complied with the
                        Scheduling Order. ...................................................................17

                5.      Solicitation of the Plan Complied with the Bankruptcy Code and
                        Was in Good Faith. .................................................................17

II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and
        Should Be Confirmed. .......................................................................18

i

**Page(s)**

A.      The Plan Complies with the Applicable Provisions of the Bankruptcy
Code (Section 1129(a)(1)). ........................................................................18

    1.      The Plan Satisfies the Classification Requirements of Section 1122
of the Bankruptcy Code. ..........................................................................19

    2.      The Plan Satisfies the Mandatory Plan Requirements of
Section 1123(a) of the Bankruptcy Code...................................................21

        a.      Designation of Classes of Claims and Equity Interests,
Specification of Unimpaired Classes, and Treatment of
Impaired Classes (Section 1123(a)(1)–(3))...................................21

        b.      Equal Treatment Within Classes (Section 1123(a)(4)). .................22

        c.      Means for Implementation (Section 1123(a)(5)). ..........................22

        d.      Issuance of Non-Voting Securities (Section 1123(a)(6))...............23

        e.      Directors and Officers (Section 1123(a)(7)). ................................24

    3.      The Plan Complies with the Discretionary Provisions of
Section 1123(b) of the Bankruptcy Code...................................................25

    4.      The Plan Complies with Section 1123(d) of the Bankruptcy Code...........27

B.      The Debtors Complied with the Applicable Provisions of the
Bankruptcy Code (Section 1129(a)(2))...................................................................27

    1.      The Debtors Complied with Section 1125 of the Bankruptcy Code. ........28

    2.      The Debtors Complied with Section 1126 of the Bankruptcy Code. ........28

C.      The Plan Is Proposed in Good Faith (Section 1129(a)(3)). ...................................30

D.      The Plan Provides that the Debtors' Payment of Professional Fees and
Expenses Are Subject to Court Approval (Section 1129(a)(4)). ...........................31

E.      The Debtors Disclosed All Necessary Information Regarding Directors,
Officers, and Insiders (Section 1129(a)(5)). .........................................................32

F.      The Plan Does Not Require Governmental Regulatory Approval
(Section 1129(a)(6))..............................................................................................34

G.      The Plan Is in the Best Interests of All the Debtors' Creditors
(Section 1129(a)(7))..............................................................................................34

H.      The Plan Is Confirmable Notwithstanding the Requirements of
Section 1129(a)(8) of the Bankruptcy Code. ........................................................36

**Page(s)**

I.    The Plan Provides for Payment in Full of All Allowed Priority Claims
(Section 1129(a)(9))..................................................................................36

J.    At Least One Impaired Class of Non-Insider Claims Accepted the Plan
(Section 1129(a)(10))...............................................................................38

K.    The Plan Is Feasible (Section 1129(a)(11)). ..........................................38

L.    All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)). .................41

M.    All Retiree Benefits Will Continue Post-Confirmation
(Section 1129(a)(13)).....................................................................................42

N.    Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan. ................42

O.    The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of
the Bankruptcy Code......................................................................................43

    1.    The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)).......................43

    2.    The Plan Does Not Unfairly Discriminate with Respect to the
    Impaired Classes that Have Not Voted to Accept the Plan
    (Section 1129(b)(1)).....................................................................45

P.    The Plan Complies with the Other Provisions of Section 1129 of the
Bankruptcy Code (Section 1129(c)–(e)). ....................................................48

III.  Modifications to the Plan Do Not Require Resolicitation. ................................49

IV.   The UST Objection Should be Overruled................................................................50

A.    The Third-Party Release is Appropriate and Consensual and Should be
Approved.........................................................................................................51

    1.    A Third-Party Release with Opportunity to Opt Out is Consensual..........51

    2.    The Facts and Circumstances of these Chapter 11 Cases Support
    the Approval of the Third-Party Release. ..............................................55

        a.    Creditors Received Clear and Conspicuous Notice of the
        Third-Party Release. ...........................................................56

        b.    Creditors Had a Fair Opportunity to Opt Out of, or
        Otherwise Object to, the Third-Party Release. ............................59

        c.    Applying Third-Party Releases to the Releasing Parties Is
        Appropriate. ...........................................................................59

**Page(s)**

    B.      The Gatekeeping Provision is Appropriate and Integral to the Plan and
Should be Approved. ........................................................................................64

V.    The Stay under Bankruptcy Rule 3020(e) should be Waived............................................70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship*,
190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *203 N. LaSalle
St. P'ship*, 526 U.S. 434 .......................................................................................................44

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (3d Cir. 1986) .................................................................................................29

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ..................................................................................34

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010).......................38, 44

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988)...................................................................................48

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (Bankr. D. Del. 2006) ......................................................................................44

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (Bankr. D. Del. 2006) ......................................................................................19

*In re Arsenal Intermediate Holdings, LLC*,
No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)..........................53

*In re Avaya Inc.*,
No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) ........................................................63

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................................44

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc.
Corp.)*,
701 F.2d 1071 (2d Cir. 1983)................................................................................................30

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)...........................................................................................34, 42, 44

*Baron v. Sherman (In re Ondova Co.)*,
2017 Bankr. LEXIS 325 (Bankr. N.D. Tex. Feb. 1, 2017)....................................................64

*Barton v. Barbour*,
104 U.S. 126 (1881).............................................................................................................64

**Page(s)**

*In re Bed Bath & Beyond Inc.*,
No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) ......................................63, 67, 70

*In re Bed Bath & Beyond Inc.*,
No. 23-13359-VFP (MBK) ................................................................................. *passim*

*In re BlockFi Inc.*
No. 22-19361 (MBK) ........................................................................................ *passim*

*In re Bowflex Inc.*,
No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 18, 2024) .......................................51, 54

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
764 F.2d 406 (5th Cir. 1985) .........................................................................29

*Cadle Co. II, Inc., v. PC Liquidation Corp. (In re PC Liquidation Corp.)*,
383 B.R. 856 (E.D.N.Y. 2008) ......................................................................12

*In re Capmark Fin. Grp. Inc.*,
No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ................38

*In re Careismatic Brands, LLC*,
No. 24-10561 (VFP) (Bankr. D.N.J. May 30, 2024) ..................................................66

*Carter v. Rodgers*,
220 F.3d 1249 (11th Cir. 2000) .....................................................................64

*In re CCA Construction, Inc.*,
No. 24-22548 (CMG) (Bankr. D.N.J. Feb. 11, 2026) ................................... *passim*

*In re Century Glove, Inc.*,
Civ. A. Nos. 90-400-SLR and 90-401-SLR, 1993 WL 239489 (D. Del. Feb.
10, 1993) ........................................................................................................29

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988) ..........................................................................3, 11

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986) ...........................................................31

*In re Charter Commcn's*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..........................................................45

*In re Coram Healthcare Corp., Inc.*,
315 B.R. 321 (Bankr. D. Del. 2004) ..........................................................25, 44

*In re Cyxtera Techs., Inc.*,
No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) ..................................63, 66, 70

vi

**Page(s)**

*Doe v. Massage Envy Franchising, LLC*,
No. S20C-05-005RFS, 2020 WL 7624620 (Del. Ch. Dec. 21, 2020) ....................................62

*In re EV Energy Partners*,
No. 18-10814 (CSS)......................................................................................................53

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ...............................................................................45

*In re Extraction Oil and Gas*,
No. 20-11548 (CSS) (Bankr. D. Del. 2020) ...................................................................53

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
116 F.3d 790 (5th Cir. 1997) .......................................................................................29

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
81 B.R. 274 (D. Del. 1988)..........................................................................................11

*In re Flintkote Co.*,
486 B.R. 99 (Bankr. D. Del. 2012) ........................................................................ *passim*

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) .......................................................................44

*Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
10 F.3d 944 (2d Cir. 1993)...........................................................................................19

*In re Future Energy Corp.*,
83 B.R. 470 (Bankr. S.D. Ohio 1988).............................................................................31

*In re Gen. Wireless Operations Inc.*,
2017 WL 5461361 (Bankr. D. Del. Oct. 26, 2017) ..........................................................48

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ...............................................................................43

*Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*,
167 B.R. 389 (Bankr. D. Md. 1994) ...............................................................................64

*Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*,
590 B.R. 75 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) .......................................................................................44, 45

*Harrington v. Purdue Pharma, L.P.*,
603 U.S. 204 (2024)................................................................................................50, 52

**Page(s)**

*Helmer v. Pogue*,
    2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) ....................................................64

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007)........................................................................1, 2, 19

*In re Invitae Corp.*,
    No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024)........................................ *passim*

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)................................................................................19

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs (In re Route 37
    Bus. Park Assocs.)*,
    987 F.2d 154 (3d Cir. 1993)..............................................................................19, 42

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)........................................................................44

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)..............................................................................37, 38

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
    337 F.3d 314 (3d Cir. 2003)................................................................................11

*In re Lannett Co., Inc.*,
    No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023)......................................45, 57, 62

*In re Lapworth*,
    1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998)................................................27

*In re Lason, Inc.*,
    300 B.R. 227 (Bankr. D. Del. 2003) ......................................................................34

*In re Lernout & Hauspie Speech Prods., N.V.*,
    301 B.R. 651 (Bankr. D. Del. 2003), *aff'd sub nom.*, 308 B.R. 672 (D. Del.
    2004) ....................................................................................................44, 45

*Liberty Nat'l Enter. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.)*,
    115 F.3d 650 (9th Cir. 1997) ..............................................................................42, 44

*In re Lisanti Foods, Inc.*,
    329 B.R. 491 (D.N.J. 2005), *aff'd sub nom.*, 241 F. App'x 1 (3d Cir. 2007)...................12, 31

*Lowenbraun v. Canary* (*In re Lowenbraun*),
    453 F.3d 314 (6th Cir. 2006) ..............................................................................64

**Page(s)**

*In re Lower Buck Hosp.*,
571 Fed. Appx. 139 (3d Cir. 2014) .................................................................................12

*In re Mallinckrodt PLC*,
639 B.R. 837 (Bankr. D. Del. 2022) ................................................................................53

*In re Martin*,
91 F.3d 389 (3d Cir. 1996) ..............................................................................................25

*In re Metrocraft Publ'g. Servs., Inc.*,
39 B.R. 567 (Bankr. N.D. Ga. 1984) ...............................................................................13

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ..............................................................................................62

*In re Motors Liquidation Co.*,
541 B.R. 104 (Bankr. S.D.N.Y. 2015), *vacated and remanded on other
grounds*, 590 B.R. 39 (S.D.N.Y. 2018) ...........................................................................65

*In re Nat'l Realty Inv. Advisors, LLC*,
No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) .......................................................63

*In re Nat'l Truck Funding LLC*,
588 B.R. 175 (Bankr. S.D. Miss. 2018) ...........................................................................48

*In re Neff*,
60 B.R. 448 (Bankr. N.D. Tex. 1985), *aff'd*, 785 F.2d 1033 (5th Cir. 1986) .........................34

*In re Neshaminy Office Bldg. Assocs.*,
62 B.R. 798 (E.D. Pa. 1986) ...........................................................................................25

*In re New Rite Aid, LLC*,
No. 25-14861 (MBK) .............................................................................................. *passim*

*Newell Rubbermaid Inc. v. Storm*,
No. 9398, 2013 WL 12668327 (Del. Ch. Mar. 27, 2014) .................................................62

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ................................................................................29

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984) .........................................................................................................30

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ................................................................................18

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988) ............................................................................................11

**Page(s)**

*In re Phx. Petrol. Co.*,
  278 B.R. 385 (Bankr. E.D. Pa. 2001) ................................................................12, 13

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
  761 F.2d 1374 (9th Cir. 1985) ...............................................................................38

*In re Premier Int'l Holdings, Inc.*,
  No. 09-12019 (CSS), 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010) ...............18

*In re Princeton Alt. Income Fund, LP*,
  No. 18-14603 (MBK) (Bankr. D.N.J. Mar. 13, 2020) .............................................63

*In re Prussia Assocs.*,
  322 B.R. 572 (Bankr. E.D. Pa. 2005) .....................................................................38

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ....................................................................................29

*In re RCS Cap. Corp.*,
  No. 16-10223 (MFW) ...............................................................................................62

*In re Richard Buick, Inc.*,
  126 B.R. 830 (Bankr. E.D. Pa. 1991) .....................................................................45

*Richardson v. Monaco (In re Summit Metals, Inc.)*,
  477 B.R. 484 (Bankr. D. Del. 2012) .......................................................................64

*In re River Vill. Assocs.*,
  181 B.R. 795 (E.D. Pa. 1995) .................................................................................12

*In re Robertshaw US Holdings Corp.*,
  No. 24-90052, 2024 WL 3897812 (Bankr. S.D. Tex. Aug. 16, 2024) .....................45

*In re S&W Enter.*,
  37 B.R. 153 (Bankr. N.D. Ill. 1984) .......................................................................18

*In re Sam Ash Music Corp.*,
  No. 24-14727 (SLM) (Bankr D.N.J. Aug. 15, 2024) ...................................51, 52, 54

*In re Scioto Valley Mortg. Co.*,
  88 B.R. 168 (Bankr. S.D. Ohio 1988) .....................................................................13

*In re Sea Garden Motel & Apartments*,
  195 B.R. 294 (D. N.J. 1996) ...................................................................................38

*In re Sea Garden Motel & Apartments*,
  464 B.R. 208 (Bankr. D. Del. 2011) .......................................................................38

x

**Page(s)**

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
  546 B.R. 284 (Bankr. S.D.N.Y. 2016) ...................................................................65

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) .................................................................59, 62

*In re Specialty Equip. Cos., Inc.*,
  3 F.3d 1043 ...........................................................................................................59

*In re Swan Transp. Co.*,
  596 B.R. 127 (Bankr. D. Del. 2018) .....................................................................64

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) .......................................................................18

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
  844 F.2d 1142 (5th Cir. 1988) ...............................................................................12

*In re Thrasio Holdings, Inc.*,
  No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 18, 2024)..........................57, 61, 63, 66

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) .......................................................................38

*In re Tricida*,
  No. 23-10024 (JTD) (Bankr. D. Del. May 19, 2023) ............................................55

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)................................................................................................11

*In re U.S. Brass Corp.*,
  194 B.R. 420 (Bankr. E.D. Tex. 1996) ...................................................................13

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ....................37

*Van Tassell v. United Mktg. Grp., LLC*,
  795 F.Supp.2d 770 (N.D.Ill.2011) .........................................................................62

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012)...........................................................................29, 37, 38

*In re WeWork, Inc.*,
  No. 23-19865 (JKS) (Bankr. D.N.J. Apr. 29, 2024)............................56, 61, 63, 66

*In re Wiersma*,
  227 F. App'x 603 (9th Cir. 2007) ...........................................................................18

**Page(s)**

*In re Worldcom, Inc.*,
No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ........................27

**Statutes**

11 U.S.C. § 101(51D)(B)................................................................................................48

11 U.S.C. § 105.................................................................................................... *passim*

11 U.S.C. § 328(a) .......................................................................................................31

11 U.S.C. § 330(a)(1)(A) .............................................................................................31

11 U.S.C. § 365............................................................................................................25

11 U.S.C. § 503(b)........................................................................................................36

11 U.S.C. § 507(a)(1).....................................................................................................36

11 U.S.C. § 507(a)(2)................................................................................................36, 40

11 U.S.C. § 507(a)(8).....................................................................................................36

11 U.S.C. § 510(b) ...............................................................................................3, 46, 59

11 U.S.C. § 1114...........................................................................................................41

11 U.S.C. § 1122...................................................................................................18, 19, 48

11 U.S.C. § 1122(a) .................................................................................................18, 21

11 U.S.C. § 1123.................................................................................................. *passim*

11 U.S.C. § 1123(a) .......................................................................................................21

11 U.S.C. § 1123(a)(4)....................................................................................................21

11 U.S.C. § 1123(a)(5)....................................................................................................22

11 U.S.C. § 1123(a)(6)....................................................................................................23

11 U.S.C. § 1123(a)(7)................................................................................................23, 24

11 U.S.C. § 1123(b)...................................................................................................24, 26

11 U.S.C. § 1123(b)(1) ...................................................................................................24

11 U.S.C. § 1123(b)(2) ...................................................................................................25

11 U.S.C. § 1123(b)(6) ...................................................................................................54

**Page(s)**

11 U.S.C. § 1123(d) ................................................................................................................26

11 U.S.C. § 1125 .............................................................................................................. *passim*

11 U.S.C. § 1125(a) ...........................................................................................................9, 11

11 U.S.C. § 1125(a)(1) .......................................................................................................9, 11

11 U.S.C. § 1125(b) ...........................................................................................................9, 11

11 U.S.C. § 1125(e) ..............................................................................................................17

11 U.S.C. § 1125(g) ............................................................................................................8, 9

11 U.S.C. § 1126 .................................................................................................5, 27, 28, 29

11 U.S.C. § 1126(a) ..............................................................................................................28

11 U.S.C. § 1126(b) ...........................................................................................................8, 9

11 U.S.C. § 1126(b)(1) ........................................................................................................10

11 U.S.C. § 1126(b)(2) .....................................................................................................11, 14

11 U.S.C. § 1126(c) ..........................................................................................................17, 28

11 U.S.C. § 1126(f) ...........................................................................................................7, 28

11 U.S.C. § 1126(g) ...........................................................................................................7, 28

11 U.S.C. § 1127 ...............................................................................................................8, 49

11 U.S.C. § 1127(a) ..............................................................................................................48

11 U.S.C. § 1129 ..........................................................................................................8, 18, 47

11 U.S.C. § 1129(a) ...........................................................................................................18, 42

11 U.S.C. § 1129(a)(1) ........................................................................................................18

11 U.S.C. § 1129(a)(2) .......................................................................................................27, 29

11 U.S.C. § 1129(a)(3) .......................................................................................................29, 30

11 U.S.C. § 1129(a)(4) ........................................................................................................31

11 U.S.C. § 1129(a)(5) ...................................................................................................31, 32, 33

11 U.S.C. § 1129(a)(5)(A) ....................................................................................................32

**Page(s)**

11 U.S.C. § 1129(a)(5)(A)(i) ...................................................................................................31

11 U.S.C. § 1129(a)(5)(A)(ii) ..................................................................................................32

11 U.S.C. § 1129(a)(5)(B) .......................................................................................................32

11 U.S.C. § 1129(a)(6)..............................................................................................................33

11 U.S.C. § 1129(a)(7)..................................................................................................33, 34, 35

11 U.S.C. § 1129(a)(7)(A)(ii) ..................................................................................................34

11 U.S.C. § 1129(a)(8).........................................................................................................35, 42

11 U.S.C. § 1129(a)(9).................................................................................................35, 36, 37

11 U.S.C. § 1129(a)(9)(A) ......................................................................................................36

11 U.S.C. § 1129(a)(9)(B) .......................................................................................................36

11 U.S.C. § 1129(a)(9)(C) ..................................................................................................36, 37

11 U.S.C. § 1129(a)(10).......................................................................................................35, 37

11 U.S.C. § 1129(a)(11).................................................................................................37, 38, 40

11 U.S.C. § 1129(a)(12).......................................................................................................40, 41

11 U.S.C. § 1129(a)(13)............................................................................................................41

11 U.S.C. § 1129(a)(14)............................................................................................................41

11 U.S.C. § 1129(a)(14) - 1129(a)(16) ...................................................................................41

11 U.S.C. § 1129(a)(15)............................................................................................................41

11 U.S.C. § 1129(a)(16)............................................................................................................42

11 U.S.C. § 1129(b) .......................................................................................................... *passim*

11 U.S.C. § 1129(b)(1) ................................................................................................42, 44, 45, 47

11 U.S.C. § 1129(b)(2)(B)(i) ...................................................................................................42

11 U.S.C. § 1129(b)(2)(B)(ii) .............................................................................................42, 43

11 U.S.C. § 1129(b)(2)(C)(ii) ..................................................................................................43

11 U.S.C. § 1129(c) ..................................................................................................................47

**Page(s)**

11 U.S.C. § 1129(d) ...................................................................................................47

11 U.S.C. § 1129(e) ...................................................................................................48

15 U.S.C. § 77q(a)(2)................................................................................................10

15 U.S.C. § 77r(b)(4)(E) ...........................................................................................10

**Rules**

Fed. R. Bankr. P. 2002 ...........................................................................................8, 14

Fed. R. Bankr. P. 3017(d) ...........................................................................8, 14, 16, 52

Fed. R. Bankr. P. 3018(b) .......................................................................................8, 14

Fed. R. Bankr. P. 3018(c) ...................................................................................8, 14, 16

Fed. R. Bankr. P. 3019 ........................................................................................8, 48, 49

Fed. R. Bankr. P. 3019(a) ...........................................................................................48

Fed. R. Bankr. P. 3020(e) ...........................................................................................69

Fed. R. Bankr. P. 9019 ...............................................................................................25

**Other Authorities**

17 C.F.R. § 240.10b-5(b) ...........................................................................................10

5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed. 1984)...............................................38

7 Collier on Bankruptcy ¶ 1123.01[6] (16th ed. 2021) ...............................................24

7 Collier on Bankruptcy ¶ 1126.03[d] (16th ed. 2021)...............................................10

7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2021) ..........................................32

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C.C.A.N. 5963 ......................................18

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C.C.A.N. 5787 ...........................................18

**RELIEF REQUESTED**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum") in support of approval of their *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* [Docket No. 5] (as may be modified, amended, or supplemented from time to time, the "Disclosure Statement") and Confirmation of their *Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* [Docket No. 156] (as may be modified, amended, or supplemented from time to time, the "Plan") pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").  In further support of Confirmation of the Plan, contemporaneously herewith, the Debtors have filed:  (a) the *Declaration of J. Federico Barreto, Chief Financial Officer of Pretium Packaging, L.L.C., in Support of the Debtors' Disclosure Statement for, and Confirmation of, the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "Barreto Declaration"); (b) the *Declaration of Matthew Basch, Managing Director of Evercore Group L.L.C., in Support the Debtors' Disclosure Statement for, and Confirmation of, the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "Basch Declaration"); and (c) the *Declaration of Lee Sweigart, Managing Director of FTI Consulting, Inc., in Support of the Debtors' Disclosure Statement for, and Confirmation of, the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "Sweigart Declaration").  The Debtors also rely on the *Declaration of Angela Tsai Regarding the Solicitation and Tabulation of Votes on the Joint Prepackaged Chapter 11 Plan of Reorganization of Pretium Packaging, L.L.C. and Its Debtor Affiliates* (the "Voting Report") in further support of Confirmation of the Plan.  In support of

Confirmation of the Plan and approval of the Disclosure Statement, the Debtors respectfully state as follows.

## PRELIMINARY STATEMENT[2]

1.      The Debtors commenced these Chapter 11 Cases on January 28, 2026, with the overwhelming support of their secured creditors and their primary equity sponsor. Just under four weeks later, the Debtors stand ready to confirm a Plan that will deleverage their balance sheet by approximately $900 million, raise new debt and equity financing, and ensure the Reorganized Debtors are well capitalized at emergence, all while leaving general unsecured claims unimpaired and preserving thousands of jobs. The expeditious case timeline was an essential part of the Plan to ensure minimal disruption to the business, send a positive signal to the Debtors' employees, vendors, and customers, and reduce administrative expenses. The Plan represents the best and only alternative for the Debtors to emerge from chapter 11 with a strong foundation for long-term success and growth.

2.      The Plan is the culmination of several months of intense, good faith, arm's-length negotiations by and among the Debtors, the ABL Lenders, the Ad Hoc Group, and the New Money Investor, among other parties. The restructuring support agreement, attached to the Disclosure Statement as Exhibit B (the "RSA," and the transactions contemplated thereby, the "Restructuring Transactions"), which served as the basis for the Plan, was ultimately supported by holders of approximately 99.6 percent of the First Lien Tranche A-1 Term Loans and approximately

---

[2]   A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of J. Federico Barreto, Chief Financial Officer of Pretium Packaging, L.L.C., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 18] (the "First Day Declaration"). Capitalized terms used but not defined in this Memorandum have the meaning ascribed to them in the First Day Declaration, the Plan, or the Scheduling Motion, as applicable.

2

96.4 percent of the Second Lien Term Loans.[3]  After executing the RSA and prior to commencing these Chapter 11 Cases, on January 25, 2026, the Debtors launched solicitation of votes to accept or reject the Plan.  Creditors in the Voting Classes (as defined herein) ***unanimously*** voted to accept the Plan.  Moreover, no economic stakeholder is objecting to Confirmation.  This level of support leaves no question that the Plan represents the value-maximizing path forward and should be confirmed.

3.        In the lead up to Confirmation, the Debtors have addressed comments to the Plan from a variety of stakeholders.  The Debtors have reached resolution on substantially all of these matters, as reflected in the amended Plan and proposed Confirmation Order, filed substantially concurrently herewith.  The only outstanding objection to Confirmation was filed by the U.S. Trustee at Docket No. 136 (the "UST Objection").  Of the matters addressed in the UST Objection, only two items remain unresolved.  *First*, the U.S. Trustee argues that the third-party release in the Plan (the "Third-Party Release") is not consensual because it requires parties to opt out of, or otherwise object to, the Third-Party Release, rather than opt in.  *Second*, the U.S. Trustee argues that the inclusion of a "gatekeeper" provision is improper.  As detailed in Part V below, the U.S. Trustee has raised substantially similar objections in numerous cases in this district and has been consistently overruled on the merits.  The same logic applies here, especially in the context of this highly consensual case that enjoys the support of *all* economic stakeholders.  Accordingly, the Bankruptcy Court should overrule the UST Objection and confirm the Plan.

4.        The Disclosure Statement and the Plan satisfy the applicable requirements of the Bankruptcy Code.  In particular, the Plan meets the "best interests" test because each individual Holder of an Impaired Claim has either accepted the Plan or will receive or retain property of

---

[3]    Support for the RSA is calculated as of the date of this Memorandum *pro forma* for unsettled trades.

greater value than such creditor would receive or retain in a case under chapter 7. Further, with respect to the requirements of section 1129(b) of the Bankruptcy Code for deemed rejecting classes, the Plan is "fair and equitable" and complies with the "absolute priority rule" because no class junior to Existing Interests (Class 9) or Section 510(b) Claims (Class 10) is receiving a recovery, and the Plan also does not "unfairly discriminate" because the separate classification and treatment of such Classes of Claims and Interests appropriately reflects the distinctions between the Claims and Interests included in such Classes. Finally, the Plan was proposed in "good faith." As set forth in the Barreto Declaration, the Plan is the result of good-faith negotiations between the Debtors, the Consenting Stakeholders, and other parties-in-interest to reach a fair and equitable resolution of various complex business and legal issues. The Plan is also feasible, as Confirmation is not likely to be followed by a liquidation based on the financial projections prepared by the Debtors, attached to the Disclosure Statement as Exhibit D. Such projections demonstrate the Reorganized Debtors' ability to generate sufficient cash to meet ongoing financial obligations of the business and otherwise satisfy their obligations under the Plan.

5. For these and other reasons set forth more fully in this Memorandum, the Debtors respectfully request that the Bankruptcy Court overrule all objections, approve the Disclosure Statement, and confirm the Plan.

**BACKGROUND**

**I. Company Background and Restructuring Transactions.**

6. The Debtors, together with their non-debtor affiliates (collectively, "Pretium" or the "Company"), are an industry-leading designer and producer of innovative and sustainable rigid packaging solutions for specialized applications across a diverse set of markets, including food and beverage, healthcare, and personal care. Founded in 1992 and headquartered in St. Louis, Missouri, Pretium operates twenty-four automated plants across five countries, using the latest

4

software and quality assurance protocols to deliver creative, cost-effective, and reliable products to Pretium's customers.  The Company is among the largest independent rigid packaging manufacturers in North America and maintains a significant international presence, employing approximately 3,100 workers globally.  The Debtors commenced these prepackaged chapter 11 cases to recapitalize their balance sheet and position Pretium for sustainable, long-term growth.

7.    On January 28, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On January 30, 2026, the Court entered an order [Docket No. 55] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

## II.    The Solicitation Process and Voting Results.

8.    On January 25, 2026, prior to commencing these Chapter 11 Cases and as more fully described in the Scheduling Motion,[4] the Debtors caused their notice, claims, and solicitation agent, Stretto, Inc. (the "Solicitation Agent"), to distribute solicitation packages (the "Solicitation Packages") containing the Solicitation Cover Letter, the Disclosure Statement, the Plan, and the

---

[4]    The "Scheduling Motion" means the *Debtors' Motion for an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Conditionally Waiving the Requirement that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (V) Shortening the Notice Requirements Related Thereto, and (VI) Granting Related Relief* [Docket No. 19], filed on January 29, 2026.

applicable Ballot(s)[5] for voting on the Plan to the Holders of First Lien Trance A-1 Claims (Class 4) and Second Lien Claims (Class 5) (each, a "Voting Class," and collectively, the "Voting Classes") holding such Claims as of January 16, 2026 (the "Voting Record Date") in accordance with sections 1125 and 1126 of the Bankruptcy Code. The Solicitation Agent transmitted the Solicitation Packages to the Voting Classes via email.[6] Shortly after filing these Chapter 11 Cases, the Debtors filed, among other things, the Plan, the Disclosure Statement, and the Scheduling Motion seeking a combined hearing to consider approval of the Disclosure Statement and Confirmation of the Plan (the "Confirmation Hearing").

9.        On January 30, 2026, the Bankruptcy Court entered the Scheduling Order that, in relevant part, (a) established February 16, 2026, at 5:00 p.m., prevailing Eastern Time, as the deadline to object to the Disclosure Statement and Confirmation of the Plan (the "Objection Deadline") and approved related procedures, (b) approved the solicitation procedures set forth in the Scheduling Motion (the "Solicitation Procedures"), (c) approved the form and manner of the Confirmation Hearing Notice, the Publication Notice, the Solicitation Cover Letter, the Ballots, the Notice of Non-Voting Status and Opt-Out Form, and the Cash Out Election Form, (d) waived the requirement to (i) convene a meeting pursuant to section 341(a) of the Bankruptcy Code and (ii) file Schedules and SOFAs if the Plan is confirmed and the Effective Date occurs within 75 days following the Petition Date, (e) allowed the notice period for the Disclosure Statement and

---

[5]   The approved form of Ballots used in solicitation are attached as Exhibit 4 and Exhibit 5 to the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Approving Related Dates, Deadlines, Notices, and Procedures, (III) Approving the Solicitation Procedures and Related Dates, Deadlines, and Notices, (IV) Conditionally Waiving the Requirement that (A) the U.S. Trustee Convene a Meeting of Creditors and (B) the Debtors File Schedules of Assets and Liabilities, Statements of Financial Affairs, and Rule 2015.3 Financial Reports, (V) Shortening the Notice Requirements Related Thereto, and (VI) Granting Related Relief* [Docket No. 57] (the "Scheduling Order").

[6]   *See Affidavit of Service* [Docket No. 94].

Confirmation Hearing to run simultaneously, and (f) shortened the notice period for the Confirmation Hearing and the Objection Deadline, all as more fully set forth in the Scheduling Order.

10.     The Voting Classes were directed in the Disclosure Statement and Ballots to follow the instructions contained in the Ballots (and described in the Disclosure Statement) to complete and submit their respective Ballots to cast a vote to accept or reject the Plan.  Each member of a Voting Class was informed in the Disclosure Statement and Ballot that such Holder needed to submit its Ballot such that it was actually received by the Solicitation Agent by February 16, 2026, at 5:00 p.m., prevailing Eastern Time (the "Voting Deadline") to be counted.  Every party that submitted a Ballot voted to accept the Plan.

11.     Holders of Claims and Interests that are either (a) Unimpaired under and conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code or (b) Impaired and entitled to receive no distribution on account of such Claims or Interests under the Plan, and therefore deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code (collectively, (a) and (b), the "Non-Voting Classes"), in each case, received the Confirmation Hearing Notice and the Notice of Non-Voting Status and Opt-Out Form.[7]

12.     The Debtors completed their final tabulation of Ballots after the Voting Deadline, following a complete review and audit of all Ballots received.[8]  As set forth below and in the Voting Report, every Holder of a Claim in the Voting Classes that submitted a Ballot accepted the Plan, which resulted in unanimous acceptance of the Plan.

---

[7]     *See Affidavit of Service* [Docket No. 95].  The Debtors were not required to mail Solicitation Packages, a Notice of Non-Voting Status and Opt-Out Form, or any other Plan-related materials to Holders of Intercompany Claims (Class 7) or Intercompany Interests (Class 8).  *See* Scheduling Order ¶ 17.

[8]     For additional discussion regarding the solicitation and vote tabulation processes, see the Voting Report.

| VOTING CLASS | ACCEPT | | REJECT | |
|---|---|---|---|---|
| | NUMBER (% of Number Voting) | AMOUNT (% of Amount Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount Voting) |
| **Class 4 First Lien Tranche A-1 Claims** | 261 (100%) | $1,222,262,061.76 (100%) | 0 (0%) | $0.00 (0%) |
| **Class 5 Second Lien Claims** | 78 (100%) | $200,204,401.13 (100%) | 0 (0%) | $0.00 (0%) |

13. On February 9, 2026, the Debtors filed the Plan Supplement [Docket No. 127] (as amended, supplemented, and modified from time to time, the "Plan Supplement") and, on the same day, served the Plan Supplement on the parties on the master service list.[9]

## ARGUMENT

14. This Memorandum is organized into five sections. The first section of this Memorandum requests approval of the Disclosure Statement and a finding that the Debtors complied with the Scheduling Order. The second section contains the Debtors' case in chief that the Plan satisfies section 1129 of the Bankruptcy Code. The third section demonstrates that the Plan satisfies section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and therefore the Debtors do not need to resolicit the Plan. The fourth section addresses the U.S. Trustee's outstanding objections to Confirmation of the Plan. Finally, the Debtors request a waiver of the 14-day stay under Bankruptcy Rule 3020(e).

15. For the reasons stated herein, and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors request that the Bankruptcy Court approve the Disclosure Statement and confirm the Plan.

---

[9]   *See Affidavits of Service* [Docket No. 129].

**I.     The Disclosure Statement should be Approved.**

**A.     The Disclosure Statement Satisfies the Requirements of the Bankruptcy Code and the Bankruptcy Rules.**

16.     To determine whether a prepetition solicitation of votes to accept or reject a plan should be approved, the Bankruptcy Court must determine whether the solicitation complied with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 3017(d), 3018(b), and 3018(c).

17.     Section 1125(g) of the Bankruptcy Code provides that:

> Notwithstanding subsection (b), an acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.[10]

18.     Section 1126(b) of the Bankruptcy Code provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if— (1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.[11]

19.     Prepetition solicitations must therefore either comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate

---

[10]   11 U.S.C. § 1125(g).  Section 1125(b) of the Bankruptcy Code prohibits solicitation of a plan on a postpetition basis unless and until a disclosure statement is approved.  *See* 11 U.S.C. § 1125(b).

[11]   11 U.S.C. § 1126(b).

information," as such term is defined in section 1125(a)(1) of the Bankruptcy Code.  As discussed below, the Debtors satisfied sections 1125(g) and 1126(b), as applicable, of the Bankruptcy Code.

1.  **The Debtors' Prepetition Solicitation Was Exempt from Registration and Disclosure Requirements Otherwise Applicable under Nonbankruptcy Law.**

20.   The Debtors' prepetition solicitation of the Plan is exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") under one or more of the exceptions from registration provided thereunder, including section 4(a)(2) thereof, state "Blue Sky" laws, or any similar rules, regulations, or statutes.  In particular, shares of the New Equity will be issued in reliance upon either (a) section 1145 of the Bankruptcy Code, which creates an exemption from, among other things, the registration requirements under the Securities Act and any other applicable U.S. state or local law for securities issued under a plan of reorganization, or (b) section 4(a)(2) of the Securities Act and/or Regulation D (a safe harbor regulation promulgated under that section), which create an exemption from the Securities Act's registration requirements and otherwise applicable state laws for transactions not involving a "public offering."[12]  Holders of Claims in the Voting Classes—First Lien Tranche A-1 Claims (Class 4) and Second Lien Claims (Class 5)— were not offered and will not receive securities pursuant to a "public offering."  Moreover, the Debtors believe that all Holders of Class 4 and Class 5 Claims—the only Holders eligible to receive New Equity under the Plan on account of their Claims—are "accredited investors."  Therefore, the requirements of section 1126(b)(1) of the Bankruptcy Code are inapplicable to the Debtors' prepetition solicitation.

---

[12]   15 U.S.C. § 77r(b)(4)(E) (preempting state law in offerings conducted pursuant to regulations under section 4(a)(2) of the Securities Act)

21.     Additionally, whether or not a registration statement is required, the Securities Act and regulations promulgated thereunder contain additional disclosure requirements.[13]  Under those generally applicable requirements, a party offering or selling securities may not make "any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[14] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[15]  No stakeholder has objected alleging the Debtors made any untrue statement, or omission, of material fact.

22.     Accordingly, the Disclosure Statement satisfies the disclosure requirements of section 1126(b)(2) of the Bankruptcy Code by providing adequate information, as defined in section 1125(a) of the Bankruptcy Code, as further described below.

**2.      The Disclosure Statement Contains Adequate Information.**

23.     The primary purpose of a disclosure statement is to provide material information, or "adequate information," that allows parties entitled to vote on a proposed plan to make an informed decision about whether to vote to accept or reject the plan.[16]  "Adequate information" is

---

[13]    *See, e.g.*, 15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b); *see also* 7 Collier on Bankruptcy ¶ 1126.03[d] (16th ed. 2021) (recognizing that the securities laws contain provisions regarding the accuracy of disclosure).

[14]    15 U.S.C. § 77q(a)(2); *see also* 17 C.F.R. § 240.10b-5(b) (same).

[15]    *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (internal quotations omitted).

[16]    *See, e.g.*, *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) ("Under 11 U.S.C. § 1125(b), a party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan.") (internal quotations omitted); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.") (internal citations omitted).

11

a flexible standard, based on the facts and circumstances of each case.[17]  Courts within the Third Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code resides within the broad discretion of the court.[18]  Courts have interpreted "adequate information" to mean information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders, if applicable, to vote on a plan of reorganization.[19]

24.     Courts look for certain information when evaluating the adequacy of the disclosures in a proposed disclosure statement, including:

a.      the events which led to the filing of the bankruptcy petition;

b.      the anticipated future of the company;

c.      the claims asserted against a debtor;

d.      the source of information stated in the disclosure statement;

e.      the estimated return to creditors under a chapter 7 liquidation;

f.      the chapter 11 plan or a summary thereof;

---

[17]   11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records."); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.") (internal citations omitted); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources) (internal citations omitted).

[18]   *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.") (internal citations omitted); *In re River Vill. Assocs.*, 181 B.R. 795, 804 (E.D. Pa. 1995) (same); *In re Phx. Petrol. Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (same); *see also Cadle Co. II, Inc., v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes adequate information in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court.") (internal citations omitted); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement."), *aff'd sub nom.*, 241 F. App'x 1 (3d Cir. 2007).

[19]   *See In re Lower Buck Hosp.*, 571 Fed. Appx. 139, 142 (3d Cir. 2014).

g.  the financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 plan;

h.  the information relevant to the risks posed to claimants under the plan;

i.  the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; and

j.  the tax attributes of a debtor.[20]

25.  The Disclosure Statement contains, among other things, descriptions and summaries of: (a) the Debtors' corporate history, business operations, and prepetition organizational and capital structure;[21] (b) the events leading to these Chapter 11 Cases, including the Debtors' prepetition restructuring efforts and entry into the RSA;[22] (c) the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan;[23] (d) a summary of certain provisions of the Plan;[24] (e) certain important effects of Confirmation of the Plan;[25] (f) the discharge, releases, exculpations, and injunctions contemplated by the Plan;[26] (g) certain financial information about the Debtors, including financial projections,

---

[20]  *See In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (listing the factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Metrocraft Publ'g. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same). Disclosure regarding all topics is not necessary in every case. *See In re Phx. Petrol.*, 278 B.R. at 393; *In re U.S. Brass*, 194 B.R. at 425.

[21]  *See* Disclosure Statement, Art V.

[22]  *See id*. Art. VI.

[23]  *See id*. Art. III.D, Art. III.E, and Art. III.S.

[24]  *See id*. Art. III and Art. IV.B.

[25]  *See id*. Art. III.N, Art. XI and Art. XII.

[26]  *See id*. Art. IV.B.2.

a liquidation analysis, and a valuation analysis of the Reorganized Debtors;[27] (h) the statutory requirements for confirming the Plan;[28] (i) certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan;[29] (j) certain important disclosures regarding securities laws;[30] and (k) certain U.S. federal income tax consequences of the Plan.[31]  In addition, prior to solicitation, the Disclosure Statement and the Plan were subject to review and comment by certain Consenting Stakeholders and their respective advisors.[32]

26.    No stakeholder—and in particular, no Impaired Holders of Claims in the Voting Classes—has disputed that the Disclosure Statement contained information sufficient for creditors in the Voting Classes to make an informed judgment about voting on the Plan.  For the reasons set forth above, the Disclosure Statement contains adequate information in satisfaction of section 1126(b) and should be approved.

**B.    The Debtors Complied with the Bankruptcy Code, the Bankruptcy Rules, and the Scheduling Order.**

27.    As set forth in the Scheduling Motion, the Debtors complied with the requirements of Bankruptcy Rules 2002, 3017(d), 3018(b), and 3018(c) with respect to the prepetition solicitation of the Plan, the form of Ballots used to solicit acceptances of the Plan, and notice of

---

[27]    *See id*. Art. X.F, Exhibit C, Exhibit D, and Exhibit E.

[28]    *See id*. Art. X.

[29]    *See id*. Art. VIII.

[30]    *See id*. Art. XI.

[31]    *See id*. Art. XII.

[32]    *See* Barreto Decl. ¶ 12.

the deadline to object to the Plan and/or the Disclosure Statement.  Accordingly, the Solicitation

Procedures complied with the Bankruptcy Code and the Bankruptcy Rules.

28.     On January 30, 2026, the Bankruptcy Court entered the Scheduling Order [33]

establishing the Voting Record Date, the Voting Deadline, the Objection Deadline, and the Opt-

Out Deadline and approving the form and manner of the Confirmation Hearing Notice, the

Publication Notice, the Solicitation Cover Letter, the Ballots, the Notice of Non-Voting Status and

Opt-Out Form, and the Solicitation Packages.  In the Scheduling Order, the Bankruptcy Court

found that the notice provided by the Confirmation Hearing Notice and the Publication Notice of

the matters set forth therein constituted good and sufficient notice of such matters for all purposes

and no other or further notice shall be necessary. [34]

> **1.     The Debtors Complied with the Notice Requirements Set Forth in the
> Scheduling Order and the Bankruptcy Rules.**

29.     The Debtors satisfied the notice requirements set forth in the Scheduling Order and

Bankruptcy Rules 2002(b) and 3017.  *First*, on January 25, 2026, the Debtors caused the

Solicitation Agent to distribute the Solicitation Packages to Holders of Claims in the Voting

Classes as of the Voting Record Date.  Specifically, the Solicitation Package contained:  (a) the

applicable Ballot; (b) the Solicitation Cover Letter; and (c) the Disclosure Statement (to which the

Plan is attached as Exhibit A). [35]  *Second*, on February 2, 2026, in accordance with the Scheduling

Order, the Debtors caused the Solicitation Agent to distribute the Confirmation Hearing Notice to

all parties-in-interest listed on the Debtors' creditor matrix (over 6,000 parties), informing the

---

[33]   For the avoidance of doubt, the factual and legal arguments set forth in the Scheduling Motion are incorporated
herein by reference in their entirety.

[34]   *See* Scheduling Order ¶ 11.

[35]   *See Certificate of Service* [Docket No. 94].

recipients of, among other things: (a) the date of commencement of these Chapter 11 Cases; (b) the date for the hearing to consider approval of the Disclosure Statement and Confirmation of the Plan; and (c) the deadline and procedures for filing objections to the Plan and the Disclosure Statement.[36] ***Third***, on February 2, 2026, in accordance with the Scheduling Order, the Debtors caused the Solicitation Agent to distribute the Notices of Non-Voting Status and Opt-Out Forms to all members of the Non-Voting Classes, as applicable.[37] ***Fourth***, the Debtors caused the Publication Notice to be published in *The New York Times* (national and international edition).[38] ***Fifth***, the Confirmation Hearing Notice included instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website or for a fee at the Bankruptcy Court's PACER website.

### 2. The Ballots Used to Solicit Holders of Claims Entitled to Vote on the Plan Complied with the Scheduling Order.

30. The form of Ballots used comply with the Bankruptcy Rules and were approved by the Bankruptcy Court in the Scheduling Order.[39] No party has objected to the sufficiency of the Ballots. Based on the foregoing, the Debtors complied with the Scheduling Order and satisfied the requirements of Bankruptcy Rules 3017(d) and 3018(c).

---

[36] *See Certificate of Service* [Docket No. 95].

[37] *See* Voting Report ¶ 8; *Certificate of Service* [Docket No. 95].

[38] *See Affidavits of Publication* [Docket Nos. 90, 128].

[39] *See* Scheduling Order ¶ 9.

> **3.** **The Debtors' Solicitation Period Complied with the Scheduling Order and Bankruptcy Rule 3018(b).**

31.     The Debtors' solicitation period complied with the Scheduling Order and Bankruptcy Rule 3018(b).  The Bankruptcy Court previously approved the Voting Record Date and the Voting Deadline in the Scheduling Order.[40]

> **4.** **The Debtors' Vote Tabulation Procedures Complied with the Scheduling Order.**

32.     As described in the Scheduling Motion, the Debtors used standard tabulation procedures in tabulating votes received by Holders of Claims in the Voting Classes. The Solicitation Agent reviewed all Ballots received in accordance with the procedures described in the Scheduling Motion and the Disclosure Statement.[41]  The Bankruptcy Court should approve the Debtors' tabulation of votes confirming that, with respect to the Voting Classes, the requisite majorities in amount and number of Claims voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.

> **5.** **Solicitation of the Plan Complied with the Bankruptcy Code and Was in Good Faith.**

33.     Section 1125(e) of the Bankruptcy Code provides that "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan."[42]

34.     As set forth in the Voting Report, the First Day Declaration, and the Barreto Declaration, and as demonstrated by the Debtors' compliance with the Scheduling Order, the

---

[40]     *See id.* ¶ 2.

[41]     *See generally* Voting Report.

[42]     11 U.S.C. § 1125(e).

Bankruptcy Code, and the Bankruptcy Rules, the Debtors at all times engaged in arm's-length, good-faith negotiations[43] and took appropriate actions in connection with the solicitation of the Plan in compliance with section 1125 of the Bankruptcy Code.  Therefore, the Debtors request that the Bankruptcy Court grant the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys, the protections provided under section 1125(e) of the Bankruptcy Code.[44]

**II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code and Should Be Confirmed.[45]**

> **A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).**

35.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[46]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the content of a plan of reorganization, respectively.[47]  As explained below, the Plan complies with

---

[43]     *See* Barreto Decl. ¶ 24.

[44]     *See* Plan, Art. XII.I.

[45]     *See In re Premier Int'l Holdings, Inc.*, No. 09-12019 (CSS), 2010 WL 2745964, at *4 (Bankr. D. Del. Apr. 29, 2010) (holding that the plan proponent must prove each element of section 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 148 (Bankr. D.N.J. 2010) ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed Chapter 11 plan has a reasonable probability of success, and is more than a visionary scheme") (citing *In re Wiersma*, 227 F. App'x 603, 606 (9th Cir. 2007)) (internal quotation marks omitted).

[46]     11 U.S.C. § 1129(a)(1).

[47]     S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

### 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

36. The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[48]  For a classification structure to satisfy section 1122 of the Bankruptcy Code, substantially similar claims or interests need not be grouped in the same class.[49]  Instead, claims or interests placed in a particular class must be substantially similar to each other.[50]  Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[51]

37. The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into separate

---

[48]  11 U.S.C. § 1122(a).

[49]  *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159 (Bankr. D. Del. 2006).

[50]  *Id.*

[51]  Courts have identified grounds justifying separate classification, including where members of a class possess different legal rights or there are good business reasons for separate classification. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.)*, 987 F.2d 154, 158–59 (3d Cir. 1993) (as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060–1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because the classification scheme had a rational basis on account of the bankruptcy court-approved settlement); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007) ("[T]he only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan.").

19

Classes based on legal or factual distinctions or otherwise based on other relevant criteria.[52] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

> a.     Class 1: Other Secured Claims;
>
> b.     Class 2: Other Priority Claims;
>
> c.     Class 3: ABL Claims;
>
> d.     Class 4: First Lien Tranche A-1 Claims;
>
> e.     Class 5: Second Lien Claims;
>
> f.     Class 6: General Unsecured Claims;
>
> g.     Class 7: Intercompany Claims;
>
> h.     Class 8: Intercompany Interests;
>
> i.     Class 9: Existing Equity Interests; and
>
> j.     Class 10: Section 510(b) Claims.

38.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[53] The Plan's classification scheme generally corresponds to the Debtors' corporate and capital structure, thereby taking into account the relative priority among Claims and Interests. In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[54] Namely, the Plan separately classifies the Claims and Interests because

---

[52]   *See* Plan, Art. III.

[53]   *See* Barreto Decl. ¶ 14.

[54]   *See id.* at ¶ 15.

each Holder of such Claims or Interests may hold (or may have held) rights in the Debtors' Estates legally dissimilar to the Claims or Interests in other Classes.

39.  For example, the classification scheme distinguishes Other Priority Claims (Class 2) due to their relative priority and required treatment under the Bankruptcy Code. In addition, the Plan classifies Existing Equity Interests (Class 9) separately from Intercompany Interests (Class 8) because the Debtors' ownership structure is dependent upon maintaining the Intercompany Interests and such Interests are preserved under the Plan for the administrative convenience of ensuring the preservation of the Debtors' corporate structure after the Effective Date.

40.  Accordingly, the Debtors submit that the Plan fully complies with and satisfies section 1122(a) of the Bankruptcy Code.  No party has asserted otherwise.

**2.  The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.**

41.  Section 1123(a) of the Bankruptcy Code sets forth seven requirements that a chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.

**a.  Designation of Classes of Claims and Equity Interests, Specification of Unimpaired Classes, and Treatment of Impaired Classes (Section 1123(a)(1)–(3)).**

42.  The first three requirements of section 1123(a) of the Bankruptcy Code are that a plan specify (a) the classification of claims and interests, (b) whether such claims and interests are impaired or unimpaired, and (c) the treatment of any impaired class under the plan.[55]  Article III

---

[55]  11 U.S.C. § 1123(a)(1)–(3).

21

of the Plan sets forth these specifications in detail, in satisfaction of these three requirements.[56]

No party has asserted otherwise.

### b.    Equal Treatment Within Classes (Section 1123(a)(4)).

43.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[57]   The Plan satisfies this requirement because Holders of Allowed Claims or Interests will receive the same treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class, unless such Holder has agreed to less favorable treatment.  No party has asserted otherwise.

### c.    Means for Implementation (Section 1123(a)(5)).

44.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[58]  The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provides the means by which the Plan will be implemented.  Among other things, Article IV of the Plan describes the means for the cancellation of documents evidencing existing Claims and Interests and implementation of the transactions provided for in the Plan, including, among other things:  (a) the Restructuring Transactions; (b) the sources of consideration for Plan Distributions; (c) the consummation of the Exit Facilities, including the execution, delivery, and implementation of all Exit Facility Documents; (d) the issuance and distribution of the New Equity; (e) the adoption of the New Organizational Documents; (f) the consummation of various corporate transaction steps necessary to implement

---

[56]   Plan, Art. III.A–B.

[57]   11 U.S.C. § 1123(a)(4).

[58]   11 U.S.C. § 1123(a)(5).

the new corporate structure upon emergence; and (g) the preservation of certain Causes of Action.

In addition to these core transactions, the Plan sets forth the other critical mechanics of the Debtors'

emergence, such as the vesting of Estate assets in the Reorganized Debtors, the assumption or

assumption and assignment of Executory Contracts and Unexpired Leases, and the settlement of

Claims and Interests.

45.     The precise terms governing the execution of these transactions are set forth in the

applicable Definitive Documents or forms of agreements included in the Plan Supplement.[59]  Thus,

the Plan sets forth adequate means for its implementation and satisfies section 1123(a)(5) of the

Bankruptcy Code.  No party has asserted otherwise.

### d.     Issuance of Non-Voting Securities (Section 1123(a)(6)).

46.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate

constituent documents prohibit the issuance of non-voting equity securities.[60]  Article IV.I of the

Plan provides that the New Organizational Documents will prohibit the issuance of non-voting

equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code, other

than incentive units that may be granted to management by the New Board of the Reorganized

Debtors in accordance with the Management Incentive Plan.[61]  New Equity distributed to Holders

of Claims or Interests on account of those Claims or Interests and pursuant to the Plan will be

---

[59]   *See* Plan Supplement, <u>Ex. A</u>, <u>Ex. B-1</u>, <u>Ex. B-2</u>.

[60]   11 U.S.C. § 1123(a)(6).

[61]   *See* Plan, Art. IV.P.

entitled to vote in accordance with section 1123(a)(6) of the Bankruptcy Code.[62]  Thus, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.  No party has asserted otherwise.

### e.        Directors and Officers (Section 1123(a)(7)).

47.        Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions be "consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan."[63]  On the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, such current directors shall be deemed to have resigned, and all of the directors for the initial term of the New Board shall be appointed in accordance with the New Organizational Documents.  As further discussed below, the Debtors will disclose the known members of the New Board in the Plan Supplement.  Certain of the Debtors' existing officers will remain in their current capacities as officers of the Reorganized Debtors and serve pursuant to the New Organizational Documents and their respective employment agreements.  From and after the Effective Date, each of the directors and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor.  The selection of the members of the New Board is consistent with the interests of all Holders of Claims and Interests and public policy.  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.  No party has asserted otherwise.

---

[62]    *See* 7 Collier on Bankruptcy ¶ 1123.01[6] (16th ed. 2021) (explaining that the purpose of section 1123(a)(6) is to ensure that "creditors who are forced to take stock in the new company, or whose rights as creditors are modified or altered so that they assume some risk of the success of the reorganized corporation, are entitled to an allocation of voting power and a voice in the selection of management that will protect their interests").

[63]    11 U.S.C. § 1123(a)(7).

**3.** **The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

48.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates; and (d) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.[64]

49.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, 3, and 6 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes. On the other hand, Classes 4, 5, 9, and 10 are Impaired since the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated in section 1123(b)(1) of the Bankruptcy Code.[65]

50.     In addition, and consistent with section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the assumption of all Executory Contracts and Unexpired Leases under section 365 of the Bankruptcy Code, except to the extent set forth in the Plan.[66]

---

[64]     *See* 11 U.S.C. § 1123(b)(1)–(3), (6).

[65]     *See* Plan, Art. III.B.  Holders of Intercompany Claims and Intercompany Interests in Class 7 and Class 8, respectively, will either be Reinstated and therefore, Unimpaired, or set off, settled, discharged, contributed, cancelled, or released without any distribution on account of such Claims or Interests, and therefore, Impaired, at the option of the Reorganized Debtors with the consent of the Required Consenting Stakeholders.  *Id.*

[66]     *See* Plan, Art. V.A.

51.     The Plan, as revised, provides for the compromise and settlement of certain Claims and Interests between and among the Debtors and each of the Released Parties, including the Consenting Stakeholders, who affirmatively entered into the RSA to settle their Claims against and Interest in the Debtors pursuant to the Restructuring Transactions, to the extent consistent with the Bankruptcy Code.  The standards for approval of a settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019.[67]  The Third Circuit has provided the following four criteria that a bankruptcy court should consider when approving a settlement pursuant to Bankruptcy Rule 9019:

a.     the probability of success in litigation;

b.     the likely difficulties in collection;

c.     the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

d.     the paramount interest of creditors.[68]

52.     The Debtors satisfy the above factors, as discussed herein.  The Debtors and their advisors have worked diligently to ensure the Debtors' creditors are receiving the greatest value on their Claims or Interests through the Plan, in the best interest of all stakeholders.  The Plan and Confirmation Order embody a settlement of Claims and Interests between the Debtors and certain other parties in interest, including the Debtors, the Debtors' directors and officers, and the Consenting Stakeholders.  If the Debtors were forced to litigate the issues necessary to resolve such Claims and Interests outside of the Plan, such litigation would be costly, protracted, inherently uncertain, and would leave the Debtors and all stakeholders in a substantially worse-off position.

---

[67]     *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004).

[68]     *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (citing *In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D. Pa. 1986)).

26

Litigation would prolong the Debtors' bankruptcy process, draining the Debtors' Estates and distracting the Debtors' key personnel and advisors, who would otherwise be focused on implementing the Restructuring Transactions and strengthening the Debtors' go-forward business.

53.     Finally, the Plan contains release, exculpation, and injunction provisions, which for the reasons set forth below, are consistent with section 1123(b) of the Bankruptcy Code.

54.     Accordingly, the Plan's discretionary general settlement provisions satisfy the requirements of section 1123 of the Bankruptcy Code.

### 4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code.

55.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[69]

56.     The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the default amount in the ordinary course of business.[70]  As noted in the Debtors' Schedule of Proposed Cure Amounts, cure amounts will be reconciled after the Effective Date pursuant to the terms of any such assumed Executory Contract or Unexpired Lease, as applicable.[71]

### B.     The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

57.     The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of

---

[69]   11 U.S.C. § 1123(d).

[70]   *See* Plan, Art. V.C.

[71]   *See* Plan Supplement, Ex. E.

the Bankruptcy Code.[72]  The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[73]  As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code.

58.    As discussed in Part I of this Memorandum, the Debtors complied with the notice and solicitation requirements of section 1125 of the Bankruptcy Code.

### 2. The Debtors Complied with Section 1126 of the Bankruptcy Code.

59.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

(f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

---

[72]    11 U.S.C. § 1129(a)(2).

[73]    *See, e.g.*, *In re Lapworth*, No. 97-34529, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2).") (internal citations omitted); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

(g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive any property under the plan on account of such claims or interests.[74]

60.     As set forth in Part I of this Memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited votes from the Holders of Allowed Claims in Classes 4 and 5—the only Classes entitled to vote on the Plan.  The Debtors did not solicit votes from Holders of Claims and Interests in Classes 1, 2, 3, 6, 7, 8, 9, or 10 because Holders of such Claims and Interests are either Unimpaired and conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code or Impaired and conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

61.     With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan if such plan has been accepted by creditors that "hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan."[75]

62.     The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[76]  Based upon the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  No party has asserted otherwise.

---

[74]    11 U.S.C. § 1126(a), (f), (g).

[75]    11 U.S.C. § 1126(c).

[76]    *See generally* Voting Report.

**C.      The Plan Is Proposed in Good Faith (Section 1129(a)(3)).**

63.      Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[77]  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[78]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[79]

64.      The Debtors negotiated, developed, and proposed the Plan in good faith, and the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The Plan was negotiated with, and is supported by, the Consenting Stakeholders and other key constituents.[80]  These parties only came to consensus after several months of intense, arm's-length negotiations.  As provided in the Barreto Declaration and the Sweigart Declaration, the Plan delivers significant value to creditors (including leaving General Unsecured Claims Unimpaired), and preserves the Reorganized Debtors as a

---

[77]   11 U.S.C. § 1129(a)(3).

[78]   *See, e.g.*, *In re PWS Holding*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400-SLR and 90-401-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[79]   *See, e.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into the totality of the circumstances surrounding the plan's proposal.") (citing *In re Sun Country Dev., Inc.*, 764 F. 2d at 408); *Century Glove*, 1993 WL 239489, at *4 ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.") (citing *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *T-H New Orleans*, 116 F.3d at 802 (same).

[80]   *See* Barreto Decl. ¶ 24.

going concern.[81]  Additionally, the Plan has been unanimously accepted by voting creditors.[82]  The Plan was proposed in good faith and not by any means forbidden by law, has a high likelihood of success, and will achieve a result consistent with the objectives of the Bankruptcy Code.

65.      The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[83]  Here, the Plan will enable the Debtors to deleverage their balance sheet, leave operational obligations unimpaired, and position the Reorganized Debtors for long-term success.[84]  The Plan's unanimous support by all voting creditors in Classes 4 and 5 is strong evidence that the Plan is likely to succeed.  Finally, throughout the negotiation of the Plan and these Chapter 11 Cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.  Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

**D.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).**

66.      Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions or property under the plan be subject to approval by the Bankruptcy Court as reasonable.[85]  Courts have construed

---

[81]    *See* Barreto Decl. ¶ 24; Sweigart Decl. ¶¶ 12-13.

[82]    *See* Voting Report ¶ 14.

[83]    *See NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.*), 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start") (internal citations omitted).

[84]    *See* Barreto Decl. ¶ 8.

[85]    *See* 11 U.S.C. § 1129(a)(4).

this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[86]

67.      The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  The Plan provides that Professional Fee Claims and corresponding payments are subject to prior Bankruptcy Court approval and the reasonableness requirements under sections 328 and 330 of the Bankruptcy Code.[87]  Moreover, the Plan provides that the Debtors' advisors shall file all final requests for payment of the Professional Fee Claims no later than sixty days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims.[88]

### E.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (Section 1129(a)(5)).

68.      Section 1129(a)(5) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.  In addition, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[89]  The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed

---

[86]    *See In re Lisanti Foods, Inc.*, 329 B.R. at 503 ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) (holding that fees and expenses related to the plan are subject to the approval by the Bankruptcy Court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[87]    11 U.S.C. §§ 328(a), 330(a)(1)(A).

[88]    Plan, Art. II.D.

[89]    11 U.S.C. § 1129(a)(5)(A)(ii).

management."[90]   Section 1129(a)(5) of the Bankruptcy Code further requires that the plan

proponent disclose the identity of insiders to be retained by the reorganized debtor and the nature

of any compensation for such insider.[91]   Courts have held that these provisions ensure that the

post-confirmation governance of a reorganized debtors is in "good hands."

69.      With respect to directors, the Plan satisfies section 1129(a)(5)(A) of the Bankruptcy

Code.  The New Board will be selected in accordance with the New Organizational Documents,

and the Debtors will disclose the known members of the New Board in the Plan Supplement.[92]

Control of the Reorganized Debtors by the proposed individuals or individuals to be appointed in

accordance with the Plan and pursuant to the New Organizational Documents is consistent with

public policy.  Therefore, the requirements under section 1129(a)(5)(A) are satisfied.

70.      The Debtors satisfy section 1129(a)(5)(B) with respect to their officers because the

Debtors propose that certain of their existing officers remain in their current capacities as officers

of the Reorganized Debtors, and serve pursuant to the New Organizational Documents and their

respective employment agreements, including the current Chief Executive Officer, Chief Financial

Officer, and Senior Vice President of Sales for North America, among others.[93]   They will be

compensated in accordance with the terms of their respective existing employment agreements.[94]

The Debtors' existing officers have at all times proceeded in good faith and with diligence and

care in connection with these Chapter 11 Cases.  Furthermore, the Reorganized Debtors' proposed

---

[90]    7 Collier on Bankruptcy ¶ 1129.02[5][b] (16th ed. 2021).

[91]    11 U.S.C. § 1129(a)(5)(B).

[92]    *See* Barreto Decl. ¶ 26.

[93]    *See* Barreto Decl. ¶ 26.

[94]    *See* Barreto Decl. ¶ 26.

officers have significant knowledge and solid business and industry experience, are competent, and will provide the Reorganized Debtors with continuity in running the business.[95] Accordingly, it is reasonable to continue such officers' employment post-emergence. Thus, the Plan complies with section 1129(a)(5). No party has asserted otherwise.

**F.      The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).**

71.      Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan. The Plan does not provide for any rate changes and the Debtors are not subject to any such regulation.[96] Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases, and no party has asserted otherwise.

**G.      The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7)).**

72.      Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a present value of not less than that which such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[97] The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes,[98] and is generally satisfied through a

---

[95]    *See* Barreto Decl. ¶ 27.

[96]    *See* Barreto Decl. ¶ 28.

[97]    *See* 11 U.S.C. § 1129(a)(7)(A)(ii).

[98]    *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

34

comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[99]

73.      The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.  As set forth in the Disclosure Statement[100] and the Sweigart Declaration, the Debtors, with the assistance of their financial advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan.[101]  As set forth in the Sweigart Declaration, projected recoveries for each Class under the Plan are not less than the recoveries estimated in a hypothetical chapter 7 liquidation.[102]

74.      Significantly, in a hypothetical chapter 7 liquidation, Holders of General Unsecured Claims—which are Unimpaired under the Plan—would receive no recovery.  Additionally, Holders of First Lien Tranche A-1 Claims and Second Lien Claims would receive no recovery, which is significantly less than the proposed Plan treatment.[103]  Lastly, all Holders of Claims entitled to vote on the Plan received the Liquidation Analysis (which was attached to the Disclosure Statement) and have been provided ample time to consider the contents thereof. Accordingly, the Plan complies with section 1129(a)(7), and no party has asserted otherwise.

---

[99]   *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan"), *aff'd*, 785 F.2d 1033 (5th Cir. 1986); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.") (internal citation and quotation marks omitted).

[100]  *See* Disclosure Statement, Ex. C.

[101]  *See* Sweigart Decl. ¶ 10.

[102]  *See id.* ¶¶ 12-13.

[103]  *Id.*

**H.**     **The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.**

75.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  If any class of claims or interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[104]  Holders of Claims and Interests in Classes 9 and 10 are deemed to have rejected the Plan and thus were not entitled to vote.   While the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Impaired Classes that were deemed to reject the Plan, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below, as at least one Impaired Class of Claims has voted to accept the Plan, and the Plan does not discriminate unfairly and is fair and equitable with respect to the Classes deemed to reject.

**I.**     **The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)).**

76.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan or receive certain other specified treatment as agreed by the claim holder in satisfaction of the claim and that the holders of certain other priority claims receive deferred cash payments. [105]   In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[106]  Section 1129(a)(9)(B)

---

[104]   11 U.S.C. § 1129(b).

[105]   *See* 11 U.S.C. § 1129(a)(9).

[106]   11 U.S.C. § 1129(a)(9)(A).

of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan) or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[107]  Finally, section 1129(a)(9)(C) provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the Petition Date, the present value of which equals the allowed amount of the claim.[108]

77.  The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim will receive Cash equal to the amount of such Allowed Claim.  ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan. ***Third***, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code.  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.  No party has asserted otherwise.

---

[107]  11 U.S.C. § 1129(a)(9)(B).

[108]  11 U.S.C. § 1129(a)(9)(C).

**J.      At Least One Impaired Class of Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).**

78.      Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."[109]  Here, Classes 4 and 5, which are Impaired, voted to accept the Plan independent of any insiders' votes.[110]  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan Is Feasible (Section 1129(a)(11)).**

79.      Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[111]  To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[112]  Rather,

---

[109]   11 U.S.C. § 1129(a)(10).

[110]   *See* Voting Report ¶ 14.

[111]   11 U.S.C. § 1129(a)(11).

[112]   *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (stating that the bankruptcy court "need not require a guarantee of success") (internal citations and quotation marks omitted); *In re W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd,* 800 F.2d 581 (6th Cir. 1986).

a debtor must provide only a reasonable assurance of success.[113]  There is a relatively low threshold

of proof necessary to satisfy the feasibility requirement.[114]  As demonstrated below, the Plan is

feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

80.      In determining standards of feasibility, courts have identified the following

probative factors:

   a.      the adequacy of the capital structure;

   b.      the earning power of the business;

   c.      the economic conditions;

   d.      the ability of management;

   e.      the probability of the continuation of the same management; and

   f.      any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[115]

81.      The Plan is feasible.  As set forth in the Barreto Declaration, the Debtors and their

advisors have thoroughly analyzed the Reorganized Debtors' ability to meet their

post-confirmation obligations under the Plan and continue as a going concern without the need for

---

[113]   *Kane*, 843 F.2d at 649; *In re Flintkote Co.*, 486 B.R. at 139; *In re W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (internal quotation marks omitted) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed. 1984)); *In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[114]   *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks and citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).

[115]   *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *28 (Bankr. D. Del. May 13, 2010) (internal citations omitted).

further financial restructuring.[116]  Additionally, the Debtors negotiated and secured commitments

for exit financing in the form of the Exit Term Loan Facility and the Exit ABL Facility to fund

Plan Distributions, manage post-emergence liquidity, and meet their obligations in the ordinary

course.[117]  The Debtors' management team and their advisors have made significant progress in

designing and implementing a business plan that will enable the Reorganized Debtors to succeed

in their go-forward operations.[118]

82.     Moreover, as set forth in the Disclosure Statement, the Debtors prepared projections

(the "Financial Projections") of the Debtors' financial performance for the remainder of the fiscal

year ended September 30, 2026, and for fiscal years 2027 through 2031 (the "Projection

Period").[119]  These Financial Projections reflect a series of realistic assumptions regarding the

Debtors and their industries and demonstrate the Debtors' liquidity and ability to meet their

obligations in the ordinary course.[120]  The Financial Projections demonstrate the Reorganized

Debtors' ability to generate sufficient cash to meet ongoing financial obligations of the business

and otherwise meet their obligations under the Plan.[121]  In sum, the Financial Projections

demonstrate a reasonable assurance that the Reorganized Debtors will have and maintain sufficient

liquidity and assets to pay amounts due under the Plan, including post-confirmation obligations,

---

[116]   *See* Barreto Decl. ¶ 33.

[117]   *Id.* at ¶ 33.

[118]   *Id.* at ¶ 33.

[119]   *See* Disclosure Statement, Exhibit D.

[120]   *See* Barreto Decl. ¶ 33.

[121]   *Id.* at ¶ 33.

and fund their operations during the Projection Period without the need for further financial restructuring.[122]

83.     In addition, upon the Effective Date, the Debtors expect to have sufficient funds to make all payments contemplated by the Plan as a result of the enhanced liquidity provided by the Exit Term Loan Facility and the Exit ABL Facility.  The Debtors, along with their professionals, have closely evaluated their cash flows to ensure that they will be able to make all Plan payments required on the Effective Date and beyond.[123]  Therefore, the Plan is feasible and Confirmation is not likely to be followed by liquidation or need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan. [124]   Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  No party has asserted otherwise.

**L.     All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12)).**

84.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[125]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under section 1930 of chapter 123 of title 28" are afforded priority as administrative expenses.[126]

85.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.E of the Plan provides that all such fees and charges, to the extent applicable, due prior to the

---

[122]   *Id.* at ¶ 33.

[123]   *See id.*

[124]   *See id.* ¶ 34.

[125]   11 U.S.C. § 1129(a)(12).

[126]   11 U.S.C. § 507(a)(2).

Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, all such fees will be paid when due and payable until these Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.[127]

86.    Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code, and no party has asserted otherwise.

**M.    All Retiree Benefits Will Continue Post-Confirmation (Section 1129(a)(13)).**

87.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits established at any level continue post-confirmation in accordance with section 1114 of the Bankruptcy Code.

88.    The Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code because Article V.H of the Plan provides that from and after the Effective Date, all retiree benefits, as defined in section 1114 of the Bankruptcy Code, if any, will continue to be paid in accordance with applicable law.[128]  The Plan therefore satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.

**N.    Sections 1129(a)(14) through 1129(a)(16) Do Not Apply to the Plan.**

89.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply. Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, none of the Debtors is a

---

[127]    Plan, Art. II.E.

[128]    *Id.*, Art. V.H.

nonprofit corporation or trust, and, therefore, section 1129(a)(16) of the Bankruptcy Code, which relates only to nonprofit corporations or trusts, is not applicable in these Chapter 11 Cases.

**O.      The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

90.      Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[129]  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[130]

91.      The Plan satisfies section 1129(b) of the Bankruptcy Code.  There are six impaired classes under the Plan.  Among them, Classes 4 and 5 voted to accept the Plan.  With respect to Classes 7, 8, 9, and 10, the Plan is fair and equitable and does not discriminate unfairly.

**1.      The Plan Is Fair and Equitable (Section 1129(b)(2)(B)(ii)).**

92.      A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[131]  With respect to any dissenting classes of creditors, such creditors must be fully satisfied before any

---

[129]  *See* 11 U.S.C. § 1129(b).

[130]  *See* 11 U.S.C. § 1129(b)(1); *In re Route 37 Bus. Park Assocs.*, 987 F.2d at 157 n.5; *Liberty Nat'l Enter. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

[131]  *203 N. LaSalle,* 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

43

junior creditor receives anything on account of its claim.[132] With respect to a class of equity interests that is receiving no recovery under a plan, the absolute priority rule requires only that no class junior to such equity interest receive any distribution under a plan.[133] While holders of General Unsecured Claims in Class 6 will be Unimpaired under the Plan, such distribution does not violate the absolute priority rule because every senior Class is either Unimpaired or voted to accept the Plan. With respect to each Impaired Class that is deemed to have rejected the Plan, the Plan nonetheless satisfies the absolute priority rule because no Class that is junior to such Impaired Class will receive or retain any property on account of the Claims or Interests in such Class.

93.     The corollary of the absolute priority rule requires that, if the holders of claims or interests in a particular class receive less than full value for their claims or interests, then senior classes cannot receive more than a 100 percent recovery for their claims or interests.[134] As set forth in more detail in the Barreto Declaration and the Sweigart Declaration, the Plan satisfies the corollary to the absolute priority rule because no Class of Claims is receiving more than a 100 percent recovery under the Plan.[135]

94.     Accordingly, given the adherence to the absolute priority rule and the corollary to the absolute priority rule, the Plan fully complies with, and satisfies the "fair and equitable" requirements of, section 1129(b) of the Bankruptcy Code.

---

[132]  *See id.*

[133]  11 U.S.C. § 1129(b)(2)(C)(ii).

[134]  *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001) ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

[135]  *See* Barreto Decl. ¶ 42; Sweigart Decl. ¶ 12; *see also* Disclosure Statement, Art. III.E; Plan, Art. VII.I.

44

### 2. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan (Section 1129(b)(1)).

95. Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[136] In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[137] A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[138] The "hallmarks of the various tests [for unfair discrimination] have been whether there is a reasonable basis for the

---

[136] *See Hargreaves v. Nuverra Env't Sols., Inc. (In re Nuverra)*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."), *rev'd on other grounds*, *203 N. LaSalle St. P'ship*, 526 U.S. 434; *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[137] *See In re Nuverra*, 590 B.R. at 93 (holding that a plan's unequal treatment of substantially similar claims did not constitute unfair discrimination where such unequal treatment was justified); *In re Aleris Int'l*, 2010 WL 3492664, at *31 ("section 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes") (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (Bankr. D. Del. 2006)); *In re Coram Healthcare Corp.*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination), *aff'd sub nom. In re Lernout & Hauspie Speech Prod. N.V.*, 308 B.R. 672 (D. Del. 2004); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[138] *See In re Aleris Int'l*, 2010 WL 3492664, at *31 (citing *In re Armstrong World Indus.*, 348 B.R. at 121).

45

discrimination, and whether the debtor can confirm and consummate a plan without the proposed

discrimination." [139]   For example, preferable treatment of general unsecured creditors who

primarily represent the applicable debtors' vendors, customers, and employees, as compared to the

debtors' prepetition funded debt, has been upheld by courts in this district, even where the

difference in treatment is significant, because such general unsecured creditors are essential to the

debtors' reorganization.[140]

96.   Here, the Plan's classification scheme rests on a legally acceptable rationale

because it separates substantively dissimilar Claims into separate Classes.  Specifically, as further

discussed above, classifications and recoveries under the Plan are based on factors such as (a) the

applicable Debtor entity and claims against such entity and assets at each entity and (b) the legal

rights of holders of Claims and Interests, including rights under applicable credit agreements and

security interests against the Debtors.   Thus, the Plan does not discriminate unfairly in

contravention of section 1129(b)(1) of the Bankruptcy Code, and the Plan may be confirmed

notwithstanding the potential deemed rejection by Classes 7 and 8 and the deemed rejection by

Classes 9 and 10.

---

[139]   *In re Lernout*, 301 B.R. at 660; *see also In re Exide Techs.*, 303 B.R. at 78 ("Therefore, in order to confirm the
[p]lan, the [d]ebtor must show that (i) there is a reasonable basis for the [d]ebtor's separate classification of the
general unsecured creditors, the 10% Senior Noteholders, and the 2.9% Convertible Note Claims; and (ii) that the
Debtor cannot confirm a plan absent the separate classification of unsecured claims.").

[140]   *See, e.g., In re Lannett Co.*, No. 23-10559 (JKS) (Bankr. D. Del. June 8, 2023) (confirming plan where trade
creditors received a 100% recovery and unsecured debt claims received a nominal recovery); *In re Nuverra*,
590 B.R. at 92 (confirming plan where trade creditors received a 100% recovery and other general unsecured
creditors received a 4% to 6% recovery); *In re Richard Buick, Inc.*, 126 B.R. 830 (Bankr. E.D. Pa. 1991)
(confirming plan where trade creditors received a 100% recovery and other general unsecured creditors received
a 5% recovery); *In re Robertshaw US Holdings Corp.*, No. 24-90052, 2024 WL 3897812 (Bankr. S.D. Tex.
Aug. 16, 2024) (confirming plan where trade creditors received a 100% recovery and other general unsecured
creditors received a 0% to 5% recovery); *In re Charter Commcn's*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009)
(confirming plan where trade creditors received a 100% recovery and unsecured note holders received a 32.7%
recovery).

97.     Claims in Class 7 and Class 8 are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests, and may be Unimpaired.  These Intercompany Claims and Intercompany Interests, which exist to support the Debtors' corporate structure, may be Reinstated because Reinstatement of intercompany claims and interests advances an efficient reorganization by avoiding the need to unwind and recreate the corporate structure and relationships of the Reorganized Debtors.  This Reinstatement does not affect the economic substance of the Plan for the Debtors' stakeholders.

98.     With respect to Existing Interests (Class 9), the Debtors formed Class 9 to include Holders of Existing Interests in Poseidon Parent, L.P.  Existing Interests are classified separately from Intercompany Interests because they reflect the economic entitlements of shareholders that own the Existing Interests in the Debtors' enterprise.[141]  Significantly, Holders of Intercompany Interests will not receive a recovery under the Plan and Intercompany Interests may be Reinstated only for administrative convenience in the restructuring process.  Thus, the Plan's treatment of Class 9 is proper because no similarly situated Class will receive more favorable treatment.  No party has asserted otherwise.

99.     Finally, with respect to Section 510(b) Claims (Class 10), the Debtors do not believe any Section 510(b) Claims exist.  Out of an abundance of caution, the Debtors formed Class 10 to include Holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code.  The Plan's treatment of Class 10 is proper because no similarly situated Class will receive more favorable treatment.  As there are no Holders of Section 510(b) Claims, no distributions should or will be made to Class 10.  No party in interest has asserted otherwise.

---

[141]   *See* Barreto Decl. ¶ 40.

100.    Thus, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code and the Plan may be confirmed notwithstanding the deemed rejection by Classes 7, 8, 9 and 10 (as applicable).

**P.      The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e)).**

101.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization.[142]

102.    Section 1129(d) of the Bankruptcy Code provides that "on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[143]  The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.[144]  The Debtors filed the Plan to accomplish their objective of reorganizing their capital structure and maximizing value for all of their stakeholders. [145] Moreover, no governmental unit or any other party has asserted otherwise.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

---

[142]   *See* 11 U.S.C. § 1129(c).

[143]   11 U.S.C. § 1129(d).

[144]   *See* Barreto Decl. ¶ 37.

[145]   *See id.*

103.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases is a "small business case." [146]    Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

### III.    Modifications to the Plan Do Not Require Resolicitation.

104.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[147]    Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.    Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[148]    Interpreting Bankruptcy Rule 3019, courts have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[149]    Bankruptcy Rule 3019 allows a creditor that is negatively impacted by a change to accept the change in writing.

---

[146]    *See* 11 U.S.C. § 1129(e).    A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,024,725 (excluding debt owed to 1 or more affiliates or insiders)."    11 U.S.C. § 101(51D)(B).

[147]    *See* 11 U.S.C. § 1127(a).

[148]    *See* Fed. R. Bankr. P. 3019(a).

[149]    *See, e.g.*, *In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988); *see also In re Gen. Wireless Operations Inc.*, 2017 WL 5461361, at *4 (Bankr. D. Del. Oct. 26, 2017) (finding that additional disclosure was not required where modifications did not "materially and adversely change the treatment of any Claims or Interests"); *In re Nat'l Truck Funding LLC*, 588 B.R. 175, 178 (Bankr. S.D. Miss. 2018) ("The disclosure requirements under § 1125 apply to a modified plan only if the modification is material.").

105.   The Debtors made certain modifications reflected in the amended Plan (the "Modifications").   The Modifications are: (a) immaterial or technical clarifications; or (b) material but not adverse to the Holders of any Claims or Interests.  The Debtors worked with the U.S. Trustee to address comments generally related to the scope of the discharge, settlement, and release and exculpation provisions.  Importantly, All Holders of Claims in Voting Classes are receiving the same recovery as contemplated under the original Plan [Docket No. 6] unless they have voluntarily elected otherwise.  Thus, the Modifications comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## IV.   The UST Objection Should be Overruled.

106.   As noted above, the Debtors expect to resolve certain remaining objections to Confirmation prior to the hearing, and only one objection to Confirmation of the Plan, which was filed by the U.S. Trustee, will remain.[150]  The primary thrust of the UST Objection is that (a) the Third-Party Release set forth in Article VIII.D of the Plan is impermissible and nonconsensual with respect to proposed Releasing Parties that (i) are not entitled to vote on the Plan or vote to reject Plan and (ii) have not opted out of the Third-Party Release and (b) the Gatekeeping Provision is improper.[151]  Contrary to the U.S. Trustee's objection, extensive case law in this district— unchanged by the Supreme Court's ruling in *Purdue*—is clear that third-party releases with an opt-out mechanism similar to the one contemplated in the Plan and related documents are appropriate

---

[150]   The Debtors worked collaboratively with the U.S. Trustee to narrow the UST Objection in advance of the Objection Deadline.  The UST Objection sets forth the remaining issues.

[151]   *See* UST Obj. ¶ 1.  With respect to the remaining objections in the UST Objection regarding the wind down of Pretium Parent and the Plan being a global settlement, the Debtors have amended the Plan and understand that the revisions resolved the U.S. Trustee's concerns.

and consensual, and gatekeeping provisions represent valid exercise of the bankruptcy court's

power to enforce the release and injunction provided by the Plan.  For the reasons set forth below,

the UST Objection should be overruled.

> **A.      The Third-Party Release is Appropriate and Consensual and Should be Approved.**
>
> **1.      A Third-Party Release with Opportunity to Opt Out is Consensual.**

107.    By requiring parties in interest to affirmatively indicate their consent to the Third-

Party Release,[152] the U.S. Trustee is seeking to impose a requirement for third-party releases that

is not required by the Supreme Court's decision in *Harrington v. Purdue Pharma, L.P.*, 603 U.S.

204 (2024).  Claiming that the opt-out mechanism is not sufficient to indicate consent, the UST

Objection restates pre-*Purdue* arguments that did not pass muster then and have been repeatedly

overruled by courts in this district since.  Nothing in *Purdue* holds that third-party releases with an

opportunity to opt out are non-consensual or *per se* improper.  Indeed, the Supreme Court was

clear in its opinion that it does "not express a view on what qualifies as a consensual release" and

that "[n]othing in the opinion should be construed to call into question consensual third-party

releases offered in connection with a bankruptcy reorganization plan."[153]

108.    To that end, in the time since *Purdue* was decided, courts in this district have

repeatedly and consistently held that third-party releases with opt-out mechanism similar to the

one proposed by the Plan are consensual and appropriate, and that the *Purdue* decision does not

alter the consensual nature of third-party releases where a creditor is given—but chooses not to

---

[152]   *See* UST Obj. ¶¶ 36–41.

[153]   *Purdue Pharma*, 144 S. Ct. at 2074.

exercise—its right to object to or opt out of such releases.[154]  Indeed, in a string of post-*Purdue*

decisions, this Bankruptcy Court and other courts in this district have declined to mandate opt-ins,

held that adequate notice and an opportunity to object or otherwise opt out is sufficient to bind

creditors to the terms of a third-party release, and confirmed plans containing similar opt-out third-

party releases as proposed by the Debtors' Plan here.[155]

109.    For example, just two weeks ago in *CCA Construction*, this Bankruptcy Court

overruled a similar objection from the U.S. Trustee and confirmed a chapter 11 plan with a

substantially similar opt-out third-party release.[156]  Likewise, in *New Rite Aid*, Judge Kaplan

overruled the U.S. Trustee on the same issue, emphasizing that "[t]o be clear, this Court's [pre-

*Purdue*] position has not changed and joins other courts in this district, the circuit and the 93 other

districts which approve the use of informed opt out procedures to reflect consent, to propose

consensual releases under the Chapter 11 plan."[157]  Similarly, in *Sam Ash Music*, Judge Meisel

held that *Purdue* does not change pre-existing practice regarding the appropriateness of third-party

---

[154]  *See In re New Rite Aid, LLC*, No. 25-14861 (MBK), Nov. 4, 2025 Hr'g Tr. at 58:1–4 ("Indeed, in the District of New Jersey our court—our courts have been rather uniform in recognizing opt out provisions as fundamentally fair and consistent with due process and applicable bankruptcy law.").

[155]  *See, e.g.*, *In re CCA Construction, Inc.*, No. 24-22548 (CMG) (Bankr. D.N.J. Feb. 11, 2026); *In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 26, 2025); *In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (Bankr D.N.J. Aug. 15, 2024); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024); *In re Bowflex Inc.*, No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 18, 2024).

[156]  *See In re CCA Construction, Inc.*, No. 24-22548 (CMG), Hr'g Tr. 24:19–20 (Bankr. D.N.J. Feb 11, 2026) (COURT: ". . . I'm 100 percent behind the opt-out releases here"); *see also* Confirmation Order, Ex. A, Art.I.A.1.46 (defining "Releasing Parties" to include "(ii) all holders of Claims or Interests that vote to accept the Plan, (iii) all holders of Claims or Interests that are entitled to vote on the Plan who either (a) abstain from voting or (b) vote to reject the Plan and, in each case, do not opt out of the third party releases provided for in Article 10.4(b) by not checking the box on the applicable ballot or form indicating that they elect to opt out of granting such releases in the Plan submitted on or before the Voting Deadline, (iv) all holders of Claims or Interests that are deemed to accept or deemed to reject the Plan and do not opt out of the third party releases provided for in Article 10.4(b) by not checking the box on the applicable form indicating that they elect to opt out of granting such releases in the Plan submitted on or before the Voting Deadline").

[157]  *In re New Rite Aid, LLC*, No. 25-14861 (MBK), Hr'g Tr. 57:21–25 (Bankr. D.N.J. Nov. 4, 2025).

releases and stated that "we don't have a Supreme Court decision that addresses this issue as to what is consent.  I mean, you all are trying to bind me to *Purdue*, and I will be the first to say I am bound by the Supreme Court, except *Purdue* doesn't bind me to the definition of consent because it's not there."[158]

110.    In the face of these clear statements, the U.S. Trustee continues to contend that opt-out third-party releases are inappropriate, arguing that because silence generally does not indicate consent under state contract law, an opt-out mechanism does not indicate consent either under federal bankruptcy law.[159]

111.    The U.S. Trustee is mistaken.  As other courts in this district indicated, the power granted to the Congress to enact uniform bankruptcy laws displaces state law where "state law interferes with uniformity or federal law directly governs the matter."[160]  In *New Rite Aid*, Judge Kaplan explained that consent under federal bankruptcy law, including with respect to the third-party releases under plan, is one such matter that is not controlled by state contract law; instead:

> Opt Out consent procedures are governed by federal rules. They involve questions concerning balance structure, disclosure adequacy, plan solicitation and release mechanisms, and they are governed by Sections 1125, 1126 and Federal Rule of Bankruptcy Procedure 3017 and 3018.  These are procedural federal rules and Federal Court statutes and, thus, the Federal Courts maintain exclusive authority over them. ***State law cannot dictate the legal effect of federal voting and solicitation process, and applying state law would defeat national uniformity.*** A Chapter 11 plan is a federal judgment, not a contract . . . ***Courts have repeatedly emphasized that a Chapter 11 plan is a Federal Court order, not merely a private contract with state law consent requirements.*** Courts evaluating releases [] apply federal bankruptcy standards, such as good faith, fairness, adequacy of notice and not necessarily

---

[158]   *In re Sam Ash*, No. 24-14727 (SLM), Hr'g Tr. 53:23–54:3 (Bankr. D.N.J. Aug. 15, 2024).

[159]   *See* UST Objection, ¶¶ 25–40.

[160]   *In re New Rite Aid, LLC*, No. 25-14861 (MBK), Hr'g Tr. 58:12–14 (Bankr. D.N.J. Nov. 4, 2025).

state assent doctrines. ***Bankruptcy laws routinely treat[] silence as consent.*** Bankruptcy law often recognized deemed consent in various contexts . . . ***Thus, federal law already treats notice and no objection as consent in appropriate situations. State contract law, which often requires affirmative consent, conflicts with this fundamental bankruptcy structure.*** (emphasis added).[161]

And this Court agreed in *CCA Construction*: "as far as this goes, the voting, the plan confirmation, in the circumstance, it makes complete sense to me that federal law has to apply."[162]  Indeed, under the alternative, opt-in mechanism, creditors who ignore the plan process may "miss out" on the benefits provided under the plan, and "[t]he very constituency that the U.S. Trustee wishes to protect may fare worse in an opt in process, all in the name of providing them with an opportunity to bring lawsuits, which in reality [they] are highly unlikely to pursue."[163]

112.    Accordingly, under this district's pre- and post-*Purdue* case law, a third-party release is consensual with respect to non-debtor parties if the releasing parties have received appropriate notice of a plan's release provisions and have had the opportunity to object or

---

[161]  *In re New Rite Aid, LLC*, No. 25-14861 (MBK), Hr'g Tr. 58:15–59:19 (Bankr. D.N.J. Nov. 4, 2025) (emphasis added); *see also In re Extraction Oil and Gas*, No. 20-11548 (CSS) (Bankr. D. Del. 2020) (holding that "I don't believe [the opt out mechanism] is necessarily a contractual point . . . as much as it is a point of notice under the Bankruptcy Code and the Bankruptcy Rules, because it's the plan that serves as the mechanism to have the release take effect and, thus, ***it's really the rules, the Federal Rules of Bankruptcy Procedure that figure out whether someone has achieved proper notice and has, by not responding, given their implied consent.*** Importantly, the Supreme Court recently, in the context of whether someone is consenting to the Article III jurisdiction of an Article I court, specifically held that you could imply consent by failure to preserve the right to argue that I don't have Article III powers.  This is no different.  This is a court who set up a mechanism to confirm a plan that contains releases and has provided a noticing mechanism under which, if it's complied with, consent can be implied.") (emphasis added).

[162]  *In re CCA Construction, Inc.*, No. 24-22548 (CMG), Hr'g Tr. 24:4–6 (Bankr. D.N.J. Feb 11, 2026).

[163]  *In re New Rite Aid, LLC*, No. 25-14861 (MBK), Hr'g Tr. 60:8–13 (Bankr. D.N.J. Nov. 4, 2025).  Courts recognize that shareholders and creditors have an obligation to read their mail.  *See In re Mallinckrodt PLC*, 639 B.R. at 880 (quoting *In re EV Energy Partners*, No. 18-10814 (CSS), Hr'g Tr. at 214 (Bankr. D. Del. May 16, 2018) ("[S]hareholders and creditors have to read legal notices; that's just the way it is.  And if you don't know that, then you're proceeding at your own risk when you invest in stocks and credit and bonds.")); *see also In re Arsenal Intermediate Holdings, LLC,* No. 23-10097 (CTG), 2023 WL 2655592, at *7 (Bankr. D. Del. Mar. 27, 2023) ("[T]he creditor who throws away the plan unopened is barred from arguing that the third-party release failed to meet the *Continental* standard.").

54

otherwise opt out of the release but fail to do so, whether by not returning the ballot or the opt-out form or not checking the opt-out box on the ballot, and no other form of affirmative consent is necessary.[164]

### 2. The Facts and Circumstances of these Chapter 11 Cases Support the Approval of the Third-Party Release.

113. The Bankruptcy Code provides a chapter 11 plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."[165] Courts in this jurisdiction regularly approve release provisions similar to the Third-Party Release if, as here, they are consensual and appropriately tailored.[166] The determination as to whether a third-party release is consensual depends on the particular circumstances at issue in a particular case.[167] The proposed Third-Party Release is appropriate under the facts and circumstances, is consistent with similar third-party releases previously approved by courts in this district, and should be approved.

114. The Third-Party Release is an integral and essential provision of the Plan, provides finality for the Released Parties regarding such parties' respective obligations under the Plan, is in exchange for good and valuable consideration (*i.e.*, the material concessions, benefits, and commitments) provided by the Released Parties, is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, is fair, equitable, and reasonable, and is given and made after due notice and opportunity to be heard. The Third-Party Release certainly does not provide

---

[164] *See*, *e.g.*, *In re CCA Construction, Inc.*, No. 24-22548 (CMG) (Bankr. D.N.J. Jan. 7, 2026) (confirming a chapter 11 plan with opt-out third-party releases); *In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 26, 2025) (same); *In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (Bankr D.N.J. Aug. 15, 2024) (same); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (same); *In re Bowflex Inc.*, No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 18, 2024) (same).

[165] 11 U.S.C. § 1123(b)(6).

[166] *See supra*, note 166.

[167] *See In re Indianapolis Downs*, 486 B.R. at 305

blanket immunity, but is tailored to claims or Causes of Actions related to the Debtors and their restructuring, capital initiatives, and related efforts.[168]

115.    Generally, whether a third-party release is consensual depends on a fact-specific inquiry that takes into account the form of the notice sent, the process for sending such notice, whether the parties solicited were given a full and fair opportunity to respond, and the identity of the parties, including their relationship to the bankruptcy case.[169]   In particular, courts in this district have emphasized the importance of providing adequate, clear, and conspicuous notice to parties that may opt out of the third-party releases.[170]   Based on these factors, as discussed further below, the proposed Third-Party Release is appropriate and should be approved.

a.      *Creditors Received Clear and Conspicuous Notice of the Third-Party Release.*

116.    All creditors received clear and conspicuous notice of the Third-Party Release through Bankruptcy Court approved Ballots, Opt-Out Forms, Publication Notices, and the Confirmation Hearing Notice.  As described above, and pursuant to the procedures set forth in the Scheduling Order, the Solicitation Agent served the Solicitation Packages as instructed to creditors in the Voting Classes on January 25, 2026, and the Notice of Non-Voting Status and Opt-Out Form

---

[168]    *See* Plan, Art. VIII.D (providing that the Third-Party Release does not release "any Claims or Causes of action arising from such Released Party's willful misconduct or actual fraud as determined by a final non-appealable order entered by a court of competent jurisdiction").

[169]    *See In re Tricida*, No. 23-10024 (JTD), Hr'g Tr. 144:9–20 (Bankr. D. Del. May 19, 2023); *see also In re Indianapolis Downs*, 486 B.R. at 305.

[170]    *See, e.g.*, *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK), Hr'g Tr. 38–40 (Bankr. D.N.J. Sept. 12, 2023) ("What is essential, though, is that the parties be given notice of that obligation.  That is critical.  And here there can be no question that there was adequate clear and conspicuous notice.  The obligation to affirmatively opt out appears in the plan, in the disclosure statement, in the ballots.  It should come as no surprise . . . Again, [the notices have] been conspicuous.  They've been clear.  There's transparency and I don't view it as burdensome in order to protect their interests.  The ability to opt out and pursue claims exists.  It takes the simple task of reading a document, either digitally or in paper, and exercising opt out.").

to creditors in the Non-Voting Classes on February 2, 2026.[171] In addition to the Notices of Non-Voting Status and Opt-Out Form, the Debtors caused the publication of the Publication Notice in *The New York Times* (national and international editions),[172] and the Confirmation Hearing Notice was also posted on the Debtors' case website maintained by the Solicitation Agent. The Solicitation Agent also served the Confirmation Hearing Notice on the over 6,000 parties-in-interest listed on the Debtors' creditor matrix.[173] The Ballots, the Opt-Out Forms, and the Confirmation Hearing Notice contained the full text of the Third-Party Release and the related defined terms;[174] the Ballots and the Opt-Out Form clearly and conspicuously informed creditors of the consequences of failing to opt out of or object to the Third-Party Releases;[175] and the Publication Notice advised all stakeholders to "carefully review and consider the Plan, including the release, exculpation, discharge, and injunction provisions, as [their] rights may be affected" and informed them how they may obtain copies of the Plan, the Disclosure Statement, and other documents filed in these Chapter 11 Cases free of charge.[176] In addition, as in many cases in this district, each Ballot in these Chapter 11 Cases informed creditors that a vote in favor of a plan includes an agreement to be bound by the third-party releases contained therein.[177] Thus, all creditors and stakeholders had notice of the Third-Party Release and its terms.

---

[171]  *See* Voting Report ¶¶ 7, 8.

[172]  *See Affidavits of Publication* [Docket Nos. 90 and 128].

[173]  *See Certificate of Service* [Docket No. 95].

[174]  *See* Scheduling Order, Exhibits 1, 4, 5, and 6.

[175]  *See* Scheduling Order, Exhibits 4 and 5.

[176]  *See Affidavits of Publication* [Docket Nos. 90 and 128].

[177]  *See, e.g.*, *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. Apr. 29, 2024) (order approving the adequacy of the disclosure statement, whose ballots provided that "if you voted to accept the plan . . . you may not opt out of the third-party release."); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Apr. 18, 2024)

57

117.    The notice provided to all creditors clearly explained the terms of the Third-Party Release and instructed creditors on how to respond.  Specifically, the Ballots, the Notice of Non-Voting Status and Opt-Out Forms, and the Confirmation Hearing Notice quoted the entirety of the Third-Party Release in bold, conspicuous font, and clearly informed such Holders that they would be bound by the Third-Party Release if they (i) voted to accept the Plan, (ii) voted to reject the Plan and did not "opt out" of the Third-Party Release on the applicable Ballot, or (iii) were not eligible to vote on the Plan and either (a) did not opt out of the Third-Party Release on the applicable Opt-Out Form or (b) did not timely File an objection on the docket of these Chapter 11 Cases, as applicable.

118.    Courts have been clear:  creditors have a responsibility to read and respond to legal notices as appropriate, and "simply checking a box to preserve [one's] right is not onerous, is not an obstacle, and is not a hindrance as long as [one is] on notice of the need to do so."[178]  This Court only recently reinforced that responsibility: "[t]he debtor has chosen to file bankruptcy, and you need to pay attention . . . you have to be aware that you very well may be affected, negatively or positively, by the reorganization plan that the debtor's proposing."[179]

---

(order approving the adequacy of the disclosure statement, whose ballots provided that "if you vote to accept the plan . . . you will be deemed to consent to the releases set forth in . . . the plan.").

[178]   *In re BlockFi Inc.* No. 22-19361 (MBK) Hr'g Tr. at 111 (Bankr. D.N.J. Sept. 26, 2023); *see also In re Lannett Co.*, No. 23-10559 (JKS), Hr'g Tr. 36:2–8 (Bankr. D. Del. June 8, 2023) ("As I and others on this Cour[t] have previously ruled, when a disclosure is prominent and conspicuous an[] opt-out mechanism is a valid means of obtaining consent.  It is incumbent on effected parties who have been properly served to protect their own rights. Parties that fail to act in response to a judicial process are routinely bound by the results of the process.").

[179]   *In re CCA Construction, Inc.*, No. 24-22548 (CMG), Hr'g Tr. 24:12–18 (Bankr. D.N.J. Feb. 11, 2026).

        b.      *Creditors Had a Fair Opportunity to Opt Out of, or Otherwise Object to, the Third-Party Release.*

119.    All parties to be bound by the Third-Party Release had sufficient opportunity to evaluate the Third-Party Release and, to the extent they were not already bound by the RSA to consent to such release, either opt out of such release or file an objection to Confirmation. Specifically, Holders of Claims in the Voting Classes had 22 days to review the Plan and submit their Ballot and Holders of Claims and Interests in the Non-Voting Classes had 14 days to return their Opt Out Form. As of the Objection Deadline and Opt-Out Deadline, eight parties have exercised their right to opt out of the Third-Party Release, and only the U.S. Trustee filed an objection to the Third-Party Release. These noticing measures were calculated to provide the most effective and expansive notice to all parties entitled to opt out of the Third-Party Release and have achieved their purpose.[180]

        c.      *Applying Third-Party Releases to the Releasing Parties Is Appropriate.*

120.    Under the Plan, the "Releasing Parties" include (a) all Holders of Claims that vote to accept the Plan; (b) all Holders of Claims or Interests that are deemed to accept or reject the Plan and who do not affirmatively opt out of the releases provided by this Plan; and (c) all Holders of Claims who abstain from voting on or vote to reject the Plan and who do not affirmatively opt out of the releases provided by this Plan.[181] The U.S. Trustee only objects to the Third-Party Release as applied to Holders of Claims or Interests that (x) (i) are deemed to accept the Plan,

---

[180]   *See* Voting Report, ¶ 17.

[181]   *See* Plan, Art. I.A.178. The Releasing Parties also include the Releasing Parties' Related Parties. *See id*. [To ensure that certain Releasing Parties do not unknowingly give up their rights to bring legitimate suits against Released Parties, the Debtors have amended the Plan to provide that the Releasing Parties shall only include the Related Parties of a Releasing Party that such a Releasing Party is legally entitled to bind under applicable non-bankruptcy law.]

(ii) are deemed to reject the Plan, and (iii) vote to reject the Plan and (y) do not affirmatively opt out of the releases.[182] The U.S. Trustee's objection should be overruled.

121. Four classes of Claims—the Class 1 Other Secured Claims, the Class 2 Other Priority Claims, the Class 3 ABL Claims, and the Class 6 General Unsecured Claims—are Unimpaired and deemed to accept the Plan, and one class of Interests—the Class 9 Existing Interests—will not receive any distribution and is deemed to reject the Plan.[183]

122. As to Unimpaired creditors, courts have held that Holders of Claims that are paid in full and thus deemed to have accepted the Plan may generally, and consensually, be bound by third-party release provisions.[184] Under the Plan, such creditors are receiving payment in full of any Claims asserted against the Debtors in exchange for a release of claims and Causes of Action against the Released Parties arising from or relating to, among other things, the Debtors' pre- and postpetition restructuring and capital efforts, including the formulation and solicitation of the Plan—*i.e.* the Plan that provides for and allows such creditors to recover in full in the first instance.[185]

---

[182] *See* UST Obj. ¶ 49.

[183] Class 10 Section 510(b) Claims are also deemed to reject the Plan, but the Debtors do not anticipate that any such Claims exist. *See* Disclosure Statement, Art. III.E.

[184] *See, e.g., In re Indianapolis Downs*, 486 B.R. at 306 ("In this case, the third-party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases."); *In re Spansion, Inc.*, 426 B.R. at 144 ("I note that no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan. While I recognize—and fully appreciate—the importance of the UST's supervision of the administration of bankruptcy cases . . . the silence of the unimpaired classes on this issue is persuasive. This aspect of the Third-Party Release is not over-reaching. The unimpaired classes are being paid in full and have received adequate consideration for the release."). *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1045–47 (upholding third-party releases where "the Plan provides that all creditors voting in favor of the Plan are deemed to give" such releases).

[185] *See* Plan, Art. III.B.

123.   Specifically, with respect to the ABL Claims, the ABL Lenders support the Restructuring Transactions by providing the DIP ABL Facility that will refinance the prepetition ABL Claims and the Exit ABL Facility that will refinance the DIP ABL Claims in return.  As an integral part of their support for the Restructuring Transactions, the ABL Lenders are both a Releasing Party and a Released Party.  With respect to the General Unsecured Claims, general unsecured creditors will receive full recovery either through payment in full in cash on the Effective Date or Reinstatement of their Claims.  All Unimpaired creditors received significant benefits from these value-maximizing Restructuring Transactions as consideration for providing the Third-Party Release, especially given that higher priority secured creditors are Impaired under the Plan and that in a hypothetical liquidation under chapter 7 of the Bankruptcy Code, General Unsecured Claims will receive no recovery.[186]  In addition, all Unimpaired creditors received the Notice of Non-Voting Status and the Opt-Out Form and thus are on notice and have ample opportunity to opt out of the Third-Party Release.

124.   As to the only deemed rejecting Class, the Class 9 Existing Interests, the Third-Party Release is also appropriate.  The Debtors are privately held.  Other than the Sponsor, who is party to the RSA, Holders of Existing Interests consist of a sophisticated institutional investors and participants in the Debtors' existing management incentive plan.[187]  Such parties are highly familiar with the Debtors, received the Notice of Non-Voting Status and the Opt-Out Form, and are on notice and have the opportunity to opt out of the Third-Party Release.  Courts in this district

---

[186]   *See* Disclosure Statement, <u>Ex. C</u>, Liquidation Analysis.

[187]   *See In re Poseidon Parent L.P.*, No. 26-10902 (CMG), voluntary petition.

have consistently approved third-party releases with a similar opt-out mechanism as applied to deemed rejecting classes of claims and interest.[188]

125.    Importantly, contrary to the U.S. Trustee's objection that "Interest holders and unimpaired classes of creditors are receiving nothing from the released non-debtors," [189] the deemed accepting classes received the significant benefit of payment in full in cash or Reinstatement, which are unlikely to be available absent the value-maximizing Restructuring Transaction.  To the extent Holders of Claims and Interests in the deemed accepting classes and deemed rejecting classes do not opt out of the Third-Party Release, they will also receive the benefits of the Third-Party Release as "Released Parties." [190]  For most Holders of Existing Interests in the deemed rejecting Class, *i.e.* members of the Debtors' management or the Debtors' equity sponsors, the benefit and finality of a conclusive and permanent release of claims and Causes of Action arising from or relating to, among other things, the Debtors' pre- and postpetition restructuring and capital efforts, including the formulation and solicitation of the Plan, are particularly meaningful and allow them to turn the page and focus on the management of the Reorganized Debtors for the benefits of all stakeholders or otherwise conclude their relationship with the Debtors with finality.

126.    Additionally, courts have recognized that unimpaired creditors—who are being paid in full—consent to third-party releases when they have not objected to the Plan, as their

---

[188]    *See, e.g.*, *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (confirming the plan and approving its opt-out releases where "Equity Interests" were a deemed rejecting class); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Jun. 13, 2024) (confirming the plan and approving its opt-out releases where multiple classes of interests were deemed rejecting classes); *In re WeWork, Inc.*, No. 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024) (confirming the plan and approving its opt-out releases where "Parent Interests" were a deemed rejecting class).

[189]    UST Obj. ¶ 42.

[190]    *See* Plan, Art I.A.177 (defining the "Released Parties" to include all Releasing Parties and their Related Parties).

silence can constitute consent.[191]  Courts have also held that failure to opt out of a release by checking a box on the ballot—"a minimal task to preserve one's rights when faced with the need to protect one's interests"—constitutes consent.[192]  Further, the Ballot and Opt-Out Form are similar to a "click wrap" agreement, which are commonly upheld by courts when coupled with clear and conspicuous notice of any associated terms.[193]  Accordingly, the Third-Party Release is reasonable and appropriate under the circumstances, is in the best interest of the Debtors and their Estates, is consistent with the precedents of this district, and should be approved.

---

[191]  *See In re Spansion*, 426 B.R. at 144 (overruling an objection to a release that bound unimpaired creditors, noting that "no creditor or interest holder whose rights are affected by the 'deemed' acceptance language has objected to the Plan" and the "silence of the unimpaired classes on this issue is persuasive").

[192]  *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK)*,* Hr'g Tr. at 38–40 (Bankr. D.N.J. Sept. 12, 2023); *see also In re Lannett Co.*, No. 23-10559 (JKS), Hr'g Tr. 36:2-8 (Bankr. D. Del. Jun. 8, 2023) ("As I and others on this Court have previously ruled, when a disclosure is prominent and conspicuous an opt-out mechanism is a valid means of obtaining consent. It is incumbent on effected parties who have been properly served to protect their own rights. Parties that fail to act in response to a judicial process are routinely bound by the result of the process."); *In re RCS Cap. Corp.*, No. 16-10223 (MFW), Hr'g Tr. 59:21–60:2 (Bankr. D. Del. Mar. 21, 2016) ("[T]here's enough affirmative action required to allow the mechanism the debtor is suggesting because it's clear in the ballot that, if they vote yes on the plan, they are granting a release. If a creditor doesn't want to grant a release, they can vote no and opt out, or just not vote. So I think affirmatively voting on the plan is enough action to be an acceptance of third-party releases"); *In re Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Release may be properly characterized as consensual and will be approved.").

[193]  *See, e.g*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78–79 (2d Cir. 2017) (upholding a "click wrap" agreement where the offeror provided notified the offeree they would be bound by its terms of service and privacy policy, provided hyperlinks to such policies, and provided such notice on a clear, uncluttered screen); *Newell Rubbermaid Inc. v. Storm*, No. 9398, 2013 WL 12668327, at *7 (Del. Ch. Mar. 27, 2014) (citing *Van Tassell v. United Mktg. Grp., LLC*, 795 F.Supp.2d 770, 790 (N.D.Ill.2011)) (upholding a "click wrap" agreement where offeree "was presented with a fair opportunity to [read the applicable agreement], opened up the appropriate pop-up from which she could do so, and even indicated through the checkbox that she did so"); *Doe v. Massage Envy Franchising, LLC*, No. S20C-05-005RFS, 2020 WL 7624620, at *3 (Del. Ch. Dec. 21, 2020) ("As soon as Plaintiff is presented with the Agreement, Plaintiff is put on notice that she would be altering her legal rights. The arbitration provision itself is conspicuous within the Agreement.  It is in bold capitalized text, instructing Plaintiff to read the section carefully.")

**B.      The Gatekeeping Provision is Appropriate and Integral to the Plan and Should be Approved.**

127.    The U.S. Trustee also objected to the so-called "gatekeeping" provision (the "Gatekeeping Provision").[194]  This objection should be overruled.

128.    The Gatekeeping Provision is a legitimate exercise of this Bankruptcy Court's power under sections 105, 1123(b)(6), and 1141(a), (b), and (c) of the Bankruptcy Code.  The purpose of the Gatekeeping Provision is to ensure that the Debtors or other Released Parties do not become bogged down in vexatious, meritless litigation of claims that have been released under the Plan, in courts that are unfamiliar with these chapter 11 proceedings and the releases and exculpation provisions contained in the Plan approved by this Bankruptcy Court.  Gatekeeping Provisions have been utilized by many courts to provide a threshold level of review following confirmation of a chapter 11 plan.  Under this construct, which has been routinely approved in numerous jurisdictions including this district,[195] the court interprets its own order in the first instance and determines whether a litigant has a colorable claim that remains assertable following confirmation of the plan.

129.    To be clear, the Gatekeeping Provision does not contemplate that the Bankruptcy Court will rule on the underlying merits of the action.  Rather, the Bankruptcy Court will make an

---

[194]    *See* Plan, Art. VIII.F; UST Obj. ¶¶ 71–80.

[195]    *See, e.g.*, *In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 26, 2025) (approving a similar gatekeeping provision); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (same); *In re Thrasio Holdings, Inc.*, No. 24-11840 (CMG) (Bankr. D.N.J. Jun. 13, 2024) (same); *In re WeWork Inc.*, No, 23-19865 (JKS) (Bankr. D.N.J. May 31, 2024) (same); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (same); In *re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) (same); *In re Nat'l Realty Inv. Advisors, LLC*, No. 22-14539 (JKS) (Bankr. D.N.J. Aug. 10, 2023) (providing that the Bankruptcy Court maintained exclusive jurisdiction to adjudicate matters related to the chapter 11 case on a post-effective date basis); *In re Princeton Alt. Income Fund, LP*, No. 18-14603 (MBK) (Bankr. D.N.J. Mar. 13, 2020) (explicitly applying the Barton Doctrine to post-confirmation suits); *In re Cineworld Grp. plc*, No. 22-90168 (MI) (Bankr. S.D. Tex. Jun. 28, 2023) (approving a similar gatekeeping provision); *In re Avaya Inc.*, No. 23-90088 (DRJ) (Bankr S.D. Tex. Mar. 21, 2023) (same).

initial threshold inquiry into whether the proposed action could be brought or whether it has been released as part of the Plan or Confirmation Order by construing the terms of the Plan and interpreting those terms in conjunction with the Confirmation Order. Undoubtedly, the Bankruptcy Court is the best forum to accurately interpret the language of the Plan that it confirmed and the Confirmation Order that it entered.

130.    In addition, the Gatekeeping Provision is an outgrowth of the long-standing "Barton Doctrine" established by the Supreme Court in *Barton v. Barbour*.[196] The Barton Doctrine provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court must be obtained.[197] While the Barton Doctrine originated as a protection for federal receivers, courts have applied the concept to various participants in chapter 11 cases, including debtors in possession,[198] trustees appointed to administer post-confirmation liquidation of the bankruptcy estate,[199] officers and directors of a debtor,[200] and professionals retained by the debtors.[201] By requiring claimants to seek leave of the Bankruptcy Court before pursuing actions

---

[196]   104 U.S. 126 (1881).

[197]   *Baron v. Sherman (In re Ondova Co.)*, 2017 Bankr. LEXIS 325, at *29 (Bankr. N.D. Tex. Feb. 1, 2017).

[198]   *Helmer v. Pogue*, 2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to a debtor in possession).

[199]   *In re Swan Transp. Co.*, 596 B.R. 127, 137 (Bankr. D. Del. 2018) (citing *Richardson v. Monaco (In re Summit Metals, Inc.)*, 477 B.R. 484, 489-98 (Bankr. D. Del. 2012)).

[200]   *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (holding that a debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (applying Barton Doctrine to president of the debtor).

[201]   *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (applying Barton Doctrine to trustees' counsel).

against the Debtors and their successors in interest, the Gatekeeping Provision is within the spirit of the protections afforded to fiduciaries and their agents under the Barton Doctrine.

131.    The gatekeeping role is one played by bankruptcy courts in numerous contexts. In the *Madoff* cases, the court served as a gatekeeper to determine whether claims against certain Madoff funds were direct or derivative claims.[202]  In *Motors Liquidation Co.*, the court served as a gatekeeper to determine whether claims may properly be asserted against the pre- or post-reorganization General Motors entity.[203]  Under this construct, the court effectively serves the same role as it does when it determines whether a statutory committee should be granted standing to file litigation on behalf of a debtor; that is, the court is asked to make a determination as to whether the claim at issue is colorable.

132.    Furthermore, contrary to the assertions of the U.S. Trustee, the Gatekeeping Provision does not impose any greater burden or administrative hurdle on claimholders than the Plan would impose without the Gatekeeping Provision.[204]  Nearly all chapter 11 plans in complex cases, including the Plan, contain an injunction permanently preventing parties from asserting released claims against released parties.  If a claimant seeks to assert a claim following the Effective Date of the Plan but is unsure whether that claim constitutes a colorable claim that has not been released, the claimant will need a judicial determination that the claim was not released under the Plan; otherwise, the claim could not be properly asserted. The Gatekeeping Provision ensures that the Bankruptcy Court—the court most familiar with the

---

[202]  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff),* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussing the bankruptcy court's gatekeeper role).

[203]  *See In re Motors Liquidation Co.*, 541 B.R. 104, 113 (Bankr. S.D.N.Y. 2015), *vacated and remanded on other grounds*, 590 B.R. 39 (S.D.N.Y. 2018) (discussing bankruptcy court's gatekeeper role).

[204]  U.S. Trustee Obj. ¶ 78.

facts and circumstances of these chapter 11 cases, and the court best-positioned to determine as to whether the claim may be asserted in the first place—is the court making that determination. This inures to the benefit of all parties, including potential claimants.

133. Courts in this district have consistently approved gatekeeping provisions similar to the one proposed in the Plan.[205] For example, the gatekeeping provision in *New Rite Aid* provided that:

> No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors (or their Affiliates), the Reorganized Debtors (or their Affiliates) (if applicable), the Wind-Down Debtors (or their Affiliates), the Exculpated Parties, or the Released Parties, as applicable, that relates to or arises out of a Claim or Cause of Action subject to Article X.C, Article X.D, or Article X.E of the Plan, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, (b) determining that such Person or Entity is not barred from commencing or pursuing such Claim or Cause of Action pursuant to Article X.F of the Plan, and (c) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such party. For the avoidance of doubt, any party that obtains such determination and authorization and then subsequently wishes to amend the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. [206]

134. Similarly, in *Bed Bath*, the court overruled the U.S. Trustee's objection to a similar gatekeeping provision, recognizing that, absent a gatekeeping function, courts across the country are likely to "construe and interpret the language of a plan and a confirmation order in inconsistent

---

[205] *See, e.g., In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 26, 2025); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024); *In re Thrasio Holdings, Inc.*, No. 24-11840 (Bankr. D.N.J. June 13, 2024); *In re WeWork Inc.*, No, 23-19865 (JKS) (Bankr. D.N.J. May 30, 2024); *In re Careismatic Brands, LLC*, No. 24-10561 (VFP) (Bankr. D.N.J. May 30, 2024); *In re Cyxtera Techs., Inc.*, No. 23-14853 (JKS) (Bankr D.N.J. Nov. 17, 2023); *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023); *In re Bed Bath & Beyond Inc.*, No. 23-13359-VFP (MBK) (Bankr. D.N.J. Sept. 14, 2023).

[206] *In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 26, 2025).

fashion."[207]  The *Bed Bath* court also recognized the minimal burden imposed on the court in acting as a gatekeeper because "in all likelihood in all of these situations it's coming back before the bankruptcy court anyway."[208]

135.  Similarly, the *In re BlockFi Inc.* gatekeeping provision stated that:

> From and after the Effective Date, any Entity (i) that opted out of the releases contained in this Article VIII.B or (ii) was deemed to reject the Plan may not assert any claim or other Cause of Action against any Released Party for which it is asserted or implied that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan without first obtaining a Final Order from the Bankruptcy Court (a) determining, after notice and a hearing, that such claim or Cause of Action is not subject to the releases contained in Article VIII.A of the Plan and (b) specifically authorizing such Person or Entity to bring such claim or Cause of Action against any such Released Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or Cause of Action constitutes a direct or derivative claim, is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, the Bankruptcy Court shall have jurisdiction to adjudicate the underlying claim or Cause of Action.[209]

136.  In overruling the U.S. Trustee's objection, the *BlockFi* court expanded on the court's reasoning in *Bed Bath*, observing that the gatekeeping provision is not an assertion of jurisdiction the court does not have, and is instead limited to what the Bankruptcy Code and the

---

[207]  *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP), Hr'g Tr. 41:17–42:1 (Bankr. D.N.J. Sept. 12, 2023) ("Absent a gatekeeping function, there is a risk that you're going to have courts across this country construe and interpret the language of a plan and a confirmation order in inconsistent fashion.  That's disservice to those plaintiffs.  It's a disservice to those who were under the impression they were benefitting by making a contribution to the reorganization and getting certain protections.").

[208]  *Id.* at 42:2–9 ("The ability of a single court to take on a limited burden, and let's be clear -- it's minimal.  Let's be clear, in all likelihood in all of these situations it's coming back before the bankruptcy court anyway.  It's either the defendant is going to come back before the court to ask for clarity and enforcement of a confirmation order, enforcement of a discharge or one of the other parties to the litigation.  And that's the way it should be because the courts will have a familiarity.").

[209]  *In re BlockFi Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023).

judicial code already allows the court to decide.[210] The court reasoned that the gatekeeper function preserves both judicial economy and the centrality of the bankruptcy court as an appropriate forum to decide the meaning of the plan and confirmation order, and how potential claims fall within such documents.[211] "It makes no sense to urge parties to make contributions to a Chapter 11 case and in return secure releases or secure certain rights that will be undercut by then having to defend their position all across the country in front of separate courts in separate forums, with inconsistent results."[212]

137.    Consistent with the prior decisions in *New Rite Aid, Bed Bath & Beyond*, and *BlockFi*, the Court should approve the Gatekeeping Provision. Rather than seeking to shift the burden of proof to claimants or provide a further release of claims or causes of action under the Plan, the Gatekeeping Provision simply provides a threshold level of review necessary to ensure the effectiveness of the Plan. In the absence of the Gatekeeping Provision, it is entirely possible that parties subject to the Plan's release and exculpation provisions will seek to assert frivolous claims, or claims barred by the Plan's injunction provisions, hindering the effectiveness of the Debtors' Plan. Critically, the absence of the Gatekeeper Provision would not hinder creditors from bringing actions related to claim disputes in front of this Bankruptcy Court. Section 502(a) of the Bankruptcy Code preserves the ability for any party to object to a claim, even post confirmation. As the court noted in its ruling on the gatekeeping provision in *In re BlockFi*:

> [a]s I said in other hearings, we end up in the same place anywhere. When these actions are brought, somebody is bringing it back to the bankruptcy court to determine whether or not it's a discharge injunction, it's a plan injunction . . . . It comes back to this court

---

[210]    *Id.,* Hr'g Tr. at 111:23–25 (Bankr. D.N.J. Sept. 26, 2023).

[211]    *Id.* at 111:25–112:6.

[212]    *Id.* at 112:15–20.

69

anyway.  So we're just putting in place in language what it is the practice.  I have no issue with the scope or the provisions of the gatekeeping function.[213]

138.   The Gatekeeping Provision represents a permissible exercise of the Bankruptcy Court's jurisdiction, and will inure to the benefit of the Debtors, their successors-in-interest, and potential claimants.   Accordingly, the Bankruptcy Court should overrule the U.S. Trustee Objection and approve the Gatekeeping Provision which "serves the interests of those who bargained for certain rights in making contributions and it serves the interest of even the plaintiffs in not spending time and money on a claim that will have no traction."[214]  Further, as observed by courts in this district, this Bankruptcy Court, "the court with close[] hands-on [] understanding of the plan and the terms of the confirmation order,"[215] is the appropriate forum to decide the meaning of the Plan and Confirmation Order.

139.   Accordingly, the UST Objection should be overruled.

## V.   The Stay under Bankruptcy Rule 3020(e) should be Waived.

140.   Bankruptcy Rule 3020(e) provides that "[u]nless the court orders otherwise, a confirmation order is stayed for 14 days after its entry."[216]  Bankruptcy Rule 6004(h) provides a similar stay to an order authorizing the use, sale, or lease of property (other than cash collateral).  Each rule also permits modification of the stay upon court order.

141.   To expeditiously consummate the Plan, the Debtors seek a waiver of the 14-day stay of the Confirmation Order under Bankruptcy Rule 3020(e).  Each day the Debtors remain in

---

[213] *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Sept. 26, 2023) Hr'g Tr. 113:5–16.

[214]  *Id.* at 113:1–4.

[215]  *Id.* at 112:21–25.

[216]  Fed. R. Bankr. P. 3020(e).

70

these Chapter 11 Cases, they incur administrative and professional costs.  These Chapter 11 Cases are highly consensual, and appeal of the Confirmation Order is unlikely.  Similar waivers have been approved in chapter 11 cases in this Court.[217]

142.   For these reasons, the Debtors, their advisors, and other key constituents are working to expedite the Debtors' entry into and consummation of the documents and transactions related to the Restructuring Transactions so that the Effective Date may occur as soon as possible after the Confirmation Date.  Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry and the Effective Date of the Plan can occur as soon as possible.

## CONCLUSION

143.   For all of the reasons set forth herein and in the Barreto Declaration, the Basch Declaration, the Sweigart Declaration, and the Voting Report, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement and confirm the Plan as satisfying all applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

---

[217]   *See, e.g.*, *In re CCA Construction, Inc.*, No. 24-22548 (CMG) (Bankr. D.N.J. Feb. 11, 2026) (waiving the 14-day stay); *In re New Rite Aid, LLC*, No. 25-14861 (MBK) (Bankr. D.N.J. Nov. 26, 2025) (same); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (same); *In re Cyxtera Tech., Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. Nov. 17, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (VFP) (Bankr. D.N.J. Sept. 14, 2023) (same).

Dated: February 19, 2026

/s/ Michael D. Sirota

**COLE SCHOTZ P.C.**
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Felice R. Yudkin, Esq.
Court Plaza North, 25 Main Street
Hackensack, New Jersey 07601
Telephone: (201) 489-3000
Email:     msirota@coleschotz.com
           wusatine@coleschotz.com
           fyudkin@coleschotz.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Jordan E. Elkin (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email:     steven.serajeddini@kirkland.com
           jordan.elkin@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anup Sathy, P.C.
Yusuf Salloum (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email:     anup.sathy@kirkland.com
           yusuf.salloum@kirkland.com

*Proposed Co-Counsel to the Debtors and*
*Debtors in Possession*